**SELENDY GAY PLLC**
Philippe Z. Selendy*
Jennifer M. Selendy*
Claire E. O'Brien*
Corey Stoughton*
Drake Reed*
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
jselendy@selendygay.com
cobrien@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com

**KATZ BANKS KUMIN LLP**
Felicia Gilbert (SBN #276348)
235 Montgomery Street, Suite 665
San Francisco, CA 94104
Tel: 415-813-3260
gilbert@katzbanks.com

Debra S. Katz*
Avi Kumin (SBN #218893)
11 Dupont Circle NW, Suite 600
Washington, DC 20036
Tel: 202-299-1140
katz@katzbanks.com

* Application for admission *pro hac vice* forthcoming

*Counsel for Plaintiff Sarah Wynn-Williams*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH WYNN-WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No.: _____<br><br>**<u>COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Sarah Wynn-Williams, by and through her undersigned attorneys, for her complaint against Meta Platforms, Inc. ("Meta"), alleges as follows:

1. Meta is punishing Sarah Wynn-Williams for disclosing its illegal and indefensible workplace conditions and corporate misconduct to federal regulators, to Congress, and in her subsequently published memoir. Meta does not and cannot deny the truth of Ms. Wynn-Williams's disclosures. Rather than focus on rectifying the issues they raise, Meta has attempted to distract and retaliate, including by launching an unlawful arbitration enforcement action against Ms. Wynn-Williams seeking untold millions of dollars Ms. Wynn-Williams does not have in purported "damages." That action is estopped by Meta's public disavowal of enforcement of

arbitration provisions like the one at issue here; is invalid under the Ending Forced Arbitration Act, 9 U.S.C. § 402; and stems from a contract formed under duress and in violation of public policy under California law.  Meta has also exploited this illegitimate arbitration to obtain a coercive order that operates as a vague and overbroad prior restraint on Ms. Wynn-Williams's speech in violation of the First Amendment.  Through this and other conduct, Meta has violated California's prohibition on unfair competition, Cal. Bus. & Prof. Code § 17203, and California tort law. The Court should end Meta's campaign of retaliation and make Ms. Wynn-Williams whole for the harm it has caused her, for her sake and the sake of the other whistleblowers Meta's actions are designed to frighten.

2.      Ms. Wynn-Williams came to Facebook, now known as Meta, in 2011 as an accomplished diplomat and public policy expert, having served at the United Nations and the New Zealand diplomatic mission to the United States.  Over the next six years, she helped build Facebook's global public policy function.  From that vantage, she saw inside Mark Zuckerberg's insular leadership circle, alongside executives including Sheryl Sandberg and Joel Kaplan, and had a direct, firsthand view as Facebook grew from a scrappy startup into one of the most powerful corporations in the world.

3.      She also saw the misconduct that growth concealed.  In those six years, Meta's pursuit of power and profit overrode restraints of law and decency.  Ms. Wynn-Williams saw Mr. Zuckerberg's readiness to hand the Chinese Communist Party access to the data of millions of Chinese and U.S. citizens as a quid pro quo for entry to the Chinese market.  She witnessed the company accelerate genocide in Myanmar through its reckless failure to invest in appropriate resources and staff.  And she saw Meta intentionally target emotionally vulnerable young women to generate additional revenue by, for example, tracking when teenage girls deleted selfies, identifying those girls as feeling worthless, and using that event as a trigger to immediately show them advertisements for beauty products.

4.      To facilitate its rapid growth, Meta's executives insisted on absolute loyalty above all else, even in the face of internal misconduct.  Ms. Wynn-Williams endured pervasive and repugnant sexual harassment and assault at the hands of Meta executives—chief among them Joel Kaplan, then Facebook's Vice President of Global Policy and Ms. Wynn-Williams's direct supervisor.  Over several years, Mr. Kaplan sent Ms. Wynn-Williams vulgar emails referring to sexual acts, interrogated her about her breasts and genitalia, grinded his body into hers at corporate events, called himself her "sugar daddy," and offered to buy her "something nice" if she did what he wanted.  Mr. Kaplan has never denied, and cannot deny, the truth of these allegations.

5.      Fearing for her career and knowing that Mr. Zuckerberg's and Ms. Sandberg's allegiance would be to Mr. Kaplan regardless of his behavior, Ms. Wynn-Williams took every opportunity to avoid raising an issue.  When workplace rumors prompted human resources to approach her, she tried to dissuade them from investigating, hoping to avoid the retaliatory consequences she knew would come.  But Mr. Kaplan's pervasive behavior proved too much for Meta's corporate structure to ignore.  When an investigation appeared inevitable, Ms. Wynn-Williams began assembling evidence to submit to human resources.  On August 24, 2017, before she could provide all the relevant documents and witnesses, Meta fired her.

6.      To compel Ms. Wynn-Williams's continued silence, Meta insisted that she sign an agreement (the "Severance Agreement") with a mandatory arbitration clause and a broad non-disparagement provision that purported to prevent Ms. Wynn-Williams from engaging in any "disparaging, critical or otherwise detrimental comments" about Meta and any of its executives and employees—like Mr. Kaplan.  Meta made executing this Severance Agreement a condition to Ms. Wynn-Williams's ability to submit for reimbursement over $300,000 in pre-approved business expenses she had paid using her personal funds, including luxury hotel rooms and other travel expenses for Mr. Zuckerberg and fellow Meta executives.  Those expenses remain unpaid.  Meta also made executing the Severance Agreement a condition to Ms. Wynn-Williams's ability to

maintain access to healthcare coverage for herself and her two young children, which Meta knew would be critical given the life-threatening health condition she experienced during childbirth and that she was still managing complications from when she was fired. Faced with no reasonable alternative, Ms. Wynn-Williams signed.

7. When Meta later made public statements that it would do "the right thing" and no longer force employees to arbitrate claims related to sexual harassment or sign non-disparagement provisions preventing discussions of unlawful workplace conduct, Ms. Wynn-Williams took Meta at its word. She began to disclose the unlawful conduct she saw while at Meta to the Securities and Exchange Commission, the Department of Justice, and to Congress. Having made those public disclosures, in March 2025, Ms. Wynn-Williams published *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism*—a memoir of her time at Facebook, laying bare the truth about the company and the people who run it.

8. Meta reacted swiftly, viciously, and in direct contradiction to its public promises. Just as *Careless People* was poised for release, Meta initiated an arbitration and filed an emergency application seeking to enjoin publication and silence Ms. Wynn-Williams. Meta knew that it could never secure such an obvious prior restraint of free speech in court, so it instead chose to drag the publishers into the arbitration, even though they were not a party to the Severance Agreement. Despite publicly claiming that *Careless People* was full of lies and defamatory, Meta tellingly declined to file a libel or defamation claim—Meta knows that the truth is a complete defense to such claims. Meta also intentionally avoided using known and reliable contact methods for Ms. Wynn-Williams that it had used to communicate with her for years to maximize the chances of *ex parte* relief. In the end, Ms. Wynn-Williams was not heard before the relief was issued.

9. An emergency arbitrator (the "Emergency Arbitrator") concluded he could not enjoin the publication of *Careless People* itself—because he lacked jurisdiction over the publishers as non-signatories to the Severance Agreement—but gave Meta all of the relief it requested against

Ms. Wynn-Williams despite the fact that she was not heard: a breathtakingly broad order (the "Interim Award") that far exceeded the scope of the non-disparagement provision it enforced. The Interim Award has now constrained Ms. Wynn-Williams's speech for well over a year and prevented her from fully participating in increasingly urgent public conversations, not only about Meta's policies and practices but also about broader social and political issues regarding technology, social media, youth, and democracy, among others.

10.     Although Ms. Wynn-Williams endeavored to comply with the unworkable and unlawful Interim Award as best she could, as a policy expert whose livelihood relies on public appearances, she also continued to speak publicly on issues of general importance within her area of professional expertise, like digital warfare and artificial intelligence, while scrupulously avoiding mentioning Meta or the book.

11.     Meta has engaged in surveillance to monitor Ms. Wynn-Williams's speech and associations. It has used the results of that surveillance to seek sanctions against Ms. Wynn-Williams for a wide range of public appearances and, in recent months, for nearly every public appearance she has made, even though she has never spoken about her book or about Meta at any appearance. Meta has filed a sanctions motion exploiting the vagueness of the Interim Award to claim that Ms. Wynn-Williams is "promoting" her book anytime she draws attention to herself, and anytime third parties she does not control respond to the controversy surrounding Meta's attempts to silence her in a manner that draws attention to her or to her book. That motion exposes the Interim Award as far in excess of the limits the First Amendment places on the coercive power of a judicial forum, particularly given that no one has yet even attempted to adjudicate whether or not *Careless People*, or any other speech constrained by the Interim Award, is constitutionally protected.

12.     Nonetheless, the merits arbitrator ("Merits Arbitrator") has declined to lift the vague and unworkable Interim Award, to clarify its terms, or to definitively dismiss Meta's efforts to exploit it, leaving Ms. Wynn-Williams unreasonably and unpredictably constrained by the threat

of financial coercion by one of the world's largest and most wealthy corporations. Meta is pursuing Ms. Wynn-Williams at the expense of free speech and legal constraints not only because she refused to bow to the greed and power of Meta, Mr. Zuckerberg, and other executives, but also to strike fear into the heart of anyone else who dares to consider speaking the truth about Meta's unlawful and abusive practices in the public interest.

13.    Meta's campaign to silence Ms. Wynn-Williams must now end. The improper and unlawful Interim Award is a blatant violation of the First Amendment and should be vacated under the Federal Arbitration Act. The Severance Agreement is unenforceable in its entirety (as are the non-disparagement and arbitration provisions themselves) as a product of duress and as against public policy, including because its provisions represent unfair labor practices under federal law. And this Court should hold Meta to account for its bad faith efforts to interfere in the life and livelihood of Ms. Wynn-Williams and her family.

## PARTIES

14.    Plaintiff Sarah Wynn-Williams was formerly employed as Director of Global Public Policy at Facebook, now known as Meta. Ms. Wynn-Williams resides in the United Kingdom. Any enforcement of the Interim Award or any other arbitral award would therefore require enforcement abroad.

15.    Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California. Meta, formerly known as Facebook, Inc., transacts or has transacted business in this district and throughout the United States.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 9 U.S.C. § 203 as well as 28 U.S.C. §§ 1331 and 1367.

17.    This Court has general personal jurisdiction over Meta because Meta's principal place of business is in the state of California. This Court also has specific personal jurisdiction

over Meta because Meta has purposefully availed itself of the privilege of doing business in the state of California and Ms. Wynn-Williams's claims arise out of or relate to those contacts.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Meta, the only defendant in this action, resides in this judicial district.  Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Ms. Wynn-Williams's claims occurred in this judicial district.  Venue is also proper in this district under 9 U.S.C. § 204 because venue would otherwise be proper in this Court for an action or proceeding with respect to the controversy between the parties.

## FACTUAL ALLEGATIONS

**I.      Ms. Wynn-Williams Envisioned Facebook's Global Future Before Facebook Did**

19.     Ms. Wynn-Williams saw the revolutionary potential of Facebook long before Facebook did.  As a diplomat—first at the United Nations and then for the New Zealand mission to the United States—Ms. Wynn-Williams recognized as early as 2009 that Facebook would soon revolutionize the way societies interact with politics and government, and that the battle among nations to control discourse on this new platform would be immense in its scale and implications. Facebook, she believed, needed a policy team to prepare.

20.     Facebook initially did not agree.  In late 2010, Ms. Wynn-Williams pitched a role for herself as a policy lead to Facebook executive Marne Levine, who dismissed the proposed role of "Facebook diplomat" as one for which the company had neither the time nor the resources.  But just weeks later—deep in the throes of the Arab Spring—Ms. Levine called back: citizens across the Middle East were using Facebook to organize protests, the media was demanding Mark Zuckerberg's views, and Facebook had been caught unprepared.

21.     For a few more months, Ms. Wynn-Williams continued to pitch her vision for a policy role at Facebook, including by advising Ms. Levine during the Arab Spring on how Facebook's response to revolutionary movements in the Middle East would affect its prospects in

China.  In late spring 2011, Facebook finally agreed to hire her as a Manager of Global Public Policy.

**II.    Ms. Wynn-Williams's Life at Facebook Is Marred by Abusive, Harassing, and Toxic Behavior**

22.    Ms. Wynn-Williams began her work at Facebook on July 5, 2011.  Throughout her time at Facebook—July 2011 to August 2017—Ms. Wynn-Williams would endure and witness instances of abuse, harassment, and unlawful corporate acts.  Principal—but by no means solitary—among these acts were pervasive, repugnant, and persistent instances of sexual harassment and gender-based discrimination.

