**SELENDY GAY PLLC**
Philippe Z. Selendy*
Jennifer M. Selendy*
Claire E. O'Brien*
Corey Stoughton*
Drake Reed*
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
jselendy@selendygay.com
cobrien@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com

**KATZ BANKS KUMIN LLP**
Felicia Gilbert (SBN #276348)
235 Montgomery Street, Suite 665
San Francisco, CA 94104
Tel: 415-813-3260
gilbert@katzbanks.com

Debra S. Katz*
Avi Kumin (SBN #218893)**
11 Dupont Circle NW, Suite 600
Washington, DC 20036
Tel: 202-299-1140
katz@katzbanks.com
kumin@katzbanks.com

* Application for admission *pro hac vice* forthcoming
** Application for admission to the Northern District
of California Forthcoming

*Counsel for Plaintiff Sarah Wynn-Williams*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH WYNN-WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No.: _____<br><br>**MOTION TO VACATE INTERIM ARBITRATION AWARD AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: _____<br>Time: _____<br>Judge: _____<br>Courtroom: _____ |

## NOTICE OF MOTIONS AND MOTIONS

PLEASE TAKE NOTICE that on _____, 2026, or as soon as the matter may be heard, in the courtroom of the Honorable _____ at the United States District Court for the Northern District of California, _____, Plaintiff Sarah Wynn-Williams, will, and hereby does, move the Court: (1) to vacate, pursuant to 9 U.S.C. § 10 and the First Amendment, the Interim Arbitration Award dated March 12, 2025 (the "Interim Award") issued in an arbitration before AAA-ICDR in March 2025 under the caption *Meta Platforms, Inc. v. Sarah Wynn-Williams*, No. 01-25-0001-2843 (filed Mar. 7, 2025) (Quintanilla, Arb.); and (2) for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65

and Civil Local Rules 7-2 and 65-2, enjoining Defendant Meta Platforms, Inc. ("Meta") from continuing its arbitration with Ms. Wynn-Williams (together, the "Motions").

The motion to vacate is made on the ground that the Interim Award exceeded the arbitrator's authority and violates the First Amendment. The motion for a preliminary injunction is made on the grounds that (a) Ms. Wynn-Williams is likely to succeed on the merits of her claims or her claims raise serious questions going to the merits, (b) Ms. Wynn-Williams will continue to suffer irreparable injury if Meta is not so enjoined, (c) the balance of hardships weighs strongly in Ms. Wynn-William's favor, and (d) the public interest supports the issuance of a preliminary injunction.

Ms. Wynn-Williams submits the attached Memorandum of Points and Authorities in support of both Motions, and requests that the Court consolidate the briefing schedule and hearing on the Motions for a hearing on the earliest possible date.

These Motions are based on this Notice of Motions, the attached Memorandum of Points and Authorities; Plaintiff's Complaint, Dkt. No. __; the declarations of Plaintiff Sarah Wynn-Williams, Dkt. No. __, and Claire E. O'Brien, Dkt. No. __; and all matters of which the Court may take judicial notice; all other pleadings on file in this action; and any other written or oral argument or evidence that Ms. Wynn-Williams may present to the Court.

Dated:   June 25, 2026

Respectfully Submitted,

By: /s/ Felicia M. Gilbert

**KATZ BANKS KUMIN LLP**
Felicia Gilbert (SBN #276348)
235 Montgomery Street, Suite 665
San Francisco, CA 94104
Tel: 415-813-3260
gilbert@katzbanks.com

Debra S. Katz*
Avi Kumin (SBN #218893)**
11 Dupont Circle NW, Suite 600
Washington, DC 20036
Tel: 202-299-1140
katz@katzbanks.com
kumin@katzbanks.com

**SELENDY GAY PLLC**
Philippe Z. Selendy*
Jennifer M. Selendy*
Claire E. O'Brien*
Corey Stoughton*
Drake Reed*
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
jselendy@selendygay.com
cobrien@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com

* Application for admission *pro hac vice* forthcoming
** Application for admission to the Northern District of California Forthcoming

*Counsel for Plaintiff Sarah Wynn-Williams*

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS .......................................................................................................3

    A.    Ms. Wynn-Williams's Tenure at Facebook, the Harassment She Experienced, and the 2017 Severance Agreement....................................................3

    B.    Meta's Public Commitments Not to Compel Arbitration of Sexual Harassment Claims, Not to Enforce Non-Disparagement Agreements, and to Support Free Expression........................................................................................5

    C.    Ms. Wynn-Williams's Whistleblower Disclosures and Publication of *Careless People* ........................................................................................................6

    D.    Meta's Pre-Publication Legal Campaign and the *Ex Parte* Interim Award.............7

    E.    *Careless People* Becomes a #1 *New York Times* Bestseller and the Subject of Public Discussion and Congressional Investigation............................................10

    F.    Meta's Exploitation of the Interim Award to Expand Its Power to Constrain and Punish Ms. Wynn-Williams ......................................................................................11

ARGUMENT ...........................................................................................................................15

I.    The Court Should Vacate the Interim Award Because It Is an Unconstitutional Prior Restraint and Overbroad Relief That Exceeds the Arbitrator's Authority ........................16

    A.    The Court May Vacate an Arbitral Order That Grants Relief Unavailable in Court, Including Relief That Violates the First Amendment.................................16

    B.    The Interim Award Violates the First Amendment ................................................18

        1.    The Interim Award Is a Prior Restraint on Unadjudicated Speech and Is Presumptively Invalid .........................................................................18

        2.    The Interim Award Is Unconstitutionally Vague and Overbroad..............20

II.    The Court Should Preliminarily Enjoin the Arbitration Because the EFAA Bars It as a Matter of Law and Meta Is Estopped from Compelling It ........................................23

    A.    The EFAA Bars the Arbitration as a Matter of Law, and the Court—Not the Arbitrator—Must Decide That Issue ................................................................25

        1.    Section 402(b) Commits the Arbitrability Question to This Court, Not the Arbitrator....................................................................................25

        2.    The Severance Agreement Is a "Predispute Arbitration Agreement" .......26

        3.    The Speech Dispute "Relates to" a "Sexual Harassment Dispute" Within the EFAA's Statutory Definition .................................................27

    B.    Meta's 2018 Public Commitment to End Forced Arbitration of Sexual Harassment Claims Estops It from Compelling Arbitration Here ........................29

C.    Compelling Ms. Wynn-Williams to Arbitrate a Dispute Meta Has No Right to Arbitrate, While the Interim Award Continues to Suppress Her Speech and Career, Is Irreparable Harm..................................................................32

D.    The Balance of Equities Tips Sharply in Ms. Wynn-Williams's Favor ................33

E.    The Public Interest Is Served by an Injunction.......................................................34

CONCLUSION.............................................................................................................37

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aceves v. U.S. Bank, N.A.*,
192 Cal. App. 4th 218 (Cal. Ct. App. 2011) ...............................................................30, 31, 32

*Aloha Islandair Inc. v. Tseu*,
128 F.3d 1301 (9th Cir. 1997) ...................................................................................27

*Balboa Island Vill. Inn, Inc. v. Lemen*,
40 Cal. 4th 1141 (Cal. 2007)......................................................................................19

*Baldwin v. TMPL Lexington LLC*,
2024 WL 3862150 (S.D.N.Y. Aug. 19, 2024).............................................................27

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)......................................................................................................18

*Bosack v. Soward*,
586 F.3d 1096 (9th Cir. 2009) ...................................................................................16

*Bruce v. Adams & Reese, LLP*,
168 F.4th 367 (6th Cir. 2026) ....................................................................................26

*Clifford v. Trump*,
2018 WL 5273913 (C.D. Cal. July 31, 2018)..............................................................23

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024)...............................................................................................24, 33

*Comedy Club, Inc. v. Improv West Associates*,
553 F.3d 1277 (9th Cir. 2009) ...................................................................................17

*D.H. Overmyer Co. v. Frick Co.*,
405 U.S. 174 (1972).....................................................................................................20

*Delo v. Paul Taylor Dance Found., Inc.*,
685 F. Supp. 3d 173 (S.D.N.Y. 2023).........................................................................27

*Diaz-Roa v. Hermes L., P.C.*,
757 F. Supp. 3d 498 (S.D.N.Y. 2024).....................................................................26, 28

*Ding v. Structure Therapeutics, Inc.*,
755 F. Supp. 3d 1200 (N.D. Cal. 2024) .....................................................................26

*DVD Copy Control Ass'n, Inc. v. Bunner*,
31 Cal. 4th 864 (Cal. 2003) (Moreno, J., concurring) ...............................................18

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................................................32

*Empros Cap. LLC v. Rosenbach*,
    2020 WL 6684854 (N.D. Cal. Nov. 12, 2020) .......................................................32

*Evans v. Evans*,
    162 Cal. App. 4th 1157 (Cal. Ct. App. 2008) .........................................................19

*Garcia v. World Sav., FSB*,
    183 Cal. App. 4th 1031 (Cal. Ct. App. 2010) .........................................................30

*Gathers v. K&K Fam. Ventures*,
    2025 WL 892773 (D.S.C. Mar. 24, 2025) ...............................................................27

*Gathers v. K&K Fam. Ventures, LLC*,
    2025 WL 1032252 (D.S.C. Feb. 19, 2025) .............................................................27

*Goffman v. Bank of Am., N.A*,
    2012 WL 6011906 (Cal. Ct. App. Nov. 29, 2012)...................................................31

*Goldman, Sachs & Co. v. City of Reno*,
    747 F.3d 733 (9th Cir. 2014) ..................................................................................24

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) .................................................................................24

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*,
    12 F. Supp. 2d 1035 (C.D. Cal. 1998) ...............................................................18, 19

*J.H. v. Lawrenceville Sch.*,
    2026 WL 217593 (N.J. Super. Ct. App. Div. Jan. 28, 2026)...................................27

*J.K. Harris & Co., LLC v. Kassel*,
    253 F. Supp. 2d 1120 (N.D. Cal. 2003) .................................................................19

*Kader v. S. Cal. Med. Ctr., Inc.*,
    99 Cal. App. 5th 214 (Cal. Ct. App. 2024) ............................................................26

*Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert*,
    194 Cal. App. 4th 519 (Cal. Ct. App. 2011) .......................................................18, 19

*Kennedy v. Meta Platforms, Inc.*,
    No. CGC-23-604370 (Cal. Super. Ct. Apr. 28, 2023) ..............................................4

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ................................................................................34

*League of Wilderness Defs. v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ..................................................................................34

*Lee v. Marriott Int'l, Inc.*,
    2025 WL 2689263 (N.D. Cal. Sep. 21, 2025) ...........................................................................28

*Leonard v. Clark*,
    12 F.3d 885 (9th Cir. 1993) ......................................................................................................20

*Levine v. U.S. Dist. Ct. for Cent. Dist. of Cal.*,
    764 F.2d 590 (9th Cir. 1985) ..............................................................................................20, 23

*Lewis v. Tesla, Inc.*,
    2025 WL 2653639 (N.D. Cal. Sep. 16, 2025) .........................................................................26

*Meta Platforms, Inc.*,
    No. 19-CA-312724, 2024 WL 3469667 (N.L.R.B. July 19, 2024) ...........................................4

*Morgan Stanley & Co., LLC v. Couch*,
    134 F. Supp. 3d 1215 (E.D. Cal. 2015).........................................................................24, 33, 36

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)..................................................................................................................18

*NAACP v. Button*,
    371 U.S. 415 (1963)..................................................................................................................21

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)..................................................................................................................19

*New.Net, Inc. v. Lavasoft*,
    356 F. Supp. 2d 1071 (C.D. Cal. 2003) ..............................................................................18, 19

*Overstreet v. United Bhd. of Carpenters & Joiners of Am., Loc. Union No. 1506*,
    409 F.3d 1199 (9th Cir. 2005) ..................................................................................................21

*Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*,
    935 F.2d 1019 (9th Cir. 1991) ............................................................................................16, 17

*Polen v. API Grp. Life Safety USA, LLC*,
    2025 WL 3251349 (D. Or. Nov. 21, 2025).........................................................................27, 28

*Pyro Spectaculars N., Inc. v. Souza*,
    861 F. Supp. 2d 1079 (E.D. Cal. 2012)....................................................................................33

*Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ....................................................................................................33

*Sateriale v. R.J. Reynolds Tobacco Co.*,
    697 F.3d 777 (9th Cir. 2012) ..............................................................................................29, 30

*Schmidt v. Lessard*,
    414 U.S. 473 (1974)..................................................................................................................20

*Shelley v. Kraemer*,
   334 U.S. 1 (1948)..................................................................................................18