**A.    As Ms. Wynn-Williams Carries and Gives Birth to Her First Child, Facebook's Gender-Based Discrimination Against Her Becomes Overt**

23.    Ms. Wynn-Williams carried and delivered her first child in early 2014 during the initial publicity tour for Facebook COO Sheryl Sandberg's book *Lean In: Women, Work, and the Will to Lead*.  A bestseller, *Lean In* purported to provide women with advice on how to pursue leadership roles and professional growth without hesitation or apology.

24.    Internally at Facebook, however, Ms. Sandberg fostered a culture in which Ms. Wynn-Williams felt she could not disclose her pregnancy.  Ms. Wynn-Williams "was too scared to tell [her] bosses" because she "felt like [she] was still on trial for this job."  She knew "it would count against [her]" if she did tell them.  But once Ms. Wynn-Williams's pregnancy became obvious, Ms. Sandberg began using her as a prop to promote *Lean In*, having Ms. Wynn-Williams staff book promotion events while pregnant as a visual example of the book's themes.  In sharp contrast to *Lean In*'s message, Ms. Wynn-Williams had no choice in the matter.

25.    After Ms. Wynn-Williams returned from a short period of maternity leave—pressured to return to work, she did not take the full amount of leave she was permitted—Facebook leadership's gender-based discrimination worsened.  Ms. Wynn-Williams's next performance review was positive overall, but her only negative feedback related to her baby.  For example,

Ms. Wynn-Williams's colleagues were frustrated that they could hear her baby in the background on late night work calls. As a proposed "solution," Ms. Sandberg told Ms. Wynn-Williams that she should "[b]e smart and hire a Filipina nanny" because they are "English speaking, [have a] sunny disposition, and [are] service oriented."

26. As Ms. Wynn-Williams proceeded into the late stages of another pregnancy a few years later, Ms. Sandberg's secretary told Ms. Wynn-Williams that she had to fly to Davos, Switzerland. When Ms. Wynn-Williams raised her concern with flying so late in pregnancy, Ms. Sandberg's assistant simply noted the medical experience of the flight attendants, and in response to Ms. Wynn-Williams's "hop[e] that none of this [medical preparation] is necessary" replied, "[y]ou and me, sister."

**B.    Facebook's Joel Kaplan Sexually Harasses Ms. Wynn-Williams**

27. In late 2014, Marne Levine became the Chief Operating Officer of Instagram, and Joel Kaplan replaced Ms. Levine as Facebook's Vice President of Public Policy and Ms. Wynn-Williams's direct supervisor. Mr. Kaplan was part of Mr. Zuckerberg and Ms. Sandberg's insular social circle at Facebook. Ms. Levine was Ms. Sandberg's best friend, and Mr. Kaplan was Ms. Sandberg's ex-boyfriend. Almost immediately, Mr. Kaplan began to sexually harass Ms. Wynn-Williams.

28. For example, in preparing to take the U.S. citizenship test, Ms. Wynn-Williams emailed Joel Kaplan and his assistant to remind them that she would be unavailable during the examination. Mr. Kaplan removed his assistant from the email chain and replied, "Did you get the dirty sanchez question? I hear that is on the test like 10 percent of the time."[1]

---

[1] *See* Letter Sen. Charles E. Grassley to Mark Zuckerberg, May 13, 2025, at 4, available at https://www.documentcloud.org/documents/25941960-2025-05-13-grassley-letter-to-meta-re-alleged-sexual-misconduct/.

From: Joel Kaplan
Sent: Thursday, January 28, 2016 10:06 AM
To: Sarah Wynn-Williams
Subject: Re: help needed! asap pls

Did you get the dirty sanchez question?  I hear that is on the test like 10 percent of the time.

Sent from my iPhone

Ms. Wynn-Williams did not understand what Mr. Kaplan meant but quickly discovered after an internet search that "dirty sanchez" referred to a vulgar sex act.  Forced to endure these sorts of comments to continue her work at Facebook, Ms. Wynn-Williams made light of the comment in her response.

29.     On a work trip to Panama, Ms. Wynn-Williams inadvertently bumped into Mr. Kaplan's hip.  When she apologized, Mr. Kaplan responded, "Don't worry, you didn't touch anything precious."

30.     In yet another example, Ms. Wynn-Williams asked Mr. Kaplan to intervene on her behalf with Facebook executives to open a new position on her team, as she was unable to allocate or hire for these positions using her own independent judgment and instead had to seek executive approval.  After Mr. Kaplan secured approval, he emailed Ms. Wynn-Williams asking, "Who is your sugar daddy?"[2]

---

[2] *Id.* at 3.

Joel Kaplan <██████@fb.com>    ○ Sarah Wynn-Williams
JK
Fwd: Latam telecoms person

Who is your sugar daddy?

Elliot approved you opening a req for a lat am iOrg head, partly because he believes you won't fill it for 6 months.  Prove him wrong.

Sent from my iPhone

31.    In another instance, Ms. Wynn-Williams sought budget approvals from Mr. Kaplan—another area in which she was unable to exercise her own independent judgment and instead had to seek approval from supervisors.  Mr. Kaplan gave Ms. Wynn-Williams approval and then emailed her promising to "personally buy [her] 'something nice' (niceness TBD by the beholder/buyer)" if Ms. Wynn-Williams spent her work budget "responsibly."[3]

**From:** Joel Kaplan
**Sent:** Wednesday, November 11, 2015 7:39 AM
**To:** Sarah Wynn-Williams
**Subject:** budget

If you responsibly spend more than $2.2 m in 2015, I will personally buy you "something nice" (niceness TBD by the beholder/buyer)

32.    At the opening reception of an offsite gathering, Mr. Kaplan dropped a napkin and stared blankly at Ms. Wynn-Williams, expecting her to kneel to the ground and pick it up for him. Later at that same offsite dinner, Mr. Kaplan called out, "Sarah Wynn-Williams is looking sultry tonight."  Mr. Kaplan ultimately approached Ms. Wynn-Williams, beer in hand, on the dance floor and began grinding into her from behind.  A fellow direct report of Mr. Kaplan was present at the offsite and confirmed that she had heard Mr. Kaplan's "sultry" remark to Ms. Wynn-Williams the same evening it was made.  Afterward, another Facebook employee warned Ms. Wynn-Williams not to discuss or report the incident, stating: "You would not believe the things these people tell

---

[3] *Id.* at 8.

me. … Unbelievable things.  Like whatever you think, worse.  Things you shouldn't tell me or shouldn't tell anyone."  This convinced Ms. Wynn-Williams she should not report the incident.

33.     Mr. Kaplan was not the only Facebook executive who sexually harassed Ms. Wynn-Williams.  On a flight from Switzerland to California in early 2016, Ms. Sandberg repeatedly told Ms. Wynn-Williams—then seven months pregnant with her second child—to "come to bed."  When Ms. Wynn-Williams refused and looked to one of Ms. Sandberg's team members Sadie[4], for help, Ms. Sandberg snapped, "Sadie's slept over lots of times and I'm not asking Sadie.  I'm asking you."  Ms. Wynn-Williams did not comply.  After the flight, Ms. Sandberg told Ms. Wynn-Williams that "[she] should have got into bed."  From that day forward, Ms. Sandberg treated Ms. Wynn-Williams with cold disregard.  When Ms. Wynn-Williams mentioned the incident to Debbie Frost, Facebook's Director of Global Communications, Ms. Frost was unsurprised, stating that "half the department" had been in Ms. Sandberg's bed by that point.

34.     Ms. Wynn-Williams observed Ms. Sandberg similarly foster an inappropriate relationship with Sadie.  On a drive from Davos to Zurich, the women took turns sleeping in each other's laps.  Ms. Sandberg had also told Sadie to buy lingerie for both of them with no budget.  Sadie did and then told Ms. Sandberg that the bra was her "breasts['] equivalent of flying private[] for the first time."  Ms. Sandberg responded that she was "[happy] to treat [Sadie's] breasts as they should be treated."  That was not all: Ms. Sandberg invited Sadie back to her house to try on the lingerie, have dinner, and stay over.  Sadie later shared with Ms. Wynn-Williams that Sadie's relationship with Ms. Sandberg worried her.

35.     Meanwhile, Ms. Wynn-Williams's strategy of remaining silent in the face of illegal and inappropriate workplace conduct was working: In February 2016, Ms. Wynn-Williams

[4] Ms. Wynn-Williams uses the pseudonym "Sadie" in *Careless People* to protect this individual's privacy and does so throughout this Complaint as well.

received her regularly scheduled performance review. It was glowing. Ms. Wynn-Williams received highly positive feedback and the highest possible performance rating she was eligible for in that cycle. At Facebook, performance evaluations were closely tied to compensation and—in particular—discretionary grants of Facebook equity reserved for the highest performers. In February 2016, Ms. Wynn-Williams received a discretionary equity grant at the top of the available range, the clearest signal a Facebook employee could receive that she was a top performer at the company.

### C. Facebook Forces Ms. Wynn-Williams to Work Through Maternity Leave and a Medical Emergency

36.     In the beginning of March 2016, Ms. Wynn-Williams began a planned maternity leave to give birth to her second child and was hospitalized due to serious, life-threatening complications. During labor, Ms. Wynn-Williams suffered an amniotic fluid embolism, a serious complication where fetal cells or amniotic fluid enter the mother's bloodstream and prevent normal blood clotting. Ms. Wynn-Williams received more than 35 units of blood transfusion but, because her blood was not clotting, those transfusions simply bled out.

37.     After hours of blood transfusions, emergency surgeries, and life support, Ms. Wynn-Williams fell into a coma for several days. When she awoke, she could not speak or walk. Ms. Wynn-Williams remained in the hospital for more than a week after waking from the coma and had to return to the hospital soon after being discharged to address further bleeding and surgery complications requiring yet more operations. After being discharged a second time at the end of March 2016, Ms. Wynn-Williams returned to the hospital yet again a week later because she was once again bleeding severely.

38.     Over the following weeks and months, Ms. Wynn-Williams would undergo additional medical treatment and further surgeries. She would understandably find herself without the energy to complete basic daily activities like making trips to the supermarket. She would seek

support walking down grocery store aisles and take breaks on benches while walking outside. When Ms. Wynn-Williams asked her doctors about the possibility of having a third child in the future, they told her that "Everyone who has what you had is dead, and if they're not dead, there's no way they're having another baby." (Fortunately, Ms. Wynn-Williams's doctors were wrong, and she now has a third healthy child.)

39. Through it all, Facebook expected Ms. Wynn-Williams to work. Ms. Wynn-Williams began receiving requests for meetings with Mr. Kaplan as early as three weeks after she went on leave—that is, just after she awoke from a coma and while she was still actively transitioning in and out of hospital to address ongoing complications. At first, Ms. Wynn-Williams, who was still ill, would ignore the requests or respond that she was on maternity leave and not available. Ms. Wynn-Williams's complications had already robbed her of the first precious moments with her new daughter and hung like a specter over the remainder of her critical early-infancy bonding time.

40. But Facebook—and Mr. Kaplan in particular—was relentless. Ultimately, Ms. Wynn-Williams felt she had no choice but to capitulate to Facebook's demand and work through her maternity leave. Ms. Wynn-Williams began working on or about April 5—just three weeks after her child's birth while she was still in and out of hospital—and would continue working almost daily for the remainder of her leave. In fact, during her maternity leave, Ms. Wynn-Williams attended over forty work-related meetings documented in her Facebook Outlook calendar and via associated Facebook Messenger messages.

41. Mr. Kaplan continued to sexually harass Ms. Wynn-Williams during her maternity leave. During one videoconference meeting with Ms. Wynn-Williams while she was on leave, Mr. Kaplan logged on from his bed with video turned on and repeatedly asked Ms. Wynn-Williams if him "being in bed when we chat" made Ms. Wynn-Williams "feel uncomfortable."

42. During another videoconference while Ms. Wynn-Williams was on maternity leave, Ms. Wynn-Williams noted that she was still experiencing bleeding and other complications from her many surgeries. Mr. Kaplan repeatedly asked Ms. Wynn-Williams where she was "bleeding from" and insisted that she tell him despite her express discomfort discussing the specifics of her recovery. Mr. Kaplan became angered by Ms. Wynn-Williams's refusal to entertain the conversation, prompting Ms. Wynn-Williams to exit the videoconference, shaken.