*Snyder v. Phelps*,
   562 U.S. 443 (2011)..............................................................................................35

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
   559 U.S. 662 (2010)..........................................................................................16, 17

*Swenson v. Bushman Inv. Props., Ltd.*,
   870 F. Supp. 2d 1049 (D. Idaho 2012) ...............................................................16

*Sykes v. Escueta*,
   2010 WL 4942608 (N.D. Cal. Nov. 29, 2010) .....................................................36

*Turner v. Tesla, Inc.*,
   686 F. Supp. 3d 917 (N.D. Cal. 2023) .................................................................26

*Univ. of Haw. Pro. Assembly v. Cayetano*,
   183 F.3d 1096 (9th Cir. 1999) .............................................................................33

*Walls v. Cent. Contra Costa Transit Auth.*,
   653 F.3d 963 (9th Cir. 2011) ...............................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).............................................................................24, 29, 32, 33

**Statutes & Rules**

U.S. Const. amend. I ........................................................................................ *passim*

9 U.S.C. § 10.................................................................................................... *passim*

9 U.S.C. § 12..........................................................................................................16

9 U.S.C. § 401.............................................................................................2, 26, 27, 36

9 U.S.C. § 402.................................................................................................. *passim*

Am. Arb. Ass'n Rule 32 ..........................................................................................17

Am. Arb. Ass'n Rule 39 .....................................................................................16, 17

Fed. R. Civ. P. 65..............................................................................................17, 23

N.D. Cal. Civil L.R. 7-2..........................................................................................23

N.D. Cal. Civil L.R. 65...........................................................................................23

**Other Authorities**

*A Time for Truth: Oversight of Meta's Foreign Relations and Representations to the United States Congress*, *Hearing Before the Subcomm. on Crime and Counterterrorism of the S. Judiciary Comm.*, 119th Cong. (2025), https://www.judiciary.senate.gov/committee-activity/hearings/a-time-for-truth-oversight-of-metas-foreign-relations-and-representations-to-the-united-states-congress ............................................................................................................10

Ashley Gold, *Tech CEOs Summoned to Capitol for June Hearing*, Axios (May 15, 2026), https://www.axios.com/2026/05/15/tech-ceos-grassley-june-hearing....................11

Dave Simpson, *Facebook, Google Won't Make Harassed Workers Arbitrate*, Law360 (Nov. 9, 2018) https://www.law360.com/articles/1101035/facebook-google-won-t-make-harassed-workers-arbitrate ..............................................................5

Douglas MacMillan, *Facebook to End Forced Arbitration for Sexual-Harassment Claims*, Wall Street J. (Nov. 9, 2018), https://www.wsj.com/articles/facebook-to-end-forced-arbitration-for-sexual-harassment-claims-1541799129 .....................................5

Emma Loffhagen, *Meta Legal Action Forces Facebook Whistleblower to Sit in Silence at Hay Festival*, https://www.theguardian.com/technology/2026/may/31/meta-legal-action-forces-facebook-whistleblower-to-stay-silent-at-hay-festival ....................................................14

Meta Platforms, Inc., *Meta Reports Fourth Quarter and Full Year 2025 Results* (Jan. 28, 2026), https://investor.atmeta.com/investor-news/press-release-details/2026/Meta-Reports-Fourth-Quarter-and-Full-Year-2025-Results/default.aspx ............................................................................................34

Paul Pigott, *Facebook Whistle-Blower Sits in Silence in Panel Discussion About Her Tell-All Book*, BBC News (June 1, 2026), https://www.bbc.com/news/articles/cy42xgeq9vpo ................................................14

Yahoo Finance, *Equities by Market Cap* (last visited June 22, 2026), https://finance.yahoo.com/research-hub/screener/largest_market_cap/?start=0&count=100 ........................................34

**ISSUES TO BE DECIDED**

The American Arbitration Association ("AAA") Rules confine an arbitrator's remedial authority to the relief a court could have awarded, and 9 U.S.C. § 10 requires vacatur of any arbitration award that exceeds that limit. Here an emergency arbitrator issued an *ex parte* arbitral injunction, the Interim Award—a sweeping and vague prior restraint on protected speech prohibiting Ms. Wynn-Williams from engaging in anything that could be viewed as "promoting" her #1 *New York Times* bestselling memoir *Careless People*, and which has operated to impair her ability to speak on a broad range of topics and to associate with individuals with specific viewpoints—in violation of the First Amendment.

**Issue 1:** Should the Court vacate the Interim Award under 9 U.S.C. § 10 because no court could have entered the prior restraint it imposes as injunctive relief and because the First Amendment prohibits courts from confirming injunctions against protected speech?

\*        \*        \*

Section 402(a) of the Ending Forced Arbitration Act (the "EFAA") renders any predispute arbitration agreement unenforceable at the plaintiff's election in a case relating to a sexual harassment dispute, and Section 402(b) of the EFAA commits that question exclusively to a court. Ms. Wynn-Williams is a former Facebook employee and whistleblower whose disclosures in *Careless People* and before Congress concern the sexual harassment she experienced at Meta; her 2017 Severance Agreement with Meta predates the dispute relating to those disclosures by eight years; and in 2018 Meta publicly disavowed enforcement of forced arbitration provisions related to sexual harassment disputes.

**Issue 2:** Should the Court enjoin the arbitration because the EFAA bars it as a matter of law and because Meta's own public disavowal independently estops it?

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Defendant Meta Platforms, Inc. ("Meta") is using a private arbitration to silence whistle-blower and former Meta employee, Plaintiff Sarah Wynn-Williams, whose #1 *New York Times* bestselling memoir, *Careless People*, lays bare the sexual harassment and corporate misconduct she reported to the Securities and Exchange Commission, the Department of Justice, and the United States Congress. When Meta learned of *Careless People*, Meta sought an emergency arbitral injunction to stop it from being published. Unable to drag the book's publisher into arbitration or prevent its publication, Meta pivoted to silencing its author, obtaining a sweeping *ex parte* injunction (the "Interim Award") prohibiting Ms. Wynn-Williams and her attorneys from "promoting" the memoir and from speaking about the misconduct she exposed. The emergency arbitrator (the "Emergency Arbitrator") issued that injunction without any effort to adjudicate whether it was a justified constraint on unprotected speech—*i.e.*, whether Ms. Wynn-Williams had validly waived her right to publish *Careless People* and whether, even if she did, the Interim Award met the demanding standard for injunctions against speech. Meta moved at once to publicize the Interim Award across social media while amplifying its attacks on Ms. Wynn-Williams's character, knowing that the order it had just secured barred Ms. Wynn-Williams from answering or having her attorneys correct the public record.

Meanwhile, Meta has exploited the breadth and vagueness of the Interim Award by filing a sanctions motion seeking severe financial penalties against Ms. Wynn-Williams every time she speaks or makes any public appearance. Its most recent threat, on June 12, 2026, targets Ms. Wynn-Williams's appearance at the Hay Festival—a high-profile cultural event in the United Kingdom—notwithstanding that she did not speak at the event and took steps to ensure *Careless People* was unavailable for purchase there. In so doing, Meta makes clear that it seeks to erase Ms. Wynn-Williams's presence in the public sphere completely, in order to punish her and intimidate other potential whistleblowers. The ongoing arbitration enables this retaliation by allowing the Interim Award to stand and Meta's sanctions threats to accumulate, while declining Ms. Wynn-Williams's repeated requests to dissolve the Award, deny the sanctions motion, or allow her to

move to dismiss the arbitration. The resulting chill on Ms. Wynn-Williams's ability to express herself and associate with others applies to multiple upcoming engagements she has been invited to as a leading public policy expert, including events at the University of Michigan regarding technology and artificial intelligence and the August 2026 Edinburgh International Book Festival.

Meta contends that it is entitled to the Interim Award because the severance agreement it presented to Ms. Wynn-Williams upon her termination from Facebook in 2017 (the "Severance Agreement") contains non-disparagement and arbitration clauses. Ms. Wynn-Williams challenges the validity and enforceability of Meta's Severance Agreement in this action. Regardless, the Interim Award contains far more expansive restrictions on Ms. Wynn-Williams's speech than the Severance Agreement and strips away clarifying limitations designed to protect her constitutional rights and independent professional activities from precisely the sort of constraints that Meta seeks to impose through its sanction threats.

The Interim Award and Meta's exploitation of the arbitration process impair Ms. Wynn-Williams's participation in public discourse on important topics, including ones within her professional expertise that have been drawing urgent attention from governments, regulators, and officials around the world, such as the global impact and regulation of artificial intelligence; youth and social media; and technology and democracy. Meta is even attempting to stop her from sitting in silence or associating with people it deems to be critics of Meta, all of which is core protected activity under the First Amendment. Ms. Wynn-Williams never agreed to such unbounded restrictions on her speech and her professional pursuits.

The Interim Award is thus an unconstitutional prior restraint on Ms. Wynn-Williams's First Amendment rights and must be vacated under 9 U.S.C. § 10. The underlying provisions of Meta's Severance Agreement are ones Congress specifically forbade in the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. 117-90, 136 Stat. 26 (2022) (codified at 9 U.S.C. § 401 *et seq.*) (the "EFAA"), and which Meta has since disavowed ever seeking to enforce against its employees. Congress enacted the EFAA in 2022 to keep victims of sexual harassment out of private arbitrations their employers' contracts forced them into and to ensure that questions about such arbitrability are resolved by the courts. The law renders the arbitration

clause of Meta's Severance Agreement unenforceable at Ms. Wynn-Williams's election and commits the merits of that question exclusively to this Court, not an arbitrator. Independently, Meta is estopped from compelling arbitration here. In 2018, Meta publicly committed to abandon enforcement of compelled arbitration of sexual harassment claims, telling the *New York Times* and the *Wall Street Journal* that doing so was "a pivotal moment" and "the right thing to do." Meta cannot be allowed to break its word now to bury the very information that Congress, and Meta itself, promised to protect.

Ms. Wynn-Williams accordingly moves this Court both to vacate the Interim Award and to preliminarily enjoin the ongoing arbitration pending resolution of her claims before this Court. The equities and the public interest only sharpen the case for this emergency relief. *Careless People* is already a #1 *New York Times* bestseller; Meta has nothing left to gain by suppressing it. Yet every day the Interim Award stands, Ms. Wynn-Williams is forced to forgo or constrain her ability to share her significant public policy expertise with the world, including on matters of obvious and urgent public concern. The Interim Award also hampers the public's ability to hear directly from a former Meta employee about the conduct she witnessed and reported during her time there, workplace issues that the public, policy experts, and regulators are subjecting to increasing scrutiny. For instance, the United States Senate has opened multiple investigations into Meta in response to the issues Ms. Wynn-Williams raised in *Careless People*, a process which has included Ms. Wynn-Williams's testimony at a public hearing, multiple letters of inquiry to Meta, and a further hearing to come.

For these reasons, the Court should vacate the Interim Award and preliminarily enjoin the arbitration pending the Court's resolution of the substantive challenges Ms. Wynn-Williams has brought to the arbitration and Meta's broader course of conduct.

## STATEMENT OF FACTS

### A.    Ms. Wynn-Williams's Tenure at Facebook, the Harassment She Experienced, and the 2017 Severance Agreement

Sarah Wynn-Williams joined Meta, then known as Facebook, in 2011 already an accomplished diplomat and public policy expert, and she served in Facebook's public policy team from

2011 to 2017, eventually serving as Director of Global Public Policy.  Wynn-Williams Decl. ¶¶ 3-5.  During her tenure, she was sexually harassed by two senior executives, including her direct supervisor Joel Kaplan, then Facebook's Vice President of Global Policy.  *Id.* ¶ 6.  Ms. Wynn-Williams strained to avoid reporting the harassment internally to protect her career from retaliation.  *Id.* ¶ 7.  But when she learned Facebook was investigating Mr. Kaplan's conduct anyway, she started compiling documents to submit to human resources.  *Id.* ¶¶ 8-10.  Before Ms. Wynn-Williams had a chance to submit those documents or take any other affirmative action, however, Facebook terminated her.  *Id.* ¶ 11.