43. Shortly after her return to work in late August 2016, Ms. Wynn-Williams met with investigators from Facebook's compliance department about a separate internal investigation related to the company's compliance with the Foreign Corrupt Practices Act. During this interview, some of her interactions with Mr. Kaplan were discussed. When the investigators asked her if she wanted them separately to investigate Mr. Kaplan, she said she did not want that to happen. Ms. Wynn-Williams remained concerned that an investigation into Mr. Kaplan would backfire on her and result in retaliation by Mr. Kaplan and by Facebook.

44. Mr. Kaplan's sexual harassment of Ms. Wynn-Williams continued. For example, in October 2016, Mr. Kaplan decided to hold an offsite event for his direct reports in India. Because Ms. Wynn-Williams was still recovering from her severe medical complications, Ms. Wynn-Williams expressed concern about whether she was medically ready to travel internationally. Mr. Kaplan nevertheless made it clear that he expected her to attend. When Ms. Wynn-Williams agreed to attend if she could figure out a way to do so without having to wean her daughter, Mr. Kaplan asked her if she was talking about breastfeeding. When Ms. Wynn-Williams said yes, Mr. Kaplan said, "explain breastfeeding to me." Ms. Wynn-Williams explained that it was important for her to maintain consistency in order to continue breastfeeding. Mr. Kaplan then repeated his request for Ms. Wynn-Williams to "explain breastfeeding to" him, asking her questions about her breasts, how she would "get the milk out of" them, and how a pump works. A few days

later, one handheld and one electric breast pump arrived at Ms. Wynn-Williams's home from Mr. Kaplan.

**III.    Ms. Wynn-Williams Witnesses Meta's Reckless Attitude Toward the Harms of Its Product**

45.    The same culture that fostered harassment against women at Facebook extended to callous disregard for human dignity in other facets of the company's business.  During her years at the company, Ms. Wynn-Williams witnessed Facebook comply with Chinese censorship demands and jeopardize the privacy and safety of its Chinese and Hong Kong users, intentionally target emotional vulnerability in young women to turn a profit, and cause chaos in Myanmar through its failure to anticipate and respond to cultural and linguistic differences.  Meta does not—and cannot—deny the accuracy of these reports.

**A.    Facebook Courts China with Censorship and Surveillance Opportunities**

46.    Mr. Kaplan insisted Ms. Wynn-Williams temporarily oversee Facebook's China policy in January 2017.  In this role, Ms. Wynn-Williams saw firsthand the great lengths Facebook was willing to go to enter the Chinese market and raised significant concerns about that conduct. Ignoring her, Facebook worked hand-in-glove with the Chinese Communist Party (the "CCP") to "promote safe and secure social order" by providing the government with special access to millions of its citizens' data.

47.    Facebook understood the risks of enabling the surveillance and censorship of hundreds of millions of Facebook users.  Facebook employees noted in an internal document that its China plan would lead to "increased human rights, media and public condemnation for censorship and user data practices"—revealing express awareness among Facebook's leadership that its plan would enable such censorship and surveillance.  Similarly, Facebook warned internally that a risk of its China policy was that employees could "leak [] additional details about how we are treating data to highlight differences in what we say to the public vs what we do."  Even the most extreme

risks—which Facebook acknowledged in the same internal document—would not stop its quest for the Chinese market: "Facebook employees will be responsible for user data responses that could lead to death, torture and incarceration."

48.    While courting China for market access, Facebook blocked the account of Guo Wengui, a Chinese billionaire critical of the CCP who sought asylum in the United States, after the CCP told Facebook that how it "handled Guo would affect whether Facebook would be allowed into China."

### B.    Facebook Targets Emotionally Vulnerable Teens

49.    Facebook also saw financial opportunity in targeting emotionally vulnerable teens. Ms. Wynn-Williams first learned of this practice following the public leak of a Facebook pitch deck for advertisers detailing Facebook's ability to target thirteen-to-seventeen-year-olds across its platforms during moments of emotional vulnerability.  Facebook offered the opportunity to advertise to teens when they feel "worthless, insecure, stressed, defeated, anxious, stupid, useless, and like a failure … [or] when they're worried about their bodies and thinking of losing weight." Facebook provided this exact strategy by tracking when thirteen-to-seventeen-year-old girls deleted selfies and immediately delivering them ads for beauty products in their deepest moments of insecurity.

50.    Ms. Wynn-Williams sought an independent audit to understand everything Facebook had done like this across the world, but was shut down by Facebook executives, who stated that "lawyers have discouraged [using the word audit] in similar contexts."

51.    The public also sought some sort of explanation but was shut down by a Facebook spokesperson stating "[w]e have opened an investigation to understand the process failure and improve our oversight.  We will undertake disciplinary and other processes as appropriate." When that statement did not satisfy the public, Facebook lied about the program in hopes of making

things go away, stating "Facebook does not offer tools to target people based on their emotional state."

### C.    Facebook Contributes to and Fails to Remedy Chaos in Myanmar

52.    Facebook successfully integrated itself into Burmese society starting in 2013. However, despite Facebook being essentially synonymous with the internet in Myanmar—Facebook made deals with local telecommunications providers to preload its app on phones—Facebook took no precautions to ensure that its immense influence could not be exploited.

53.    This first became clear to Ms. Wynn-Williams in 2014.  A Facebook post with false claims about Muslims in Myanmar spread rapidly on Facebook and led to riots, raids of Muslim-owned shops, and death.  Lacking any available Burmese speakers, Facebook's moderation team could not determine whether the post violated Facebook's rules.  So Facebook left it up.

54.    Facebook's indifference to the need to prepare for its operations in a foreign language and culture caused content moderation issues on multiple fronts.  Facebook had not posted its "Community Standards" in Burmese, rendering it impossible for users to know what was permitted.  Facebook's code was incompatible with the Burmese language, and coding issues made it so users in Myanmar could read the Burmese posts, but users outside of the country only saw jumbled text.  Content moderation was impossible.  Meanwhile, Facebook learned that Burmese users had begun using unofficial apps as an alternative means to access Facebook's platform, leaving no way for users to report violations or for Facebook's content moderation team to receive the reports from these unauthorized, third-party apps.

55.    Amidst further chaos through Myanmar's 2015 election and continuing propagation of hate speech in 2016, Ms. Wynn-Williams sought to hire someone who could address these issues.  In May 2017, after more than two years of efforts to hire for the role, Mr. Kaplan stonewalled Ms. Wynn-Williams, telling her that "it's time to move on and get over it" and she should "not [] raise the issue again."

56. These failures culminated in Facebook's contribution to the Myanmar military's August 2017 genocide of Burmese Muslims, which occurred shortly after Facebook fired Ms. Wynn-Williams. The military deployed at least seven hundred people to spread hate and misinformation about Muslims on Facebook. They created and took over verified accounts with significant followings and used them to stoke chaos and inflame the public. In the end, more than ten thousand people were killed, and more than seven hundred thousand Muslims fled the country. Facebook's complicity was detailed across twenty pages in the UN's 2018 report on the genocide.

## IV. Ms. Wynn-Williams Remains at Facebook Despite Serious Misgivings

57. Despite everything, Ms. Wynn-Williams continued to believe in the possibility for positive change that had drawn her to Facebook in the first place. She hoped to support Meta to fulfill its potential to connect people across borders, support democratic movements, and give a voice to the voiceless.

58. Ms. Wynn-Williams had constraints that made it challenging to leave Facebook. As is common among tech companies, much of Ms. Wynn-Williams's compensation came in the form of time-vested equity interests. If she left, she would lose that equity, which was a fundamental component of her young family's financial security. As a mother of two young children and herself suffering serious medical complications, Ms. Wynn-Williams lacked both the physical stamina and the available time to hunt for a replacement job. Her family relied on her for financial support as well as her healthcare benefits. Her immigration status was also tied to her ongoing employment with Meta.

## V. Facebook Fires Ms. Wynn-Williams

59. In January 2017, Mr. Kaplan's executive assistant Erin King met Ms. Wynn-Williams for drinks. Ms. King told Ms. Wynn-Williams that Facebook was looking into Mr. Kaplan's conduct and warned her that he "values loyalty" and so she should not cooperate if contacted by the compliance department.

60.     As of early 2017, Ms. Wynn-Williams was the nominal leader of policy teams working in both the Asia Pacific region ("APAC") and Latin America ("LATAM").  In her February 2017 performance review, Mr. Kaplan gave Ms. Wynn-Williams a performance rating of "Meets Most Expectations"—the lowest rating Ms. Wynn-Williams had ever received in her six years at Facebook.  Mr. Kaplan criticized Ms. Wynn-Williams as "aggressive," "selfish," "focused on [her]self," and "difficult to work with."  When Ms. Wynn-Williams asked for examples, Mr. Kaplan cited to what he claimed was a lack of responsiveness during her 2016 maternity leave (during which she had been periodically comatose and hospitalized extensively for life-threatening complications).

61.     Concerned that Mr. Kaplan would assume she had instigated any investigation into him, Ms. Wynn-Williams met with Heidi Swartz, Facebook's head employment lawyer.  Ms. Swartz offered Ms. Wynn-Williams the option of participating in an investigation or engaging in a "facilitated conversation" with Mr. Kaplan.  Still hoping to save her career at Facebook by avoiding initiating any formal dispute, Ms. Wynn-Williams opted for the facilitated conversation.

62.     In early May 2017, Ms. Wynn-Williams and Mr. Kaplan had a conversation facilitated by human resources.  During this facilitated conversation, Mr. Kaplan told Ms. Wynn-Williams that he believed she had caused Facebook to launch an investigation into him and became increasingly hostile toward Ms. Wynn-Williams.

63.     Throughout the remainder of 2017, Mr. Kaplan and his team sidelined Ms. Wynn-Williams and stripped her of any remaining authority she had over hiring and supervising staff.  For example, in February 2017, Juan de Dios, a member of the LATAM policy team and Ms. Wynn-Williams's direct report for two years, received instructions from Mr. Kaplan forbidding him from communicating with Ms. Wynn-Williams and instead ordering him to direct all contact and take all supervision directly from Mr. Kaplan.  Around the same time, Ms. Wynn-Williams lost the ability to approve expenses from her former direct reports in the Facebook

COMPLAINT

20

expense management system, including for Juan de Dios. When Ms. Wynn-Williams asked what had happened, Mr. Kaplan told her "Juan shouldn't be clearing anything with you right now. The reporting line is him to me." Mr. Kaplan then removed the entire LATAM policy team from Ms. Wynn-Williams and directed them to report to him instead.

64. Around the same time, it became virtually impossible for Ms. Wynn-Williams even to participate in hiring decisions related to the APAC team, and Mr. Kaplan told her he would eventually remove that team from her oversight entirely. During early 2017, Ms. Wynn-Williams repeatedly tried to facilitate the hiring of additional staff but was blocked or stonewalled by Mr. Kaplan and his team. The hiring actions Mr. Kaplan and his team excluded Ms. Wynn-Williams from making decisions on included for the positions of: the Head of Public Policy for Thailand (Luc Lampriere); the Head of Public Policy for Instagram in Asia-Pacific (Helena Lersch), in connection with which Mr. Kaplan threatened to "release" Instagram public-policy lead to Nicky Jackson Colaco and remove the role from Ms. Wynn-Williams's team; the Head of Public Policy for Indonesia (Rivana Mezaya); the never-approved Head of Public Policy for Greater China; and the Head of Public Policy for Southeast Asia, the backfill for Elizabeth Hernandez.

65. In June 2017, Ms. Wynn-Williams requested a transfer to a different department so she would not have to report to Mr. Kaplan anymore. Human resources informed Ms. Wynn-Williams that her recent poor performance rating given by Mr. Kaplan in February 2017 rendered her ineligible for a transfer. Although Javier Olivan and his team in Facebook's Growth organization were prepared to give Ms. Wynn-Williams a senior role in their department, other executives intervened and blocked the transfer, telling Ms. Wynn-Williams the new role "might be a problem" because it may overlap with the work of Mr. Kaplan's policy team. Stacey Tomey in human resources and Ms. Swartz then refused to grant the routine exception that would have permitted the transfer notwithstanding her February 2017 performance rating, leaving Ms. Wynn-Williams no way to continue to dodge or ignore the harassment and retaliation she faced from

Mr. Kaplan. On information and belief, Mr. Kaplan and others influenced the decision to deny Ms. Wynn-Williams the exception.