After terminating Ms. Wynn-Williams, Facebook presented her with a Severance Agreement she had no reasonable alternative but to sign. *Id.* ¶ 12; *id*. Ex. A (the "Severance Agreement" or "Agreement").  Meta's Severance Agreement contains a non-disparagement clause, *id.* § 9, as well as an arbitration clause, *id*. § 16(d), both of which are at issue in this litigation.  Courts and the National Labor Relations Board have invalidated similar clauses in other of Meta's employment agreements.  *See Meta Platforms, Inc.*, No. 19-CA-312724, 2024 WL 3469667 (N.L.R.B. July 19, 2024) (describing and invalidating less restrictive non-disparagement portion of Meta separation agreement under the National Labor Relations Act); *Kennedy v. Meta Platforms, Inc.*, No. CGC-23-604370 (Cal. Super. Ct. Apr. 28, 2023) (describing and invalidating similar arbitration provision of Meta employment agreement under the EFAA) [https://perma.cc/8UW8-LARH].  Though Meta has used its Severance Agreement as a basis to obtain an arbitral injunction silencing Ms. Wynn-Williams and impairing her career as a public policy expert, the Agreement on its face protects her participation in professional activities, prohibiting "disparaging, critical or otherwise detrimental comments" about Meta and its officers and expressly carving out "good faith expressions of opinion or competitive comparisons involving [Meta] that are not disparaging and are offered in the scope of [Ms. Wynn-Williams's] future employment or business ventures."  Agmt. § 9.

**B.** **Meta's Public Commitments Not to Compel Arbitration of Sexual Harassment Claims, Not to Enforce Non-Disparagement Agreements, and to Support Free Expression**

In the years following Ms. Wynn-Williams's termination, Meta repeatedly told the world that it would not enforce arbitration clauses for sexual harassment claims and would not enforce non-disparagement clauses in any circumstances; Meta's Severance Agreement with Ms. Wynn-Williams contains precisely these two clauses. On November 9, 2018, Meta's Vice President of People, Lori Goler, announced in the *New York Times* and other outlets that Meta would end its practice of using its contractual power to force arbitration of sexual harassment claims, calling the change "a pivotal moment ... and the right thing to do." Wynn-Williams Decl. Ex. B (*New York Times* article).[1] Meta's strategy to publicize its policy change worked; Ms. Wynn-Williams learned of it through the *New York Times*'s reporting in November 2018. Wynn-Williams Decl. ¶ 15.

Four years later, in its 2022 Proxy Statement—issued in response to a shareholder proposal on "concealment clauses" that Ms. Wynn-Williams herself helped organize while in leadership at the Minderoo Foundation—Meta represented that it does not require employees to remain silent about harassment or discrimination, does not enforce non-disparagement clauses preventing discussion of unlawful workplace conduct, and intends to comply with the National Labor Relations Act and the California Silenced No More Act. Wynn-Williams Decl. ¶¶ 22-23 Ex. D (Meta 2022 Proxy Statement) at 71. The representation did not carve out former employees, prior agreements, or any other exception, and it spoke directly to the type of non-disparagement provision Meta had required Ms. Wynn-Williams to sign. The Proxy Statement was issued by the Board of Directors and sent to all shareholders. *See id*. Ex. D. Because of the Proxy Statement, Ms. Wynn-Williams understood that she was free to speak out about the sexual harassment she experienced at Meta

---

[1] *See also, e.g.*, Douglas MacMillan, *Facebook to End Forced Arbitration for Sexual-Harassment Claims*, Wall Street J. (Nov. 9, 2018), https://www.wsj.com/articles/facebook-to-end-forced-arbitration-for-sexual-harassment-claims-1541799129 [https://perma.cc/5JP5-EK9U]; Dave Simpson, *Facebook, Google Won't Make Harassed Workers Arbitrate*, Law360 (Nov. 9, 2018) https://www.law360.com/articles/1101035/facebook-google-won-t-make-harassed-workers-arbitrate [https://perma.cc/7RAC-9H38].

without being subjected to the non-disparagement clause or the arbitration clause of the Severance Agreement Meta required her to sign.  *Id.* ¶¶ 18, 25.

Following Ms. Wynn-Williams's departure from Meta, the company also made numerous public commitments to free speech and free expression that Ms. Wynn-Williams followed with interest as a former employee and as an expert in technology policy.  On October 17, 2019, Ms. Wynn-Williams watched live as Facebook streamed Mr. Zuckerberg's "Standing for Voice and Free Expression" speech from Georgetown University.  Wynn-Williams Decl. ¶ 19.  In the speech, Mr. Zuckerberg discussed how his and Meta's values were "inspired" by the First Amendment and its ideals of free expression, how "most progress in our lives comes from regular people having more of a voice," and stated "I don't think it's right for a private company to censor politicians or the news in a democracy."  *Id*. Ex. C (Oct. 17, 2019 Press Release).  On January 7, 2025, Meta issued a press release in which Meta reaffirmed its "commitment to free expression," stating that "inhibiting speech, however well-intentioned the reasons for doing so, often reinforces existing institutions and power structures instead of empowering people," and that free expression "can be messy … But that's free expression."  *Id*. Ex. E (Jan. 7, 2025 Press Release).  Ms. Wynn-Williams read this press release when Meta issued it, and based on it and Mr. Zuckerberg's speech at Georgetown University, as well as other statements, gained additional confidence that Meta had truly committed to allowing her to speak the truth about what she saw and experienced at the company.  *See id*. ¶¶ 21, 26, 28.

**C.    Ms. Wynn-Williams's Whistleblower Disclosures and Publication of *Careless People***

Ms. Wynn-Williams took Meta at its word.  Beginning in 2024, after years of good-faith compliance with the terms of the Severance Agreement (despite its invalidities as set forth in the Complaint), she began to disclose what she had observed at Meta to federal regulators and to Congress.  Wynn-Williams Decl. ¶¶ 29-30.  She filed a whistleblower complaint with the SEC in April 2024 and a whistleblower complaint with the Department of Justice in March 2025.  *Id.* ¶¶ 30-33, Ex. F (SEC whistleblower filing), Ex. G (DOJ whistleblower filing).  She made these disclosures despite the fact that Section 4 of the Severance Agreement illegally prohibits her from

"recover[ing] any monetary benefit as a result of any claim brought on [her] behalf by any government agency." Agmt. § 4. Ms. Wynn-Williams has not received any monetary benefit from the SEC or DOJ in connection with her whistleblower filings. Wynn-Williams Decl. ¶ 35. Following her disclosures to the SEC and DOJ, in March 2025, she published *Careless People*, a memoir laying bare the conduct she had witnessed at Meta and experienced at the hands of its executives. *Id.* ¶ 34. *Careless People* and the whistleblower filings recount the sexual harassment Ms. Wynn-Williams endured at the hands of Joel Kaplan and Sheryl Sandberg during her time at Facebook—the very conduct Meta had publicly disclaimed any intention of silencing or forcing into arbitration. *See id.* ¶¶ 6, 36, Ex. H (*Careless People* excerpts), Ex. F (SEC whistleblower filing), Ex. G (DOJ whistleblower filing).

### D.    Meta's Pre-Publication Legal Campaign and the *Ex Parte* Interim Award

Before the book could even be published, Meta put its hypocrisy on full display with an aggressive legal campaign to silence and punish Ms. Wynn-Williams. On March 6, 2025, Meta sent a letter to Ms. Wynn-Williams's publishers, Macmillan, Inc. ("Macmillan") and its affiliated imprint Flatiron Books ("Flatiron"), threatening defamation liability and demanding pre-publication review on the theory that the publishers "intend[ed] to imminently publish a book that may contain false statements" about Meta. O'Brien Decl. Ex. A (Mar. 6, 2025 Ltr. to Flatiron/Macmillan) at 1. That letter did not mention Ms. Wynn-Williams at all, nor did it mention Meta's Severance Agreement, the non-disparagement clause, or the arbitration provision. *See id.*

One day later, on March 7, 2025, Meta abandoned the defamation framing and filed an emergency arbitration demand premised entirely on the non-disparagement clause in Meta's Severance Agreement, walking back its promises concerning non-enforcement of both forced arbitration for sexual harassment claims and non-disparagement clauses. *Id*. Ex. B (Mar. 7, 2025 Application for Emergency Relief). Although Meta's Severance Agreement could not bind the publishers—who were not parties to it—Meta sought sweeping injunctive relief against them anyway, including an order enjoining publication of *Careless People* in its entirety. *See id*. Meta's application also sought more expansive restrictions on Ms. Wynn-Williams's speech than the Severance

Agreement contains, without the full scope of that Agreement's clarifying limitations designed to protect her professional activities. *See id*. at 10-11.

Meta then took deliberate steps to ensure Ms. Wynn-Williams would not appear at the emergency hearing. Meta directed its purported "notice" of the application to a single stale email address from her contact card as a Facebook employee in 2017—one that, on information and belief, Meta knew she had not used in many years—despite being aware of several other operable ways of communicating with her. Wynn-Williams Decl. ¶ 44. Meta knew Ms. Wynn-Williams's active personal email; Meta's own employment counsel had used that address for discussions around Meta's Severance Agreement, and the address remained connected to her active Meta product accounts. *Id*. Meta also knew the contact email publicly listed on her website. *Id*. Meta used none of these channels. However, Meta later used the active email address and a process server at her London home to deliver the Interim Award, demonstrating that Meta was perfectly capable of providing effective notice all along, yet chose not to. *Id*. ¶¶ 47-48. Ms. Wynn-Williams did not attend the March 11, 2025, emergency hearing on Meta's application. *Id*. ¶ 45.

On March 12, 2025, the Emergency Arbitrator, without the benefit of any opposition from Ms. Wynn-Williams, issued the Interim Award, giving Meta all the constraints on Ms. Wynn-Williams's speech it had asked for. The Interim Award purports to enjoin Ms. Wynn-Williams— and "her agents, servants, employees, attorneys, and any other person(s) or entities [] which she controls"—(1) from making any "disparaging, critical or otherwise detrimental comments" about Meta, without limitation; (2) from "further promoting *Careless People* [] on a book tour or otherwise," without defining what constitutes "promoting"; (3) from further publishing or distributing the book to the extent within her control; and (4) from "amplifying or repeating" any prior such comments to the extent within her control, while also requiring her to retract any prior such comments. O'Brien Decl. Ex. C ("Interim Award") at 3-4.

Meta moved immediately to enforce the Interim Award against Ms. Wynn-Williams and ensure its maximum public exposure in an effort to undermine her credibility, intimidate her from speaking out, and punish her for whistleblowing. Andy Stone, Meta's Director of Communications, posted a link to the Interim Award on X to ensure its widest possible public dissemination.

*See* Wynn-Williams Decl. Ex. K (Mar. 12, 2025 Andy Stone X post).  Having already posted that Ms. Wynn-Williams "was fired for poor performance and toxic behavior" and made "false accusations" in *Careless People*, Mr. Stone reposted statements purportedly from current and former Meta employees intended to discredit Ms. Wynn-Williams's allegations about Mr. Kaplan's behavior and her experience at Meta.[2]  *Id.* ¶ 49, Ex. J (Mar. 10-12, 2025 Andy Stone X thread). Meta's outside counsel also transmitted the Interim Award to Ms. Wynn-Williams under cover of a letter accusing her of having "breached [her] contractual duties."  O'Brien Decl. Ex. D (Mar. 12, 2025 Ltr. to Ms. Wynn-Williams).  And on May 13, 2025, Meta's Vice President and Deputy General Counsel Heidi Swartz wrote a letter to Senator Chuck Grassley reiterating Meta's disparaging statements against Ms. Wynn-Williams.  *Id.* Ex. N (May 13, 2025 Ltr. to Sen. Grassley). Meta made these false and disparaging statements despite seeking to enforce a contract that expressly obliged them not to make any "disparaging, critical or otherwise detrimental comments concerning" Ms. Wynn-Williams or her "employment with or departure from" Meta.  Agmt. § 9. Meta knew that it could make these false statements without rebuttal, as it had just obtained the Interim Award to prohibit both Ms. Wynn-Williams and her attorneys from responding.

Thus, on March 18, 2025—just five days after being served—Ms. Wynn-Williams moved to vacate the Interim Award.  O'Brien Decl. Ex. E (Mot. to Vacate).  The same Emergency Arbitrator who had issued the Interim Award denied vacatur on March 31, 2025.  *Id.* Ex. G (Order on Mot. to Vacate).  In denying vacatur, the Emergency Arbitrator advanced startling views of the constraints on Ms. Wynn-Williams's speech, suggesting that under the Severance Agreement and Interim Award, Ms. Wynn-Williams "is not permitted to engage in informal discussions with legislators in the United States and Europe" because "nothing would limit or prevent those legislators (or their aides) from parroting to the public" Ms. Wynn-Williams's allegations or promoting *Careless People*.  *Id.* Ex. G at 11-12.