66. Feeling she had no other choices left, Ms. Wynn-Williams began collecting information to support the internal investigation into Mr. Kaplan. On July 28, 2017, however, while Ms. Wynn-Williams was still gathering further documentation and a witness list to provide to these investigators, Ms. Wynn-Williams received an email stating that Facebook had concluded that Mr. Kaplan had not engaged in any form of misconduct.

67. Later that day, Ms. Wynn-Williams contacted Ms. Swartz to ask if she should still submit the information she was working to gather. Ms. Swartz told her to do so and the investigators would still consider whatever she submitted. Ms. Wynn-Williams told Ms. Swartz she would gather that information.

68. On August 24, 2017, while Ms. Wynn-Williams was still gathering this information, she arrived at her regularly scheduled performance review and was surprised to find Ms. Swartz waiting for her. Ms. Swartz, Facebook's lead employment counsel, did not typically attend performance reviews. Rather than give her a performance review, Ms. Swartz abruptly terminated Ms. Wynn-Williams. The termination meeting itself was deliberately punitive and humiliating. Ms. Swartz fired Ms. Wynn-Williams in a perfunctory manner moments into the meeting, confiscated her laptop on the spot, refused to allow her to return to her desk to retrieve personal belongings, refused to permit her to say goodbye to her colleagues or her assistant, and had a security guard escort her out of the building. Ms. Wynn-Williams left Facebook with no opportunity to submit documents to investigators, contact witnesses, or communicate with the colleagues to whom she had reported Mr. Kaplan's conduct.

69. Even after terminating her, Facebook exercised tremendous leverage over Ms. Wynn-Williams. As a young mother with two young children and severe medical

complications from her second pregnancy, maintaining the same healthcare coverage post-termination was critical for Ms. Wynn-Williams's health and that of her children.

70.    Technology companies in Silicon Valley frequently dispense a large part of employee compensation in the form of equity interests that vest over time but vanish if the employee is terminated before they vest.  Facebook was no different.  As a veteran employee at the company, the majority of Ms. Wynn-Williams's compensation—and ultimately her net worth as an individual—was in the form of unvested equity interests in Facebook.  When Facebook terminated her, that termination stripped Ms. Wynn-Williams of 13,167 Restricted Stock Units, today worth approximately eight million dollars.  Facebook intended this result.

71.    Facebook also was financially sponsoring Ms. Wynn-Williams's immigration naturalization.  Her husband, a citizen of the United Kingdom, depended on Ms. Wynn-Williams's naturalization for his own lawful permanent residency, which was part of her family's plan to secure its ability to permanently remain in the country they had called home for many years.

72.    As a Facebook employee, Ms. Wynn-Williams had also been expected to use her personal funds to cover work-related expenses for Facebook executives and wait for reimbursement.  Over her six years at the company, Ms. Wynn-Williams had accrued over $329,000 in work-related expenses the company still had not reimbursed, including bills for Mark Zuckerberg's luxury hotel rooms and private travel.  Facebook controlled the decision of whether to reimburse Ms. Wynn-Williams for these expenses upon her termination.

73.    Given these levers, Facebook knew that Ms. Wynn-Williams would have no choice but to accept whatever severance terms Facebook demanded in exchange for allowing her to keep her healthcare coverage, receive a stabilizing payment to prevent falling off the financial cliff created by her lost equity interests and other resources, and retain the right to seek reimbursement for the hundreds of thousands of dollars in advanced business expenses for Facebook's executives that she was owed.

74. Under this duress, Ms. Wynn-Williams was compelled to sign the Severance Agreement on September 7, 2017, which included Facebook's non-disparagement and arbitration provisions.

75. The non-disparagement provision (Section 9) stated:

> [Y]ou agree not to make disparaging, critical or otherwise detrimental comments to any person or entity concerning the Company, its officers, directors or employees; the products, services or programs provided or to be provided by the Company; the business affairs, operation, management or the financial condition of the Company; or the circumstances surrounding your employment and/or separation of employment from the Company. The foregoing paragraph, is not intended to restrict your good faith expressions of opinion or competitive comparisons involving Company that are not disparaging and are offered in the scope of your future employment or business ventures, so long as any such statements do not rely upon confidential or proprietary information of the Company.

Severance Agreement § 9.

76. Meta incurred a similar non-disparagement obligation in the same section: "The Company agrees not to issue any internal or public statements or press releases concerning you, your employment with or departure from the Company containing disparaging, critical or otherwise detrimental comments concerning you." *Id.*

77. The arbitration provision (Section 16(d)) stated in relevant part that:

> The parties agree that any and all disputes arising out of the terms of this Agreement, their interpretation, and any of the matters herein released, shall be subject to arbitration, before the American Arbitration Association ("AAA") in accordance with the Employment Arbitration Rules and Mediation Procedures.

*Id.* § 16(d).

78. Separately, Section 4 of the Severance Agreement also provided that "you ... agree that you may not recover any monetary benefit as a result of any claim brought on your behalf by any government agency."

79. Meta refused to fulfill its side of the Severance Agreement almost immediately. From at least October 2017 through August 2018, Facebook refused reimbursement of

$310,953.19[5] in pre-approved and audited business expenses, repeatedly disabled and reset Ms. Wynn-Williams's access to Facebook's expense system, and required her to relitigate years of previously approved expenses.

80.     The obligation to reimburse Ms. Wynn-Williams's pre-approved business expenses was a term of the Severance Agreement.  *See* Severance Agreement § 8.  Facebook's refusal to reimburse Ms. Wynn-Williams for those $310,953.19 in expenses was a material breach of the Severance Agreement that deprived Ms. Wynn-Williams of a principal benefit of her bargain.

**VI.     Meta Announces That It Will No Longer Enforce Arbitration Agreements Related to Sexual Harassment or Non-Disparagement Provisions Related to Unlawful Workplace Conduct**

81.     For years following Ms. Wynn-Williams's termination, the non-disparagement provision in the Severance Agreement deterred her from speaking publicly and fully about the unlawful and abusive practices she witnessed and experienced, including Mr. Kaplan's sexual assault and harassment, while a Facebook employee.

82.     Meanwhile, in 2018, Facebook announced publicly that it would no longer force arbitration for claims related to sexual harassment in the workplace.  Lori Goler, Facebook's Vice President of People, announced the change in a statement provided to the press, calling it "a pivotal moment for our industry and corporate America more broadly" and "the right thing to do."[6]  Facebook's announcement was part of a collective change in policy in Silicon Valley—around the same time other tech giants announced similar changes to their policies.

83.     Facebook intended this announcement to send a clear signal to Facebook's current and former employees.  In response to sustained and withering criticism of these sorts of employment policies emerging at the time, Facebook would agree to allow employees to assert claims

---

[5] Facebook did reimburse Ms. Wynn-Williams for $18,369.72 in such pre-approved expenses.

[6] Daisuke Wakabayashi & Jessica Silver-Greenberg, *Facebook to Drop Forced Arbitration in Harassment Cases*, N.Y. Times (Nov. 9, 2018), https://www.nytimes.com/2018/11/09/technology/facebook-arbitration-harassment.html [https://perma.cc/9R3U-CE35].

related to sexual harassment in court, not force them into arbitration, even if those individuals had signed arbitration agreements that might conceivably cover those claims.

84.    Ms. Wynn-Williams followed issues related to tech policy closely—and, in particular, issues related to employment policy at Meta.  Her contacts in the industry had told her that this policy change was on the horizon.  She learned this change in Facebook's policy was official when it was publicly reported in November 2018.

85.    Then, in 2022, Ms. Wynn-Williams's friend and fellow former Facebook employee Ifeoma Ozoma worked to help pass California's Silenced No More Act, Cal. Gov't Code § 12964.5, taking aim at precisely the sort of non-disparagement provisions that Facebook had demanded Ms. Wynn-Williams sign.  Under that statute, which became law in California on January 1, 2022, "[i]t is an unlawful employment practice for an employer or former employer to include in any agreement related to an employee's separation from employment any provision that prohibits the disclosure of information about unlawful acts in the workplace" and any contract with such a provision "is against public policy and shall be unenforceable."  Cal. Gov. Code § 12964.5.

86.    Recognizing the importance of protecting the disclosure of unlawful workplace conduct—both for herself personally and for others like her in the tech industry—Ms. Wynn-Williams began working with Ms. Ozoma to support implementation of the Silenced No More Act. During 2022, Ms. Wynn-Williams was serving as CEO of Frontier Technology, an initiative of the Minderoo Foundation, an Australian non-profit.  Frontier Technology's mission was to address the societal implications of emerging technologies, particularly artificial intelligence and data-driven systems.  Ms. Wynn-Williams's Frontier Technology formed the TEA Coalition with other similarly concerned non-profits and began advocating for shareholder resolutions at tech companies wherein the company would commit to compliance with the Silenced No More Act.  Ms.

Wynn-Williams's leadership role at Frontier Technology and within the TEA Coalition was public knowledge.

87. In 2022, the TEA Coalition, including Ms. Wynn-Williams's Frontier Technology, sponsored a shareholder resolution at Meta requiring Meta to commit to compliance with the Silenced No More Act.  The TEA Coalition and its individual member organizations regularly communicated directly with Meta in relation to the campaign related to this shareholder resolution.  On information and belief, Meta knew that Ms. Wynn-Williams had a leadership role within the campaign for this shareholder resolution.

88. In Meta's 2022 Proxy Statement for the shareholder resolution that Ms. Wynn-Williams helped organize, Meta's Board of Directors stated "we do not require our personnel to enter into employment agreements that include non-disparagement clauses that would prevent them from discussing workplace conduct" and "[a]ll of our policies are intended to comply with ... the recently enacted California Silence No More Act, which generally prohibits the use of non-disparagement clauses in employment agreements."[7]  The Proxy Statement further represented that Meta "do[es] not require or encourage our personnel to remain silent about harassment or discrimination."[8]  Meta thus publicly aligned its policies with the federal labor-law principles and California public-policy protections it now seeks to circumvent in arbitration.  Meta's representation was unequivocal: it did not carve out former employees, prior agreements, or any other exception, and it spoke directly to the type of non-disparagement provision Meta had required Ms. Wynn-Williams to sign.

---

[7] Meta Platforms, Inc., Definitive Proxy Statement (Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934) 71 (Apr. 1, 2022), https://www.sec.gov/Archives/edgar/data/1326801/000132680122000043/meta2022definitiveproxysta.htm [https://perma.cc/4KWP-HSYB].

[8] *Id*.

89.     Secure in the belief that Meta's policy shift permitted her to share the sexual harassment she experienced at Meta and that she would not be forced to arbitrate any claims Meta brought against her related to that disclosure, Ms. Wynn-Williams concluded it was time to speak up.

90.     First, in April 2024, Ms. Wynn-Williams agreed to submit a whistleblower report to the Securities and Exchange Commission (the "SEC"). In her 78-page report filed with the SEC, Ms. Wynn-Williams detailed sexual assault and unlawful conduct related to Facebook's attempts to penetrate China and other APAC countries, including providing access to user data to the Chinese government, removing U.S.-based user accounts at the request of the Chinese government, and giving false testimony to Congress on at least three occasions.

91.     Also in 2024, Ms. Wynn-Williams agreed to publish *Careless People*. She relied on Meta's public statements, including its 2018 policy change and 2022 Proxy Statement, in proceeding with publication, reasonably believing that Meta meant it when it announced that employees could speak freely about unlawful workplace conditions at Meta.

92.     In March 2025, Ms. Wynn-Williams also submitted a whistleblower complaint to the United States Department of Justice, again in reliance on Meta's public commitments not to enforce arbitration or non-disparagement provisions against employees who disclose unlawful workplace conduct.

**VII.     Meta Attempts to Bankrupt and Silence Ms. Wynn-Williams in Retaliation**

93.     On or about December 17, 2024, Ms. Wynn-Williams entered into a written publishing agreement with Macmillan Inc. ("Macmillan") for the publication, distribution, and promotion of *Careless People* (the "Publishing Agreement"). Among other things, the Publishing Agreement contemplated that Ms. Wynn-Williams would actively participate in the publicity, marketing, and promotion of *Careless People*, including through a book tour, media appearances, and other promotional activities customary for a major nonfiction release.

94.     Macmillan announced *Careless People*'s publication on its website.  Ms. Wynn-Williams's book would share "shocking accounts of workplace harassment and misogyny."  *Careless People* was scheduled to be published on March 11, 2025, in the United States and March 13, 2025, in the United Kingdom.