---

[2] [2]Those attacks are baseless.  Ms. Wynn-Williams joined Facebook as an accomplished diplomat and public policy expert, served on its public policy team from 2011 to 2017—eventually serving as Director of Global Public Policy—and was terminated only after Facebook learned she planned to submit further documentation of Mr. Kaplan's harassment to human resources.  *See* Wynn-Williams Decl. ¶¶ 4-11.  She received above-average performance reviews during her entire tenure at Meta.  *See* Compl. ¶¶ 35, 60.

The American Arbitration Association appointed a merits arbitrator on May 13, 2025, and the parties have since proceeded through preliminary discovery and procedural motions. O'Brien Decl. Ex. O (AAA Notice of Appointment).

**E.    *Careless People* Becomes a #1 *New York Times* Bestseller and the Subject of Public Discussion and Congressional Investigation**

As these legal maneuvers unfolded, the book was released on March 11, 2025, and quickly became a #1 *New York Times* bestseller and the subject of considerable public discussion. *See* Wynn-Williams Decl. ¶ 38; O'Brien Decl. Ex. H (*New York Times* bestseller list). This was not because Ms. Wynn-Williams set out to drive that discussion—constrained by Meta's legal strategy, she could not—but because of the resonance of her account and Meta's controversial effort to silence it.

Additionally, following the release of *Careless People*, the United States Senate opened multiple bipartisan investigations into the issues Ms. Wynn-Williams raised in the memoir. In connection with these investigations, Senators submitted multiple letters of inquiry to Meta concerning its "efforts to silence whistleblowers," O'Brien Decl. Ex. K (Apr. 14, 2025 Ltr.); its retaliation against Ms. Wynn-Williams for reporting Mr. Kaplan's sexual misconduct, *id*. Ex. M (May 13, 2025 Ltr.); its conduct in China, *id*. Ex. I (Apr. 1, 2025 Ltr.); and its efforts to address online dangers to children and teenagers, *id*. Ex. J (Apr. 8, 2026 Ltr.), Ex. L (Apr. 16, 2025 Ltr.), Ex. P (Sep. 2, 2025 Ltr.). And on April 9, 2025, Ms. Wynn-Williams testified before the Senate Judiciary Committee's Subcommittee on Crime and Counterterrorism regarding "Oversight of Meta's Foreign Relations and Representations to the United States Congress." Wynn-Williams Decl. ¶ 39, Ex. I (hereinafter "Jud. Comm. Hr'g").[3] The full Senate Judiciary Committee recently announced another hearing with the CEOs of Meta and other large technology companies entitled, "Examining Tech Industry Practices and the Implications for Users and Families: Is This Social Media's Big Tobacco Moment?" in connection with these investigations. *See* Ashley Gold, *Tech*

---

[3] *See also A Time for Truth: Oversight of Meta's Foreign Relations and Representations to the United States Congress*, *Hearing Before the Subcomm. on Crime and Counterterrorism of the S. Judiciary Comm.*, 119th Cong. (2025) (statement of Sarah Wynn-Williams), https://www.judiciary.senate.gov/committee-activity/hearings/a-time-for-truth-oversight-of-metas-foreign-relations-and-representations-to-the-united-states-congress [https://perma.cc/DX79-CVXW].

*CEOs Summoned to Capitol for June Hearing*, Axios (May 15, 2026), https://www.axios.com/2026/05/15/tech-ceos-grassley-june-hearing [https://perma.cc/347C-KBYY].

**F.      Meta's Exploitation of the Interim Award to Expand Its Power to Constrain and Punish Ms. Wynn-Williams**

Ms. Wynn-Williams has scrupulously adhered to her understanding of the Interim Award. *See* Wynn-Williams Decl. ¶¶ 54-77.  To speak in public at all, she disclaims in advance any mention of Meta or her book.  *See id.* ¶¶ 55, 64, 67.  Sponsors, organizers, and prospective clients have curtailed or withdrawn engagements they otherwise would have offered as a result.  *See id*. ¶ 73. For every invitation she has been able to accept, Ms. Wynn-Williams has declined countless others. For instance, she declined an invitation to speak as an honoree of the April 29, 2026 Organization for Social Media Safety Gala in Los Angeles, which sought to honor the publication of *Careless People*, because the organizers decided to give a copy of the book to each attendee as a gift and she feared that would be attributed to her as promotion.  *Id.* ¶ 72.

Nevertheless, in a March 5, 2026 letter to the Merits Arbitrator, Meta said that Ms. Wynn-Williams was committing "ongoing and flagrant violations" of the Interim Award because of her February and March 2026 appearances at events in the United Kingdom and her keynote address at the Legal 500 Enterprise GC 2026 conference in London.  O'Brien Decl. Ex. Q (Mar. 5, 2026 Ltr.).  As Meta knew, this was incorrect.  Before each of the events Meta complained about, Ms. Wynn-Williams informed the organizers that she could not speak about her book or about Meta. Wynn-Williams Decl. ¶ 55.  At each event, she judiciously confined her remarks to her professional areas of expertise—internet regulation, artificial intelligence, and digital technology in warfare.  *Id.* ¶ 57.  Ms. Wynn-Williams informed the Merits Arbitrator of her compliance efforts in a March 6, 2026, email, and at a March 12, 2026, status conference, the Merits Arbitrator conveyed that the Interim Award permitted her to speak about certain matters within her area of expertise, including those she had identified in the March 6 email.  *Id.* ¶ 57; O'Brien Decl. Ex. R (Mar. 6, 2026 Email to Arbitrator).  In subsequent correspondence between counsel, she challenged Meta to articulate any specific basis for their claim that Ms. Wynn-Williams's attendance at the events violated the Interim Award, hoping to gain clarity to allow her to conform her conduct to the

injunction's vague and overbroad terms. Wynn-Williams Decl. ¶ 59; O'Brien Decl. Ex. T (Sanctions Opp'n, Naik Decl. Ex. G) ¶¶ 8-12. Meta did not attempt to provide any further clarity. *See id.*

Nonetheless, on March 27, 2026, Meta filed an application for sanctions against Ms. Wynn-Williams in the arbitration based on events identified in its earlier correspondence. O'Brien Decl. Ex. S (Sanctions Appl.) at 1-8. Meta presented no evidence to contradict Ms. Wynn-Williams's representations to the Merits Arbitrator about the steps she took to avoid violating the Interim Award at her prior engagements, despite the fact that Meta's counsel attended at least one them for the express purpose of gathering evidence of a breach—one part of Meta's broader effort to monitor and catalogue Ms. Wynn-Williams's movements. *See* Wynn-Williams Decl. ¶ 78; O'Brien Decl. Ex. T (Sanctions Opp'n) at 13. Instead, Meta seeks to sanction Ms. Wynn-Williams for the actions of *others* who spoke about, promoted, or sold the book, despite having no evidence that Ms. Wynn-Williams had any control over those individuals and entities. Indeed, Ms. Wynn-Williams had confirmed to Meta and the Merits Arbitrator that she could not control the venues, individuals, or entities offering *Careless People* for sale. *Id*. Ex. R (Mar. 6, 2026 Email to Arbitrator). Meta seeks $1,500 per alleged violation related to those specific events, an award of attorneys' fees, and disgorgement of any income Ms. Wynn-Williams has derived from the events in question, including from subsequent book sales. *Id*. Ex. S (Sanctions Appl.) at 17-18. That is in addition to the substantial relief Meta seeks in the underlying arbitration demand—liquidated damages of $50,000 for each purported violation of the non-disparagement provision of the Severance Agreement, compensatory damages, punitive damages, and disgorgement of any proceeds Ms. Wynn-Williams is said to have derived from sales of her book attributable to the purported violations. *Id*. Ex. F (Am. Arb. Demand).

Ms. Wynn-Williams opposed the sanctions motion and asked for the Interim Award to be vacated as a violation of her First Amendment rights, among other reasons, arguing that the sanctions request was an abuse of the arbitration process and exposed the untenable vagueness in the Interim Award. *See id*. Ex. T (Sanctions Opp'n). At a status conference on April 22, 2026, the Merits Arbitrator acknowledged that the Interim Award could raise First Amendment concerns but

nevertheless declined to rule on Ms. Wynn-Williams's opposition and later denied Ms. Wynn-Williams's request for leave to seek dismissal of the arbitration as a matter of law. *Id*. ¶ 22, Ex. U (May 7, 2026 Email from Merits Arbitrator).  Instead, the Merits Arbitrator appeared to endorse aspects of Meta's sweeping interpretation of the Interim Award, cautioning that in his view Ms. Wynn-Williams violates the Interim Award any time she voluntarily appears at any event where she knows or should know that her book will be available for sale and that her presence there will likely encourage sales.  *Id.* ¶ 22; Wynn-Williams Decl. ¶ 63.  When Ms. Wynn-Williams's counsel asked for specific guidance on how that standard would apply to her planned Hay Festival appearance, the Merits Arbitrator declined, stating that there was too much factual granularity to address the matter further and that Ms. Wynn-Williams must conform her conduct to what she thinks is appropriate.  O'Brien Decl. ¶ 22.

The Hay Festival is a world-renowned event to which Ms. Wynn-Williams was invited to speak alongside the journalist Carole Cadwalladr and academic Tim Wu regarding contemporary technology policy issues.  Wynn-Williams Decl. ¶ 64, Ex. L (Hay Festival event page).  Accepting invitations to speak at such high-profile engagements is critical to Ms. Wynn-Williams's career as a public policy expert.  *Id*. ¶¶ 41-42.  The description of the event did not mention *Careless People* or Meta, and neither did Ms. Wynn-Williams's planned remarks.  *Id.* ¶ 64.  The Hay Festival website links to a third-party bookshop offering everything from *Careless People* to *Wuthering Heights* for sale.  *Id.* ¶ 66, Ex. M.

In order to comply with the Merits Arbitrator's guidance, Ms. Wynn-Williams, through counsel, requested that the festival organizers "ensure that *Careless People* is not sold at any festival bookshop, book-signing schedule, point-of-sale mechanism, or online link through which sales could be attributed to Ms. Wynn-Williams's appearance at the festival." O'Brien Decl. Ex. V (Ltr. to Hay Festival).  Ms. Wynn-Williams was aware that part of Meta's still-pending sanctions motion turned on its accusation that Ms. Cadwalladr's work included "negative coverage of [Meta]" and that Mr. Wu was "another known critic" of the company, and was concerned that she would be accused of violating the Interim Award by virtue of speaking alongside them, regardless of whether she mentioned *Careless People* or Meta.  O'Brien Decl. Ex. S (Sanctions Appl.) at 7.

Ms. Wynn-Williams was also aware that whatever she did, including if she cancelled her appearance because of Meta's sanctions threat, Meta would accuse her of engaging in promotion by drawing attention to herself. *See* Wynn-Williams Decl. ¶ 68. Thus, instead of speaking, Ms. Wynn-Williams sat in silence during the panel discussion in which she had been invited to participate out of fear that anything she said in response to her fellow panelists would be used by Meta to support its motion. *Id.* Ms. Cadwalladr and Mr. Wu both expressed strong negative reactions to the effects of Meta's silencing campaign in their remarks. O'Brien Decl. Ex. X (Sanctions Addendum Opp'n) at 5. At the conclusion of the event, Ms. Wynn-Williams received a standing ovation from the audience, a reaction which moved her to tears. Wynn-Williams Decl. ¶ 68. The response of the panelists and the audience was widely covered in the press.[4]

Having witnessed their silencing strategy once again backfire by generating further controversy and attention, on June 12, 2026, Meta filed an addendum to its sanctions motion against Ms. Wynn-Williams, requesting that the Merits Arbitrator impose sanctions immediately, including additional penalties based on the Hay Festival appearance. *See* O'Brien Decl. Ex. W (Sanctions Addendum). Notwithstanding that Ms. Wynn-Williams followed the Merits Arbitrator's instruction in good faith by taking steps to ensure that the book would not be sold or promoted and did not speak in any manner about Meta or her book, Meta claimed that further sanctions were warranted because, according to press reports, book sales rose due to the attention drawn by Meta's attempts to prevent Ms. Wynn-Williams from speaking at the Festival. *Id.* Meta also sought to require Ms. Wynn-Williams to disclose a list of future public appearances, to enable it to further trace her movements and surveil her public appearances. *Id.* Ms. Wynn-Williams opposed Meta's sanctions addendum on June 18, 2026. *See* O'Brien Decl. Ex. X (Addendum Opp'n).