95.     Meta sprang into action to silence and retaliate against Ms. Wynn-Williams and her publisher.  The day after Macmillan's announcement, Meta's lawyers sent a threatening letter to Macmillan and its affiliated imprint Flatiron Books ("Flatiron").  In the letter, Meta's lawyers suggested (falsely) that Ms. Wynn-Williams and her publishers could be subject to defamation liability simply for declining to give Meta an advance copy of the book or allowing Meta to verify their fact-checking processes.  Meta's contention at that time was that Macmillan and Flatiron Books "intend[ed] to imminently publish a book that may contain false statements regarding Meta Platforms, Inc.; Mark Zuckerberg, Joel Kaplan, Sheryl Sandberg, and other current or former Meta employees."  Meta's letter was not sent to Ms. Wynn-Williams, nor did it refer to any severance agreement, non-disparagement clause, or arbitration provision.  No such defamation claim has ever been filed.

96.     Just one day later, however, on March 7, 2025, Meta shifted tactics by filing an arbitration demand and application for emergency relief against Ms. Wynn-Williams, Macmillan, and Flatiron, purportedly pursuant to the Severance Agreement's arbitration and non-disparagement provisions.  Meta's application was intentionally calculated to secure unlawful relief that Meta could never receive in a court and deny Ms. Wynn-Williams an opportunity to defend herself.

97.     First, Meta carefully managed the service of process to impair Ms. Wynn-Williams's ability to obtain notice of the emergency application and the associated hearing.  Meta did not use the personal email address Ms. Wynn-Williams had used to correspond with Meta about her Severance Agreement—an email address that Meta had used to correspond with Ms. Wynn-Williams throughout her employment and that was connected to her active Meta accounts.  Nor

did Meta use Ms. Wynn-Williams's physical address in London—an address Meta must have had since it served the Interim Award on her there days later. Meta also did not use the contact email address publicly listed on Ms. Wynn-Williams's website. Instead, Meta used only an email address Meta dug up in its eight-year-stale employment records for Ms. Wynn-Williams that, on information and belief, Meta knew she did not use. That email address was defunct, and Ms. Wynn-Williams did not appear at the hearing on March 11, 2025.

98. Second, Meta sought and secured emergency relief that it knew was unlawful and that no court could legally provide, and which contains vague proscriptions that go far beyond the terms of the Severance Agreement. That included seeking an injunction against the publication of *Careless People*. The full scope of Meta's absurdly broad requested relief was for an order:

> enjoining Ms. Wynn-Williams, her agents, and other persons acting in active concert or participation with her, including [Macmillan and Flatiron]:
>
> 1. from making "disparaging, critical or otherwise detrimental comments to any person or entity concerning [Meta], its officers, directors or employees; the products, services or programs provided or to be provided by [Meta]; the business affairs, operation, management or the financial condition of [Meta]; or the circumstances surrounding [her] employment and/or separation of employment from [Meta]";
>
> 2. from publishing or promoting *Careless People*;
>
> 3. from amplifying or repeating all such previous "disparaging, critical or otherwise detrimental comments";
>
> 4. to retract all such previous "disparaging, critical or otherwise detrimental comments."

99. On March 12, 2025, an Emergency Arbitrator of the American Arbitration Association—without any appearance by Ms. Wynn-Williams—issued the Interim Award, which granted the vast majority of the relief Meta had requested. The Emergency Arbitrator first concluded he lacked jurisdiction over Macmillan or Flatiron because they were not parties to the Severance Agreement, and he therefore could not enjoin the publication of *Careless People* itself. The

Emergency Arbitrator then issued the Interim Award,[9] granting Meta virtually every form of relief it had requested directed at Ms. Wynn-Williams.  The Interim Award enjoins

> Ms. Wynn-Williams, her agents, servants, employees, attorneys, and any other person(s) or entities [] she controls:

> 1.  from making orally, in writing, or otherwise any 'disparaging, critical or otherwise detrimental comments to any person or entity concerning [Meta], its officers, directors or employees; the products, services or programs provided or to be provided by [Meta]; the business affairs, operation, management or the financial condition of [Meta]; or the circumstances surrounding [her] employment and/or separation of employment from [Meta],' except as permitted by Sections 4 and 9 of the Severance Agreement and regardless of whether Ms. Wynn-Williams believes her statements are true or false;

> 2.  from further promoting Careless People [] on a book tour or otherwise, including with respect to electronic and audio versions of the book;

> 3.  to the extent within Respondent Wynn-Williams'[s] control, from further publishing or distributing Careless People [], including with respect to electronic and audio versions of the book;

> 4.  to the extent within Respondent Wynn-Williams'[s] control, from amplifying or repeating in any forum all such previous 'disparaging, critical or otherwise detrimental comments,' regardless of whether Ms. Wynn-Williams believes her statements are true or false;

> 5.  to the extent within Respondent Wynn-Williams'[s] control, retract all such previous 'disparaging, critical or otherwise detrimental comments' from all forums, including online, on which they appear.

100.    The Interim Award includes no findings as to the content of *Careless People* or any other speech that it constrains.  It does not determine that *Careless People* was in fact disparaging within the meaning of the non-disparagement provisions of the Severance Agreement, that the Severance Agreement validly limits Ms. Wynn-Williams's speech, or that the Interim Award's restraint on speech is narrowly tailored to address a compelling interest.

---

[9] The Interim Award includes an express reference to enforcement via the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

101.    The Interim Award's vague proscriptions also sweep far more broadly than the non-disparagement provision ever did or could.  Where the Severance Agreement only applied to Ms. Wynn-Williams's direct speech, the Interim Award purports to require her to exert control over the speech and acts of third parties and extends to her attorneys.  Where the Severance Agreement only applies to particular instances of disparaging speech, the Interim Award precludes Ms. Wynn-Williams from "promoting" an entire book—no part of which has been adjudged as disparaging in the first place—without defining the term "promoting."  And where the Severance Agreement preserves Ms. Wynn-Williams's "good faith expressions of opinion or competitive comparisons involving [Meta] that are not disparaging and are offered in the scope of [her] future employment or business ventures," the Interim Award only partially incorporates that limitation, eroding this critical protection.

102.    The Interim Award is indisputably an impermissible prior restraint on Ms. Wynn-Williams's First Amendment rights.  Meta pursued it anyway.

103.    After being granted an *ex parte* Interim Award, Meta's calculus changed.  Where before it had intentionally avoided giving notice to Ms. Wynn-Williams by known, reliable means, Meta now needed to use the Interim Award to threaten and intimidate her into silence.  So Meta chose service mechanisms it could have used—but intentionally declined to use—earlier.

104.    The same day it secured the *ex parte* Interim Award, Meta's counsel emailed only the Interim Award—not the underlying arbitration demand or emergency application—to Ms. Wynn-Williams's active personal email address that Meta had declined to use to provide notice of the emergency hearing.  The following day, March 13, 2025, a process server appeared at Ms. Wynn-Williams's home in London while her toddler was present and personally served only the Interim Award, again without the underlying papers.

105.    To ensure that both Ms. Wynn-Williams and any other potential whistleblowers felt the full effect of Meta's retaliation, Meta crowed about its success in silencing Ms. Wynn-Williams

by posting the Interim Award on its own website[10] and then set out on a concerted campaign to smear Ms. Wynn-Williams with false and disparaging statements while both Ms. Wynn-Williams and her attorneys were unable to respond (because they were silenced by the Interim Award).  It did so notwithstanding that in the Severance Agreement, Meta "agree[d] not to issue any internal or public statements or press releases concerning [Ms. Wynn-Williams], [her] employment with or departure from [Meta] containing disparaging, critical or otherwise detrimental comments concerning [Ms. Wynn-Williams]."

106.    In direct violation of that promise, on March 10, 2025, just before the Interim Award was issued, Meta's spokesperson Andy Stone posted to X: "Sarah Wynn-Williams hasn't worked at Meta in eight years.  She was fired for poor performance and toxic behavior and an investigation at the time determined she made misleading and unfounded allegations.  Her book is a mix of old claims and false accusations about our executives."[11]



**Andy Stone** ✔ ∞
@andymstone

Sarah Wynn-Williams hasn't worked at Meta in eight years. She was fired for poor performance and toxic behavior and an investigation at the time determined she made misleading and unfounded allegations. Her book is a mix of old claims and false accusations about our executives.

2:41 PM · Mar 10, 2025 · **15.9K** Views

107.    On March 12, 2025, Stone linked to the Interim Award on Threads (Meta's Instagram-associated version of Twitter/X) and posted: "This ruling affirms that Sarah Wynn-Williams'[s] false and defamatory book should never have been published.  This urgent legal action

---

[10] Meta Platforms, Inc., *The Arbitrator's Interim Award* (Mar 12, 2025), https://about.fb.com/wp-content/uploads/2025/03/Arbitration-Interim-Award.pdf [https://perma.cc/Z9RX-UQVX].

[11] Andy Stone (@andymstone), X (Mar. 10, 2025, at  10:41 ET), https://x.com/andymstone/status/1899108417282674805 [https://perma.cc/Q6KC-V9WS].

was made necessary by Williams, who more than eight years after being terminated by the company, deliberately concealed the existence of her book project and avoided the industry's standard fact-checking process in order to rush it to shelves after waiting for eight years."[12]

andymstone 03/12/25

This ruling affirms that Sarah Wynn Williams' false and defamatory book should never have been published. This urgent legal action was made necessary by Williams, who more than eight years after being terminated by the company, deliberately concealed the existence of her book project and avoided the industry's standard fact-checking process in order to rush it to shelves after waiting for eight years.

about.fb.com/wp-co...

108.   On the same day, March 12, 2025, Mr. Stone separately posted a link to the Interim Award itself on Twitter/X, ensuring its widest possible public dissemination.

109.   Ms. Wynn-Williams moved to vacate the Interim Award on March 18—just five days after being served.  The same Emergency Arbitrator who had issued the Interim Award on March 12 denied the motion to vacate on March 31.  In denying the motion, the Emergency Arbitrator suggested that under the Severance Agreement and Interim Award, Ms. Wynn-Williams "is not permitted to engage in informal discussions with legislators in the United States and Europe" because those legislators or aides might promote *Careless People* by "parroting" the statements in the book to the public.  Following the Emergency Arbitrator's March 31 order, Ms. Wynn-Williams objected to arbitrability and the parties elected to stay the arbitration while they entered mediation.

---

[12]   Andy   Stone   (@andymstone),   Threads   (Mar.   12,   2025,   at   17:42   ET), https://www.threads.com/@andymstone/post/DHHWKxixxS5?xmt=AQGzo4sQ5HzfvZNg-ScWqK_egwb6ck4JMrrnmcRwP3AM9ug [https://perma.cc/CKR5-WWCT].

110. Meanwhile, Meta continued to disparage Ms. Wynn-Williams. On May 13, 2025, Ms. Swartz of Meta wrote an open letter claiming that "Ms. Wynn-Williams brought her allegations only after it had been made clear to her that her ongoing and well-documented performance issues could no longer be ignored." Ms. Swartz went on to accuse Ms. Wynn-Williams of being "the instigator" of the abuse she experienced and of "making off-color jokes." Ms. Swartz acknowledged that Ms. Wynn-Williams had not provided Facebook with the information she had been compiling on Mr. Kaplan but claimed (falsely) that Ms. Wynn-Williams failed to do so because she "did not want to prompt an investigation into her own behavior." Ms. Swartz concluded by declaring Mr. Kaplan's "personal conduct" as "above reproach" but suggesting that she had been approached by "many employees past and present with extensive experience ... and concerns about Ms. Wynn-Williams'[s] behavior."

111. These statements were false, defamatory and misleading. And as Meta knew when it made these false and disparaging statements, Ms. Wynn-Williams was unable to defend herself against them because of the Interim Award.

112. On April 9, 2025, Ms. Wynn-Williams told the United States Senate that "the American people deserve to know the truth" about Meta.[13] When a reporter asked whether Meta would seek sanctions against Ms. Wynn-Williams for the statements she made during her testimony, Meta declined to comment.[14] The Senate's bipartisan investigation into Meta continues,

---

[13] *A Time for Truth: Oversight of Meta's Foreign Relations and Representations to the United States Congress*, *Hearing Before the Subcomm. on Crime and Counterterrorism of the S. Judiciary Comm.*, 119th Cong. (2025) (statement of Sarah Wynn-Williams), https://www.judiciary.senate.gov/committee-activity/hearings/a-time-for-truth-oversight-of-metas-foreign-relations-and-representations-to-the-united-states-congress [https://perma.cc/DX79-CVXW].