Because the Merits Arbitrator has foreclosed resolution of these matters until his final decision in the arbitration, Ms. Wynn-Williams must operate under the constraints of the Interim

---

[4] *E.g.*, Paul Pigott, *Facebook Whistle-Blower Sits in Silence in Panel Discussion About Her Tell-All Book*, BBC News (June 1, 2026), https://www.bbc.com/news/articles/cy42xgeq9vpo [https://perma.cc/HD6U-ABHE]; Emma Loffhagen, *Meta Legal Action Forces Facebook Whistleblower to Sit in Silence at Hay Festival*, The Guardian (May 31, 2026, at 13:18 ET), https://www.theguardian.com/technology/2026/may/31/meta-legal-action-forces-facebook-whistleblower-to-stay-silent-at-hay-festival [https://perma.cc/LK7S-YS5W].

Award and the threat of further sanctions—and will have no opportunity to challenge those constraints—until the full merits hearing, currently scheduled for October 2026. O'Brien Decl. Ex. U (May 7, 2026 Email from Merits Arbitrator) Ex. Y (June 24, 2026 Email from Merits Arbitrator). Until then, she will remain subject to Meta's ongoing surveillance, *see* Wynn-Williams Decl. ¶ 78; O'Brien Decl. Ex. W (Sanctions Addendum), and the impairment of her First Amendment rights and her professional development. For example, Ms. Wynn-Williams has been invited to speak in September 2026 at the University of Michigan on artificial intelligence and technology, and to appear at the prestigious Edinburgh International Book Festival in August 2026, but has been unable to commit to doing either because of the specter of the Interim Award and Meta's zealousness to sanction her. *See* Wynn-Williams Decl. ¶ 74.

The success of Ms. Wynn-Williams's career as a public policy expert and in-demand commentator on artificial intelligence, technology, geopolitics, regulation, and culture depends in part upon regular public appearances. *Id*. ¶¶ 41-42. Similarly, the success of Ms. Wynn-Williams's career as an author depends in part upon engaging with readers at precisely the type of events that Meta is using the Interim Award to prevent her from attending. *Id*. ¶ 42. Indeed, Ms. Wynn-Williams earns part of her livelihood directly through paid public engagements like the Hay Festival, where she was meant to be compensated for sharing expertise that did not touch on Meta or her memoir. *Id*. ¶¶ 42, 64.

## ARGUMENT

Ms. Wynn-Williams requests two forms of relief. *First*, this Court should vacate the Interim Award under 9 U.S.C. § 10 and the First Amendment. No court could constitutionally issue an injunction like the Interim Award, the Emergency Arbitrator exceeded his authority by issuing it, and the Interim Award is an overbroad prior restraint on protected speech which violates the First Amendment. *Second*, this Court should enjoin the ongoing arbitration because the agreement to arbitrate is unenforceable in the first instance under the EFAA and, independently, because Meta is estopped from enforcing it. Under the EFAA, a court and not an arbitrator must decide whether the statute applies to a case like this one involving sexual harassment. And Ms. Wynn-Williams easily satisfies the equitable preliminary injunction factors.

**I.      The Court Should Vacate the Interim Award Because It Is an Unconstitutional Prior Restraint and Overbroad Relief That Exceeds the Arbitrator's Authority**

The Interim Award is invalid and unenforceable.  The governing AAA Rules and 9 U.S.C. § 10 permit an arbitrator to award only relief a court could grant; awards exceeding that limit must be vacated.  No court could have entered the Interim Award—a sweeping, untailored ban on Ms. Wynn-Williams's unadjudicated speech about her bestselling memoir, which has been applied to broadly restrict her ability to engage in public speech and appearances.  The Interim Award is an unconstitutional prior restraint that exceeded the Emergency Arbitrator's authority and must be vacated for the same reasons that any court order containing such relief would be.[5]

**A.      The Court May Vacate an Arbitral Order That Grants Relief Unavailable in Court, Including Relief That Violates the First Amendment**

A court has authority under 9 U.S.C. § 10(a)(4) to vacate an arbitral award "where the arbitrators exceeded their powers."[6]  An arbitrator exceeds his powers when he "strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (cleaned up).

The Severance Agreement and the incorporated AAA Rules limit the scope of any arbitral award to the relief a court could grant in the same circumstance.  The arbitration provision of the Severance Agreement provides that disputes about the Agreement "shall be subject to arbitration … in accordance with the [AAA] Employment Arbitration Rules."  Agmt. § 16(d).  Those Rules permit an arbitrator to "grant any remedy or relief that would have been available to the parties had the matter been heard in court … in accordance with applicable law."  Am. Arb. Ass'n,

---

[5] This ground for relief corresponds to Count I in Ms. Wynn-Williams's Complaint.

[6] This Court has clear authority to grant that relief.  Since the Emergency Arbitrator recited the preliminary injunction factors of "likelihood of success on the merits" and "immediate and irreparable loss … in the absence of emergency relief," Interim Award at 3, the Interim Award is a "temporary equitable order[]" that binding Ninth Circuit precedent makes reviewable, *Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1023 (9th Cir. 1991); *see id.* at 1022 (explaining that an award "in the nature of a preliminary injunction … is temporary equitable relief").  The rationale for that rule is that if such relief "is to have any meaning, [it] must be enforceable at the time it is granted," so it follows that a court has power of review under 9 U.S.C. § 10. *Id.* at 1023.  Indeed, Meta presently is attempting to enforce the Interim Award by imposing punishing sanctions on Ms. Wynn-Williams.  See O'Brien Decl. Ex. S (Sanctions App.) at 1-8.  And review is timely because the Interim Award has not yet merged into a final award, which is the event triggering the three-month limitations period for review under 9 U.S.C. § 12.  *See Swenson v. Bushman Inv. Props., Ltd.*, 870 F. Supp. 2d 1049, 1054 (D. Idaho 2012) (citing *Bosack v. Soward*, 586 F.3d 1096, 1103 (9th Cir. 2009)).

*Employment Arbitration Rules and Mediation Procedures* Rule 39(d), The Award (June 1, 2009), https://www.icdr.org/sites/default/files/Employment%20Arbitration%20Rules%20and%20Mediation%20Procedures%20Jun%2001%2C%202009.pdf [https://perma.cc/WPT7-MXYC] ("AAA Rules"); *see also* AAA Rule 32, Interim Measures ("At the request of any party, the arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court, as stated in Rule 39(d), Award.").

Since "an arbitrator derives his or her powers from the parties' agreement," *Stolt-Nielsen*, 559 U.S. at 682, an award that contravenes those rights and expectations by sweeping far beyond the relief a court could grant exceeds the arbitrator's authority. The Supreme Court concluded as much in *Stolt-Nielsen*, finding that an arbitrator exceeded his authority in ordering classwide arbitration absent evidence the parties agreed to such proceedings. *See* 559 U.S. at 684-87. The Court rejected an argument that the parties' silence on the matter was an "implicit agreement to authorize class-action arbitration" because classwide adjudication was too "fundamental" a change for silence to imply consent. *Id.* at 685-86. Similarly, in *Comedy Club, Inc. v. Improv West Associates*, the Ninth Circuit vacated an arbitral injunction that purported to bind non-parties; that relief went "well beyond" any "proper use of equitable power" under California law and Federal Rule of Civil Procedure 65(d). 553 F.3d 1277, 1287 (9th Cir. 2009). The Ninth Circuit went on to vacate another portion of the injunction because it imposed an "economic restraint … on competition" that was "too broad to be countenanced in light of the clear prohibition" against such relief under California law. *Id.* at 1293. These cases illustrate that when parties agree to arbitrate disputes that arise between them, the terms of the parties' agreement constrain the arbitrator from granting relief exceeding those terms, including by granting relief unauthorized by the law the parties agreed would apply. Here, the parties agreed that the relief available in arbitration would be the relief the parties could obtain in court. *See* Agmt. § 16(d); AAA Rules 32, 39(d). It follows that if no court could enter the Interim Award, the Emergency Arbitrator exceeded his powers in issuing it, and this Court must vacate it under 9 U.S.C. § 10(a)(4).

Furthermore, an arbitral injunction like the Interim Award has no inherent enforceability; rather, it derives its coercive power solely from the prospect of judicial enforcement. *Cf. Pacific*

*Reinsurance*, 935 F.2d at 1023 ("Arbitrators have no power to enforce their decisions. Only courts have that power."). The First Amendment thus constrains the enforceability of the Interim Award, just as it constrains any other injunction curtailing speech. It "has long been established" that a court's enforcement of a private contractual agreement is state action subject to full constitutional review. *Shelley v. Kraemer*, 334 U.S. 1, 14 (1948); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) (explaining state-court enforcement of a private libel claim constitutes state action restricting speech). Courts routinely enforce this rule in the context of arbitral awards enjoining speech. *Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert*, 194 Cal. App. 4th 519, 533 (Cal. Ct. App. 2011) (an arbitral injunction against speech must be "couched in the narrowest terms that will accomplish the pin-pointed objective" and "tailored as precisely as possible to the exact needs of the case"). The Interim Award, which is only enforceable against Ms. Wynn-Williams through judicial confirmation, must therefore satisfy constitutional muster. For all the reasons below, it does not.

> ### B.    The Interim Award Violates the First Amendment

No court could have entered the Interim Award because it is an impermissible prior restraint on speech and is vague and overbroad in violation of the First Amendment.

> #### 1.    The Interim Award Is a Prior Restraint on Unadjudicated Speech and Is Presumptively Invalid

As an injunction prohibiting speech without adjudication that the specific speech is unprotected, the Interim Award is a paradigmatic unconstitutional prior restraint. *See, e.g.*, *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 898 (Cal. 2003) (Moreno, J., concurring); *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071, 1089-90 (C.D. Cal. 2003) (collecting cases); *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1049 (C.D. Cal. 1998) (rejecting injunction against "disseminating or publishing further false, defamatory or disparaging information" because "[s]uch an injunction would necessarily precede an adequate determination that a particular statement by defendant was false, defamatory or disparaging"). Prior restraints on speech bear "a heavy presumption against [their] constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963), and have long been regarded as "the most serious and the least

tolerable infringement on First Amendment rights," *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  A prior restraint like the Interim Award that purports to proscribe "defamatory, untrue, or misleading statements … is overbroad" under the First Amendment unless it is limited to statements a tribunal has "specifically found to be false and deceptive." *J.K. Harris & Co., LLC v. Kassel*, 253 F. Supp. 2d 1120, 1128 (N.D. Cal. 2003) (cleaned up); *cf. Evans v. Evans*, 162 Cal. App. 4th 1157, 1167 (Cal. Ct. App. 2008) (prior restraints may survive only if "necessary" to promote a "compelling" interest and "less extreme measures are unavailable").  The danger is particularly acute in the context of an Interim Award or preliminary injunction, as "interim restraints present a threat … that expression will be abridged prior to a full and fair hearing before an independent judicial forum to determine the scope of the speaker's constitutional right." *Balboa Island Vill. Inn, Inc. v. Lemen*, 40 Cal. 4th 1141, 1156 (Cal. 2007) (citation omitted).

That is exactly what happened here.  The Interim Award does not even purport to make the determinations necessary to protect Ms. Wynn-Williams's First Amendment rights.  It contains no finding that any specific statement Ms. Wynn-Williams has made in *Careless People* or otherwise, or any statement she might make in the future, is within the scope of the non-disparagement provision of Meta's Severance Agreement nor does it contain any finding that any such provision operates as a valid waiver of First Amendment rights.  It contains no analysis whatsoever of the First Amendment implications of its sweeping prohibitions.  And it makes no effort to tailor its restrictions to any compelling interest or specifically identified harm.  The entirety of the Emergency Arbitrator's findings and analysis supporting the Interim Award consists of the conclusory statements that Meta had "established a likelihood of success on the merits of its contractual non-disparagement claim against Respondent Wynn-Williams, and that immediate and irreparable loss [would] result in the absence of emergency relief."  Interim Award at 3.  These rote statements—issued immediately following a proceeding in which Ms. Wynn-Williams was not heard—do not establish any basis to impose a prior restraint on Ms. Wynn-Williams's speech.  *See Isuzu*, 12 F. Supp. 2d at 1049; *Kassel*, 253 F. Supp. 2d at 1128; *New.Net*, 356 F. Supp. 2d at 1089-90; *Kelly Sutherlin*, 194 Cal. App. 4th at 533.