[14] Lily Jamali, *Meta Whistleblower Alleges Company Worked with China on Censorship*, BBC News (Apr. 9, 2025), https://www.bbc.com/news/articles/c4grrwvn1lyo [https://perma.cc/7FRS-83AC].

and a hearing entitled "Examining Tech Industry Practices and the Implications for Users and Families: Is This Social Media's Big Tobacco Moment?" is scheduled for the coming weeks.[15]

**VIII.   Ms. Wynn-Williams Labors Under the Interim Award While Meta Watches Her Every Move**

113.   Ms. Wynn-Williams attempted carefully to abide by the vague and amorphous Interim Award. The resonating truth of Ms. Wynn-Williams's story meant *Careless People* went on to become a #1 *New York Times* bestseller. Nevertheless, the Interim Award has caused Ms. Wynn-Williams concrete and continuing economic harm.

114.   Because the Interim Award issued during the publication of *Careless People*, Ms. Wynn-Williams lost the opportunity to actively participate in activities related to the release and promotion of her first book. To date, Ms. Wynn-Williams has declined hundreds of invitations to speak about *Careless People*. She has forgone attendance at various literary festivals, including Chicago's 40th Annual Printers Row Lit Fest and the Dulwich Literature Festival. She has declined invitations to conferences at the University of Chicago, the University of Canterbury, Stanford University, the University of Houston, the Mercer University School of Law, MIT, the National Women's Foundation of Washington, D.C., and the British and European Parliament. She declined an honoree invitation to the April 29, 2026, Organization for Social Media Safety Gala recognizing her work because the organizers would gift copies of *Careless People* to attendees, and has deferred decision on invitations to speak on artificial intelligence at the University of Michigan and the August 2026 Edinburgh International Book Festival.

115.   Sponsors, organizers, and prospective clients have scaled back or withdrawn engagements they otherwise would have extended. She has lost income from cancelled book tour appearances and from paid speaking engagements she has been forced to decline or which have

---

[15] Ashley Gold, *Tech CEOs Summoned to Capitol for June Hearing*, Axios (May 15, 2026), https://www.axios.com/2026/05/15/tech-ceos-grassley-june-hearing [https://perma.cc/347C-KBYY].

been withdrawn—even when those speaking engagements do not relate to Meta or *Careless People*.

116. Macmillan has likewise materially curtailed its publicity efforts in support of *Careless People* in light of the Interim Award's restrictions on Ms. Wynn-Williams's participation. The lost revenue and lost royalties from these cancellations and curtailments are directly attributable to Meta's conduct.

117. To comply with the Interim Award, Ms. Wynn-Williams has been forced to turn down interviews with some of the world's leading news outlets—including CNN, NPR, PBS Frontline, CNBC, Fox & Friends, *Vanity Fair*, *The New York Times*, *The Washington Post*, *The New York Post*, and *The Atlantic*—and journalists—including Christiane Amanpour, Fareed Zakaria, and Jon Favreau.

118. Ms. Wynn-Williams's professional life as a public-policy expert and sought-after commentator on technology, artificial intelligence, regulation, and geopolitics depends on her ability to appear and speak at public events, and a meaningful part of her income comes directly from paid engagements of exactly the kind the Interim Award has impaired.

119. Following the issuance of the Interim Award, Ms. Wynn-Williams still accepted invitations to speak at events on other matters not specifically related to her book or to Meta. Before each such engagement, Ms. Wynn-Williams has carefully informed the organizers that, under the terms of the Interim Award, she cannot speak about her book or about Meta. But Ms. Wynn-Williams did not understand the Interim Award to prevent her from appearing in public or speaking about matters unrelated to Meta or her book.

120. Meta disagreed. In fact, Meta had been surveilling Ms. Wynn-Williams in order to use those speaking engagements as a basis for further harassment and punishment and to expand the reach of the Interim Award to prevent her from any further such appearances. On March 5, 2026, Meta wrote a letter to the Merits Arbitrator accusing Ms. Wynn-Williams of

"flagrant violations" of the Interim Award by appearing at venues in the United Kingdom to discuss issues like digital warfare and artificial intelligence, even though she never discussed Meta or *Careless People*. According to Meta, because third parties at these events—whom Meta concedes Ms. Wynn-Williams does not control—made reference to *Careless People* at these events or held a copy of it, Ms. Wynn-Williams herself violated the Interim Award.

121. Also according to Meta's March 5, 2026, letter, Ms. Wynn-Williams violated the Interim Award because third parties created promotional materials for events that used publicly licensed images of Ms. Wynn-Williams and *Careless People*. But the letter did not assert that Ms. Wynn-Williams knew about, requested, controlled, consented to, or made any use of these promotional materials.

122. Meta even produced a declaration including photos taken by one of its own lawyers who attended one of these events. The lawyer's declaration conspicuously lacked any assertion that Ms. Wynn-Williams spoke about *Careless People* or Meta in any way during the event. Indeed, the absence of any evidence of direct violations by Ms. Wynn-Williams in the declaration was conspicuous because lawyers for Meta had suggested to the Merits Arbitrator that they had such evidence prior to the filing of the motion.

123. Ms. Wynn-Williams informed the Merits Arbitrator of her efforts to comply with the Interim Award in a March 6, 2026, email submission, specifying that she accepted invitations to speak about certain matters within her area of expertise but did not mention her book or Meta, and informed organizers of those constraints. At a March 12, 2026, status conference, the Merits Arbitrator confirmed to Ms. Wynn-Williams that the Interim Award permitted her to speak about those matters.

124. In subsequent correspondence, Ms. Wynn-Williams, through counsel, challenged Meta to clarify its position regarding what she can and cannot do without violating the Interim Award, hoping that such clarity would allow her to conform her conduct to the vague and

overbroad terms of the Interim Award. Meta did not respond, knowing that the Interim Award's vagueness is precisely what gives them maximum control over her actions.

125. Meta then applied to the Merits Arbitrator for sanctions on March 27, 2026. Meta noted that Ms. Wynn-Williams was scheduled to appear at other public events in the United Kingdom, including the Hay Festival on May 31, 2026. Meta requested that the Merits Arbitrator impose a $1,500 sanction on her for each alleged violation of the Interim Award, and to award Meta its attorneys' fees and disgorgement of any income she derived from those events, including any attributable book sales.

126. That sanctions request is in addition to the relief Meta already seeks in the underlying arbitration demand—liquidated damages of $50,000 for each purported violation of the non-disparagement provision of the Severance Agreement, together with compensatory and punitive damages. Meta further seeks disgorgement of any proceeds Ms. Wynn-Williams is said to have derived from sales of *Careless People* attributable to the purported violations. The cumulative threat of these penalties, wielded by one of the world's largest corporations against a single individual, is calibrated to coerce Ms. Wynn-Williams into silence rather than to vindicate any legitimate contractual interest stemming from the Severance Agreement.

127. Ms. Wynn-Williams opposed that application on April 17, 2026, arguing (among other things) that the Interim Award was an invalid prior restraint under the First Amendment and that, at a minimum, First Amendment principles would require a narrowing construction of its vague and overbroad terms that could not possibly encompass the kind of conduct Meta alleged. She asked the Merits Arbitrator to deny the motion and lift the Interim Award so that Meta could no longer use it to deter her from speaking in public.

128. The Merits Arbitrator refused to do so. Instead, during a status conference regarding the sanctions motion on April 22, 2026, the Merits Arbitrator held the motion open and stated that if Ms. Wynn-Williams voluntarily appeared at an event, including the Hay Festival, where she

knows or should know that her book will be available for sale, or knows or should know that her presence there will likely encourage book sales, then she has likely violated the Interim Award.

129.    As Ms. Wynn-Williams's counsel pointed out during the conference, this was an exceptionally broad conception of the scope of the Interim Award—one that extended far beyond the text of the Severance Agreement and dramatically increased the burden on Ms. Wynn-Williams.  Counsel attempted to clarify that the Merits Arbitrator's comment applied only to situations in which the actual event organizer made the book available for sale in connection with Ms. Wynn-Williams's appearance, pointing out that the Hay Festival, for example, did not appear to do so but instead simply had a link on the event website to another site run by a separate organization that offered books written by Hay Festival speakers.  But, notwithstanding that the details of the Hay Festival appearance had been fully briefed by the parties in their submissions on the sanctions motion, the Merits Arbitrator refused to clarify, stating that there was too much factual granularity for him to give any further guidance and that Ms. Wynn-Williams needed to conform her conduct to what she thinks is appropriate given his endorsement of the Interim Award's vague proscription on promotion.

130.    As Ms. Wynn-Williams's counsel expressed to the Merits Arbitrator, this conception of the Interim Award escalates the chilling effect of Meta's illegitimate arbitration to new heights.  If "promotion" includes Ms. Wynn-Williams's mere presence where it could encourage book sales, her presence in grocery stores or airports, for example—both of which sell copies of *Careless People*—now has the potential to form the basis for a violation of the Interim Award. And as Meta's conduct to date makes clear, Meta will go to great lengths to surveil Ms. Wynn-Williams to gather evidence of and pursue any instance in which it can argue that Ms. Wynn-Williams has run afoul of the Interim Award.

131.    Following the conference, counsel for Ms. Wynn-Williams requested leave from the Merits Arbitrator to move to dismiss the arbitration as a matter of law.  The Merits Arbitrator

denied that request, and will not resolve Meta's pending sanctions motion or Ms. Wynn-Williams's objections until the full hearing on the merits which is currently scheduled for October 2026.

132. As intended, Meta's actions and the Merits Arbitrator's refusal to resolve them have had and continue to have a severe chilling effect. Ms. Wynn-Williams now feels she cannot speak in public without being surveilled by Meta, and she has to second-guess whether she can speak or appear in public at all lest she risk a further sanctions motion under Meta's extreme and inchoate understanding of the Interim Award, which the Merits Arbitrator has declined to reject.

133. The May 31, 2026, Hay Festival made this clear. Ms. Wynn-Williams was invited to speak at the Hay Festival on a panel with two other speakers, the journalist Carole Cadwalladr and the academic Tim Wu, on the topic of digital technology and public policy. The Hay Festival is a prestigious, high-profile event, and Ms. Wynn-Williams was offered an honorarium for appearing. Both the appearance itself and maintaining good relations with the organizers of the Hay Festival are important to the long-term success of Ms. Wynn-Williams's career.

134. In a good-faith effort to abide by the Merits Arbitrator's guidance and anxious to avoid further sanction attempts from Meta, Ms. Wynn-Williams repeatedly asked the organizers ahead of time, including through a letter from counsel, not to make *Careless People* available for sale in any manner as part of the festival and informed them of the scope of the Interim Award. The Hay Festival organizers agreed.

135. In addition, fearful that anything she said could be the basis of another sanctions motion and wishing to protest that constraint on her speech, Ms. Wynn-Williams appeared for the panel but sat in silence for its entire duration, neither speaking nor responding to any question or remark. Ms. Wynn-Williams did not understand that speaking on a panel with Ms. Cadwalladr and Mr. Wu would violate the Interim Award given her intention not to refer to Meta or *Careless People*, but assumed that Meta would accuse her of endorsing things the other panelists—whom Meta believes are some of its "known critics"—might say. Ms. Wynn-Williams also believed that

making the alternative decision to cancel her appearance due to the Interim Award would also have drawn attention to *Careless People* that Meta would interpret as "promotion" of the book.

136. Notwithstanding that Ms. Wynn-Williams remained silent and did not say anything about Meta or her book and that the Hay Festival removed her book as requested in order to avoid any suggestion of promotion under the Merits Arbitrator's guidance, Meta wrote the Merits Arbitrator on June 12, 2026, to request the Merits Arbitrator rule on the sanctions motion immediately and impose additional sanctions based on the Hay Festival.

137. Meta based its request on the fact the other individuals on the panel are, in Meta's view, "critics" of Meta, suggesting that Ms. Wynn-Williams's mere appearance with those individuals in a public forum was a violation regardless of what she says or whether she speaks at all, and regardless of the fact that she does not control what those individuals say. Meta noted that Ms. Cadwalladr and Mr. Wu responded to Meta's campaign to silence Ms. Wynn-Williams in a manner that Meta found disparaging, alleging that the ensuing controversy resulted in additional sales of Ms. Wynn-Williams's book, notwithstanding that Meta's own actions created that controversy. Meta further suggested that Ms. Wynn-Williams's reaction to her silencing drew attention to herself in a manner that inevitably promoted sales of her book, notwithstanding that Meta's silencing campaign meant that any action Ms. Wynn-Williams took in response—including withdrawing from the Hay Festival—would have drawn such attention. Meta's exploitation of the Interim Award is thus calculated to make it impossible for her to avoid punishment.