It does not matter that, in theory, First Amendment rights can be waivable by contract. *See Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993) (citing *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185, 187 (1972)). "[F]ederal courts indulge every reasonable presumption against waiver of fundamental constitutional rights," *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 969 (9th Cir. 2011) (citation omitted), so a waiver is only valid "upon clear and convincing evidence that the waiver is knowing, voluntary and intelligent," *Leonard*, 12 F.3d at 889. Meta has never asserted, and no tribunal has ever found, that the non-disparagement provision of Meta's Severance Agreement was a knowing, voluntary, and intelligent waiver of Ms. Wynn-Williams's First Amendment rights. Moreover, as Ms. Wynn-Williams alleges in her Complaint, Meta's Severance Agreement and its non-disparagement provision are invalid because they were procured under duress and are contrary to public policy, among other reasons. *See* Compl. ¶¶ 141-94. In any event, the non-disparagement provision of Meta's Severance Agreement only purports to prohibit statements that are "disparaging, critical or otherwise detrimental." Agmt. § 9. That simply begs the question of whether the statements in *Careless People* meet that standard, as well as the question of how the statements Ms. Wynn-Williams has made unrelated to the book or to Meta and her sitting in silence at the Hay Festival meet that standard. Without a full adjudication of these questions on the merits, the Interim Award is presumptively invalid as a prior restraint on speech.

**2.      The Interim Award Is Unconstitutionally Vague and Overbroad**

In addition, the Interim Award's scope and vague terms exceed the boundaries of a permissible injunction on speech. An injunction restraining speech "is unconstitutionally vague if it fails to give clear guidance regarding the types of speech for which an individual may be punished." *Levine v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 764 F.2d 590, 599 (9th Cir. 1985). "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). That requirement applies with particular force where, as here, the conduct restrained is core First Amendment activity—public commentary on matters of contemporary policy concern and association among individuals with particular viewpoints. *Cf.*

*NAACP v. Button*, 371 U.S. 415, 432 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression."); *Overstreet v. United Bhd. of Carpenters & Joiners of Am., Loc. Union No. 1506*, 409 F.3d 1199, 1208 n.13 (9th Cir. 2005) (explaining that courts perform "particularly close review of preliminary injunction[s]" when "there is at least some risk that constitutionally protected speech will be enjoined").

The Interim Award fails this requirement. The Merits Arbitrator's evolving and expanding constructions and inability to issue clear guidance establish this point. At a March 12, 2026, status conference, the Merits Arbitrator conveyed that the Interim Award would not penalize Ms. Wynn-Williams merely for speaking at events about various topics within her areas of expertise. Wynn-Williams Decl. ¶ 57. Yet on April 22, 2026, the Merits Arbitrator contradicted that position, declaring that Ms. Wynn-Williams violates the Interim Award any time she voluntarily appears at any event where she knows or should know that her book will be available for sale and her presence there will likely encourage sales. *Id.* ¶ 63; O'Brien Decl. ¶ 22. When Ms. Wynn-Williams's counsel sought the Merits Arbitrator's specific guidance on how that standard would apply to the then-forthcoming Hay Festival, the details of which had been fully briefed by the parties in pending motions, the Merits Arbitrator stated that he was not capable of providing such guidance. O'Brien Decl. ¶ 22; Wynn-Williams Decl. ¶ 60. An order whose scope shifts from one moment to the next and whose meaning the issuing tribunal is unable to apply to a specific factual scenario does not permit Ms. Wynn-Williams to conform her conduct to it, and cannot satisfy the First Amendment.

Meta's ongoing ability to exploit the Interim Award to intimidate, harass, and retaliate against Ms. Wynn-Williams also establishes its unconstitutional vagueness and overbreadth. Meta has sought to sanction Ms. Wynn-Williams based on allegations that she merely appeared at events that can be characterized as "literary" and because event bookshops stock speakers' books, regardless of her affirmative refusal to mention Meta or her book and her acceptance of such invitations only for the purpose of speaking on topics of general public importance. *See* O'Brien Decl. Ex. S (Sanctions Appl.); Ex. W (Sanctions Addendum). By Meta's logic, Ms. Wynn-Williams must avoid appearing anywhere she suspects books may be sold—like bookshops, libraries, or even the supermarket—lest her presence next to a copy of *Careless People* be interpreted as promoting it.

Meta has also sought to sanction Ms. Wynn-Williams for appearing at professional or policy conferences where, without her participation or control, organizers reference her authorship of *Careless People* as a credential or other attendees reference the book or even bring a copy to the event hoping to get it signed. *See* O'Brien Decl. Ex. S (Sanctions Appl.); Ex. W (Sanctions Addendum). Ms. Wynn-Williams's inability to control the actions of third parties makes it impossible for her to accept any public-speaking invitation without facing another Meta threat of sanctions. That Meta has sought sanctions when Ms. Wynn-Williams did not even speak at all—as at the Hay Festival—shows that Meta will interpret any public act she undertakes as garnering attention in a manner that constitutes "promotion" in violation of the Interim Award and punish her for any controversy generated by its own indefensible actions. Indeed, had Ms. Wynn-Williams cancelled her appearance at the Hay Festival as Meta's position demanded, Meta no doubt would have sought to sanction her anyway, as the cancellation itself would have garnered attention and provoked the same reaction from her justifiably outraged co-panelists. Ms. Wynn-Williams has challenged Meta to clarify what it believes she can and cannot do without violating the Interim Award, but Meta has refused, knowing that the Award's vagueness is precisely what gives it maximum control over her actions. *See* O'Brien Decl. Ex. T (Sanctions Opp'n, Naik Decl. Ex. G) ¶¶ 8-12.

The Interim Award also sweeps far beyond what any plausible reading of Meta's Severance Agreement could authorize, in several ways.[7] *First,* the non-disparagement clause applies only to specifically enumerated instances of disparaging speech. Agmt. § 9. The Interim Award, by stark contrast, prohibits "promoting *Careless People* ... on a book tour or otherwise," Interim Award at 4—without any requirement that the promotion itself be "disparaging." *Second*, the non-disparagement clause contains express carve-outs to protect Ms. Wynn-Williams's ability to speak generally on matters of public importance and within her areas of expertise, Agmt. § 9, whereas the Interim Award's broader prohibition on "promotion" contains no such limitation and enables any public speech to be interpreted as an act of self-promotion, which by promoting the author in turn

---

[7] For this reason, any suggestion that Ms. Wynn-Williams waived her First Amendment rights through Meta's Severance Agreement cannot save the overbreadth of Interim Award, regardless of that Agreement's validity.

promotes the book. *Third*, the non-disparagement clause applies only to speech delivered by Ms. Wynn-Williams personally. Agmt. § 9. The Interim Award, at least in Meta's and the Merits Arbitrator's application, layers an affirmative obligation on Ms. Wynn-Williams to police the conduct of third parties (including event organizers, moderators and panelists) she does not control. Meta's sanctions motions demonstrate how the challenge of meeting that obligation unreasonably chills Ms. Wynn-Williams's ability to speak or even appear silently in public. *Fourth*, the Interim Award applies broadly to Ms. Wynn-Williams's "agents," including specifically her attorneys. Interim Award at 3. That overbreadth is particularly shocking, as it enabled Meta to publicly disparage Ms. Wynn-Williams after the Interim Award issued, and has continued to give Meta free rein to disparage her, knowing that neither she nor her attorneys may publicly respond. Courts recognize that gag orders on attorneys, like the Interim Award and all prior restraints, are subject to strict scrutiny under the First Amendment. *See Levine*, 764 F.2d at 591, 595; *Clifford v. Trump*, 2018 WL 5273913, at *1 (C.D. Cal. July 31, 2018).

As these facts establish, through the Interim Award, Meta is exploiting the legal process of the arbitration as cover for its campaign of private censorship and retaliation, sending a signal not only to Ms. Wynn-Williams but to any other whistleblower who dares to take on the power of one of the world's most powerful corporations. When called to account by the press for the silencing of Ms. Wynn-Williams at the Hay Festival, Meta expressly shifted blame to the arbitration process, responding—falsely—that the Interim Award was not something Meta did, but something Ms. Wynn-Williams "agreed to during her time at Meta," and that it was "an arbitrator's order, not Meta deciding to silence anyone."[8] This Court should put an end to Meta's ability to hide its agenda behind a flawed arbitration process and, for the reasons set forth above, vacate the Interim Award pursuant to 9 U.S.C. § 10 and the First Amendment.

## II. The Court Should Preliminarily Enjoin the Arbitration Because the EFAA Bars It as a Matter of Law and Meta Is Estopped from Compelling It

This Court should preliminarily enjoin Meta pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rules 7-2 and 65 from forcing Ms. Wynn-Williams to arbitrate a dispute Meta

---

[8] Pigott, supra n.4.

has no right to arbitrate. Ms. Wynn-Williams easily satisfies the four preliminary injunction requirements: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tip in her favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Ms. Wynn-Williams is likely to succeed on the merits of her challenges to Meta's right to arbitrate,[9] or at least raises "serious questions going to the merits," for two reasons. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022) (citation omitted). *First*, the EFAA renders any predispute arbitration agreement unenforceable at the plaintiff's election in a case relating to a sexual harassment dispute; the Act also commits that question exclusively to a court. 9 U.S.C. § 402. Ms. Wynn-Williams's whistleblower speech dispute relates to the sexual harassment misconduct she reported, and she has elected to void the arbitration clause in Meta's Severance Agreement. *Second*, and independently, Meta's 2018 public disavowal of forced arbitration estops it from enforcing the arbitration clause. Courts regularly enjoin arbitration proceedings where, as here, "there is no valid, enforceable arbitration agreement between the parties." *Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215, 1234 (E.D. Cal. 2015) (collecting cases); *Goldman, Sachs & Co. v. City of Reno,* 747 F.3d 733, 747 (9th Cir. 2014) (remanding for district court to consider plaintiff's entitlement to preliminary injunction against arbitration). And "a court, rather than an arbitrator," must decide whether the EFAA renders an arbitration agreement unenforceable, "irrespective of whether the agreement purports to delegate such determinations to an arbitrator," 9 U.S.C. § 402(b), overriding the usual rule that parties may agree to delegate questions of "whether they agreed to arbitrate the merits" and "who has the primary power to decide arbitrability" to an arbitrator, *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148-49 (2024).

Ms. Wynn-Williams has no reasonable alternative but to seek preliminary relief, and the remaining equitable factors weigh decisively in her favor. *See Winter*, 555 U.S. at 20. The Merits

---

[9] Ms. Wynn-Williams's grounds for preliminary relief correspond to Counts II and VII in her Complaint, each of which relate to the enforceability of the arbitration clause of the Severance Agreement. Ms. Wynn-Williams does not seek preliminary relief on the Complaint's remaining Counts, which challenge other aspects of the Severance Agreement or seek money damages for Meta's conduct.

Arbitrator—who is prohibited by statute from resolving the applicability of the EFAA—refused Ms. Wynn-Williams's request to move to dismiss the arbitration and will not consider whether the Interim Award violates the First Amendment until the full merits hearing, currently scheduled for October 2026. Every day the arbitration continues, it harms Ms. Wynn-Williams's career and impinges on her First Amendment rights, as well as preventing the public from hearing Ms. Wynn-Williams speak about her expertise on matters of urgent public concern.

### A. The EFAA Bars the Arbitration as a Matter of Law, and the Court—Not the Arbitrator—Must Decide That Issue

In 2022, Congress amended the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*., (the "FAA"), to enact the EFAA, which permits victims of sexual harassment or assault, like Ms. Wynn-Williams, to invalidate and make unenforceable any agreement purporting to force a case related to sexual harassment or assault to arbitration. The operative section of the EFAA provides:

> [A]t the election of the person alleging conduct constituting a sexual harassment dispute … no predispute arbitration agreement … shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to … the sexual harassment dispute.

9 U.S.C. § 402(a). The EFAA renders unenforceable the arbitration provision of Meta's Severance Agreement, as Ms. Wynn-Williams exercised her right to non-enforcement by objecting to the arbitrability of Meta's dispute with her and by filing her Complaint. The arbitration—which Meta is using to wrongfully silence Ms. Wynn-Williams and her experience of sexual harassment while employed at Facebook—therefore must be enjoined.

### 1. Section 402(b) Commits the Arbitrability Question to This Court, Not the Arbitrator

As a threshold matter, the EFAA states in no uncertain terms that only a court, and not an arbitrator, must decide whether the law applies to any agreement to arbitrate:

> An issue as to whether this chapter applies with respect to a dispute shall be determined under Federal law. The applicability of this chapter to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter applies shall be determined by a court, rather than an arbitrator, irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other terms of the contract containing such agreement, and irrespective of whether the agreement purports to delegate such determinations to an arbitrator.

9 U.S.C. § 402(b).  Courts uniformly so hold.  *See, e.g.*, *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 923 (N.D. Cal. 2023); *Ding v. Structure Therapeutics, Inc.*, 755 F. Supp. 3d 1200, 1212 (N.D. Cal. 2024); *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 531, 531 n.7 (S.D.N.Y. 2024); *Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 372 (6th Cir. 2026).