138. Meta's sanctions campaign has been built on sustained surveillance of Ms. Wynn-Williams. Meta's evidentiary submissions in the arbitration have revealed that its representatives attended her public appearances in person, assembled photographs and written records of her movements, and traveled the length of the United Kingdom to do so—including making the long journey to rural Wales for the Hay Festival—all to document that at each event, Ms. Wynn-Williams said nothing about Meta or her book. In its most recent filing, Meta sought to escalate its

coercive surveillance of Ms. Wynn-Williams, asking the Merits Arbitrator to compel Ms. Wynn-Williams to disclose, in advance, a list of her planned public appearances, so that it can continue to monitor where she goes and what she says.

139. Throughout the arbitration process, Meta has continuously exploited the Interim Award's vagueness and breadth, retaliating against actions far beyond the scope of the non-disparagement provision it was said to enforce. What began as an effort to enjoin publication of *Careless People* became an effort to bar Ms. Wynn-Williams from promoting it, then from speaking about Meta at all, then from appearing alongside anyone Meta deems a critic, then from making any public appearance whatsoever. At each step, the Merits Arbitrator has declined to address the underlying vagueness, overbreadth, and lack of constitutional foundation of the Interim Award that enables Meta's exploitation. The result leaves Ms. Wynn-Williams unable to conform her conduct to the order and hands Meta open-ended control over her speech, livelihood, movements, and ability to associate with others, the result of a blatantly unconstitutional chilling effect on core First Amendment rights of speech and association.

140. Meta's campaign to maintain its public image at Ms. Wynn-Williams's expense is futile, and this Court can and should put an end to it. The Interim Award cannot bear the load of that campaign because it is an overbroad prior restraint on speech in violation of the First Amendment, relief Meta could never obtain in court and therefore must be vacated. The underlying Severance Agreement cannot support that campaign either, as it is invalid in whole and in part for a plethora of reasons, and this Court should issue declaratory relief to make that clear. As it waged its campaign, Meta committed three independent California torts, for which Ms. Wynn-Williams is entitled to compensatory relief to remedy her loss of liberty in complying to the letter with the overbroad, unfair, and illegal Interim Award.

## COUNT I
### 9 U.S.C. § 10 – Review of a Temporary Equitable Award

141.    Ms. Wynn-Williams incorporates all paragraphs above as if fully set forth herein.

142.    The Interim Award constitutes temporary equitable relief which this Court has jurisdiction to review under 9 U.S.C. § 10.  *See Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022-23 (9th Cir. 1991).

143.    The Interim Award restrains Ms. Wynn-Williams's ability to engage in speech and association protected by the First Amendment.

144.    The Interim Award contains unconstitutionally vague and overbroad proscriptions on Ms. Wynn-Williams's speech.

145.    The Interim Award is not narrowly tailored to any compelling government interest.

146.    The Interim Award therefore exceeds the arbitrators' powers and should be vacated under 9 U.S.C. § 10(a)(4).

147.    In the alternative, this Court should declare that the Interim Award cannot be enforced in this Court or any other court because to do so would be to impose an impermissibly vague, overbroad, and unjustifiable prior restraint on Ms. Wynn-Williams's speech.

## COUNT II
### Declaratory Judgment – Estoppel

148.    Ms. Wynn-Williams incorporates all paragraphs above as if fully set forth herein.

149.    There exists a justiciable controversy between Ms. Wynn-Williams and Meta as to the enforceability of the Severance Agreement.

150.    In November 2018, Facebook announced that it would no longer enforce arbitration agreements in cases related to sexual harassment.

151.    In 2022, Meta's Board of Directors announced in a Proxy Statement to shareholders that Meta would no longer enforce non-disparagement provisions that prevented employees from disclosing unlawful conduct in the workplace.

152.     Meta made these promises understanding and intending that current or former employees including Ms. Wynn-Williams would hear and rely upon them.

153.     Ms. Wynn-Williams reasonably relied on these promises in filing her whistleblower complaints with the DOJ and SEC, and in electing to write and publish *Careless People*, in which she discloses unlawful workplace conditions, including sexual harassment, during her time at Meta.

154.     Ms. Wynn-Williams has been damaged by her reliance on Meta's promise if Meta is allowed to enforce the arbitration provision and non-disparagement provision against her for publication of *Careless People*.

155.     This Court should enter an order declaring that Meta is estopped from enforcing Section 9 and Section 16(d) of the Severance Agreement against Ms. Wynn-Williams with respect to any claims related to Ms. Wynn-Williams's publication of *Careless People*.

## COUNT III
## Declaratory Judgment – Duress

156.     Ms. Wynn-Williams incorporates all paragraphs above as if fully set forth herein.

157.     There exists a justiciable controversy between Ms. Wynn-Williams and Meta as to the enforceability of the Severance Agreement.

158.     On August 24, 2017, Facebook terminated Ms. Wynn-Williams as part of a pattern of discrimination against her based on her gender and in retaliation against her for reporting that discrimination and harassment.

159.     Facebook knew that this termination would eliminate Ms. Wynn-Williams's unvested equity interests in Facebook and other critical employment benefits (cornerstones of her financial stability), Ms. Wynn-Williams's healthcare benefits (which Ms. Wynn-Williams needed access to as the mother of two young children who was actively undergoing medical treatment and

monitoring for life-threatening post-pregnancy complications), and Ms. Wynn-Williams's over $300,000 in unreimbursed business expenses, and would jeopardize her family's citizenship status.

160. Facebook then offered Ms. Wynn-Williams the Severance Agreement, which would allow her to retain many of these benefits and obtain a significant, stabilizing cash payment.

161. Lacking a reasonable alternative, Ms. Wynn-Williams had no choice but to sign the Severance Agreement.

162. But for Meta's choice to terminate her in this manner, Ms. Wynn-Williams would not have agreed to the terms of the Severance Agreement.

163. This Court should enter an order declaring that the Severance Agreement is unenforceable as procured under duress.

### COUNT IV
### Declaratory Judgment – Prior Material Breach

164. Ms. Wynn-Williams incorporates all paragraphs above as if fully set forth herein.

165. There exists a justiciable controversy between Ms. Wynn-Williams and Meta as to the enforceability of the Severance Agreement and as to whether Ms. Wynn-Williams's obligations under the Severance Agreement have been discharged.

166. The Severance Agreement obligated Meta, then Facebook, to reimburse Ms. Wynn-Williams for the pre-approved business expenses she was required to incur in performing her job for Facebook. *See* Severance Agreement § 8.

167. Ms. Wynn-Williams performed, or was excused from performing, her own obligations under the Severance Agreement.

168. Meta materially breached the Severance Agreement by refusing to reimburse $310,953.19 in pre-approved and audited business expenses owed to Ms. Wynn-Williams.

169. Meta's breach was material. The unreimbursed amount constituted the vast majority of the business expenses Ms. Wynn-Williams was owed and deprived her of a principal benefit for which she bargained in entering into the Severance Agreement.

170. Due to Meta's prior material breach, Ms. Wynn-Williams's obligations under the Severance Agreement—including the non-disparagement provision (Section 9) and the arbitration provision (Section 16(d))—have been discharged, and Meta cannot enforce those provisions against her.

171. This Court should enter an order declaring that, by reason of Meta's prior material breach, the Severance Agreement is unenforceable against Ms. Wynn-Williams and her obligations thereunder are discharged.

## COUNT V
### Declaratory Judgment – Violation of Public Policy (Section 9)

172. Ms. Wynn-Williams incorporates all paragraphs above as if fully set forth herein.

173. There exists a justiciable controversy between Ms. Wynn-Williams and Meta as to the enforceability of Section 9 of the Severance Agreement.

174. At the time Facebook offered Ms. Wynn-Williams the Severance Agreement, Ms. Wynn-Williams did not have the ability to exercise independent judgment with respect to employment decisions towards other employees including, hiring, directing, firing, or any other form of discipline.

175. The language of Section 9 is an unfair labor practice under the National Labor Relations Act (the "NLRA"), 29 U.S.C. §§ 157-58. *See Meta Platforms, Inc.*, 2024 WL 3469667, at *10 (N.L.R.B. July 19, 2024).

176. Accordingly, Section 9 of the Severance Agreement is unenforceable under California law as against public policy insofar as it violates the provisions of the NLRA.

177.    The language of Section 9 is also a violation of the California Silenced No More Act, Cal. Gov. Code § 12964.5(b)(1).  It is therefore "against public policy and ... unenforceable." *Id.*

178.    This Court should enter an order declaring Section 9 of the Severance Agreement unenforceable.

## COUNT VI
### Declaratory Judgment – Violation of Public Policy (Section 4)

179.    Ms. Wynn-Williams incorporates all paragraphs above as if fully set forth herein.

180.    There exists a justiciable controversy between Ms. Wynn-Williams and Meta as to the enforceability of Section 4 of the Severance Agreement.

181.    The final sentence of Section 4 of the Severance Agreement (the "Government Claims Provision") illegally precludes Ms. Wynn-Williams from receiving any "monetary benefit," such as a whistleblower award, from cooperating with federal regulators.  The Government Claims Provision therefore discourages and impedes potential whistleblowers from coming forward and reporting illegal acts by prohibiting recovery.  *See* 17 C.F.R. § 240.21F-17(a) (prohibiting "any action to impede an individual from communicating directly with the [SEC] staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement … with respect to such communications[.]").

182.    Removing "the minimum payout that any individual could look towards in determining whether to take the enormous risk of blowing the whistle in calling attention to fraud," S-Rep. No. 111-76 at 181 (April 30, 2010), violates the Dodd-Frank Wall Street Reform and Consumer Protection Act, H.R. 4713, 111th Cong. § 922 (2010) and 17 C.F.R. § 240.21F-17(a).

183.    Accordingly, the Government Claims Provision is unenforceable under California law because it violates public policy established via federal law.

184.    This Court should enter an order declaring the Government Claims Provision unenforceable.

**COUNT VII**
**Declaratory Judgment – Ending Forced Arbitration Act (9 U.S.C. § 402)**

185.    Ms. Wynn-Williams incorporates all paragraphs above as if fully set forth herein.

186.    There exists a justiciable controversy between Ms. Wynn-Williams and Meta as to the enforceability of Section 16(d) of the Severance Agreement.

187.    The Ending Forced Arbitration Act, 9 U.S.C. § 402 (the "EFAA"), renders any "predispute arbitration agreement" unenforceable in a case relating to a "sexual harassment dispute" at the election of the person alleging such dispute; the Act also commits questions as to its applicability to a court, not an arbitrator, regardless of contractual language to the contrary.

188.    *Careless People* involves Ms. Wynn-Williams's extensive allegations that she experienced sexual harassment while working at Facebook.

189.    Meta's arbitration against Ms. Wynn-Williams and the instant action "relate[] to" a "sexual harassment dispute" within the meaning of the EFAA.

190.    Section 16(d) of the Severance Agreement is a "predispute arbitration agreement" within the meaning of the EFAA.

191.    The EFAA renders Section 16(d) of the Severance Agreement invalid and unenforceable at Ms. Wynn-Williams's election.

192.    Ms. Wynn-Williams exercised her statutory right to elect that Section 16(d) of the Severance Agreement be found invalid and unenforceable.

193.    This Court should enter an order declaring Section 16(d) of the Severance Agreement unenforceable as to any dispute between Ms. Wynn-Williams and Meta relating to *Careless People*, including the ongoing arbitration.

194. This Court should enjoin Meta from prosecuting its ongoing arbitration against Ms. Wynn-Williams.

**COUNT VIII**
**California Unfair Competition Law (Cal. Bus. & Prof. Code § 17203)**

195. Ms. Wynn-Williams incorporates all paragraphs above as if fully set forth herein.

196. Meta has engaged and continues to engage in unlawful and unfair business acts and practices within the meaning of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* (the "UCL").

197. Meta's unlawful conduct includes, and is not limited to: (a) procurement, pursuit, and enforcement of an Interim Award that operates as an impermissible prior restraint in violation of the First Amendment; (b) Meta's enforcement of a Severance Agreement procured under duress; (c) Meta's enforcement of Sections 9 and 16(d) of the Severance Agreement in derogation of its prior public commitments not to enforce arbitration provisions in cases related to sexual harassment or non-disparagement provisions concerning unlawful workplace conduct; and (d) Meta's inclusion and enforcement of a non-disparagement provision that contravenes the public purpose of the NLRA.