**2.    The Severance Agreement Is a "Predispute Arbitration Agreement"**

Meta's Severance Agreement is a "predispute arbitration agreement" within the meaning of the EFAA and thus is voidable and unenforceable at Ms. Wynn-Williams's election.  *See* 9 U.S.C. § 402. Meta's Severance Agreement is an agreement generally governing Ms. Wynn-Williams's separation from Meta (a decision Meta instigated by terminating her), and its arbitration provision was Meta's standard condition for such contracts to ensure that any subsequently arising disputes with its former employees went to arbitration (a provision it has since disavowed).  The arbitration provision of that Agreement provides in relevant part, "[t]he parties agree that any and all disputes arising out of the terms of this Agreement, their interpretation, and any of the matters herein released, shall be subject to arbitration[.]"  Agmt. § 16(d).  The EFAA broadly defines "predispute arbitration agreement" as "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement."  9 U.S.C. § 401(1).  Meta's dispute with Ms. Wynn-Williams arose no earlier than March 2025, when Meta learned of the publication of *Careless People* and asserted a claim that the book violated the non-disparagement provision of the Severance Agreement.  *See* 9 U.S.C. § 401(1).  Thus, the Severance Agreement is a "predispute arbitration agreement" under the EFAA and is void and unenforceable as applied to this dispute.  *See id.*

Courts have interpreted the EFAA in the same way, explaining that under the statute, "a dispute arises 'when one party asserts a right, claim, or demand, and the other side expresses disagreement or takes an adversarial posture.'"  *Lewis v. Tesla, Inc.*, 2025 WL 2653639, at *3 (N.D. Cal. Sep. 16, 2025) (quoting *Kader v. S. Cal. Med. Ctr., Inc.*, 99 Cal. App. 5th 214, 222 (Cal. Ct. App. 2024)).  Here, no party asserted any right, claim, or demand related to sexual harassment until Meta claimed that the publication of *Careless People* and any promotion of the book violated the non-disparagement provision of the Severance Agreement in March 2025.

The dispute post-dates Meta's Severance Agreement, regardless of exactly when the harassment occurred. The EFAA applies where the alleged sexual harassment or assault occurred prior to the execution of the arbitration agreement at issue. *See Baldwin v. TMPL Lexington LLC*, 2024 WL 3862150, at *2-4 (S.D.N.Y. Aug. 19, 2024) (EFAA applied where harassment occurred prior to plaintiff signing arbitration agreement); *Gathers v. K&K Fam. Ventures, LLC*, 2025 WL 1032252, at *8 (D.S.C. Feb. 19, 2025) (EFAA applied where harassment occurred prior to plaintiff signing arbitration agreement, as claim did not arise until plaintiff later received right-to-sue letter), *report and recommendation adopted in relevant part*, 2025 WL 892773 (D.S.C. Mar. 24, 2025); *J.H. v. Lawrenceville Sch.*, 2026 WL 217593, at *6 (N.J. Super. Ct. App. Div. Jan. 28, 2026) (EFAA applied to bar arbitration of claim of 2019 sexual assault where arbitration agreement was signed in 2022, as sexual assault claim had not yet arisen under New Jersey law).

### 3. The Speech Dispute "Relates to" a "Sexual Harassment Dispute" Within the EFAA's Statutory Definition

Meta's arbitration against Ms. Wynn-Williams and Ms. Wynn-Williams's Complaint against Meta each "relat[e] to conduct that is alleged to constitute sexual harassment under applicable … law." 9 U.S.C. § 401(4). Where, as here, a company seeks to enforce a non-disparagement provision against a current or former employee who speaks out about sexual harassment, that is a "sexual harassment dispute."

In the EFAA context, courts give "broad[]" construction to the phrase "relates to," the recognized plain meaning of which is "has a connection with or reference to." *Polen v. API Grp. Life Safety USA, LLC*, 2025 WL 3251349, at *4 (D. Or. Nov. 21, 2025) (quoting *Aloha Islandair Inc. v. Tseu*, 128 F.3d 1301, 1302 (9th Cir. 1997)). "Congress's use of 'relates to' extends the EFAA exemption to all cases that have a connection to a dispute that involves (includes or concerns) sexual assault. The statute is unambiguous in requiring only that there be a dispute with the defendant involving a nonconsensual sexual act or contact." *Id.* The statute "contains no limitation regarding who committed the sexual assault, where it was committed, or when it was committed." *Id.* Moreover, "there is nothing in the text of the EFAA that suggests its applicability hinges on how a claim is labeled." *Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 181

(S.D.N.Y. 2023). Ms. Wynn-Williams also need not have "asserted a cause of action for sexual harassment or hostile work environment" to fall within the protections of the EFAA. *Lee v. Marriott Int'l, Inc.*, 2025 WL 2689263, at *9 (N.D. Cal. Sep. 21, 2025). "This is because the EFAA does not refer to a 'sexual harassment claim' or 'sexual harassment cause of action,' but rather a 'sexual harassment dispute.'" *Id.*

Thus, courts find that the EFAA applies where the plaintiff's causes of action do not require proof that sexual harassment or assault took place. For instance, in *Polen*, the court found the EFAA applied to the plaintiff's claim that her employer terminated her after she informed her supervisor she was taking time off to move away from an abusive ex-partner who later sexually assaulted her. 2025 WL 3251349, at *5-6. The "dispute over how [the defendant] handled [the plaintiff]'s status as a victim of sexual assault" itself constituted a "sexual assault dispute." *Id.* at *6. And the EFAA covers retaliation claims even though "[t]he issue on such a claim is whether the plaintiff was retaliated against for reporting sexual harassment, not the plausibility of the underlying harassment claim." *Diaz-Roa*, 757 F. Supp. 3d at 536.

Ms. Wynn-Williams's dispute with Meta fits well within those confines. Ms. Wynn-Williams's whistleblower complaints with the SEC and DOJ and her book *Careless People* extensively discuss Mr. Kaplan's and Ms. Sandberg's sexual harassment of Ms. Wynn-Williams. Meta's action to silence Ms. Wynn-Williams from speaking about those allegations, now or indefinitely into the future, undoubtedly "relates to" them, just as in *Polen* the claims based on the defendant's reaction to the plaintiff's discussion of her sexual assault related to a "sexual assault dispute." 2025 WL 3251349, at *5-6. After all, Meta's public response to *Careless People* included rebuttals to Ms. Wynn-Williams's allegations about Mr. Kaplan's conduct. *See* Wynn-Williams Decl. Ex. J (Mar. 10-12, 2025, Andy Stone X thread). And because this action seeks to enjoin Meta's retaliatory efforts to sanction Ms. Wynn-Williams for earning her livelihood by speaking in public about matters within her area of expertise, the action, like formal claims for retaliation, is covered by the EFAA. *See Diaz-Roa*, 757 F. Supp. 3d at 536. Indeed, the purpose of Meta's dispute with Ms. Wynn-Williams—the arbitration—is to silence her from "alleging conduct constituting" sexual harassment. 9 U.S.C. § 402(a).

In short, Ms. Wynn-Williams is likely to succeed on her claim that under the EFAA she is entitled to litigate her dispute with Meta about *Careless People* and its sexual harassment allegations in open court, not private arbitration. She therefore satisfies the merits *Winter* factor. *See* 555 U.S. at 20.

### B.    Meta's 2018 Public Commitment to End Forced Arbitration of Sexual Harassment Claims Estops It from Compelling Arbitration Here

Ms. Wynn-Williams is likely to succeed on the merits of her claim that the arbitration provision of Meta's Severance Agreement is unenforceable for an independent reason: Meta has made public statements disavowing it. Wynn-Williams Decl. Exs. B-F. Ms. Wynn-Williams relied on these public statements and, as a result, Meta is estopped from enforcing the arbitration clause. *Id.* ¶ 18. Meta's actions meet the four elements of promissory estoppel: (1) clear and unambiguous promise, (2) reliance, (3) reliance that is both reasonable and foreseeable, and (4) injury from the reliance. *See Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 792 (9th Cir. 2012).

In a 2018 statement to the press, Lori Goler, Facebook's Vice President of People, announced that Meta would "end[] its policy of requiring employee sexual-harassment claims to be settled in private arbitration" and "will let Facebook employees pursue those claims in court." Wynn-Williams Decl. Ex. B (*New York Times* article). In its statement, Meta acknowledged this was "a time when we can be part of taking the next step," and that their policy change was "the right thing to do." *Id.* Meta's Director of Corporate Media Relations, Anthony Harrison stated, "Today, we are publishing our updated Workplace Relationships policy and amending our arbitration agreements to make arbitration a choice rather than a requirement in sexual harassment claims." Simpson, *supra* n.1.

Employment policies relating to sexual harassment, especially by senior executives, came under heavy scrutiny around this time due to the push to prevent workplace harassment from going unchecked. Wynn-Williams Decl. ¶ 17. Other large tech companies like Google and Microsoft adopted similar policies to Meta's, no longer requiring sexual harassment disputes to be forced into arbitration. *Id.* Ex. B (*New York Times* article). Ms. Wynn-Williams learned of this

announced change from the 2018 *New York Times* article Meta used to publicize its new policy. *Id.* ¶ 15. Meta is thus estopped from now forcing Ms. Wynn-Williams into arbitration. Ms. Wynn-Williams relied on Meta's statements that employees would no longer be forced to arbitrate claims arising from sexual harassment. *Id.* ¶ 18. Meta unilaterally pursued arbitration here, and Ms. Wynn-Williams has opposed this arbitration at each stage. Ms. Wynn-Williams continues to be injured by this ongoing arbitration, and she is entitled to litigate in open court any disputes with Meta related to sexual harassment.

*First*, Meta made a clear promise to end its policy of requiring disputes related to employee sexual harassment to be settled in private arbitration. The promise underlying a promissory estoppel claim must be clear, unambiguous, and "definite enough that a court can determine the scope of the duty, and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." *Aceves v. U.S. Bank, N.A.*, 192 Cal. App. 4th 218, 226 (Cal. Ct. App. 2011) (quotations omitted). Meta's statements, both to the press and in its publicly available harassment policy, amount to a clear and unambiguous promise. *Cf. Sateriale*, 697 F.3d at 792 (concluding that a publicly disseminated promise akin to an advertisement was sufficiently clear and definite to support a promissory estoppel claim). The statements were definite, such that this Court can easily determine the scope of Meta's duty not to enforce a mandatory arbitration provision relating to a sexual harassment dispute, and constituted a clear assurance that Meta would not demand arbitration of sexual harassment claims such as Ms. Wynn-Williams's.

*Second*, Ms. Wynn-Williams relied on Meta's promise not to demand arbitration of sexual harassment claims, and *third*, Ms. Wynn-Williams's reliance on Meta's promise was reasonable and foreseeable. *Aceves*, 192 Cal. App. 4th at 227 (explaining elements of reasonable and foreseeable reliance). Under the doctrine of promissory estoppel, a "promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." *Garcia v. World Sav., FSB*, 183 Cal. App. 4th 1031, 1041 (Cal. Ct. App. 2010).

Ms. Wynn-Williams began speaking publicly about the sexual harassment she experienced at Meta only after she learned about Meta's 2018 commitment not to enforce its arbitration clauses.

That reliance was reasonable. Meta's 2018 statement was that it would "end[] its policy of requiring employee sexual-harassment claims to be settled in private arbitration" and "will let Facebook employees pursue those claims in court." Wynn-Williams Decl. Ex. B (*New York Times* article). Ms. Wynn-Williams reasonably understood this policy change to mean that despite the arbitration clause in Meta's Severance Agreement, she could elect to have any dispute arising out of her sexual harassment claims take place in court, rather than before an arbitrator. *Id*. ¶ 18. Meta publicly announced and touted this change to its policy, stating this was "a time when we can be part of taking the next step." *Id*. Ex. B (*New York Times* article). Ms. Wynn-Williams reasonably took this to mean it was her decision whether to consent to arbitration or not. This was not "misguided belief or guileless action," *Aceves*, 192 Cal. App. 4th at 227 (quotation omitted), especially since Meta had acknowledged it was against public policy interests to force employees to arbitrate such disputes without the option to be heard before a court. Ms. Wynn-Williams did not consent to this arbitration, which arises out of her statements in *Careless People* about the sexual harassment she experienced at Meta, and she has continued to object to this arbitration at each step.