198. Additionally, Meta has engaged and continues to engage in unfair business practices in violation of the UCL. Meta's conduct in pursuing the Interim Award without reliable notice to Ms. Wynn-Williams; in seeking and obtaining sweeping prior-restraint relief that no court could lawfully enter on these claims; in disseminating the Interim Award through its corporate website and through the disparaging public posts of its spokesperson Andy Stone and others; in moving for sanctions to expand the reach of the Interim Award to bar Ms. Wynn-Williams from appearances at events such as the Hay Festival that have nothing to do with *Careless People* or Meta; and in surveilling and harassing Ms. Wynn-Williams and her family is immoral, unethical, oppressive, unscrupulous, and substantially injurious to Ms. Wynn-Williams and to the public.

199. Meta's conduct is further unfair because it is contrary to established California public policy permitting employees and former employees to speak freely about workplace conditions, including unlawful conduct. That public policy is reflected in laws such as the California Silenced No More Act, Cal. Gov. Code § 12964.5 and other provisions of California law which, taken together, "establish as a minimum employment standard an employee anti gag rule." *Doe v. Google Inc.*, 54 Cal. App. 5th 948, 961 (Cal. Ct. App. 2020).

200. Meta's conduct is also unfair because the Interim Award restrains Ms. Wynn-Williams's speech and prevents the promotion of *Careless People* even though no tribunal has adjudicated that any speech covered by the Interim Award is in fact disparaging within the meaning of Section 9 of the Severance Agreement.

201. Meta's conduct is also unfair because it attempts to expand the non-disparagement provisions of the Severance Agreement beyond the plain meaning of those terms (which, for the reasons discussed, are unenforceable in any event). Meta's attempts to expand the scope of the non-disparagement provision via the Interim Award effectively read this provision out of the Severance Agreement.

202. Meta's conduct is also unfair because Meta seeks to enforce the Severance Agreement against Ms. Wynn-Williams—including its non-disparagement and arbitration provisions—even though Meta itself materially breached that Agreement by refusing to reimburse Ms. Wynn-Williams for the pre-approved business expenses she was owed under Section 8. It is inequitable for Meta to demand the benefit of Ms. Wynn-Williams's continued performance while withholding the performance Meta owed her under the same Agreement.

203. The harm Meta's conduct inflicts on Ms. Wynn-Williams, on Meta's investors and consumers, on governments and regulators, and on the public interest in receiving truthful information about workplace conditions at one of the world's largest technology companies vastly outweighs any legitimate justification Meta could offer for that conduct.

204. As a direct and proximate result of Meta's unlawful and unfair business practices, Ms. Wynn-Williams has suffered injury-in-fact and lost money or property, including lost income from cancelled book-tour appearances; lost income from paid speaking engagements she has been forced to decline; lost royalties attributable to Macmillan's material curtailment of its publicity efforts in support of *Careless People*; and lost income from consulting, advisory, and other professional engagements she has been unable to pursue—harms that, taken together, have curtailed her ability to practice her profession and earn her livelihood.

205. Pursuant to Section 17203, this Court should enjoin Meta from continuing to engage in the unfair competition alleged above, including by directing Meta to cease enforcement of the Interim Award and Sections 9 and 16(d) of the Severance Agreement against any current or former Meta employee subject to the same or substantially similar language, and against Ms. Wynn-Williams herself, and should enter such further orders as may be necessary to restore to Ms. Wynn-Williams any money or property she has lost by reason of Meta's unfair competition.

## COUNT IX
## Tortious Interference with Contracts

206. Ms. Wynn-Williams incorporates all paragraphs above as if fully set forth herein.

207. The Publishing Agreement is a valid and enforceable contract between Ms. Wynn-Williams and a third party, Macmillan.

208. The Publishing Agreement contemplated that Ms. Wynn-Williams would actively participate in the publicity, marketing, and promotion of *Careless People*, including through a book tour, media appearances, and other promotional activities customary for a major nonfiction release.

209. Meta knew or should have known of the existence of the Publishing Agreement. On March 5, 2025, Macmillan publicly announced the forthcoming publication of *Careless People* on its website. On March 6, 2025, Meta's lawyers sent a letter directly to Macmillan and Flatiron

concerning the imminent publication of the book. And on March 7, 2025, Meta filed an arbitration demand naming Macmillan and Flatiron as respondents alongside Ms. Wynn-Williams. Meta is also familiar with the publishing industry because, for example, Ms. Sandberg published the best-selling books *Lean In* and *Option B* during her and Ms. Wynn-Williams's tenure at Facebook.

210. Meta engaged in intentional acts designed to induce the breach or disruption of the Publishing Agreement. Those acts include: (a) Meta's March 6, 2025, letter to Macmillan and Flatiron concerning the imminent publication of *Careless People*; (b) Meta's March 7, 2025, arbitration demand against Ms. Wynn-Williams, Macmillan, and Flatiron; (c) Meta's contemporaneous application for emergency relief seeking, among other things, to enjoin the publication and promotion of *Careless People* in their entirety; (d) Meta's procurement of the Interim Award on March 12, 2025, which by its terms enjoined Ms. Wynn-Williams from promoting *Careless People* on a book tour or otherwise and from further publishing or distributing the book to the extent within her control; and (e) Meta's public dissemination of the Interim Award, including by posting it on Meta's corporate website and by Meta spokesperson Andy Stone's posts publicizing the Interim Award on Threads and Twitter/X.

211. When Meta sought and obtained the Interim Award and disseminated it to the public, Meta knew, or was substantially certain, that doing so would disrupt Ms. Wynn-Williams's ability to perform her publicity and promotional obligations under the Publishing Agreement. Authors of major nonfiction works are routinely required to participate in the publicity and promotion of their books, and Meta drafted its requested relief to enjoin precisely those activities. Meta intended this injurious result in conscious disregard of Ms. Wynn-Williams's rights.

212. Meta's conduct caused actual disruption of the Publishing Agreement. Following the issuance of the Interim Award, Macmillan materially curtailed its publicity efforts in support of *Careless People.* Ms. Wynn-Williams was forced to cancel or forgo book tour appearances and

other publicity activities that the Publishing Agreement contemplated she would perform, and has had to decline more than 200 invitations to speak about or otherwise promote the book.

213.    Meta's intentional conduct caused Ms. Wynn-Williams to suffer damages, including lost royalties attributable to Macmillan's curtailed publicity efforts in support of *Careless People*, lost income from cancelled book tour appearances and forgone publicity activities, lost income from paid speaking engagements she was forced to decline because she could not promote or discuss the book, and damages associated with the stress of complying with the endlessly evolving Interim Award.  Ms. Wynn-Williams is entitled to compensatory and punitive damages in an amount to be determined at trial, together with such other and further relief as the Court deems just and proper.

### COUNT X
### Tortious Interference with Prospective Economic Advantage

214.    Ms. Wynn-Williams incorporates all paragraphs above as if fully set forth herein.

215.    Before and after Meta procured and disseminated the Interim Award, Ms. Wynn-Williams maintained ongoing economic relationships with paid speaking organizers, conference and festival hosts, media outlets, sponsors, consulting and advisory clients, and other prospective business partners.  These relationships had each generated, and were highly likely to continue to generate, substantial economic benefit for Ms. Wynn-Williams in the form of speaking fees, increased royalties, retainers, and consulting income.

216.    Each of these relationships carried with it the probability of future economic benefit to Ms. Wynn-Williams.

217.    Meta knew of Ms. Wynn-Williams's continuing professional relationships and economic prospects.  Ms. Wynn-Williams is publicly known as a sought-after public-policy expert with extensive experience advising governments, multilateral institutions, and private organizations on issues such as digital warfare, artificial intelligence, and government regulation of the

internet.  Meta has, moreover, surveilled Ms. Wynn-Williams, including at venues in the United Kingdom like the Hay Festival.

218.  Meta engaged in intentional acts designed to disrupt those economic relationships. Those acts include: (a) Meta's March 6, 2025, letter to Macmillan and Flatiron concerning the imminent publication of *Careless People*; (b) Meta's March 7, 2025, arbitration demand and contemporaneous application for emergency relief; (c) Meta's procurement of the Interim Award on March 12, 2025; (d) Meta's public dissemination of the Interim Award, including by posting it on Meta's corporate website and through Andy Stone's posts on Threads and X; (e) Meta's March 27, 2026, motion for sanctions seeking to bar Ms. Wynn-Williams from appearing at events such as the Hay Festival and the Edinburgh International Book Festival even when she does not speak about *Careless People* or Meta; (f) Meta's June 12, 2026, addendum seeking additional sanctions based on Ms. Wynn-Williams's silence on the Hay Festival stage; and (g) Meta's continuing surveillance and harassment of Ms. Wynn-Williams.

219.  When Meta engaged in the foregoing conduct, Meta knew, or was substantially certain, that doing so would disrupt Ms. Wynn-Williams's economic relationships with paid speaking organizers, consulting and advisory clients, and other prospective business partners.  Meta intended this injurious result in conscious disregard of Ms. Wynn-Williams's rights.

220.  Meta's conduct caused actual disruption of those economic relationships.  Since the issuance of the Interim Award, Ms. Wynn-Williams has had to decline hundreds of invitations to speak; before each event she has been able to accept on subjects unrelated to *Careless People* or Meta, she has been required to disclaim in advance any discussion of the book or of Meta; and Meta's expansive view of the Interim Award and its sanctions practice have caused organizers, sponsors, and prospective clients to withdraw or curtail engagements they otherwise would have offered.

221.    Meta's conduct was independently wrongful by measures beyond the fact of the interference itself, including in at least the following respects: (a) the Interim Award is an impermissible prior restraint in violation of the First Amendment; (b) Meta's enforcement of Section 9 of the Severance Agreement against Ms. Wynn-Williams contravenes the public purpose of the NLRA, 29 U.S.C. §§ 157–158; (c) Meta's enforcement of Sections 9 and 16(d) of the Severance Agreement against a case relating to allegations of conduct constituting sexual harassment contravenes the EFAA; (d) Meta's enforcement of Section 9 contravenes the public policy of the Silenced No More Act; and (e) Meta's procurement and enforcement of the Interim Award constitutes unfair competition in violation of the UCL, as alleged in Count VIII above.

222.    Meta's intentional conduct caused Ms. Wynn-Williams to suffer damages, including lost speaking fees from cancelled and declined engagements, lost retainers and consulting income, lost prospective income from sponsor, board, and advisory relationships she has been unable to pursue, and damages associated with the stress of complying with the endlessly evolving Interim Award.  Ms. Wynn-Williams is entitled to compensatory and punitive damages in an amount to be determined at trial, together with such other and further relief as the Court deems just and proper. The mounting cost and burden of defending against Meta's repeated sanctions applications have independently diverted her time and resources and further impaired her ability to earn a living.

WHEREFORE, Ms. Wynn-Williams respectfully requests this Court:

a.    Enter an order vacating the Interim Award and any related orders and declaring it unenforceable and invalid under 9 U.S.C. § 10 and the First Amendment;

b.    Enter an order enjoining Meta's arbitration against Ms. Wynn-Williams;

c.    Enter an order declaring the Severance Agreement unenforceable in its entirety;

d.    In the alternative, enter an order declaring Section 4 of the Severance Agreement unenforceable;

e.    In the alternative, enter an order declaring Section 9 of the Severance Agreement unenforceable;

f.     In the alternative, enter an order declaring Section 16(d) of the Severance Agreement unenforceable;

g.     Award Ms. Wynn-Williams compensatory and punitive damages in an amount to be determined at trial;

h.     Award Ms. Wynn-Williams her reasonable attorneys' fees and costs; and

i.     Award such other relief as the Court may deem just and proper.

Dated:    June 25, 2026               Respectfully submitted,

By: /s/ Felicia M. Gilbert

**KATZ BANKS KUMIN LLP**
Felicia Gilbert (SBN #276348)
235 Montgomery Street, Suite 665
San Francisco, CA 94104
Tel: 415-813-3260
gilbert@katzbanks.com

Debra S. Katz*
Avi Kumin (SBN #218893)
11 Dupont Circle NW, Suite 600
Washington, DC 20036
Tel: 202-299-1140
katz@katzbanks.com

**SELENDY GAY PLLC**
Philippe Z. Selendy*
Jennifer M. Selendy*
Claire E. O'Brien*
Corey Stoughton*
Drake Reed*
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
jselendy@selendygay.com
cobrien@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com

* Application for admission *pro hac vice* forthcoming

*Counsel for Plaintiff Sarah Wynn-Williams*