Ms. Wynn-Williams's reliance was also foreseeable. When Meta made this public statement, it was foreseeable that Ms. Wynn-Williams—who Meta knew had compiled evidence regarding Mr. Kaplan's sexually harassing conduct—would rely on its updated statements about the company's arbitration policy. Similarly, in *Goffman v. Bank of Am., N.A*, the plaintiff's reliance was reasonably foreseeable to the defendant bank, which knew from prior communications that the plaintiff was seeking to preserve an interest and had pursued earlier relief consistent with that goal. 2012 WL 6011906, at *5 (Cal. Ct. App. Nov. 29, 2012). So too here. Ms. Wynn-Williams had pursued the relief of submitting evidence regarding Mr. Kaplan's actions, and Meta knew that she might continue to rely on its statements pertaining to employee sexual harassment claims. Meta cannot enjoy the public-relations spoils of trumpeting its new policy to bring transparency to sexual harassment disputes and then retreat into the shadows of arbitration to bury embarrassing sexual harassment allegations involving one of its senior executives. This is the exact scenario that the doctrine of promissory estoppel seeks to protect against.

*Fourth*, Ms. Wynn-Williams was injured by relying on Meta's promise. Promissory estoppel "generally entitles a plaintiff to the damages [that would be] available on a breach of contract claim." *Aceves*, 192 Cal. App. 4th at 231. Forced arbitration amounts to irreparable injury. *Empros Cap. LLC v. Rosenbach*, 2020 WL 6684854, at *9 (N.D. Cal. Nov. 12, 2020) ("Being compelled to arbitrate claims without having agreed to arbitrate them is an irreparable injury."). Ms. Wynn-Williams has been injured because she has been forced to arbitrate this sexual harassment dispute in private rather than in the public arena of a courtroom. Ms. Wynn-Williams has also suffered damages, as she has not been able to promote *Careless People* or attend paid speaking engagements as a result of the injunction stemming from the improper arbitration. *See* Wynn-Williams Decl. ¶¶ 72-76.

Ms. Wynn-Williams is thus likely to succeed on her claim that Meta is estopped from enforcing the arbitration clause. *See Winter*, 555 U.S. at 20.

**C.    Compelling Ms. Wynn-Williams to Arbitrate a Dispute Meta Has No Right to Arbitrate, While the Interim Award Continues to Suppress Her Speech and Career, Is Irreparable Harm**

Ms. Wynn-Williams faces three independent forms of irreparable harm. *First*, every day the arbitration proceeds, the Interim Award remains in force, thereby suppressing Ms. Wynn-Williams's First Amendment rights. The Supreme Court has long held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And Ms. Wynn-Williams's speech is chilled by her loss of those freedoms. *See* Wynn-Williams Decl. ¶¶ 68-72, 78-82. That alone establishes Ms. Wynn-Williams's irreparable harm.

*Second*, the ongoing arbitration is permanently damaging Ms. Wynn-Williams's career as a public policy expert. That career—her livelihood—depends upon speaking engagements and public appearances. Wynn-Williams Decl. ¶¶ 41, 42. Ms. Wynn-Williams has been compelled to decline invitations to speak following the Interim Award, such as the April 29, 2026 Organization for Social Media Safety Gala, which was held in her honor. *Id*. ¶ 72. For every speaking invitation she has been able to accept because the subject of the event is not *Careless People*, she has had to affirmatively disclaim in advance any reference to Meta or her book—which are matters of great,

urgent public concern—and sponsors, organizers, and prospective clients have curtailed or withdrawn engagements they otherwise would have offered. *Id.* ¶¶ 55, 58, 73. Meta's response to the Hay Festival and the ongoing uncertainty about the scope of the Interim Award create an escalating chilling effect on Ms. Wynn-Williams's ability to accept *any* invitation going forward. Such "intangible injuries" to professional goodwill are not easily measured or fully compensable in damages and therefore "qualify as irreparable harm." *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012) (quoting *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).

*Third*, being forced to arbitrate an unarbitrable dispute "is *per se* irreparable harm." *Morgan Stanley*, 134 F. Supp. 3d at 1235; *see also id.* at 1235 n.21 (collecting cases). As the court in *Morgan Stanley* observed, this *per se* rule follows from "the underlying (and obvious) principle that a party should not be required to arbitrate disputes where the party initiating the arbitration has no right to do so." *Id.* at 1236. As discussed in Section II.A, *supra*, Meta cannot compel arbitration of this dispute. Rather, under the EFAA, Ms. Wynn-Williams is entitled to avoid arbitration, and the statute is clear that arbitrability of agreements within its scope "shall be determined by a court, rather than an arbitrator, … irrespective of whether the agreement purports to delegate such determinations to an arbitrator." 9 U.S.C. § 402(b). *Compare id. with Coinbase*, 602 U.S. at 149 (explaining parties may ordinarily delegate the question of arbitrability). Absent an injunction, Ms. Wynn-Williams must expend significant resources defending herself in a forum the EFAA entitles her to avoid and faces the prospect of an adverse final award that would itself need to be unwound.

### D.   The Balance of Equities Tips Sharply in Ms. Wynn-Williams's Favor

The balance of equities weighs strongly in Ms. Wynn-Williams's favor. The Court must "identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it," and weigh "the hardships of each party against one another." *Univ. of Haw. Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999); *see also Winter*, 555 U.S. at 24-25.

Simply put, Meta has nothing on its side of the scale. Meta has never identified a concrete harm that enjoining the Interim Award or the Arbitration would inflict on the company. Meta is one of the world's largest and most powerful corporations. Measured by market capitalization, today Meta is the world's seventh most valuable publicly traded company, exceeding Berkshire Hathaway, JPMorgan Chase, Exxon Mobil, Philip Morris, and Bank of America. *See* Yahoo Finance, *Equities by Market Cap* (last visited June 22, 2026), https://finance.yahoo.com/research-hub/screener/largest_market_cap/?start=0&count=100 [https://perma.cc/DVY9-VA2N]. Its power is such that its leadership sits at tables with the Presidents of the United States, China and other nations. It has virtually unlimited resources to ensure that its message on any issue reaches almost any audience. Whatever interest Meta could have once claimed in suppressing the message of *Careless People* through monetary sanctions for purported violations of the Interim Award has long since evaporated. The book has been published, has sold widely, and has become a #1 *New York Times* bestseller. Wynn-Williams Decl. ¶ 38; O'Brien Decl. Ex. H (*New York Times* bestseller list). The publication of Careless People has not affected Meta's position as one of the world's largest and most powerful companies; its $200 billion in revenue in 2025 was 22% higher than the year before. *See* Meta Platforms, Inc., *Meta Reports Fourth Quarter and Full Year 2025 Results* (Jan. 28, 2026), https://investor.atmeta.com/investor-news/press-release-details/2026/Meta-Reports-Fourth-Quarter-and-Full-Year-2025-Results/default.aspx [https://perma.cc/HX58-ZFMW]. Any countervailing interest Meta might be able to identify can be protected in court.

### E.    The Public Interest Is Served by an Injunction

The public interest decisively favors preliminary relief. The primary focus of this inquiry is the impact of the injunction on "non-parties." *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014); *cf. Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (explaining the "significant public interest in upholding free speech principles," because violations of those principles "infringe not only the free expression interests of plaintiffs, but also the interests of other people subjected to the same restrictions") (cleaned up). That public interest is at its zenith here, as *Careless People* relates to matters of substantial public concern. Ms. Wynn-

Williams was a policy employee at one of the world's largest and influential companies, and the memoir is a firsthand look at the gender-based discrimination and sexual harassment Ms. Wynn-Williams endured there as well as how Meta offered to censor its products to enter the Chinese market then lied about it to Congress, offered advertisers the personal information of vulnerable teenage users including the ability to target teen girls at the moment they had deleted selfies and were feeling "worthless" and contributed to genocide in Myanmar, among other topics "plainly relate[d] to broad issues of interest to society at large." *Snyder v. Phelps*, 562 U.S. 443, 454 (2011). Speech on these issues lies at the "heart of the First Amendment's protection." *Id*. at 451-52 (citation omitted). The arbitration, and the Interim Award, deprive the public of one of the few primary sources that can explain what Meta is, what drives it, and how its culture shapes its political and societal impact—questions that are among the defining issues of the modern era.[10] Ms. Wynn-Williams also has unique expertise in public policy matters unrelated to Meta or *Careless People*— including the geopolitical implications of artificial intelligence and emerging technologies—that are of urgent and increasing public importance, particularly as society absorbs the lessons of the social-media era. Wynn-Williams Decl. ¶ 41.

The public is also clearly interested in hearing Ms. Wynn-Williams speak. The Senate Judiciary Committee is conducting a bipartisan investigation into the issues raised by Ms. Wynn-Williams in *Careless People*, a process that has included letters of inquiry to Mr. Zuckerberg and testimony by Ms. Wynn-Williams before Congress. *See* O'Brien Decl. Exs. I–M, P (Ltrs.); Jud. Comm. Hr'g, *supra*. Those investigations are ongoing, with another hearing entitled "Examining Tech Industry Practices and the Implications for Users and Families: Is This Social Media's Big Tobacco Moment?" scheduled in the coming weeks where technology company CEOs including Mark Zuckerberg have been invited to testify. *See* Gold, *supra*, at 10.

---

[10] Of course, Meta might not like what Ms. Wynn-Williams has to say. But whether speech is "controversial" is "irrelevant to the question whether it deals with a matter of public concern." *Snyder*, 562 U.S. at 453 (citation omitted). As Meta acknowledged just months before it obtained a prior restraint on Ms. Wynn-Williams's speech, the robust exchange of ideas "can be messy …. But that's free expression." Wynn-Williams Decl., Ex. E (Jan. 7, 2025 Press Release).

The public interest is further disserved by allowing arbitration to proceed where the parties have not validly agreed to arbitrate. *See, e.g.*, *Morgan Stanley*, 134 F. Supp. 3d at 1235; *Sykes v. Escueta*, 2010 WL 4942608, at *5 (N.D. Cal. Nov. 29, 2010). That principle has even greater weight here, because Congress enacted the EFAA precisely to vindicate the public interest in keeping sexual harassment disputes out of forced arbitration. *See* 9 U.S.C. §§ 401-402; § II.A, *supra*. And Meta itself publicly committed in 2018 and 2022 not to enforce arbitration of sexual harassment claims. The public has a manifest interest in holding employers to those commitments. § II.B, *supra*.

The stakes for the public interest are reflected in Meta's true rationale for maintain the Arbitration and the Interim Award: the opportunity to unlawfully silence and punish Ms. Wynn-Williams for telling the public the unvarnished truth about the company and its executives and to send a message to others who may wish to blow the whistle on Meta in the future. Meta's own shifting rationale confirms as much. What began as a defamation theory aimed at the book's publishers (the March 6, 2025, letter) became a non-disparagement theory against Ms. Wynn-Williams alone (the March 7, 2025, demand) and has now devolved into an effort to drive her out of public life (the March 28, 2026, sanctions motion and June 12, 2026, addendum). That progression is telling. Meta abandoned its defamation theory the day after raising it, as succeeding on a defamation claim would have required Meta to prove that Ms. Wynn-Williams's account is false—a burden it has never attempted to carry. And its *ex parte* pursuit of the overbroad and vague proscriptions of the Interim Award, ongoing surveillance of Ms. Wynn-Williams, and aggressive exploitation of the Award to seek sanctions after every public appearance she makes demonstrate that Meta is not merely attempting to enforce an alleged non-disparagement promise but seeking to intimidate, harass and punish a whistleblower, enabled by the misguided arbitration process. The Court should preliminarily enjoin that process while the Court considers the important issues raised by this Complaint.

**CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests the Court vacate the Interim Award and preliminarily enjoin the ongoing Arbitration, including the Interim Award and Meta's attempts to enforce it, pending its resolution of Plaintiff's underlying Complaint.

Dated:   June 25, 2026                                  Respectfully submitted,


By: /s/ Felicia M. Gilbert
_____

**KATZ BANKS KUMIN LLP**
Felicia Gilbert (SBN #276348)
235 Montgomery Street, Suite 665
San Francisco, CA 94104
Tel: 415-813-3260
gilbert@katzbanks.com

Debra S. Katz*
Avi Kumin (SBN #218893)**
11 Dupont Circle NW, Suite 600
Washington, DC 20036
Tel: 202-299-1140
katz@katzbanks.com
kumin@katzbanks.com

**SELENDY GAY PLLC**
Philippe Z. Selendy*
Jennifer M. Selendy*
Claire E. O'Brien*
Corey Stoughton*
Drake Reed*
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
jselendy@selendygay.com
cobrien@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com


* Application for admission *pro hac vice* forthcoming
** Application for admission to the Northern District of California Forthcoming

*Counsel for Plaintiff Sarah Wynn-Williams*