Mathew S. Rosengart (SBN CA 255750)
Mark D. Kemple (SBN CA 145219)
Alex Linhardt (SBN CA 303669)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121
Telephone: 310.586.7700
Facsimile: 310.586.7800
rosengartm@gtlaw.com
kemplem@gtlaw.com
linhardta@gtlaw.com

Jonathan F. Cohn (DC 476551) (*PHV forthcoming*)
Mary Elizabeth Miller (DC 252694) (*PHV forthcoming*)
200 Massachusetts Ave., NW, Suite 700
Washington, DC 20001
William T. Thompson (TX 24088531) (*PHV forthcoming*)
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
LEHOTSKY COHN LLP
Telephone: (512) 693-8350
Facsimile: (512) 727-4755
jon@lehotskycohn.com
mary@lehotskycohn.com
will@lehotskycohn.com

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| SARAH WYNN-WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | CASE NO. 4:26-CV-06341<br><br>**DECLARATION OF ALEX LINHARDT IN SUPPORT OF META PLATFORMS, INC.'S MOTION TO COMPEL ARBITRATION AND STAY FURTHER PROCEEDINGS UNDER 9 U.S.C. §§ 3, 4**<br><br>Complaint Filed Date: June 25, 2026<br><br>***Hearing Date Pending Judicial Assignment***<br>Judge: _____<br>Date: _____<br>Time: _____<br>Courtroom: \_\_ |

## DECLARATION OF ALEX LINHARDT

I, Alex Linhardt, hereby declare as follows:

1. I am an attorney licensed and admitted to practice law before the Northern District of California and all courts in the State of California. I am a shareholder at Greenberg Traurig, LLP and counsel representing Defendant Meta Platforms, Inc. ("Meta") in the above-captioned case. I make this declaration based on my personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

2. I respectfully submit this declaration in support of Meta's Motion to Compel Arbitration and Stay Further Proceedings Under 9 U.S.C. §§ 3, 4.

3. Attached hereto as **Exhibit A** is a true and correct copy of the Severance Agreement executed by the parties, as acknowledged by Sarah Wynn-Williams in the Complaint (*see, e.g.*, Compl. ¶¶ 6, 74, 101).

4. Attached hereto as **Exhibit B** is a true and correct copy of Meta's March 7, 2026 Application for Emergency Relief.

5. Attached hereto as **Exhibit C** is a is a true and correct copy of Meta's March 7, 2025 Demand for Arbitration.

6. Attached hereto as **Exhibit D** is a true and correct copy of Meta's March 24, 2025 Amended Demand for Arbitration.

7. Attached hereto as **Exhibit E** is a true and correct copy of the arbitrator's March 31, 2025 Order Denying Ms. Wynn-Williams' Emergency Motion to Vacate Interim Award.

8. Attached hereto as **Exhibit F** is a true and correct copy of the arbitrator's March 12, 2025 Interim Award.

9. Attached hereto as **Exhibit G** is a true and correct copy of Ms. Wynn-Williams' March 18, 2025 Motion to Vacate the Interim Award.

10. Attached hereto as **Exhibit H** is a true and correct copy of Ms. Wynn-Williams' March 21, 2025 Comments for ICDR Review.

DECLARATION OF ALEX LINHARDT ISO META PLATFORMS, INC.'S MOTION TO COMPEL ARBITRATION, CASE NO. 4:26-CV-06341

11.     Attached hereto as **Exhibit I** is a true and correct copy of Macmillan's March 21, 2025 Supplemental Brief.

12.     Attached hereto as **Exhibit J** is a true and correct copy of Ms. Wynn-Williams' April 22, 2025 Answering Statement and Counterclaim.

13.     Attached hereto as **Exhibit K** is a true and correct copy of Ms. Wynn-Williams' April 22, 2025 Objections to Arbitrability of Meta's Claims.

14.     Attached hereto as **Exhibit L** is a true and correct copy of Ms. Wynn-Williams' July 21, 2025 Letter Brief addressing the scope of discovery in the arbitration.

15.     Attached hereto as **Exhibit M** is a true and correct copy of Meta's March 5, 2026 letter to the arbitrator.

16.     Attached hereto as **Exhibit N** is a PDF of emails from Ms. Wynn-Williams in response to Meta's March 5, 2026 letter to the arbitrator.

17.     Attached hereto as **Exhibit O** is a PDF of emails containing an email from Ms. Wynn-Williams' counsel at Selendy Gay when they appeared in the arbitration on April 3, 2026

18.     Attached hereto as **Exhibit P** is a true and correct copy of Meta's March 27, 2026 Application for Sanctions.

19.     Attached hereto as **Exhibit Q** is a true and correct copy of Ms. Wynn-Williams' April 27, 2026 Opposition to Meta's Application for Sanctions.

20.     Attached hereto as **Exhibit R** is a true and correct copy of Ms. Wynn-Williams' April 20, 2026 letter to the arbitrator.

21.     Attached hereto as **Exhibit S** is a true and correct copy of Meta's May 6, 2026 letter to the arbitrator.

22.     Attached hereto as **Exhibit T** is a true and correct copy of Ms. Wynn-Williams' May 6, 2026 letter to the arbitrator.

23.     Attached hereto as **Exhibit U** is a PDF of an email from the arbitrator on May 7, 2026.

DECLARATION OF ALEX LINHARDT ISO META PLATFORMS, INC.'S MOTION TO COMPEL ARBITRATION, CASE NO. 4:26-CV-06341

24.    Attached hereto as **Exhibit V** is a true and correct copy of the Protective Order executed by the arbitrator on June 15, 2026.

25.    Attached hereto as **Exhibit W** is a true and correct copy of Ms. Wynn-Williams' April 20, 2026 letter to the arbitrator.

26.    Attached hereto as **Exhibit X** is a true and correct copy of Ms. Wynn-Williams' June 18, 2026 Opposition to Meta's Addendum to the Application for Sanctions.

27.    In addition to the above, I attest that over the course of more than 15 months, Ms. Wynn-Williams, through her counsel, has attended status conferences, met and conferred with Meta's counsel, and submitted letter briefs, seeking resolution of issues the parties could not resolve, including on the scope of discovery.

28.    Ms. Wynn-Williams also propounded voluminous discovery requests on Meta, including 73 requests for admission, 59 requests for production, and 11 interrogatories.

29.    In the arbitration, the parties have actively negotiated discovery issues for months. I sent a draft protective order to Ms. Wynn-Williams' new counsel on April 8, 2026, and Ms. Wynn-Williams' counsel proposed an extensive redline on April 24, 2026. Ms. Wynn-Williams' counsel and I continued to negotiate the protective order for another seven weeks, exchanging additional redlines and submitting disputed provisions to the arbitrator twice, before the arbitrator finally entered the protective order on June 15, 2026.

30.    On June 18, 2026, following the entry of the protective order, Ms. Wynn-Williams' counsel agreed to provide responses to Meta's 68 discovery requests in the arbitration by June 26, 2026. Although Plaintiff filed the Complaint on June 25, 2026, she served substantive responses to Meta's discovery requests in the arbitration—including verified interrogatory responses—the very next day, on June 26, 2026. Likewise, Meta has served its responses to Ms. Wynn-Williams' voluminous discovery and produced documents.

DECLARATION OF ALEX LINHARDT ISO META PLATFORMS, INC.'S MOTION TO COMPEL ARBITRATION, CASE NO. 4:26-CV-06341

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 6, 2026, in Los Angeles, California.

/s/ Alex Linhardt
Alex Linhardt (SBN CA 303669)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121
Telephone:310.586.7700
Facsimile: 310.586.7800
linhardta@gtlaw.com

5

DECLARATION OF ALEX LINHARDT ISO META PLATFORMS, INC.'S MOTION TO COMPEL ARBITRATION, CASE NO. 4:26-CV-06341

# Exhibit A

*For FB internal use only:*
*Signed copy received on _____ by _____*

August 24, 2017

**_VIA Hand Delivery_**

Sarah Wynn-Williams

<span style="background:black">████████████</span>

Re:    Severance Agreement and Release

Dear Sarah:

This letter summarizes the terms of your separation from employment with Facebook, Inc. and/or any of its subsidiaries or corporate affiliates ("**Company**") and the severance agreement and release between you and the Company ("**Agreement**"). The purpose of this Agreement is to establish an amicable arrangement for ending your employment relationship, for you to release the Company of any claims and to resolve any disputes you may have with the Company regarding your employment or separation from that employment, and to permit you to receive severance pay and related benefits to the extent specified below. With these understandings and in exchange for the promises of you and the Company as set forth below, you and the Company agree as follows:

**1.    Employment Status:**

(a)    The Company intends that your employment will end on November 10, 2017. Both parties agree that you are not to engage in any work on behalf of the Company between the date of this Agreement and the Separation Date. The date on or before November 10, 2017, that your employment actually ends will be referred to hereafter as the "**Separation Date**." On the Separation Date you will be paid all of your accrued but unused PTO and all of your salary earned, but unpaid, less all legally required and permitted deductions and withholdings, through the Separation Date. As of the Separation Date, your salary will cease. Any entitlement you have or might have under a Company-provided benefit plan, program, contract or practice will terminate in accordance with the terms of those plans.

**2.    Consideration:** In exchange for, and in consideration of, your full execution and return of this Agreement no later than 5:00 pm PT on September 6, 2017, and the supplemental release of claims attached hereto as Exhibit B (which you must sign on or within 3 days after your Separation Date) the Company agrees as follows:

(a)    Severance Pay: Although you are not otherwise entitled to receive any severance pay from the Company, the Company will pay you a lump-sum severance amount of $580,000.00, plus any additional amount that reflects your salary between the Separation Date and November 10, 2017 (if any), less all legally required and permitted payroll deductions and withholdings.

(b)    Attorney's Fees: The Company will also pay a lump sum payment in the amount of Twenty-Thousand dollars ($20,000.00) made payable to "Rudy, Exelrod, Zieff & Lowe, LLP"

representing compensation for attorneys' fees and costs incurred by you. This payment will be made within 7 days of the Separation Date. Facebook will issue 1099 Forms(s) to both the law firm and to you for this payment.

(c)    Second Payment: Provided you have not materially violated Sections 9, 10, or 12 of this Agreement at the time the payment is due, the Company will also pay you an additional amount of $200,000, less all legally required and permitted payroll deductions and withholdings, within 90 days of the Separation Date.

(d)    COBRA: The Company will pay the COBRA premiums for you to continue health benefits for yourself and all of your eligible dependents so that your coverage continues through and until May 31, 2018, provided you are eligible and timely apply for COBRA benefits.

(e)    Career Outplacement Services: The Company has contracted with Lee Hect Harrison ("**LHH**") to provide you with career outplacement services for whichever period is less: (i) six (6) months, or (ii) until you accept other full-time employment. You must commence using these outplacement services no later than 60 days after the Separation Date. Enclosed is a summary of LHH's outplacement services.

(f)    The Company knows of no reason to contest any claims you make to California's EDD for unemployment benefits after your Separation Date.

(g)    The Company agrees that you will have the opportunity to announce your own departure from Facebook on or before the Separation Date.

All compensation described herein shall be subject to all applicable federal, state and/or local withholding and/or payroll taxes.

**3.    Equity:** To the extent that you hold any Facebook equity awards, such as stock options or restricted stock units ("**RSUs**") or any underlying shares of Facebook stock, these equity awards remain subject to the terms and conditions of the applicable agreement(s) signed by you and the terms and conditions of the Company's 2005 Stock Plan and/or 2012 Equity Incentive Plan ("**Equity Agreements**"). If you would like a report regarding the status of your equity awards, please send an email to ▮▮▮▮▮▮▮▮▮▮

**4.    Government Agency Claims:** Nothing in this Agreement, including the Release provision in Section 5, the Non-Disparagement provision in Section 9, the Confidentiality provision in Section 12, and the Cooperation provision in Section 13, should be read to prevent or prohibit you from filing a claim with a federal, state or local government agency that is responsible for enforcing a law on behalf of the government, such as the Equal Employment Opportunity Commission ("EEOC"), Department of Labor ("DOL"), National Labor Relations Board ("NLRB") or Securities Exchange Commission ("SEC") and their applicable state and/or local equivalents. Nor should anything in this Agreement be read to deter or prevent you from cooperating with or providing information to such a governmental agency during the course of its investigation or during litigation. However, you understand and agree that you may not recover any monetary benefit as a result of any claim brought on your behalf by any government agency.

2

**5.    Release:**

(a)    Except as described in Section 4, in exchange for the consideration described in Section 2, which is in addition to anything of value to which you are entitled to receive, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, you and your representatives, agents, estate, heirs, successors and assigns, absolutely and unconditionally hereby release, remise, discharge, and hold harmless the Company Releasees ("**Company Releasees**") defined to include the Company and/or any of its parents, subsidiaries or affiliates, predecessors, successors or assigns, and its and their respective current and/or former partners, directors, shareholders/stockholders, officers, employees, employee benefit plans, insurers, attorneys and/or agents, all both individually and in their official capacities), from any and all legally waivable actions or causes of action, suits, claims, complaints, contracts, liabilities, agreements, promises, contracts, torts, debts, damages, controversies, judgments, rights and demands, whether existing or contingent, known or unknown, suspected or unsuspected, which arise out of your employment with, change in employment status with, and/or separation of employment from, the Company.  This release is intended by you to be all-encompassing and to act as a full and total release of any legally waivable claims, whether specifically enumerated herein or not, that you may have or have had against the Company Releasees arising from conduct occurring up to and through the date of this Agreement, including, but not limited to, any legally waivable claims arising from any federal, state or local law, regulation or constitution dealing with either employment, employment benefits or employment discrimination including any claims or causes of action you have or may have relating to discrimination under federal, state or local statutes including, but not limited to, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964, the Employee Retirement Income Security Act of 1974, the Americans with Disabilities Act, the Family and Medical Leave Act, the California Fair Employment and Housing Act, the California Civil Code, all as amended from time to time, and, if you were located and worked for the Company outside the State of California, the non-exhaustive list of statutes set forth on Schedule 1 hereto for your particular location (as applicable); any contract, whether oral or written, express or implied; any tort; any claim for equity or other benefits; or any other statutory and/or common law claim.

(b)    You acknowledge that your execution of this Agreement shall be effective as a bar to each and every claim specified in Sections 5(a) and 6 of this Agreement.  Accordingly, you hereby expressly waive any and all rights and benefits conferred upon you by the provisions of Section 1542 of the California Civil Code (or analogous statute(s) from any other state) and expressly consent that this Agreement shall be given full force and effect with respect to each and all of its express terms and provisions, including those related to unknown and/or unsuspected claims, if any, as well as those relating to any other claims specified in Sections 5(a) and 6 of this Agreement.  Section 1542 provides as follows:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

You further represent that you understand and acknowledge the significance and consequence of such release as well as the specific waiver of Section 1542.

3

(c)    The only exceptions to this release are any claim(s) you may have for:

(i)    Unemployment benefits pursuant to the terms of applicable law (to the extent available to you under applicable law);

(ii)    Workers' compensation insurance benefits pursuant to Division 4 of the California Labor Code or a comparable and applicable state law, under the terms of any workers' compensation insurance policy or fund of the Company;

(iii)    Continued participation in certain of the Company's medical, dental, vision health benefit plans pursuant to the terms and conditions COBRA, if applicable, and/or any applicable state law counterpart to COBRA;

(iv)    Any benefit entitlements vested as of your Separation Date, pursuant to written terms of any applicable employee benefit plan sponsored by the Company; and

(v)    Any claims that, as a matter of applicable law, are not waivable.

(d)    The release in Section 5(a) and full payment representation in Section 6 of this Agreement do not include any claim which, as a matter of law, cannot be released by private agreement, nor, as described in Section 4, does this release prevent or prohibit you from filing a claim with a federal, state or local government agency that is responsible for enforcing a law on behalf of the government.

6.    **Full Payment:**  The amounts set forth above in Section 2 shall be complete and unconditional payment, settlement, accord and/or satisfaction with respect to all obligations and liabilities of the Company Releasees to you, including, without limitation, all claims for disputed compensation or benefits, including, bonuses, stock and stock options, commissions, severance pay, reimbursement of expenses or other costs or sums.

7.    **Company Files, Documents and Other Property:**  You agree that on or before the Separation Date you will return to the Company all Company property and materials, including but not limited to (if applicable), personal computers, laptops, fax machines, scanners, copiers, cellular phones, Company credit cards and telephone charge cards, manuals, building keys and passes, courtesy parking passes, diskettes, intangible information stored on diskettes, software programs and data compiled with the use of those programs, software passwords or codes, tangible copies of trade secrets and confidential information, sales forecasts, names and addresses of Company customers and potential customers, customer lists, customer contacts, sales information, sales forecasts, memoranda, sales brochures, business or marketing plans, reports, projections, and any and all other information or property previously or currently held or used by you that is or was related to your employment with the Company ("**Company Property**"). You agree that in the event that you discover any other Company Property in your possession after your Separation Date, you will immediately return such materials to the Company.

8.    **Final Expense Reimbursement Request.**  You understand that you are no longer expected to perform duties on behalf of Facebook, and as of the date of this Agreement, you are not authorized to incur any additional work-related expenses without prior authorization from HR or

4

Legal. You agree that on or before October 31, 2017, you will submit to the Company all final requests for reimbursement of any business expenses you were required to incur in performing your job for the Company prior to that date. You understand and agree that all such reimbursements will be subject to the terms and conditions of the Company's then current Travel and Expense Reimbursement policy and other applicable policies and procedures.

9.     **Nondisparagement**: Except as described in Section 4, and not including any testimony given truthfully under oath or as required by any other legal proceeding, you agree not to make disparaging, critical or otherwise detrimental comments to any person or entity concerning the Company, its officers, directors or employees; the products, services or programs provided or to be provided by the Company; the business affairs, operation, management or the financial condition of the Company; or the circumstances surrounding your employment and/or separation of employment from the Company. The foregoing paragraph, is not intended to restrict your good faith expressions of opinion or competitive comparisons involving Company that are not disparaging and are offered in the scope of your future employment or business ventures, so long as any such statements do not rely upon confidential or proprietary information of the Company. Nor is the term "circumstances surrounding your employment" intended to restrict your ability to describe your role, responsibilities and achievements during your employment with the Company. The Company agrees not to issue any internal or public statements or press releases concerning you, your employment with or departure from the Company containing disparaging, critical or otherwise detrimental comments concerning you. If you wish Facebook to provide employment verification to a future employer, please refer all reference requests to ████████ (or if this number is discontinued, then ████████

10.     **Unauthorized Media Statements**: In any communications with the media ("**Media Statements**"), you agree that you will not represent yourself as authorized to speak on behalf of Facebook, or otherwise imply that any statements you make are representative of the views or policies of Facebook without advance, express written permission from an authorized representative of Facebook's Communications Department. Media Statements include but are not limited to statements made on television, radio, internet blogs, sites, or videos, or newspapers or magazines, or any other form of media, whether in electronic or other format, or any other form of media ("**Media**") about the Company's and/or any of its current or future parent companies, subsidiaries, affiliates, successors or assigns' (collectively "**Facebook**") business, technologies, market position, employment policies and practices, employees (past and present), operations, products or services ("**Facebook Business**"). You understand and agree that this covenant against unauthorized Media Statements is reasonable and will prevent your being perceived by any member of the public as speaking on behalf of Facebook or as an authority on Facebook, particularly on matters which you have incomplete, stale or incorrect information. If you make any unauthorized Media Statement about Facebook Business to the Media wherein you represent yourself as authorized to speak on behalf of Facebook, or otherwise imply that any statements you make are representative of the views or policies of Facebook without advance, express written permission from Facebook's Communications Department, the act shall constitute a material breach of this Agreement.

11.     **Prior Agreement**: You understand and agree that you have continuing obligations under the Confidential Information and Inventions Assignment Agreement between you and the

Company dated June 26, 2011 ("**CIIAA**"). A copy of the CIIAA is attached hereto as Exhibit A and incorporated herein by reference. You reaffirm your commitment under the CIIAA in this Agreement, and agree that, as part of this Agreement, you will comply fully with the terms of the CIIAA. You also confirm that you have not violated the CIIAA.

**12.     Confidentiality**: Except as described in Section 4, you agree that you will not disclose to others the fact or terms of this Agreement, except that you may disclose such information to your attorney or accountant in order for such individuals to render services to you and to members of your immediate family.

**13.     Cooperation**: Except as described in Section 4, you agree to make yourself reasonably available to the Company to respond to reasonable requests by the Company for information pertaining to or relating to the Company and/or its subsidiaries, affiliates, partners, directors, officers, agents or employees that may be within your knowledge. Moreover, you agree to cooperate fully with the Company in connection with any and all existing or future litigation or investigations brought by or against the Company or any of its subsidiaries, affiliates, partners, directors, officers, agents or employees, whether administrative, civil or criminal in nature, in which and to the extent the Company reasonably deems your cooperation necessary. The Company will reimburse you for any expenses you incur by cooperating with the Company in response to its reasonable requests.

**14.     No Filing of Claims**: You represent and warrant that you do not presently have on file any claims, charges, grievances, actions, appeals or complaints against Company Releasees in or with any administrative, state, federal or governmental entity, agency, board or court, or before any other tribunal or arbitrator(s), public or private, based upon any actions occurring prior to the date of this Agreement.

**15.     Tax Compliance**: It is the intent of the parties that the provisions of this Agreement to comply with all applicable requirements of Internal Revenue Code Section 409A. Payments under this Agreement are intended to be exempt from Code Section 409A under the short-term deferral exception under Treasury Regulation 1.409A-1(b)(4). To the extent there is any ambiguity as to whether one or more provisions of this Agreement would otherwise contravene the applicable requirements or limitations of Code Section 409A, then those provisions shall be interpreted and applied in a manner that does not result in a violation of the applicable requirements or limitations of Code Section 409A and the applicable Treasury Regulations thereunder.

**16.     Certain Covenants and Representations; Governing Law:**

(a)     Except as explicitly provided herein, this Agreement sets forth the complete and sole agreement between the parties and supersedes any and all other agreements or understandings, whether oral or written, between you and the Company. As such, the CIIAA and the Equity Agreements referenced herein shall remain in full force and effect in accordance with their respective terms. This Agreement may not be changed, amended, modified, altered or rescinded except upon the express written consent of both the CEO of the Company and you.

(b)     If any provision of this Agreement, or part thereof, is held invalid, void or voidable as against public policy or otherwise, the invalidity shall not affect other provisions, or parts thereof, which may be given effect without the invalid provision or part. To this extent, the provisions and

6

parts thereof of this Agreement are declared to be severable. Any waiver of any provision of this Agreement shall not constitute a waiver of any other provision of this Agreement unless expressly so indicated otherwise. The language of all parts of this Agreement shall in all cases be construed according to its fair meaning and not strictly for or against either of the parties.

    (c)    Any claims arising out of this Agreement (or any other claims arising out of the relationship between the parties) shall be governed by and construed in accordance with the laws of the State of California and shall in all respects be interpreted, enforced and governed under the internal and domestic laws of California, without giving effect to the principles of conflicts of laws of such state. Any claims or legal actions by one party against the other shall be commenced and maintained in a court of competent jurisdiction in the jurisdiction in which your assigned Company office is located, and you hereby submit to the jurisdiction and venue of any such court.

    (d)    **Arbitration:** The parties agree that any and all disputes arising out of the terms of this Agreement, their interpretation, and any of the matters herein released, shall be subject to arbitration, before the American Arbitration Association ("AAA") in accordance with the Employment Arbitration Rules and Mediation Procedures, **including its Optional Rules for Emergency Measures of Protection, to the extent not inconsistent with the terms of this Agreement.** The rules can be found at www.adr.org. All fees and costs of the Arbitrator and AAA will be paid for by the Company. The arbitrator may grant injunctions and other relief in such disputes. The arbitrator shall administer and conduct any discovery in accordance with the Federal Rules of Civil Procedure or any other discovery required by state law in arbitration proceedings. Also, to the extent that any of the Employment Arbitration Rules and Mediation Procedures of the AAA or anything in this Agreement conflicts with any arbitration procedures required by law, the arbitration procedures required by law shall govern. Employee and Employer also agree that nothing in this Agreement relieves either of them from any obligation they may have to exhaust certain administrative remedies before arbitrating any claims or disputes under this Agreement.

    The decision of the arbitrator shall be final, conclusive, and binding on the parties to the arbitration. The parties agree that the prevailing party in any arbitration shall be entitled to relief in any court of competent jurisdiction to enforce the arbitration award. THE PARTIES HEREBY AGREE TO WAIVE THEIR RIGHT TO HAVE ANY DISPUTE BETWEEN THEM RESOLVED IN A COURT OF LAW BY A JUDGE OR JURY. Notwithstanding the foregoing, this section will not prevent either party from seeking preliminary injunctive relief (or any other provisional remedy) from any court having jurisdiction over the parties and the subject matter of their dispute relating to this Agreement and the agreements incorporated herein by reference. Should any part of the arbitration agreement contained in this Paragraph conflict with any other arbitration agreement between the parties, the parties agree that this arbitration agreement shall govern.

    (e)    This Agreement shall not be construed as an admission by you or the Company of any wrongful act, unlawful discrimination, or breach of contract.

(f)    In the event that the Company prevails in any action to establish that you have materially violated Sections 9, 10, or 12 of this Agreement, you will owe the Company $50,000 in liquidated damages for each material violation you are found to have committed.

(g)    You acknowledge that, together with liquidated damages and any other relief that may be appropriate, you will be subject to a permanent injunction and/or temporary restraining order for any violations of this Agreement, including any violations of the CIIAA attached as Exhibit A or any breach of Sections 9, 10, and 12. In the event that the Company prevails in any action brought by the Company to enforce any provision of this Agreement or the CIIAA attached as Exhibit A (including but not limited to an action for a permanent injunction or a temporary restraining order).

(h)    You may not assign any of your rights or delegate any of your duties under this Agreement. The rights and obligations of the Company shall inure to the benefit of the Company's successors and assigns.

(i)    The failure or any delay on the part of the Company to exercise any right, remedy, power or privilege under this Agreement shall not operate as a waiver thereof, nor shall any single or partial exercise of any right preclude any other or further exercise of the same or of any other right, nor shall any waiver of any right with respect to any occurrence be construed as a waiver of such right with respect to any other occurrence.

(j)    This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

If this letter correctly states the agreement and understanding we have reached, please indicate your acceptance by countersigning the enclosed copy and returning it to Chelsea Bedard ▮▮▮▮▮▮▮▮▮▮▮ no later than 5:00 pm PT on September 6, 2017.

Best regards,

Facebook, Inc.

By: _____

Name: Heidi Swartz

Title: Director and Associate General Counsel

I REPRESENT THAT I HAVE READ THE FOREGOING AGREEMENT, THAT I FULLY UNDERSTAND THE TERMS AND CONDITIONS OF SUCH AGREEMENT AND THAT I AM KNOWINGLY AND VOLUNTARILY EXECUTING THE SAME WITHOUT DURESS OR COERCION FROM ANY SOURCE. IN ENTERING INTO THIS AGREEMENT, I DO NOT RELY ON ANY REPRESENTATION, PROMISE OR INDUCEMENT MADE BY THE COMPANY OR ITS REPRESENTATIVES WITH THE EXCEPTION OF THE CONSIDERATION DESCRIBED IN THIS DOCUMENT.

Accepted and Agreed to:

_____
Sarah Wynn-Williams

Date: 9/ 6/ 2017

9

## SCHEDULE 1

If you were located and worked for the Company outside the State of California and in one of the states enumerated below, you acknowledge and agree that the release set forth in Section 5(a) includes, but is not limited to, a release of all legally waivable claims under the statutes identified below for your particular location:

| | |
|---|---|
| Illinois | Illinois Human Rights Act |
| | Illinois Wage Payment and Collection Act |
| | Illinois Workers' Compensation Act |
| | Illinois Equal Pay Laws |
| | Illinois Minimum Wage Law |
| | Family Military Leave Requirement |
| Michigan | Elliott-Larsen Civil Rights Act |
| | Michigan Persons with Disabilities Civil Rights Act |
| | Whistleblowers' Protection Act |
| | Minimum Wage Law |
| | Equal Pay Law |
| New York | New York State Human Rights Law |
| | New York City Humans Rights Law (where applicable) |
| | New York State Labor Relations Act |
| | New York Equal Rights Law |
| | New York Wage Hour and Wage Payment Law |
| | New York Minimum Wage Law |
| | New York WARN |
| Oregon | Oregon Equal Pay for Equal Work Act |
| | Oregon Fair Employment Practices Act |
| | Oregon Handicapped Persons' Civil Rights Act |
| | Oregon Whistleblower Protection Law |
| | Oregon Family and Medical Leave Law |
| | Oregon Wage Law |
| Texas | Texas Commission on Human Rights Act |
| | Texas Employment Discrimination Law |
| | Texas Disability Discrimination Law |
| | Texas State Wage Payment and Work Hour Laws |
| Washington | Law Against Discrimination |
| | Washington State Civil Rights Act |
| | Washington Age Discrimination Law |
| | Washington Family Leave Act |
| | Washington Equal Pay Law |
| | Washington Sex Discrimination Law |
| | Washington Wage Payment and Work Hour Law |
| | Washington Family Leave Act |

**EXHIBIT A**

**CONFIDENTIAL INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT**

# facebook

## CONFIDENTIAL INFORMATION AND
## INVENTION ASSIGNMENT AGREEMENT

### FOR EMPLOYEES

As a condition of my becoming employed (or my employment being continued) by or retained as a consultant (or my consulting relationship being continued) by Facebook, Inc., a Delaware corporation or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company" or "Facebook"), and in consideration of my employment or consulting relationship with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

1. **Employment or Consulting Relationship**. I understand and acknowledge that this Agreement does not alter, amend or expand upon any rights I may have to continue in the employ of, or in a consulting relationship with, or the duration of my employment or consulting relationship with, the Company under any existing agreements between the Company and me or under applicable law. Any employment or consulting relationship between the Company and me, whether commenced prior to or upon or after the date of this Agreement, shall be referred to herein as the "Relationship."

2. **Duties**. I will perform for the Company such duties as may be designated by the Company from time to time. During the Relationship, I will devote my best efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company.

3. **At-Will Relationship**. I understand and acknowledge that my Relationship with the Company is, and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability except for those obligations expressly set forth herein or expressly stated in another written agreement signed by an authorized officer of the Company.

4. **Confidential Information**.

(a) **Company Information**. I agree at all times during the term of my Relationship with the Company and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company solely to the extent necessary to perform my obligations to the Company under the Relationship, or to disclose to any person, firm, corporation or other entity without written authorization of the Company (via an agreement to permit disclosure signed by a member of the Board of Directors or a Senior Corporate Officer in each instance), any Confidential Information of the Company which I obtain or create. I further agree not to make copies of such Confidential Information except as necessary to perform my obligations to the Company under the Relationship. I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I

became acquainted during the Relationship), prices and costs, markets, software, developments, inventions, laboratory notebooks, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, licenses, finances, budgets or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment or created by me during the period of the Relationship whether or not during working hours and including Inventions (as defined below). I understand that Confidential Information includes, but is not limited to,

1601 S. California Avenue • Palo Alto, CA 94304 • T: 650-543-4800 • F: 650-543-5363

OHS West:260429398.4

Sep 07 2017 10:07AM HP Fax

Sep 07 2017 10:07AM HP Fax

# facebook

information pertaining to any aspect of the Company's business, which is either information not known by actual or potential competitors of the Company or other third parties not under confidentiality obligations to the Company, or is otherwise proprietary information of the Company or its customers or suppliers whether of a technical nature or otherwise. I further understand that Confidential Information does not include any of the foregoing items which has become publicly and widely known and which has been made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

(b)     Prior Obligations. I represent that my performance of all terms of this Agreement as an employee or consultant of the Company has not breached and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me prior or subsequent to the commencement of my Relationship with the Company, and I will not disclose to the Company or use any inventions, confidential or nonpublic proprietary information or material belonging to any current or former client or employer or any other party. I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any current or former client or employer or any other party. I acknowledge and agree that I have listed on Exhibit A all agreements (e.g., non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.) with a current or former employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability as an employee or consultant to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties as an employee of the Company or any obligation I may have to the Company.

(c)     Third Party Information. I recognize that the Company has received and in the future will receive confidential or proprietary information from third parties subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

5.     Inventions.

(a)     Inventions Retained and Licensed. I have attached hereto, as Exhibit A, a list describing with particularity all inventions, original works of authorship, developments, concepts, discoveries, processes, computer programs, know-how, ideas, methodologies, improvements, and trade secrets which were made by me prior to the commencement of the Relationship (collectively referred to as "Prior Inventions"), which belong solely to me or belong to me jointly with another, which relate in any way to any of the Company's proposed businesses, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions. If, in the course of my Relationship with the Company, I incorporate into a Company product, process or machine a Prior Invention or any other Invention not covered by Section 5(b) which is owned by me or in which I have an interest (including without limitation any Approved Open Source Contribution), I will promptly so inform the Company. Whether or not I give such notice, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Prior Invention or Invention as part of or in connection with such product, process or machine.

(b)     Assignment of Inventions. I agree that I will promptly make full written disclosure to Facebook, will hold in trust for the sole right and benefit of Facebook, and hereby assign to Facebook, or its designee, all my right, title and interest throughout the world in and to any and all inventions, original works

1601 S. California Avenue • Palo Alto, CA 94304 • T: 650-543-4800 • F: 650-543-5363

OHS West:260429398.4

# facebook

of authorship, developments, concepts, know-how, designs, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of my Relationship with the Company (collectively referred to as "Inventions"), except as provided in Section 5(e) below. I further acknowledge that all Inventions which are made by me (solely or jointly with others) within the scope of and during the period of my Relationship with the Company are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary (if I am an employee) or by such amounts paid to me under any applicable consulting agreement or consulting arrangements (if I am a consultant), unless regulated otherwise by the mandatory law of the state of California. To the maximum extent permitted by applicable law, I hereby waive and agree not to enforce any moral rights I may have on or to any such Inventions.

(c)    Exception to Assignment - Open Source Code. Notwithstanding the intellectual property assignment or ownership provision in Section 5(b) of this Agreement, Company acknowledges that I retain all rights in any Approved Open Source Contributions. "Open Source" shall mean any software or source code licensed under an open source license as defined by the Open Source Initiative (http://www.opensource.org). Prior to contributing any source code to an Open Source project, even if such source code was created on my own time, I will submit my source code to the Company for (i) confirmation that the source code does not contain Company code (i.e., it is not a work for hire as defined under United States copyright law or falls outside the requirements of California Labor Code § 2870) or (ii) approval from Company to contribute my source code to an Open Source project. Only software or source code that has been duly approved by Company in writing will be an "Approved Open Source Contribution." I acknowledge that I have no authority to contribute, release, or make publicly available any Open Source software on behalf of Company. When contributing, releasing, or making publicly available any Approved Open Source Contributions, I will use my own copyright notice, and not any notice of Company, and I will not name Company as the source or origin of the Approved Open Source Contributions. When contributing any Approved Open Source Contributions to an Open Source project, any contribution agreement will be executed only in my name and not in Company's name. For avoidance of doubt, the foregoing will not apply to contributions Company elects to make directly to Open Source projects, even where such contributions are authored or facilitated by me. Any contribution agreement necessary for Company to contribute to such Open Source project will be directly between the Company and the applicable Open Source project. I will ensure that any Approved Open Source Contribution does not contain or disclose any Company trade secrets. I will ensure that any Approved Open Source Contribution does not contain any patentable inventions claimed by Company.

(d)    Maintenance of Records. I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my Relationship with the Company. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, and any other format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. I agree to deliver all such records (including all copies thereof) to Facebook at the time of termination of my Relationship with the Company as provided for in Section 6.

(e)    Patent and Copyright Rights. I agree to assist Facebook, or its designee, at its expense, in every proper way to secure Facebook's, or its designee's, rights in the Inventions and any copyrights, patents, trademarks, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to Facebook or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which Facebook or its designee shall deem necessary in

1601 S. California Avenue • Palo Alto, CA 94304 • T: 650-543-4800 • F: 650-543-5363
OHS West:260429398.4

**facebook**

order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive such rights, and in order to assign and convey to Facebook or its designee, and any successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement until the expiration of the last such intellectual property right to expire in any country of the world. If Facebook or its designee is unable because of my mental or physical incapacity or unavailability or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents, copyright, mask works or other registrations covering Inventions or original works of authorship assigned to Facebook or its designee as above, then I hereby irrevocably designate and appoint Facebook and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright or other registrations thereon with the same legal force and effect as if originally executed by me. I hereby waive and irrevocably quitclaim to Facebook or its designee any and all claims, of any nature whatsoever, which I now or hereafter have for infringement of any and all proprietary rights assigned to Facebook or such designee.

(f)    Exception to Assignments. I understand that the provisions of this Agreement requiring assignment of Inventions to Facebook do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B). I will advise the Company promptly in writing of any inventions that I believe meet such provisions and are not otherwise disclosed on Exhibit A during and after the term of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the period of the Relationship.

6.    Company Property; Returning Company Documents. I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, stored company files, e-mail messages and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. I agree that, at the time of termination of my Relationship with the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns. In the event of the termination of the Relationship, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C; however, my failure to sign and deliver the Termination Certificate shall in no way diminish my continuing obligations under this Agreement.

7.    Notification to Other Parties.

(a)    Employees. In the event that I leave the employ of the Company, I hereby consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

(b)    Consultants. I hereby grant consent to notification by the Company to any other parties besides the Company with whom I maintain a consulting relationship, including parties with whom such relationship commences after the effective date of this Agreement, about my rights and obligations under this Agreement.

1601 S. California Avenue • Palo Alto, CA 94304 • T: 650-543-4800 • F: 650-543-5363

OHS West:260429398.4

**facebook**

8.    **Solicitation of Employees, Consultants and Other Parties.**  I agree that during the term of my Relationship with the Company, and for a period of twenty-four (24) months immediately following the termination of my Relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity. Further, during my Relationship with the Company and at any time following termination of my Relationship with the Company for any reason, with or without cause, I shall not use any Confidential Information of the Company to attempt to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct his or its purchase
of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

9.    **Likeness Use and Consent.**  I consent and give Facebook and its licensees, legal agents, and representatives (collectively, "Facebook Agents") the absolute, irrevocable and perpetual right and permission throughout the universe to photograph, film, record, edit, mix, use, print, reproduce, exhibit, display, publish, perform, transmit, disseminate, market, lease, license, transfer, modify, sell, make derivative works of and/or otherwise exploit (collectively, "Use") my name, likeness, appearance picture, portrait, photograph, image, voice, sounds, performance and personal attributes (collectively, "Likeness"), in whole or in part, in all forms of media, broadcast, exhibition, display, performance or distribution, whether alone or with other productions, whether now known or later developed, and in all manners, including written extractions, composite or distorted representations.

I am fully aware of and consent to the Use of my Likeness for the production of or use in a television show, documentary, commercial, promotional video, Internet production, screenshot, image or any other type of visual and/or audio advertising, promotion material or production (a "Production"). I acknowledge that Facebook Agents shall exclusively own all such Productions, derivative works and proceeds, and I have no ownership rights therein. I am fully aware that such Productions will be used, in whole or in part, for advertising, promotions, marketing, and any other lawful purpose whatsoever.

I waive any right to inspect or approve drafts or the final version(s) of any Production, including any written copy produced in connection with any Production, and any right that I may have to control the use of any Production. I hereby release Facebook Agents from any liability by virtue of any blurring, distortion, alteration, optical illusion or use in composite form, whether intentional or otherwise, that may occur or be produced in the making, processing, duplication, displaying or distribution of the Productions.

To the fullest extent allowed by law, I hereby release, discharge and agree to defend, indemnify and hold harmless Facebook Agents from all claims, causes of action, damages, losses and liability of any kind, now known or unknown, in law or in equity, based upon, arising out of or resulting from my participation in any Production, including without limitation, personal injury, property damage, death, defamation, unauthorized use of name or likeness, privacy right, right of publicity, trademark, copyright or any other intellectual property, or moral right (including "droits morale"). I represent and warrant that I have full, unrestricted right to agree to this provision, participate in the Productions and Use any materials that I present or include in the Productions. I further represent that participation and Use of such materials will not infringe or conflict with the rights of any third party; and that no other authorization to Use my Likeness or such materials is necessary. I hereby grant Facebook Agents full, unrestricted right to Use such materials in its Productions, and agree to defend, indemnify and hold harmless Facebook Agents from and against any liability for the use and distribution of such materials.

1601 S. California Avenue • Palo Alto, CA 94304 • T: 650-543-4800 • F: 650-543-5363

OHS West:260429398.4

**facebook**

10.    **Representations and Covenants.**

(a)    **Facilitation of Agreement.** I agree during the term of the Relationship and for a reasonable amount of time thereafter to execute promptly any proper oath or verify any proper document required to carry out the terms of this Agreement upon the Company's written request to do so.

(b)    **Conflicts.** I represent that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to commencement of my Relationship with the Company. I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

(c)    **Voluntary Execution.** I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

11.    **General Provisions.**

(a)    **Governing Law.** The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of California, without giving effect to the principles of conflict of laws.

(b)    **Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by both parties. Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement. The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by another duly authorized officer of the Company.

(c)    **Severability.** If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d)    **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(e)    **Survival.** The provisions of this Agreement shall survive the termination of the Relationship and the assignment of this Agreement by the Company to any successor in interest or other assignee.

(f)    **Remedies.** I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore agree that the Company will be entitled to seek extraordinary relief in court, including but not limited to temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security and in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

OHS West:260429398.4

**facebook**

     (g)    ADVICE OF COUNSEL. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

[Signature Page Follows]

# facebook

The parties have executed this Agreement on the respective dates set forth below:

COMPANY:

FACEBOOK

By: _____

Name: SARITA PANZ

Title: STAFFING MANAGER

Date: 6/22/2011

Address: ▮▮▮▮▮▮▮▮

Palo Alto, CA 94304

EMPLOYEE:

Sarah Wynn-Williams, an Individual:

Signature _____

Date: 26 / 6 / 2011

▮▮▮▮▮▮▮▮    D.C 2000

**facebook**

## EXHIBIT A

### LIST OF PRIOR OBLIGATIONS UNDER SECTION 4(b)

#### and

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP
### EXCLUDED UNDER SECTION 5

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

# facebook

## EXHIBIT B

Section 2870 of the California Labor Code is as follows:

(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)     Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**facebook**

## EXHIBIT C

### TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to Facebook, Inc., its subsidiaries, affiliates, successors or assigns (together the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twenty-four (24) months from the date of this Certificate, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity. Further, I shall not at any time use any Confidential Information of the Company to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct his or its purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

Date:_____

_____
(Employee's Signature)

_____
(Type/Print Employee's Name)

1601 S. California Avenue • Palo Alto, CA 94304 • T: 650-543-4800 • F: 650-543-5363

OHS West:260429398.4
16069-22 DKY/DKY

**EXHIBIT B**

**SUPPLEMENTAL RELEASE OF CLAIMS**

**SEVERANCE & SUPPLEMENTAL GENERAL RELEASE AGREEMENT**

I, Sarah Wynn-Williams, enter into this Severance & Supplemental General Release Agreement ("**Suppl. Agreement**") and hereby agree as follows:

1. My employment with Facebook, Inc. (the "**Company**") ended on November 10, 2017 ("**Separation Date**").

2. I have re-read the letter to me from the Company dated August 24, 2017, "Re: Severance Agreement and Release," ("**Agreement**") which became effective after I signed the Agreement. I understand that capitalized terms used herein and not defined will have the meaning given them in the Agreement.

3. I have complied with the requirements of Section 2 of the Agreement, and I continue to comply with the obligations of Sections 7-14 of the Agreement.

4. I have received from the Company all wages and other forms of compensation, including accrued but unused PTO, earned by me through the Separation Date, as well as any business expense reimbursements due to me, and no further amounts are owed to me by the Company.

5. I intend and hereby agree that the General Release of All Claims of Section 5 of the Agreement, including the waiver of unknown Claims of Section 5(a) of the Agreement, shall be effective to release, discharge and hold harmless the Company Releasees from any and all legally waivable actions or causes of action, suits, claims, complaints, contracts, liabilities, agreements, promises, contracts, torts, debts, damages and other forms of individual relief, controversies, judgments, rights and demands, whether existing or contingent, known or unknown, suspected or unsuspected, arising from or relating to any fact, act or omission occurring prior to and through the date I sign this Suppl. Agreement.

6. I understand and agree that:

    a.    I cannot sign this Suppl. Agreement any earlier than the Separation Date;

    b.    If I choose to accept the terms of this Suppl. Agreement, I must return my signature on this Suppl. Agreement to **Chelsea Bedard** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮**) within three (3) days after the Separation Date;**

    c.    I have carefully read and fully understand all of the provisions of this Suppl. Agreement, and I knowingly and voluntarily agree to all of the terms set forth in this Suppl. Agreement

    d.    The "**Effective Date**" of this Suppl. Agreement will be the date the Company

receives my signature on this Suppl. Agreement, and I will receive the Severance described in Section 2 of the Agreement within seven (7) days following the Separation Date; and

e.    In entering into this Suppl. Agreement, I am not relying on any representation or promise that is not expressly written in the Agreement or in the Suppl. Agreement.

7.   The provisions of the Agreement are incorporated into, and made a part of, this Suppl. Agreement as if fully set forth here, *except* that this Suppl. Agreement does not cancel and replace the CIIAA, Mutual Arbitration or the Equity Agreements referenced in the Agreement, or the Agreement itself, as each shall remain in full force and effect in accordance with its respective terms.

**I REPRESENT THAT I HAVE READ THE FOREGOING SUPPL. AGREEMENT, THAT I FULLY UNDERSTAND ITS TERMS AND CONDITIONS, AND THAT I AM KNOWINGLY AND VOLUNTARILY SIGNING THE SAME WITHOUT DURESS OR COERCION FROM ANY SOURCE. IN ENTERING INTO THIS SUPPL. AGREEMENT, I AM NOT RELYING ON ANY REPRESENTATION, PROMISE OR INDUCEMENT THAT IS NOT EXPRESSLY WRITTEN IN THE AGREEMENT OR IN THIS SUPPL. AGREEMENT.**

Accepted and Agreed to:


_____
Sarah Wynn-Williams


Date: _____


13

# Exhibit B

**AMERICAN ARBITRATION ASSOCIATION**
**EMPLOYMENT ARBITRATION DIVISION**

| | |
|---|---|
| Meta Platforms, Inc., | |
| *Claimant*, | No. 01-25-0001-2843 |
| v. | |
| Sarah Wynn-Williams; Macmillan Publishers; Flatiron Books, | |
| *Respondents.* | |

**META'S APPLICATION FOR EMERGENCY RELIEF UNDER RULE O-4**

Claimant Meta Platforms, Inc., requests emergency relief to stop a former employee's imminent and willful breach of contract for violating a nondisparagement clause in her Severance Agreement. Absent relief, Respondent Sarah Wynn-Williams will irreparably harm Meta by publicly disparaging the company and its employees through publication of a scurrilous book and related publicity tour. Accordingly, Meta asks the AAA to immediately appoint an emergency arbitrator and establish an expedited briefing schedule. Before March 11, Respondents should be ordered to refrain from making "disparaging, critical or otherwise detrimental comments" about Meta and its employees and leadership, cease promotion of such disparaging comments, and retract disparaging comments already made. McKenna Decl. Ex. A-1 (Severance Agreement), § 9.

1

When Meta terminated Ms. Wynn-Williams' employment in 2017, both parties signed a binding Severance Agreement and Release. In exchange for $780,000 and other benefits, *see id.* § 2, Ms. Wynn-Williams, who was represented by counsel, agreed not to make "disparaging, critical or otherwise detrimental comments to any person or entity concerning the Company, its officers, directors or employees," *id.* § 9.

Ms. Wynn-Williams has breached—and threatens to continue breaching—that clear contractual duty. In flagrant disregard of her contractual commitment, Ms. Wynn-Williams intends to publish a book accusing Meta of having "a rotten company culture." Roehrkasse Decl. Ex. A-2, A-3. She will portray Meta executives as "callously indifferent," "profoundly flawed, self-interested, and careless human beings." *Id.* Ex. A-1, A-2. She will even blame Meta for failing to "stop genocide-fuelling lies and hate speech." *Id.* Ex. A-2. These incendiary and unfair portrayals will significantly hurt Meta's reputation and goodwill.

The irreparable harm Meta will suffer in the absence of an injunction more than justifies emergency relief. Reputational injuries are archetypical examples of irreparable harm because public accusations, once made, cannot be scrubbed from existence. To maintain the status quo and enforce the Severance Agreement, the emergency arbitrator should enjoin Ms. Wynn-Williams from disparaging Meta or its employees.

Unfortunately, Ms. Wynn-Williams' deceptive actions have made emergency relief necessary. Apparently trying to prevent Meta from securing relief before publication of the book, Ms. Wynn-Williams and her publishers, Macmillan Publishers and Flatiron Books, kept the book's existence secret until less than a week before publication. As a result, Meta did not learn about the March 11 publication until public reports on March 5. Ms. Wynn-Williams should not benefit from her effort to hide the truth. Meta respectfully requests relief **before publication of Ms. Wynn-Williams' disparaging allegations on March 11.**

## BACKGROUND

Respondent Sarah Wynn-Williams was the Director of Global Public Policy at Facebook (now Meta) before her employment was terminated effective November 10, 2017. *See* McKenna Decl. ¶ 2. During her employment, Ms. Wynn-Williams made unfounded and misleading accusations. To avoid the irreparable harm to Meta that would result from a public airing of those unfounded and misleading accusations, the company asked Ms. Wynn-Williams not to make such disparaging comments. Ms. Wynn-Williams, who was represented by counsel, agreed to this request by signing a "Severance Agreement and Release." *See* McKenna Decl., Ex. A-1. Under the Severance Agreement, Ms. Wynn-Williams received $780,000 in severance pay and other valuable benefits.

3

Severance Agreement, § 2. In exchange, she agreed not to disparage Meta or its employees:

> 9. **Nondisparagement**: Except as described in Section 4, and not including any testimony given truthfully under oath or as required by any other legal proceeding, **you agree not to make disparaging, critical or otherwise detrimental comments** to any person or entity **concerning the Company, its officers, directors or employees**; the products, services or programs provided or to be provided by the Company; the business affairs, operation, management or the financial condition of the Company; or the circumstances surrounding your employment and/or separation of employment from the Company. . . .

Severance Agreement, § 9 (emphasis added).[1]

The Severance Agreement also included a binding arbitration provision. Ms. Wynn-Williams agreed "that any and all disputes arising out of the terms of [the Severance Agreement] their interpretation, and any of the matters herein released, shall be subject to arbitration, before the American Arbitration Association ('AAA') in accordance with the Employment Arbitration Rules and Mediation Procedures, **including its Optional Rules for Emergency Measures of Protection, to the extent not inconsistent with the terms of this Agreement**." *Id*. § 16(d). The contract specifically provides that an "arbitrator may grant injunctions and other relief in such disputes." *Id*.

---

[1] Section 4 of the Severance Agreement does not apply here. It provides that the nondisparagement provision does not prohibit Ms. Wynn-Williams from "filing a claim with a federal, state or local government agency that is responsible for enforcing a law on behalf of the government." Severance Agreement, § 4.

4

On March 5, 2025, Meta learned from public reports that Ms. Wynn-Williams intends to release a book called *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism* on March 11. *See* Roehrkasse Decl. ¶ 2. The book is already available for pre-order from online booksellers.

Flatiron's public statements regarding the book make clear it will disparage Meta and Meta's employees. According to Flatiron and its parent company Macmillan, the book is a "shocking" and "searing" memoir and "explosive insider account" that will expose "a rotten company culture." Roehrkasse Decl. Ex. A-1, A-3. Flatiron promises the book will "paint[] a portrait" of high-profile Meta executives as "callously indifferent to the price others would pay for their own enrichment." *Id*. Ex. A-2. The publisher also describes Ms. Wynn-Williams' book as telling a "story" about Meta's supposed failure "to stop genocide-fuelling lies and hate speech." *Id*.

To promote her new book, Ms. Wynn-Williams has scheduled media events, including interviews to discuss her disparaging claims against Meta. *See* Roehrkasse Decl. ¶ 4. For example, Ms. Wynn-Williams is scheduled to appear on the BBC on March 11. *See id.*

Without relief, Ms. Wynn-Williams' public disparagement of Meta and its personnel will irreparably harm the company. As Meta's Vice President of Public Affairs

5

explains in an attached declaration, Ms. Wynn-Williams' comments "will undoubtedly harm Meta's business reputation and will cost Meta users and goodwill." *Id*. ⁋ 6.

## STANDARD

The emergency arbitrator may grant emergency relief if "the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief." AAA Employment Rule O-4.

## ARGUMENT

The emergency arbitrator should enjoin Ms. Wynn-Williams from disparaging Meta or its employees in violation of her Severance Agreement. And she should be ordered to retract—and refrain from promoting—any previous disparaging comments. That is the only remedy that can prevent imminent and irreparable harm to Meta's reputation. *See Lopez v. Noa*, No. B222183, 2011 WL 3211471, at *2 (Cal. Ct. App. July 29, 2011) (describing arbitration order prohibiting author and anyone acting in concert from violating contractual nondisparagement provision of settlement agreement by selling book proposal).

### I.    Disparaging Meta Violates Ms. Wynn-Williams' Contractual Obligation.

The Severance Agreement is crystal clear. Ms. Wynn-Williams agreed "not to make disparaging, critical or otherwise detrimental comments to any person or entity"

6

about Meta, its employees, products, or operations. Severance Agreement, § 9. By publishing the book and discussing her allegations in the media, Ms. Wynn-Williams has breached and will breach that obligation.

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811 (2011). There can be no doubt that Ms. Wynn-Williams and Meta entered into a binding Severance Agreement and that Meta honored its end of the deal by paying Ms. Wynn-Williams $780,000 and providing additional benefits. *See* Severance Agreement, § 2; McKenna Decl. ⁋ 3.

But Ms. Wynn-Williams has not honored her contractual duty not to "make disparaging, critical or otherwise detrimental comments to any person" about Meta. Severance Agreement, § 9. To "[d]isparage" means "to lower in rank or reputation," to "speak slightingly about," or to "bring discredit upon." *Vivian v. Labrucherie*, 214 Cal. App. 4th 267, 277 n.4 (2013) (citation omitted). Even a relatively minor, subjective statement, such as saying that a company "does not do good work for its clients" may be "sufficient to allege breach of [an] anti-disparagement clause." *New Box Sols., LLC v. Davis*, No. CV 18-5324-RSWL-KS, 2018 WL 4562764, at *6 (C.D. Cal. Sept. 18, 2018); *see also Bakst v. Cmty. Mem'l Health Sys., Inc.*, No. CV 09–08241 MMM, 2011 WL 13214303, at *5-7

7

(C.D. Cal. Jan. 31, 2011) (holding that disparagement claim related to statements that the plaintiff was a "bully[]," had engaged in "financial misconduct," and "defrauded the Hospital" survived summary judgment).

Here, Ms. Wynn-Williams' book is blatantly disparaging, critical, and detrimental. It is not even a close call. Indeed, the public descriptions of the book *themselves* disparage Meta. Flatiron promises the book will expose "a rotten company culture," reveal that Meta executives are "callously indifferent to the price others would pay for their own enrichment," and fault Meta for failing to "stop genocide-fuelling lies and hate speech." Roehrkasse Decl. Ex. A-2. These statements are disparaging by any definition of the word.

## II.      Emergency Relief Is Necessary to Prevent Irreparable Harm to Meta's Reputation.

Courts routinely find that loss of customer goodwill and damage to brand reputation constitute irreparable harm. *See MacSweeney Enters., Inc. v. Tarantino*, 235 Cal. App. 2d 549, 562 (Ct. App. 1965) ("A plaintiff is not required to stand by and see his business actually injured before he may stay the hand of the person usurping his goodwill and reputation." (cleaned up)); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("[T]hreatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("damage to

8

. . . goodwill qualif[ies] as irreparable harm"); *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) ("Harm to business goodwill and reputation is unquantifiable and considered irreparable.").

Just so here. Meta's reputation is at the core of its business, and publication of these allegations will undoubtedly cost Meta customers and goodwill. *See* Roehrkasse ¶ 6.

Finally, even if money damages *could* fully compensate Meta—and to be clear, they could not—Ms. Wynn-Williams, as an individual, would likely be unable to pay such a substantial judgment. *See* McKenna Decl. ¶ 4. That provides an independent basis for finding irreparable harm. *See Alliant Ins. Servs., Inc. v. Gaddy*, 159 Cal. App. 4th 1292, 1299 (2008) (affirming finding of irreparable harm where lack of a preliminary injunction would make "a subsequent judgment . . . ineffective").

Emergency relief "would prevent harm to [Meta] by requiring [Ms. Wynn-Williams] to remove old disparaging [comments] and by prohibiting [Ms. Wynn-Williams] from adding new disparaging [comments]." *GAF Materials LLC v. Lipinskiy*, No. 20-cv-2194, 2020 WL 6867412, at *6 (D. Minn. Nov. 23, 2020). To the extent Ms. Wynn-Williams has already disseminated her disparaging comments, she should retract them. That includes pulling back the book to the maximum extent possible. Declaring it too late and allowing Ms. Wynn-Williams to benefit from hiding her breaches, would be inconsistent with the Severance Agreement and fundamentally inequitable.

9

For Ms. Wynn-Williams' flagrant violations of the nondisparagement clause, injunctive relief is necessary. That is why the Severance Agreement expressly provides that Ms. Wynn-Williams "will be subject to a permanent injunction and/or temporary restraining order for any violations of this Agreement, including . . . any breach of Sections 9, 10, and 12." Severance Agreement, § 16(g); *see also id.* § 16(d) ("The arbitrator may grant injunctions and other relief in such dispute.").

## EMERGENCY RELIEF REQUESTED

For the reasons given, Meta respectfully requests that the emergency arbitrator enter emergency relief enjoining Ms. Wynn-Williams, her agents, and other persons acting in active concert or participation with her, including the Respondent Publishers:

1. from making "disparaging, critical or otherwise detrimental comments to any person or entity concerning [Meta], its officers, directors or employees; the products, services or programs provided or to be provided by [Meta]; the business affairs, operation, management or the financial condition of [Meta]; or the circumstances surrounding [her] employment and/or separation of employment from [Meta]";

2. from publishing or promoting *Careless People*;

3.  from amplifying or repeating all such previous "disparaging, critical or otherwise detrimental comments";

10

4.  to retract all such previous "disparaging, critical or otherwise detrimental comments."

Dated: March 7, 2025

Respectfully submitted.

*/s/ Mathew S. Rosengart*

Mathew S. Rosengart
Mark D. Kemple
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

*Attorneys for Claimant*

*/s/ Jonathan F. Cohn*

Jonathan F. Cohn
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
jon@lkcfirm.com

William T. Thompson
Todd L. Disher
Alexis Swartz
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, Fifth Floor
Austin, TX 78701

Drew F. Waldbeser
Danielle Kerker Goldstein
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Meredith R. Criner
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC 27615

*Attorneys for Claimant*

11

## CERTIFICATE OF SERVICE

I certify on March 7, 2025, I served this document by e-filing through casefiling@adr.org and emailing a copy to Respondents.


/s/ *Alexis Swartz*
Alexis Swartz

12

# Exhibit C

**AMERICAN ARBITRATION ASSOCIATION®**

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

To ensure your demand is processed promptly, please complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

https://www.adr.org/EmploymentForms

| Mediation: If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box ☐. |

### Parties (Claimant)

| Name of Claimant: Meta Platforms, Inc. | | |
|---|---|---|
| Address: 1 Meta Way | | |
| City: Menlo Park | State: California ▾ | Zip Code: 94025 |
| Phone No.: ▮▮▮▮▮ | Fax No.: | |
| Email Address: | | |
| Representative's Name (if known): Jon Cohn | | |
| Firm (if applicable): Lehotsky Keller Cohn LLP | | |
| Representative's Address: 200 Massachusetts Ave. NW | | |
| City: Washington | State: District of Columbia ▾ | Zip Code: 20009 |
| Phone No.: (512) 693-8350 | Fax No.: | |
| Email Address: jon@lkcfirm.com | | |

### Parties (Respondent)

| Name of Respondent: Sarah Wynn-Williams (other Respondents listed in attached addendum) | | |
|---|---|---|
| Address: ▮▮▮▮▮ | | |
| City: ▮▮▮▮▮ | State: Select... | Zip Code: ▮▮▮▮▮ |
| Phone No.: | Fax No.: | |
| Email Address: ▮▮▮▮▮ | | |
| Representative's Name (if known): | | |
| Firm (if applicable): | | |
| Representative's Address: | | |
| City: | State: Select... | Zip Code: |
| Phone No.: | Fax No.: | |
| Email Address: | | |
| Claim: What was/is the employee/worker's annual wage range? ☐ Less than $100,000 ☐ $100,000-$250,000 ☑ Over $250,000 Note: This question is required by California law. | | |
| Amount of Claim: At least $50,000 per violation of contractual nondisparagement clause Claim involves: ☐ Statutorily Protected Rights ☑ Non-Statutorily Protected Rights | | |

**AMERICAN ARBITRATION ASSOCIATION**®

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

See attached addendum

Other Relief Sought: ☑ Attorneys Fees  ☐ Interest  ☑ Arbitration Costs  ☐ Punitive/ Exemplary
☑ Other:  Injunctive relief barring disparagement of Claimant, including emergency relief

Please describe the qualifications for arbitrator(s) to hear this dispute:

Claimant seeks an arbitrator with experience in employment disputes involving breach of nondisparagement clauses, as well as an emergency arbitrator available to hear a motion for emergency relief immediately.

Hearing: Estimated time needed for hearings overall:          hours  or  1          days

Hearing Locale:  Los Angeles, CA

(check one) ☑ Requested by Claimant  ☐ Locale provision included in the contract

Filing Fee requirement or $300 (max amount per AAA)

Filing by Company:  ☐ $2,200 single arbitrator  ☑ $2,800 three arbitrator panel

Notice: To begin proceedings, **please send a copy of this Demand and the Arbitration Agreement, along with filing fee as provided for in the Rules,** to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. Send the original Demand to the Respondent.

| Signature (may be signed by a representative): | Date: |
|---|---|
| /s/ Jon Cohn | March 7, 2025 |

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Case Filing Services can be reached at 877-495-4185. Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879.

# Exhibit D

**AMERICAN ARBITRATION ASSOCIATION**®

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

To ensure your demand is processed promptly, please complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

https://www.adr.org/EmploymentForms

| **Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box ☐ |
|---|

| **Parties (Claimant)** | | |
|---|---|---|
| Name of Claimant:  Meta Platforms, Inc. (represented by counsel) | | |
| Address: 1 Meta Way | | |
| City:  Menlo Park | State: California  ▼ | Zip Code: 94025 |
| Phone No.:  ▓▓▓▓ | Fax No.: | |
| Email Address: | | |
| Representative's Name (if known):  Jonathan F. Cohn and Mathew S. Rosengart | | |
| Firm (if applicable):  Lehotsky Keller Cohn LLP and Greenberg Traurig, LLP | | |
| Representative's Address:  See Addendum | | |
| City:  See Addendum | State:  Select... | Zip Code:  See Addendum |
| Phone No.:  See Addendum | Fax No.:  See Addendum | |
| Email Address:  jon@lkcfirm.com; rosengartm@gtlaw.com | | |

| **Parties (Respondent)** | | |
|---|---|---|
| Name of Respondent:  Sarah Wynn-Williams (represented by counsel) | | |
| Address: | | |
| City: | State:  Select... | Zip Code: |
| Phone No.: | Fax No.: | |
| Email Address: | | |
| Representative's Name (if known):  Courtney Forrest | | |
| Firm (if applicable):  Kaiser PLLC | | |
| Representative's Address:  1099 14th St, NW | | |
| City:  Washington | State:  District of Columbia | Zip Code:  20005 |
| Phone No.:  ▓▓▓▓ | Fax No.:  ▓▓▓▓ | |
| Email Address:  ▓▓▓▓ | | |

| Claim: What was/is the employee/worker's annual wage range? ☐ Less than $100,000  ☐ $100,000-$250,000  ☑ Over $250,000 |
|---|
| *Note: This question is required by California law.* |

| Amount of Claim: | At least $50,000 per violation of nondisparagement clause, actual damages for breach of confidentiality clauses, and actual and punitive damages for fraud, among other claims. |
|---|---|
| Claim involves:  ☐ Statutorily Protected Rights  ☑ Non-Statutorily Protected Rights | |

**AMERICAN ARBITRATION ASSOCIATION®**

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

See Demand for Arbitration dated March 7, 2025 and accompanying Amended Description of the Nature of Claims/Statement of Changes of Claims dated March 24, 2025 (see Addendum).

Other Relief Sought: ☐ Attorneys Fees  ☑ Interest  ☐ Arbitration Costs  ☑ Punitive/ Exemplary
☑ Other:  Injunctive and declaratory relief barring further disparagement of Claimant and its employees and executives (see Addendum).

Please describe the qualifications for arbitrator(s) to hear this dispute:

Claimant seeks an arbitrator with experience in employment disputes involving breach of nondisparagement clauses.

| Hearing: Estimated time needed for hearings overall: | hours or  1 | days |
|---|---|---|

Hearing Locale:  Los Angeles, CA

*(check one)* ☑ Requested by Claimant  ☐ Locale provision included in the contract

Filing Fee requirement or $300 (max amount per AAA)

Filing by Company:  ☐ $2,200 single arbitrator  ☑ $2,800 three arbitrator panel

Notice: To begin proceedings, **please send a copy of this Demand and the Arbitration Agreement, along with filing fee as provided for in the Rules,** to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. Send the original Demand to the Respondent.

| Signature (may be signed by a representative): | Date: |
|---|---|
| /s/ Mathew S. Rosengart | March 24, 2025 |

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Case Filing Services can be reached at 877-495-4185. Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879.

**Addendum to Arbitration Demand—AAA Employment Arbitration Rules**

**Amended Description of the Nature of Claims/Statement of Changes of Claims**

I.    <u>Introduction</u>

This Demand arises from Respondent Sarah Wynn-Williams' unlawful disparagement of Claimant Meta Platforms, Inc. ("Claimant" or "Meta") and its employees and executives in a published book entitled *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism* ("*Careless People*" or the "book"), as well as her misappropriation and misuse of Claimant's confidential information, and her breaches of contract in that regard. As demonstrated herein and as Claimant will prove at the plenary Hearing, Wynn-Williams' misconduct was intentional and deceptive, also giving rise to claims against her of fraud and conversion, subjecting her not only to contractual but also to punitive damages.

By way of background, in November 2017, Claimant terminated Wynn-Williams' employment with Meta, where she had served as a Director of Global Public Policy. As part of the Severance Agreement (or "Agreement") that Wynn-Williams negotiated with Claimant through her counsel, she agreed not to disparage Claimant, its employees, and its executives, in exchange for a generous severance payment and other benefits. Despite Meta performing its duties under the Agreement, including paying Wynn-Williams at least $780,000, Wynn-Williams has now indisputably breached her Agreement by publishing and promoting her disparaging and salacious book.[1] Wynn-Williams has also breached her confidentiality agreement with Claimant, which she signed in connection with and as a precondition to her employment and which was expressly incorporated into the Agreement. The agreed-upon, bargained-for remedies available to Claimant under the Agreement and governing law include a liquidated damages provision entitling Meta to $50,000 for each material violation of her Agreement and a permanent injunction, among other remedies.

It is now also apparent that Wynn-Williams never intended to comply with the Agreement and fraudulently concealed her true plans from Claimant, which is evidenced by her stealing and keeping Claimant's confidential documents to write her book. These stolen documents confirm that *even as Wynn-Williams negotiated her severance package*, she intended to breach it by publishing her book using Claimant's confidential documents, since at least her termination from the company in 2017. Consequently, in addition to her many contractual breaches, Wynn-Williams should also be held liable for fraud and conversion, and punitive damages should be imposed for her tortious misconduct.

---

[1] Although the focus of this Demand is on Wynn-Williams' contractual and fraudulent misconduct, her book is also replete with false, reckless, and defamatory statements, which were made with actual malice and reckless disregard for the truth. Although this Demand does not assert such claims against Wynn-Williams or her agent-publishers, Meta expressly reserves all rights to assert them in a further amendment.

1

II.    Procedural History and Relief Sought

Wynn-Williams and her publishers concealed the book's publication until just days before it was published on March 11, 2025. Nevertheless, immediately after the book's publication was announced, on March 6, 2025, Meta served her publishers with a cease-and-desist letter and the next day filed before this tribunal an Application for Emergency Relief Under Rule O-4 ("Application"). On March 11, 2025, after Wynn-Williams and her publishers were provided notice of the proceeding, the Emergency Arbitrator, Nicholas A. Gowen, conducted a hearing on the Application and, on March 12, 2025, issued an Interim Award granting Meta emergency relief. Among other things, Emergency Arbitrator Gowen found that Claimant had "established a likelihood of success on the merits of its contractual non-disparagement claim against Respondent Wynn-Williams, and that immediate and irreparable loss will result in the absence of emergency relief." The Interim Award prohibits Wynn-Williams—as well as her "agents, servants, employees, attorneys, and any other person(s) or entities" she controls—from making, promoting, publishing, or distributing any further "disparaging, critical or otherwise detrimental comments" concerning Meta and its leadership and employees, among other relief.

Against this backdrop, this Amended Demand seeks to hold Wynn-Williams accountable for her pattern of disparagement and related misconduct against Meta and its employees and leadership, which is egregious, and specifically asserts claims against her for (i) breach of the Agreement and its implied covenant of good faith and fair dealing, (ii) breach of her confidentiality agreement and its implied covenant of good faith and fair dealing, (iii) fraud, and (iv) conversion. Claimant seeks compensatory and punitive damages, an award of attorneys' fees, and permanent injunctive relief, providing, among other things and according to proof at the Hearing, that Wynn-Williams must immediately return to Claimant all documents and devices she misappropriated and misused, enjoining Wynn-Williams from further promotion of her book (consistent with the standing Interim Award), and ordering Wynn-Williams to retract the disparaging statements she has already made (consistent with the standing Interim Award). Claimant is also entitled to a declaration that Claimant has ownership rights over all property and materials misappropriated by Wynn-Williams, including all portions of her book using those property and materials, and has the right to require the redaction and/or deletion of certain contents of the book due to Wynn-Williams' unlawful conduct.

III.    Factual Background and the Relevant Contracts

Wynn-Williams was Meta's Director of Global Public Policy from 2011 until her employment was terminated effective November 10, 2017. As part of her employment, she signed a Confidentiality Information and Invention Assignment Agreement (the "CIIAA"), which was attached to her employment agreement. In the CIIAA, Wynn-Williams promised:

I agree at all times during the term of my Relationship with the Company and thereafter, to **_hold in strictest confidence_**, and **_not to use_**, except for the benefit of the Company solely

2

to the extent necessary to perform my obligations to the Company under the Relationship, or to *disclose to any person, firm, corporation or other entity without written authorization of the Company* . . . *any Confidential Information of the Company which I obtain or create* . . . . I understand that Confidential Information includes, but is not limited to, any information pertaining to *any aspect of the Company's business*, which is either information not known by actual or potential competitors of the Company or other third parties not under confidentiality obligations to the Company, or is otherwise proprietary information of the Company or its customers or suppliers *whether of a technical nature or otherwise* . . . .

(CIIAA, Section 4(a) [emphases added].)

Wynn-Williams further agreed:

I agree that, at the time of termination of my Relationship with the Company, *I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else)* any and all devices, records, data, notes, reports, proposals, lists, correspondence[,] . . . other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company."

(CIIAA, Section 6 [emphasis added].)

Wynn-Williams' employment was terminated after she received her second consecutive poor performance review, and after making unfounded claims against a Meta executive. As part of her termination, Wynn-Williams negotiated, with the assistance of counsel, her Agreement, which among other things, prohibited her from making further disparaging statements about Meta, its employees, and its executives in exchange for $780,000 in severance pay and other valuable benefits.

As a material part of her Agreement, Wynn-Williams agreed not to disparage Meta or its employees and executives, expressly promising:

. . . [Y]ou agree not to make *disparaging, critical or otherwise detrimental comments to any person or entity* concerning the Company, its officers, directors or employees; the products, services, or programs provided or to be provided by the Company; the business affairs, operation, management or the financial condition of the Company; or the circumstances surrounding your employment and/or separation of employment from the Company . . . .

(Agreement, Section 9 [emphasis added].)

3

The Agreement also included a material provision regarding "Company Files, Documents and Other Property":

> You agree that on or before the Separation Date [Nov. 10, 2017] *you will return to the Company all Company property and materials*, including but not limited to (if applicable), personal computers, laptops[,] . . . software programs and data compiled with the use of those programs, software passwords or codes, tangible copies of trade secrets and confidential information . . . and *any and all other information or property previously or currently held or used by you that is or was related to your employment with the Company* ('Company Property'). You agree that in the event that you discover any other Company Property in your possession after your Separation Date, you will immediately return such materials to the Company.

(*Id*., Section 7 [emphasis added].)

Notably, the Agreement also expressly incorporated and attached the CIIAA, requiring Wynn-Williams to "reaffirm your commitment under the CIIAA in this Agreement, and agree[ing] that, as part of this Agreement, you will comply fully with the terms of the CIIAA." Wynn-Williams also agreed that, by signing the Agreement, she confirmed that she had not violated the CIIAA. (*Id*., Section 11.)

Finally, the Agreement also included a liquidated damages provision, which states: "In the event that the Company prevails in any action to establish that you have materially violated Sections 9, 10, or 12 of this Agreement, you will owe the Company $50,000 in liquidated damages for each material violation you are found to have committed." (*Id*., Section 16(f).) And expressly setting forth grounds for injunctive relief, the Agreement provides: "You acknowledge that, together with liquidated damages and any other relief that may be appropriate, *you will be subject to a permanent injunction and/or temporary restraining order for any violations of this Agreement*, including any violations of the CIIAA attached as Exhibit A or any breach of Sections 9, 10, and 12." (*Id*., Section 16(g) [emphasis added].)

In direct violation of the express, plain language in her binding agreements, Wynn-Williams covertly wrote and promoted *Careless People*. The book, and the public statements promoting it, are built upon disparaging statements and wrongfully include Meta's confidential and proprietary information.[2]

---

[2] As referenced above, *supra* at n.1, in addition to the "disparaging, critical, and detrimental" statements, the book is also replete with *false and defamatory* statements, but truth or falsity are not presently at issue because the Agreement precludes "disparaging, critical, or otherwise detrimental comments" about Meta and its employees, regardless of whether Wynn-Williams subjectively (and falsely) believes any of her claims are "true."

IV.    <u>Wynn-Williams Has Violated Her Non-Disparagement Obligations in Breach of the Agreement</u>

As demonstrated above, the Agreement required Wynn-Williams "not to make disparaging, critical or otherwise detrimental comments to any person or entity concerning the Company, its officers, directors or employees; the products, services, or programs provided or to be provided by the Company; the business affairs, operation, management or the financial condition of the Company; or the circumstances surrounding your employment and/or separation of employment from the Company . . . ." Despite that obligation, Wynn-Williams has written, published, and circulated hundreds of pages of disparaging statements in *Careless People* and its surrounding publicity.

The following represents only a portion of the many disparaging statements made by Wynn-Williams, both in the book and as part of Wynn-Williams' press junket:

- *No "Genocide" or "Hate Speech"*: Wynn-Williams alleged that Meta created and/or promoted "genocide-fuelling lies and hate speech"[3] and astonishingly stated that Meta exhibited so-called "lethal carelessness." In a nationally televised interview on NBC's *Today* (Mar. 10, 2025), she further claims she saw Meta "causing harm and damage and in some instances leading to death and not doing anything about it."

- *Meta's Discussions with China*: Wynn-Williams alleged Meta was "operating illegally in China," launching apps "in violation of Chinese law," and had its employees working in China "illegally." Wynn-Williams also stated that Meta misled Congress by purportedly failing to disclose that the company had launched "illegal" apps in China. In nationally distributed interviews, Wynn-Williams went even further, stating in an interview with *The Free Press* (Mar. 11, 2025) that "Facebook's been working hand in glove with the Chinese Communist Party" and that, for Facebook, "[t]orture and death wasn't a limit." And, in an *NBC News* interview (Mar. 10, 2025), she said that Meta believed some people might be "killed," but that it would be "worth it" if Meta could "get into China." Even after Meta sought emergency injunctive relief against Wynn-Williams in this arbitration, her disparagement continued. In a *Business Insider* interview (Mar. 13, 2025), Wynn-Williams stated Meta "has been doing things in the shadows for so long with the Chinese Communist Party" and that Mark Zuckerberg, Meta's Chief Executive Officer, "was cozying up with the Chinese Communist Party."

- *Congressional Testimony*: Wynn-Williams alleged that Mr. Zuckerberg lied to Congress during sworn testimony by saying that Meta did not know how the Chinese government would regulate Facebook.

---

[3] *https://www.panmacmillan.com/blogs/general/careless-people-facebook-memoir.*

5

- *No Targeting of Users by Emotional State*: Wynn-Williams alleged that Meta executives lied when they said in 2017 that the company did not offer tools to target users based on their emotional state. According to Wynn-Williams, Meta's management believed their own statement to be "a lie."

- *Meta's Support of Families:* Wynn-Williams stated in press materials that Meta allowed and sanctioned "grueling demands and humiliations of working motherhood." Wynn-Williams made a similar statement in her book: "The expectation at Facebook is that mothering is invisible, and the more skilled you are, the more invisible it is," suggesting that Meta has an unwritten policy of "don't mention the children." Wynn-Williams went further in her book and in her televised *Today* interview, claiming that late in her pregnancy a Meta officer told her that she should continue flying on airplanes for her job despite concerns that it was unsafe. Wynn-Williams also stated that she was required to participate in meetings throughout her maternity leave and was questioned about her postpartum surgery.

- *South Korea*: Wynn-Williams alleged that Meta asked her and another employee to fly to South Korea to see if they would get arrested due to a potential investigation of the company.

These disparaging statements, among many others, were published for wide distribution to media around the world and the public at large, for profit, and to numerous individuals, companies, and other entities with current or prospective relationships with Meta, including users and advertisers around the world. Under the Agreement, Meta is entitled to liquidated damages and permanent injunctive relief enjoining Wynn-Williams from further promotion of the book and ordering her to retract the disparaging statements that have already been made.

V.    <u>Wynn-Williams Has Violated Her Confidentiality Obligations in Breach of the Agreement and the CIIAA</u>

As described above, the CIIAA—which was expressly incorporated into and attached to the Agreement—required Wynn-Williams to "hold in strictest confidence," and not "disclose to any person, firm, corporation or other entity without written authorization of the Company," "any Confidential Information of the Company" that she obtained. (CIIAA, Section 4(a).). Wynn-Williams further agreed in the CIIAA that at the time of termination she would "deliver to the Company (and will not keep in [her] possession, recreate, or deliver to anyone else)" all documents or property belonging to Meta (*id*., Section 6). Similarly, in the Agreement, Wynn-Williams once again agreed to "return to the Company all Company property and materials . . . any and all other information or property previously or currently held or used by [her] that is or was related to your employment with the Company" (Agreement, Section 7).

6

Instead of complying with these legal obligations, and others, *even as she was negotiating her exit and her severance package*, Wynn-Williams secretly retained extensive amounts of confidential Meta documents, including sensitive business emails between and amongst Meta's leadership, did not return them upon her termination, disclosed them to the public at large in a published book designed for international circulation, and then proceeded to write and/or make hundreds of disparaging statements attacking Meta and its employees. Wynn-Williams then went even further, brazenly and unlawfully, sharing some of those documents with journalists, including *NBC News*, which broadcast them to an international audience. Wynn-Williams never sought or received written authorization from Meta.

Accordingly, Wynn-Williams also breached the CIIAA, and the implied covenant of good faith and fair dealing because she knew that it would frustrate the purpose of the CIIAA and the Agreement if she secretly kept confidential Meta documents for publication in a disparaging book to be circulated around the world. These multiple breaches have caused Meta to suffer compensatory damages in an amount to be determined during arbitration, and entitles Meta to the return of its property and materials, as well as a declaration—pursuant to Section 7 of the Agreement and Sections 4 and 6 of the CIIAA, among other provisions—that Meta has ownership rights over all property and materials misappropriated by Wynn-Williams, including all portions of her book using that property and materials, and has the right to redact and/or delete the contents of the book to the extent they disclose or reflect that information pursuant to the CIIAA and the Agreement.

VI.    Fraud: Wynn-Williams' Secret, Premeditated Plan to Violate Her Agreements

It is evident from the above—and as the evidence at the Hearing will further demonstrate—that even as Wynn-Williams was negotiating her generous severance package from Meta, she secretly intended to violate her confidentiality and non-disparagement obligations. Indeed, it is obvious from Wynn-Williams' public relations campaign and the book itself (which, again, uses stolen, confidential information and documents wrongfully misappropriated by Wynn-Williams when she was terminated *in 2017*) that she concealed her true intent from Meta and negotiated her 2017 exit package in bad faith. Specifically, it is evident from her publication of Meta's confidential information in 2025 that at the time she signed her Agreement in 2017, she concealed her true intent: to steal and later publish confidential information in violation of the Agreement requiring her to comply with her contractual legal obligations to Meta, including confidentiality and non-disparagement.

As alleged in more detail above, and as Meta will prove at the Hearing, Meta reasonably relied to its detriment on Wynn-Williams' false representations and her concealment of the facts that she intended to steal Meta's confidential information in order to disparage Meta with it and to sell her book. Wynn-Williams made these representations and concealed these facts with knowledge and with an intent to deceive Meta into executing the Agreement. Meta would not have relied upon Wynn-Williams' false representations and concealment, and would not have executed

7

the Agreement, if Wynn-Williams had not concealed the facts and her true intent (*i.e.*, to not comply with her Agreement and concomitant legal obligations).

As a result of her wrongful and fraudulent misconduct, Wynn-Williams should be held liable for compensatory and punitive damages, in addition to paying Meta liquidated damages of $50,000 for each material violation in accordance with the terms of her Agreement.

VII.    Conversion: Wynn-Williams Misappropriated Meta's Property, Sold It, and Profited Therefrom

In violation of her legal obligations to Meta, Wynn-Williams intentionally misappropriated Meta's property for the purpose of writing her book. She wrongfully profited from her misconduct and was thereby unjustly enriched. According to at least one public report, Wynn-Williams received at least $500,000 as an advance for her book, and she is evidently receiving additional revenue based on her continued use of Meta's stolen property. All such sums obtained by Wynn-Williams as a result of her unlawful use of Meta's property must be disgorged by Wynn-Williams to Meta, and all such property must be returned to Meta.

VIII.   Conclusion

This Demand identifies only a portion of the disparaging statements Wynn-Williams has disseminated throughout the world in her lengthy, 382-page book and international press tour. As a result, Meta is entitled to compensatory and punitive damages; attorneys' fees; injunctive and declaratory relief, including a declaration that Meta has ownership rights over all property and materials misappropriated by Wynn-Williams; liquidated damages; the return and destruction of Meta's confidential information and misappropriated property; redactions of the offending portions of the book; and an order enjoining Wynn-Williams from further promotion of the book.

Dated: March 24, 2025                    Respectfully submitted,


/s/ Mathew S. Rosengart                  /s/ Jonathan F. Cohn

Mathew S. Rosengart                      Jonathan F. Cohn
Mark D. Kemple                           Mary Elizabeth Miller
Alex Linhardt                            LEHOTSKY KELLER COHN LLP
GREENBERG TRAURIG, LLP                   200 Massachusetts Ave. NW, Suite 700
1840 Century Park East, Suite 1900       Washington, DC 20001
Los Angeles, CA 90067
                                         William T. Thompson
*Attorneys for Claimant*                 Todd L. Disher
                                         Alexis Swartz
                                         LEHOTSKY KELLER COHN LLP

8

408 W. 11th Street, Fifth Floor
Austin, TX 78701

Drew F. Waldbeser
Danielle Kerker Goldstein
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
Meredith R. Criner
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC 27615

*Attorneys for Claimant*

9

# Exhibit E

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**Emergency International Arbitral Tribunal**

| | |
|---|---|
| Meta Platforms, Inc., | |
| *Claimant*, | No. 01-25-0001-2843 |
| v. | |
| Sarah Wynn-Williams; Macmillan Publishers; Flatiron Books, | |
| *Respondents.* | |

**ORDER DENYING RESPONDENT WYNN-WILLIAMS'**
**EMERGENCY MOTION TO VACATE INTERIM AWARD**

I, Nicholas A. Gowen, the undersigned Emergency Arbitrator, having been designated in accordance with the arbitration agreement entered into between the parties and dated September 6, 2017, and having been duly sworn, and having duly heard the proofs and allegations of the parties, and having issued the Interim Award dated March 12, 2025, and having reviewed the parties' submissions, issues the following ruling DENYING Respondent' Wynn-Williams'[1] Emergency Motion to Vacate Interim Award.

### BACKGROUND

**Initial Proceedings.**

On March 7, 2025, Claimant filed an Application for Emergency Relief seeking interim and emergency measures pursuant to AAA Employment Rule 0-4 concerning the publication of *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism*. On March 10, 2025, the

---

[1] On March 24, 2024, the ICDR advised the parties of the administrative determination that the Claimant did not meet the filing requirements concerning Respondents Flatiron Books and Macmillan Publishers and the ICDR would not proceed with the administration of claims against these Respondents. These two Respondents will be collectively referred to as "Macmillan" and Respondent Wynn-Williams will be referred to as "Respondent."

1

Emergency Arbitrator was appointed and scheduled an emergency telephonic hearing with the parties to occur on March 11, 2025 at 3:15 p.m. (CT) / 4:15 p.m. (ET). AAA Employment Rule O-1 provides that "notice [of an application for emergency relief] may be given by facsimile transmission, or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties." AAA Employment Rule O-3 provides that the emergency arbitrator must "establish a schedule for consideration for the application for emergency relief. Such schedule shall provide a reasonable opportunity to all parties to be heard [ ]."

Claimant's filing indicated that it provided notice to the parties at the following email addresses ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████; and ██████████████████████. According to publicly available information, the individuals with Macmillan-related email addresses are identified as follows: Megan Lynch - Executive Vice President and Publisher of Flatiron Books, Deb Futter - President and Publisher of Celadon Books, a division of Macmillan, Kimberley Nyamhondera – Senior Publicity Manager at Macmillan, Yassy Okamoto – Vice President and Deputy General Counsel of Macmillan, and Poppy North – Publicity Director at Macmillan.

The ICDR used those same email addresses to provide scheduling information to all parties, indicating that the initial hearing would occur on March 11 at 3:00 p.m. (CT). The Emergency Arbitrator subsequently responded to that email exchange to modify the hearing time to occur at 3:15 p.m. (CT). Prior to the hearing, Macmillan's counsel responded to an email chain requesting that the Emergency Arbitrator, the ICDR, and Claimant remove his clients from future email threads, indicating that he would be Macmillan's point of contact. Macmillan's counsel had

2

not been copied on prior emails, indicating that he had been informed of the proceedings by Macmillan.

On March 11, 2025, the Emergency Arbitrator held the telephonic hearing. Claimant, through its counsel, appeared and presented oral argument. Claimant represented that the email address for Respondent was the best contact information that it had available. Claimant also represented that none of the emails that had been sent had "bounced back," indicating that the emails had been successfully delivered. Respondent did not appear at the hearing. Macmillan, through its counsel, did specially appear (while preserving its objections to jurisdiction).

On March 12, 2025 at 11:16 a.m. (ET), the Emergency Arbitrator informed the parties that he would provide Respondent additional time until 9:00 a.m. (ET) on March 13, 2025 to file any written objection to Claimant's Motion. Shortly thereafter, at 12:19 p.m. (ET), Claimant provided the Arbitrator and the parties additional evidence regarding Respondent's purported knowledge of the proceedings. Claimant reported that on the morning of March 12, 2025, Respondent appeared on a popular podcast where she discussed her book and Claimant's attempts to "shut this book down." The Emergency Arbitrator considered Claimant's March 12 submission of the podcast's partial transcript as another exhibit in support of its Emergency Motion. The Emergency Arbitrator found that Respondent was on notice of the emergency proceeding, satisfying AAA Employment Rule O-3. The Emergency Arbitrator subsequently issued the Interim Award, granting Claimant's Application for Emergency Relief against Respondent, and making no findings or ruling as to Macmillan

**Respondent's Motion.**

On March 18, 2025, Respondent filed an Emergency Motion to Vacate Interim Award (the "Motion"). Respondent argues that the Interim Award should be vacated on two primary grounds.

3

First, Respondent argues that Claimant did not provide her proper notice of the proceedings, as the documents were purportedly sent to an "inactive" email address (⬛⬛⬛⬛⬛⬛), as opposed to the address that Claimant was purportedly aware that she had previously used ⬛⬛⬛⬛⬛⬛) or the email address listed on her website (⬛⬛⬛⬛⬛⬛).

Second, Respondent argues that Claimant's Emergency Application should not have been granted because Claimant could not (and cannot) demonstrate a likelihood of success on the merits of its breach of contract claim. Respondent argues that Claimant's cause of action fails for the following reasons:

1. The Severance Agreement is illegal and unenforceable as it purportedly contains provisions that confuse and deter employees from reporting misconduct, including a bar on any monetary recovery for reporting Meta's misconduct to government agencies.

2. If the Severance Agreement is valid, Claimant purportedly was the first to breach by failing to pay Respondent certain reimbursements.

3. Claimant purportedly waived its right to arbitration by publicly stating in 2018 that it would not require employees to arbitrate sexual harassment claims, which Respondent relied upon.

4. The non-disparagement provision in the Severance Agreement is purportedly unenforceable as it violates federal and California laws that protect whistleblowers from retaliation.

5. The non-disparagement provision is purportedly unenforceable because it is contrary to public policy by preventing Respondent from communicating with political officials regarding her allegations.

**Claimant's Opposition.**

On March 24, 2025, Claimant filed its opposition. Claimant argues that Respondent was provided reasonable notice of the claims pursuant to AAA Employment Rule O-3. Claimant also argues that the Severance Agreement is enforceable because it is not barred by SEC regulations,

4

the National Labor Relations Act, or California's Silenced No More Act. Claimant further argues that it can succeed on the merits because it did not commit a prior breach nor waive its right to arbitrate. Claimant also argues that the Severance Agreement does not contravene public policy.

## JURISDICTION

**The Emergency Arbitrator Has Jurisdiction.**

As an initial matter, the Emergency Arbitrator continues to have jurisdiction over this dispute because a Merits Arbitrator has not been appointed, pursuant to AAA Employment Rule O-5. Moreover, Respondent has properly requested that the Interim Award be vacated, despite not having cited a AAA-ICDR rule explicitly allowing such a request. The applicable AAA Employment Arbitration Rules, specifically Rule 48,  provides that "[t]he arbitrator shall interpret and apply these rules as they relate to the arbitrator's powers and duties." The Emergency Arbitrator interprets the AAA Employment Arbitration Rules to permit reconsideration or vacating any ruling made prior to the Close of Hearing, as provided in AAA Employment Rules O-4 and O-5. Accordingly, the Emergency Arbitrator has the authority to allow a party to file a motion to reconsider or to vacate an order, to rule on such motions, and to reconsider a previous order if necessary.

## RULING

In addition to the AAA procedural rules, California substantive law applies to this dispute. California law provides that courts retain power to vacate or modify injunctive orders at any point, "upon a showing that there has been a material change in the facts upon which the injunction was granted." *In re Butler*, 413 P.3d 1178, 1184 (Cal. 2018). The Emergency Arbitrator has considered the facts and arguments that Respondent raised and has determined that she has not presented a material change in the facts that supported entry of the Interim Award.

5

The Emergency Arbitrator denies Respondent's Motion for two reasons. *First*, Respondent had reasonable notice of the proceedings. *Second*, regardless of the issue of notice, Respondent has presented no compelling argument establishing that Claimant would not be successful on the merits of its breach of contract claim, justifying vacatur of the Interim Award.

## I.    Respondent Had Reasonable Notice of the Proceedings.

The Emergency Arbitrator finds that AAA Employment Rule O-3 was satisfied and that Respondent had reasonable notice of the proceedings. Respondent argues that although she created the ███████████████████ email address, she does not currently use it, does not have access to the login credentials, and that it is "inactive." The Emergency Arbitrator does not know that to be true. The facts establish that none of the emails that were sent by Claimant, or the AAA-ICDR, "bounced back."

Moreover, even if Respondent did not receive emails from Claimant or the AAA-ICDR, it is likely that she was aware of the proceedings. Over a period of six days, between March 7 and March 12, 2025, Claimant's counsel and the AAA-ICDR sent several emails copying multiple Macmillan senior employees and attorneys regarding the emergency arbitration, the scheduling of the hearing, and the proposed interim award. It is unlikely that multiple emails regarding such a significant legal matter, that were sent to five people who are seemingly senior-level Macmillan employees – with responsibilities ranging from publishing, legal, publicity and communications – did not inform Respondent of the emergency arbitration. That is particularly unlikely considering the significance of the proceeding – and the potential outcome – for all parties. To be clear, Macmillan's knowledge does not impute knowledge on Respondent. However, that information is significant because it establishes that Respondent had reasonable notice of the emergency proceeding.

6

Additionally, the Motion argues that Respondent's statements regarding Claimant's attempts to "shut this book down" during a March 12 podcast referred to a March 6 letter directed at Macmillan.[2] Respondent's Declaration does not make such an assertion, but is silent regarding the context of the comments Respondent made during the March 12 podcast. Moreover, Respondent's Declaration states that she never "received notice from Meta to the Primary Email" notifying her of the arbitration. (Decl. at ¶ 14.) The Declaration noticeably fails to state that Respondent was unaware of the arbitration proceeding. The Arbitrator considers all of these facts and finds that Respondent had reasonable notice of the arbitration proceeding sufficient to satisfy AAA Employment Rules O-1 and O-3.

## II.    Claimant Established a Likelihood of Success on the Merits.

Even if Respondent lacked reasonable notice of the hearing – an argument that the Emergency Arbitrator rejects – that alone does not require vacatur of the Interim Award. As Claimant argues, if there was a lack of notice, that would only permit Respondent to present her arguments that had not been previously presented. Having now done so, the Emergency Arbitrator considers Respondent's arguments in full and rejects them. The Emergency Arbitrator again finds that Claimant is likely to succeed on the merits of its breach of contract claim requiring issuance of the Interim Award granting Claimant's Emergency Application.

To obtain a preliminary injunction, Claimant must show a reasonable probability it will prevail on the merits. *Prigmore v. City of Redding*, 211 Cal. App. 4th 1322, 1333 (2012). The elements to establish a breach of contract are well-settled. Claimant must plead (1) the existence of the contract, (2) its performance or excuse for nonperformance, (3) Respondent's breach, and

---

[2] Considering that Claimant's March 6 letter had been sent to Macmillan – and not Respondent – further establishes that Respondent had been in communication with her publisher in the days preceding the release of her book.

(4) resulting damages. *Maxwell v. Dolezal*, 231 Cal. App. 4th 93, 97–98 (2014). Respondent argues that Claimant cannot succeed because (a) the Severance Agreement is invalid, and (b) her affirmative defenses of prior breach and waiver establish that Claimant failed to perform its obligations. The Emergency Arbitrator rejects Respondent's assertions.

### A.  Respondent's Arguments Do Not Support Invalidating the Severance Agreement.

Respondent argues that the Severance Agreement is invalid because certain of its provisions purportedly violate federal and California laws. Respondent's arguments are unpersuasive.

### 1.  The Severance Agreement Does Not Prevent Whistleblower Activity.

*First*, Respondent argues that the Severance Agreement discourages whistleblowers from reporting improper activity in violation of the Dodd-Frank Act and 15 U.S.C. 78u-6. Respondent's assertion is unsupported by the plain language of Section 4 of the Severance Agreement, which the Interim Award adopted. Section 4 explicitly carves out Respondent's right to "fil[e] a claim with a federal, state or local government agency that is responsible for enforcing a law on behalf of the government." In fact, Respondent took advantage of those rights by filing a whistleblower claim with the SEC nearly one year before publishing her book.

Respondent argues that the Section 4 carveout is illusory because it does not allow her to recover money for reporting misconduct. Respondent cites no binding authority to support her assertion. Instead, she cites several non-binding SEC orders. *See e.g., In re Facebook, Inc. Sec. Lit.*, 477 F. Supp. 3d 980, 1017 n.4 (N.D. Cal. 2020) (explaining that positions articulated, and statements made by the SEC in settlement documents are not law and are not binding). There is no indication that a court would determine the Section 4 carveout to be invalid.

8

Even if the SEC settlements that Respondent relies upon are binding, they are factually distinguishable. Each addressed prohibitions on incentive awards to whistleblowers, not a lawsuit that a government agency may file on behalf of a former employee. In *HomeStreet Inc. v. Darrel Van Amen*, HomeStreet required employees sign severance agreements that waived potential claims the employee made against it as a condition of being paid a monetary settlement. Exchange Act Release No. 34-79844, 115 SEC Docket 18 (Jan. 19, 2017), at ¶ 38. The agreement further stated that employees were not prohibited from filing a charge with the EEOC or discussing any matter relevant to the employee's employment with any government agency, "but shall be considered a waiver of any damages or monetary recovery therefrom." *Id*. at ¶ 39. The SEC found that the agreement removed "financial incentives that are intended to encourage persons to communicate directly with the Commission staff about possible securities law violations." *Id*. at ¶ 40.

HomeStreet's severance agreement is factually distinguishable. First, HomeStreet's severance agreement sought to bar damages and monetary recovery from claims filed by the individual employee, whereas the Severance Agreement bars monetary benefit from claims brought on behalf of the individual employee by a government agency. Second, HomeStreet's severance agreement acts as a bar of all damages or monetary recovery whereas the Severance Agreement is more limited and only bars monetary benefit when the claim is brought by a government agency.

Additionally, in *In the Matter of BlackRock, Inc.*, BlackRock utilized a form separation agreement that stated that an employee waives "any right to recovery of, incentives for reporting of misconduct, including without limitation, under the Dodd-Frank [Act]. . ." Exchange Act Release No. 34-79804, 115 SEC Docket 18 (Jan. 17, 2017), ¶ 7. The SEC found that BlackRock's

9

separation agreement violated Rule 21F-17(a) by impeding an individual from communicating directly with the SEC. *Id.* at ¶ 10. BlackRock's separation agreement differs from the Severance Agreement in that it expressly forbid an employee from recovering incentives under Dodd-Frank.

Respondent does not establish that the Severance Agreement barred whistleblower activities such that would invalidate the agreement.

### 2.   The NLRA Does Not Apply to Respondent.

***Second*,** Respondent argues that the Severance Agreement should be invalidated because it violates the National Labor Relation Act (NLRA), by preventing Claimant from criticizing her workplace conditions. Even if Respondent's assertion is true, Section 2(3) of the NLRA excludes supervisors from the protections of the NLRA. 29 U.S.C. § 152(3). The NLRA defines a supervisor as one who (1) has authority to engage in certain supervisory functions defined in the Act, (2) uses independent judgment when exercising this authority, and (3) holds this authority in the interest of the employer. *NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 713 (2001). Claimant argues, and Respondent does not contest, that Respondent was a senior-level employee who had supervisory authority. Accordingly, the NLRA is inapplicable to this dispute.

### 3.   The Silenced No More Act Does Not Apply to the Severance Agreement.

***Third*,** Respondent argues that the Severance Agreement violates California's Silenced No More Act, which forbids a severance agreement that prohibits disclosure of information about unlawful acts in the workplace. The Silenced No More Act, which became effective January 1, 2022, is inapplicable because it does not apply retroactively. *See* Cal. Civ. Proc. Code § 1001 ("The amendments made . . . by Senate Bill 331 of the 2021-22 Regular Session [The Silenced No More ACT] apply only to agreements entered into on or after January 1, 2022."). Moreover, the statute only applies to "a provision within a settlement agreement that prevents or restricts the

disclosure of factual information related to a claim filed in a civil action or a complaint filed in an administrative action . . ." *Id*. The non-disparagement clause of the Severance Agreement does not prevent Respondent from disclosing information in a civil action. Additionally, the facts establish that Respondent's disparaging statements also included statements unrelated to her accusations of sexual harassment. The Silenced No More Act does not invalidate the Severance Agreement.

### 4.  Public Policy Does Not Invalidate the Severance Agreement.

***Finally,*** Respondent argues that the Severance Agreement's non-disparagement provision violates public policy because it purportedly prevents her from communicating with legislators in the United States and abroad. "Whether a contract is contrary to public policy is a question of law to be determined from the circumstances of the particular case." *Bovard v. Am. Horse Enters*., 201 Cal. App. 3d 832, 838 (1988). To determine whether a contract violates public policy is subjective. *Id*. California courts cautiously apply "public policy reasons to nullify otherwise enforceable contracts." *Id*. "The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." *Id*. at 839. The Respondent has the burden to show that enforcement of the Severance Agreement would violate the "settled public policy of [California], or [be] injurious to the morals of its people." *Id*.

At this stage of the proceedings, the facts do not demonstrate that the Severance Agreement violates public policy merely because Respondent is not permitted to engage in informal discussions with legislators in the United States and Europe. The purpose of the non-disparagement clause is to limit Respondent's discussions with third-parties regarding her former employment with Claimant. If Respondent were permitted to communicate with legislators (outside of the context of an investigation), such actions would only create an exception that would

11

eat the rule. In such a circumstance, nothing would limit or prevent those legislators (or their aides) from parroting to the public any disparaging statements that Respondent is otherwise barred from disclosing to anyone other than a governmental investigatory body. Those legislators could also use their respective platforms as public officials to explicitly assist Respondent promote her book, which she is barred from doing.

Section 4 of the Severance Agreement provides Respondent broad relief to file claims, communicate, and cooperate with any federal, state or local government agency that is conducting an investigation of her allegations against Claimant. That is sufficient to protect her rights. No further carveout is appropriate nor necessitated by the Severance Agreement. The Emergency Arbitrator will not nullify the Severance Agreement by finding that its restrictions violate public policy.

### B. Respondent's Affirmative Defenses Will Not Negate Claimant's Cause of Action.

#### 1. Respondent Does Not Establish Claimant Committed a Prior Material Breach.

Respondent argues that Claimant cannot enforce the Severance Agreement because Claimant committed a prior breach of the Severance Agreement by purportedly failing to reimburse Respondent certain expenses. Prior breach is an affirmative defense requiring Respondent establish that Claimant's alleged prior breach was material. *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.,* 195 Cal. App. 3d 1032, 1051 (1987) ("California courts allow contract termination only if the breach can be classified as 'material,' 'substantial,' or 'total.'"). Whether a partial breach of a contract is material depends on the importance or seriousness of the breach and the probability of the injured party getting substantial performance. *Brown v. Grimes*, 192 Cal. App. 4th 265, 278 (2011).

12

Respondent has not demonstrated that Claimant's alleged failure to reimburse certain expenses was material. Sections 2 and 6 of the Severance Agreement establish that Claimant paid Respondent all amounts due at the time the agreement was executed. Section 8 of the Severance Agreement provides that any remaining expenses that were unpaid that Respondent incurred prior to September 6, 2017 were to be submitted by October 31, 2017. Respondent has not demonstrated that the alleged unpaid expenses were incurred before the Severance Agreement was executed. Rather, Claimant has demonstrated that some of Respondent's reimbursement requests were for expenses incurred after the Severance Agreement was executed.

Ultimately, this is a factual dispute that cannot be resolved at this time. *Brown*, 192 Cal. App. 4th at 277. However, the Emergency Arbitrator can consider the seriousness of the alleged prior breach to determine whether Claimant's prior actions were material, based on the facts presented. *Id*. at 278. Here, the alleged unpaid amount was less than 30% of the total amount of the consideration provided ($230,000 versus $800,000). Additionally, Claimant's alleged failure to reimburse those expenses occurred in 2017 and 2018. Yet, Respondent has never filed suit seeking to recover the alleged unreimbursed expenses.[3] Respondent has never otherwise alleged that Claimant breached the Severance Agreement. Respondent has also not alleged that the Severance Agreement had terminated in the seven years following Claimant's alleged breach.

The Emergency Arbitrator makes no factual finding regarding whether Respondent's prior breach affirmative defense will ultimately prevail. At this stage of the proceedings, the facts do not establish that Claimant's alleged failure to reimburse certain of Respondent's expenses

---

[3] It is unclear if Respondent could assert such a claim now because the four-year statute of limitations for breach of a written contract likely began to run in 2017 and may bar a recovery. *Eloquence Corp. v. Home Consignment Center*, 49 Cal. App. 5th 655, 661 (2020) ("when a controversy is ripe—that is, when all of the elements of a cause of action have occurred and a suit may be maintained.").

constituted a material breach of the Severance Agreement. Respondent's affirmative defense is insufficient to negate Claimant's breach of contract claim.

## 2. Respondent Does Not Establish that Claimant Waived Its Right to Arbitrate.

Respondent argues that Claimant waived its right to arbitrate its breach of contract claim because of public comments Claimant made in 2018 that it would not arbitrate sexual harassment claims. Waiver is an affirmative defense and is the intentional relinquishment of a known right. *Quach v. Cal. Commerce Club, Inc.*, 16 Cal. 5th 562, 569 (2024) (citing *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022)) (California courts applying the Federal Arbitration Act hold that arbitration contracts are placed on equal footing as other contracts requiring courts apply the same rules as any other contract when determining whether a party to an arbitration agreement has lost the right to enforce the agreement.)

The *Quach* court held that to establish waiver of a contract claim, the party opposing enforcement of a contract must prove by clear and convincing evidence that the waiving party knew of the contractual right and intentionally relinquished or abandoned it. *Id*. at 584. The clear and convincing standard requires the proponent of a fact show that it is "highly probable" the fact is true. *Id*. The waiving party's intentional relinquishment or abandonment of the right may be proved by "evidence of words expressing an intent to relinquish the right or of conduct that is so inconsistent with an intent to enforce the contractual right [so] as to lead a reasonable fact finder to conclude that the party had abandoned it." *Id*.

Respondent will be unable to establish that Claimant waived its right to arbitrate its claim, despite any public statements it made seven years ago. *First*, Claimant's general public statements regarding not requiring sexual harassment victims to arbitrate sexual harassment claims does not establish that Claimant waived its rights to pursue this arbitration against Respondent.

14

*Second*, this is not a sexual harassment case. It is a breach of a severance agreement related to alleged disparaging statements that Respondent published – not all of which pertain to allegations of her being sexually harassed.

*Third*, Claimant cannot be said to have acted intentionally to abandon its rights to arbitrate its claim. Respondent argues that other former employees of Claimant have recently written books that have not led Claimant to file arbitration against those former employees. The Emergency Arbitrator does not know if Respondent's assertion is true. Even so, the point is irrelevant, because those other employees are not party to the Severance Agreement. At any time since 2018, when Claimant made its public statements, Claimant and Respondent could have sought to modify the Severance Agreement to remove the arbitration clause. They did not. There are no facts related to how Claimant interacted with Respondent, demonstrating that Claimant has acted inconsistently with asserting its arbitration rights here.

*Fourth*, Claimant did not demonstrate that it acted inconsistently by pursuing arbitration. Claimant initiated this proceeding days after learning of Respondent's scheduled book release. Respondent's waiver affirmative defense would not negate Claimant's breach of contract claim.

<div align="center">*****</div>

For the preceding reasons, Respondent's Motion to Vacate the Interim Award is DENIED. The Interim Award entered on March 12, 2025, is reaffirmed and remains in effect unless and until modified or vacated by the merits tribunal, once appointed, or by agreement of the parties.

The Emergency Arbitrator's fees shall be borne by Claimant, pursuant to the terms of the arbitration agreement. This allocation may be modified by the merits tribunal, once appointed, pursuant to AAA Employment Rule O-8.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on

<div align="center">15</div>

the recognition and Enforcement of Foreign Arbitral Awards, this Order was made in Los Angeles,

California, United States of America.

Dated: March 31, 2025

Nicholas A. Gowen,
Emergency Arbitrator

State of Illinois          )
                           )    SS:
County of Cook             )

I, Nicholas A. Gowen, do hereby affirm upon my oath as Emergency Arbitrator that I am the individual described in and who executed this instrument.

3/31/2025

Nicholas A. Gowen, Emergency Arbitrator

16

# Exhibit F

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
### Emergency International Arbitral Tribunal

Meta Platforms, Inc.,

    *Claimant,*

v.

Sarah Wynn-Williams; Macmillan
Publishers; Flatiron Books,

    *Respondents.*

No. 01-25-0001-2843

### INTERIM AWARD

I, Nicholas A. Gowen, the undersigned Emergency Arbitrator, having been designated in accordance with the arbitration agreement entered into between the parties and dated September 06, 2017, and having been duly sworn, and having duly heard the proofs and allegation of the parties, do hereby, award as follows:

The International Centre for Dispute Resolution ("ICDR"), the international division of the American Arbitration Association ("AAA"), appointed the undersigned pursuant to Section O-2 of the Optional Rules for Emergency Measures of Protection of the AAA Employment Arbitration Rules to rule on Claimant's application for emergency relief. The Optional Rules were incorporated into the parties' arbitration agreement.

This dispute arises between Claimant, Meta Platforms, Inc. (represented by Lehotsky Keller Cohn LLP & Greenberg Traurig LLP) and Respondents, Sarah Wynn-Williams (having failed to appear after notice was provided by email sent to her last known email address); and Macmillian Publishers and Flatiron Books (collectively, "Macmillian")[1] (represented by Jassy Vick Carolan LLP, but objecting to the jurisdiction of the ICDR/AAA), and governed by the

---

[1] According to their counsel, both are DBAs for Macmillian Publishing Group, LLC.

1

arbitration agreement between Claimant and Respondent Wynn-Williams found in the Severance Agreement dated September 06, 2017.

### CLAIMANT'S APPLICATION FOR EMERGENCY RELIEF

On March 7, 2025, Claimant filed an Emergency Motion seeking interim and emergency measures pursuant to AAA Employment Rule 0-4 concerning the publication of *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism*. On March 10, 2025, the Emergency Arbitrator was appointed and scheduled an emergency telephonic hearing with the parties to occur on March 11, 2025 at 3:15 p.m. (CT) / 4:15 p.m. (ET). On March 11, 2025, the Emergency Arbitrator held the telephonic hearing. Claimant, through its counsel, appeared and presented oral argument. Respondent Wynn-Williams did not appear, despite notice being provided by email. Respondent Macmillian, through its counsel, did specially appear (while preserving its objections to jurisdiction) and was provided the opportunity to be heard, and argued, among other points, that the Emergency Arbitrator did not have jurisdiction over Respondent Macmillian, and that Respondent Macmillian should not be specifically named in this award.

On March 12, 2025 at 11:16 a.m. (ET), the Emergency Arbitrator informed the parties that he would provide Respondent Wynn-Williams additional time until 9:00 a.m. (ET) on March 13, 2025 to file any written objection to Claimant's Motion. Shortly thereafter at 12:19 p.m. (ET), Claimant provided the Arbitrator and the parties additional evidence regarding Respondent Wynn-Williams knowledge of the proceedings. On the morning of March 12, 2025, Respondent Wynn-Williams apparently appeared on a popular podcast where she discussed her book and Claimant's attempts to "shut this book down." The Emergency Arbitrator will consider Claimant's March 12 submission of the podcast's partial transcript as a further exhibit in support of its Emergency

2

Motion. Accordingly, the Emergency Arbitrator finds that Respondent Wynn-Williams is on notice of this emergency proceeding.

The Emergency Arbitrator will not wait to issue a ruling until after 9:00 a.m. (ET) on March 13, 2025, as that delay is unnecessary, and strikes his March 12 order.

### EMERGENCY ARBITRATOR'S FINDINGS

The Emergency Arbitrator finds that he has jurisdiction over the dispute between the signatory parties, Claimant and Respondent Wynn-Williams.

The Emergency Arbitrator finds that Respondent Wynn-Williams received reasonable notice and a reasonable opportunity to be heard but did not appear at the emergency hearing. Accordingly, the Arbitrator determines that Rule O-3 has been satisfied.

The Emergency Arbitrator makes no factual findings as to Respondent Macmillian.

The Emergency Arbitrator finds that, after reviewing the briefs and hearing oral argument, Claimant has established a likelihood of success on the merits of its contractual non-disparagement claim against Respondent Wynn-Williams, and that immediate and irreparable loss will result in the absence of emergency relief.

For the reasons stated above, I award as follows:

### INTERIM AWARD

The Emergency Arbitrator grants the Claimant's application for emergency relief and enjoins Respondent Wynn-Williams, her agents, servants, employees, attorneys, and any other person(s) or entities for which she controls as follows:

1. from making orally, in writing, or otherwise any "disparaging, critical or otherwise detrimental comments to any person or entity concerning [Meta], its officers, directors or employees; the products, services or programs provided or to be provided by [Meta];

3

the business affairs, operation, management or the financial condition of [Meta]; or the circumstances surrounding [her] employment and/or separation of employment from [Meta]," except as permitted by Sections 4 and 9 of the Severance Agreement and regardless of whether Ms. Wynn-Williams believes her statements are true or false;

2. from further promoting *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism* on a book tour or otherwise, including with respect to electronic and audio versions of the book;

3. to the extent within Respondent Wynn-Williams' control, from further publishing or distributing *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism*, including with respect to electronic and audio versions of the book;

4. to the extent within Respondent Wynn-Williams' control, from amplifying or repeating in any forum all such previous "disparaging, critical or otherwise detrimental comments," regardless of whether Ms. Wynn-Williams believes her statements are true or false;

5. to the extent within Respondent Wynn-Williams' control, retract all such previous "disparaging, critical or otherwise detrimental comments" from all forums, including online, on which they appear.

Nothing in this order shall be construed to "prevent or prohibit" Respondent Wynn-Williams from "filing a claim with a federal, state, or local government agency that is responsible for enforcing a law on behalf of the government," as authorized by Section 4 of the Severance Agreement. Nothing in this order shall be construed to "deter or prevent" Respondent Wynn-

4

Williams from "cooperating with or providing information to such a governmental agency during the course of its investigation or during litigation," as authorized by Section 4 of the Severance Agreement. *Id.* And nothing in this order shall be construed to prohibit Respondent Wynn-Williams from giving "any testimony … truthfully under oath or as required by any other legal proceeding," as authorized by Section 9 of the Severance Agreement.

The Emergency Arbitrator's fees shall be borne by Claimant, pursuant to the terms of the arbitration agreement.

This Interim Award shall be binding on the parties and shall remain in effect until and unless modified or vacated by the merits tribunal, once appointed.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the recognition and Enforcement of Foreign Arbitral Awards, this Interim Award was made in Los Angeles, California, United States of America.

Dated: March 12, 2025

Nicholas A. Gowen,
Emergency Arbitrator

State of Illinois          )
                           )  SS:
County of Cook             )

I, Nicholas A. Gowen, do hereby affirm upon my oath as Emergency Arbitrator that I am the individual described in and who executed this instrument, which is my Interim Award.

3/12/2025

Date                          Nicholas A. Gowen, Emergency Arbitrator

5

State of Illinois )
) SS:
County of Cook )

On this 12th day of March, 2025, before me personally came and appeared Nicholas A. Gowen, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

OFFICIAL SEAL
GRACIELA BALDERAS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 5/30/2025

6

# Exhibit G

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**Emergency International Arbitral Tribunal**

| | |
|---|---|
| Meta Platforms, Inc., | No. 01-25-0001-2843 |
| *Claimant*, | |
| v. | |
| Sarah Wynn-Williams; Macmillan Publishers; Flatiron Books, | |
| *Respondents*, | |

**EMERGENCY MOTION TO VACATE INTERIM AWARD**

Meta Platforms, Inc. ("Meta") has brought this arbitration to silence Sarah Wynn-Williams, a whistleblower who told the world what she saw first-hand: Meta and its executives abused their employees, their technology, and the trust placed in them by billions of users. This arbitration is a continuation of Meta's abusive tactics.

Ms. Wynn-Williams now brings this motion to vacate the Interim Award on two bases: (i) it was issued based on the false premise that Ms. Wynn-Williams was notified of the proceedings at her "last known email address"; and (ii) Meta cannot demonstrate a likelihood of success on the merits of its contractual claim because the Severance Agreement as a whole, as well as the arbitration and non-disparagement provisions specifically, are unenforceable.

First, Ms. Wynn-Williams had no notice of the proceedings.

Second, Meta cannot establish a likelihood of success on the merits of its claim against Ms. Wynn-Williams, and therefore is not entitled to interim injunctive relief. Once Ms. Wynn-Williams's evidence is fairly considered, there are many reasons why Meta cannot show that it is likely to prevail on the merits of its non-disparagement claim:

1

- First, the entire Severance Agreement is illegal and unenforceable. The Agreement is rife with provisions that confuse and deter employees from reporting misconduct, including a bar on any monetary recovery for reporting Meta's misconduct to government agencies. The Securities and Exchange Act (the "Exchange Act") is clear: such contracts are unenforceable. This illegality taints the entire contract; Meta cannot enforce it.

- Second, if the Agreement were valid, Meta was the first party to breach the Agreement because it failed to reimburse Ms. Wynn-Williams for expenses, as the contract requires. Since Meta caused the first breach, it cannot come after Ms. Wynn-Williams for alleged breaches that happened later.

- Third, Meta waived its right to arbitration. Facebook[1] told the world that it would not force employees into arbitration for sexual harassment claims, and Ms. Wynn-Williams relied on that unequivocal representation. Meta should be required to keep its word and adhere to its own policy.

- Fourth, the non-disparagement provision in the Severance Agreement is unenforceable because it violates both federal and California laws that protect whistleblowers from retaliation.

- Fifth, Meta's non-disparagement provision is unenforceable because it is contrary to public policy. Members of the United States Congress, the Parliament of the United Kingdom, and the Parliament of the European Union have requested to speak with Ms. Wynn-Williams on the issues of public concern raised in her

---

[1] Facebook changed its name to Meta in or around December 2021. In this brief, we refer to the Claimant as "Facebook" when referring to events prior to that switch.

2

memoir. These include Meta's coordination with the Chinese Communist Party, its exploitation of emotionally vulnerable teenage girls, and its conduct in this very arbitration. Yet, under the Interim Award, Ms. Wynn-Williams appears to be blocked from speaking with America's elected representatives, democratically elected members of parliament in the UK, and democratically elected representatives around the world.

The Interim Award is the product of a process that was unfair to Ms. Wynn-Williams, and to the arbitration process. In compliance with the Interim Award, Ms. Wynn-Williams has stopped promoting or speaking about her truthful memoir, which is causing her ongoing financial losses and emotional distress. Further, the public interest is suffering due to her inability to respond to outreach from legislators, journalists, and the public. The Interim Award should therefore be vacated. Furthermore, Ms. Wynn-Williams respectfully requests that the Interim Award be suspended while her Motion to Vacate is pending.

## BACKGROUND

Respondent Sarah Wynn-Williams was Facebook's Director of Global Public Policy from 2011 to 2017. In that capacity, she worked directly with the company's top leadership, including Mark Zuckerberg, Sheryl Sandberg, and Joel Kaplan. By 2017, Ms. Wynn-Williams had responsibility for Facebook's China policy.

While working at Facebook, Ms. Wynn-Williams was sexually harassed by two top executives, including Mr. Kaplan, Facebook's then-Vice President of Global Policy and Ms. Wynn-Williams's manager. Ms. Wynn-Williams reported Mr. Kaplan's behavior, and Facebook Human Resources initiated an investigation. Shortly thereafter, Ms. Wynn-Williams was fired. Ms. Wynn-

Williams and Facebook executed a Severance Agreement and Release ("Severance Agreement" or "Agreement") on or about September 6, 2017.  Interim Award at 1; Ex. 2.

In the seven years she worked for Facebook (now Meta), Ms. Wynn-Williams witnessed blatant violations of law, including lying to investors and Congress about issues like Facebook's attempted entry into China; Facebook's reckless apathy that led to a genocide in Myanmar; and sexual harassment at the company.  In April 2024, Ms. Wynn-Williams filed a whistleblower complaint with the Securities and Exchange Commission.  In March 2025, she filed a whistleblower complaint with the Department of Justice raising these issues, among others.

On March 11, 2025, Ms. Wynn-Williams's memoir, *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism*, was released in the United States by Flatiron Books, an imprint of Macmillan Publishers.

## ARGUMENT

## I.     MS. WYNN-WILLIAMS DID NOT HAVE NOTICE OF THE ARBITRATION

On March 7, 2025, Meta filed an Emergency Motion seeking interim and emergency measures against Ms. Wynn-Williams and her publishers concerning her forthcoming memoir.  *See* Interim Award at 2.  The Interim Award states that notice of arbitration was sent to Ms. Wynn-Williams's "last known email address."  Interim Award at 1.  The email address to which Meta appears to have sent the notice is inactive.  Ms. Wynn-Williams never received notice of the Emergency Motion or any other arbitration proceedings to the email accounts she uses and that Meta knows she uses.  Ex. 1 (Declaration of Sarah Wynn-Williams) ¶¶ 2-24.

4

Her primary personal email account is ███████████████ ("Primary Email").[2] Ex. 1 ¶ 6. This address is the one that (i) she provided to Facebook when she received her offer of employment from Facebook; (ii) she provided Facebook during her employment; (iii) was on her employment file with Human Resources; (iv) was used during extensive email exchanges with Facebook staff, including about expense receipts; (v) is linked to her accounts on Meta products; (vi) senior Facebook employees (including Joel Kaplan) have used to email her personally; and (vii) she used to communicate with Facebook after she left the company, including to finalize the Severance Agreement and to establish a point of contact with Heidi Swartz, employment counsel at Meta. Ex. 1 ¶¶ 7-13; Exs. 3–6.

Further, Ms. Wynn-Williams established a public webpage promoting her book, www.sarahwynnwilliams.com, by the time of Meta's filing of the Emergency Motion.[3] It contained an email address, ███████████████ ("Webpage Email"). Ex. 1 ¶ 18. Ms. Wynn-Williams did not receive notice at either of these email addresses. Ex. 1 ¶ 19.

Moreover, Meta did not provide notice of the arbitration to the attorney who represented Ms. Wynn-Williams in the negotiation of the Severance Agreement. Ex. 1 ¶¶ 22-24.

Due to lack of notice, Ms. Wynn-Williams did not appear at the telephonic hearing, nor did she file an opposition to the Emergency Motion.

The Interim Award was issued March 12, 2025. On the morning of March 13, 2025, Meta, through a private process server, personally delivered to Ms. Wynn-Williams a copy of the Interim Award only, along with a cover letter, at her personal residence in the United Kingdom. Ex. 1 ¶ 2; Ex. 7. The process server did not deliver a copy of the notice of the Emergency Motion that was

---

[2] Filed alongside this Emergency Motion to Vacate is an Emergency Motion for Protective Order. Meta must refrain from releasing Ms. Wynn-Williams's personal identifying information (PII) to the public.

[3] This webpage has been replaced by a contact form to comply with the Interim Award.

purportedly emailed to her, the Demand for Arbitration, or any of the other filings in the case.  The cover letter listed ███████████████████ ("Inactive Email") as Ms. Wynn-Williams's email address.  Ex. 1 ¶ 3.  The Inactive Email is one that Ms. Wynn-Williams created in approximately 2007, has used rarely, and hasn't checked in years.  Ex. 1 ¶ 4.  In fact, Ms. Wynn-Williams does not remember the password to the Inactive Email account to access it now.  Ex. 1 ¶ 5.

Rather than use the Primary Email or the Webpage Email, it appears that Meta sent documents to the Inactive Email.  Ms. Wynn-Williams does not know how Meta received the Inactive Email, as she does not recall having used it in any communication with Meta.  The only reasonable interpretation of "last known email address" is her Primary Email.  But whatever the reason chosen to serve the Inactive Email, the result was that Ms. Wynn-Williams was not on notice, and the emergency hearing occurred without her knowledge of the emergency hearing at that time and without her being present or represented.

Furthermore, the Interim Award indicates that Ms. Wynn-Williams had actual notice of the proceedings because she stated on "a popular podcast" on March 12, 2025, that Meta was attempting to "shut this book down."  Interim Award at 2-3.  On this basis, the arbitrator concluded that Ms. Wynn-Williams was "on notice of this emergency proceeding." *Id.* at 3. This finding of specific knowledge by Ms. Wynn-Williams is not supported by the broad statement made by her.  Instead, this finding is incorrect and based on a misunderstanding of what Ms. Wynn-Williams said and did.  Ms. Wynn-Williams did appear on a podcast on March 11, but at no point in the interview did Ms. Wynn-Williams refer to arbitration or the emergency proceeding.  Instead, Ms. Wynn-Williams's "shut this book down" comment was about a letter dated March 6, 2025, that was directed to Flatiron Books and Macmillan Publishers.  That letter was sent before the book

6

was published and before the Emergency Motion was filed, and it did not refer to arbitration or the Severance Agreement at all.[4] Ms. Wynn-Williams's comment was also informed by and consistent with news stories at the time that Meta was threatening legal action against the publisher alone. *See, e.g.,* Anupriya Datta, *Meta to take legal action against Macmillan books over explosive memoir*, EURACTIV (Mar. 10, 2025). Simply, the March 6 letter did not give Ms. Wynn-Williams notice of the arbitration.

The truth is that Ms. Wynn-Williams had no knowledge of the Emergency Motion, the relief being sought, or the proceedings conducted by the emergency arbitrator. Ex. 1 ¶¶ 14, 17, 19, 21, 24. It was Meta's responsibility to take sufficient steps to provide actual notice of its claims to Ms. Wynn-Williams, and they had ample means to do so, including knowledge of the Primary Email Address and Ms. Wynn-Williams's home address. It failed to meet that standard. Ms. Wynn-Williams's statements on "a popular podcast," in which she refers to a threatening letter received by her publishers and did not mention the arbitration, is in no way sufficient to determine that she had knowledge or was on notice of the emergency proceeding, when the reality is that neither was the case.

Accordingly, the Interim Award must be vacated because the circumstances in this arbitration have changed. *See* AAA Employment Arbitration Rule O-5. In summary, despite having multiple reliable routes through which to contact Ms. Wynn-Williams, Meta did not do so. Meta chose not to use the Primary Email account that it had on file, that was registered to Ms. Wynn-Williams's Facebook and Instagram accounts, and which Meta had used to communicate with her for many years. It similarly did not send notice to a publicly-available email address

---

[4] Instead, the letter demanded that the publishers not publish any false and defamatory information about Meta, and it encouraged the publishers "to discuss these serious issues with [Ms. Wynn-Williams] before the book is released publicly."

7

listed on the website promoting the book. And yet, when Meta wanted Ms. Wynn-Williams to see—and presumably comply with—the Interim Award, it promptly delivered a hard copy to her home. Whether Meta made an (albeit inexplicable) mistake or had some other motive, the outcome is the same. Ms. Wynn-Williams had no notice of the Emergency Motion, and the emergency arbitrator should not have been considered it until Ms. Wynn-Williams was given proper notice. As of the time of this filing, Ms. Wynn-Williams still has not seen Meta's Emergency Motion. Now that she has received the Interim Award, Ms. Wynn-Williams should be permitted to respond to the arguments Meta offered in the emergency proceeding. The Interim Award should be vacated, as it proceeded on a flawed premise regarding notice.

## II.    THE INTERIM AWARD SHOULD BE VACATED BECAUSE META IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### A.    The Severance Agreement Is an Illegal Contract

The Severance Agreement violates federal securities laws and is wholly unenforceable. The Exchange Act prohibits "any action to impede an individual from communicating directly with the [SEC] staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement … with respect to such communications[.]" 17 C.F.R. § 240.21F-17(a). This Rule (Rule 21F-17) was adopted by the SEC pursuant to Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Section 21F of the Exchange Act, and 15 U.S.C. § 78u-6. Its "principal purpose" was to "promote effective enforcement of the Federal securities laws by providing incentives for persons with knowledge of misconduct to come forward and share their information with the Commission." *Securities Whistleblower Incentives and Protections*, 76 Fed. Reg. 34300-01, 34308 (June 13, 2011). This included offering "significant financial incentives" to whistleblowers. *Id.* at 34360 n.457 (citing

Geoffrey Christopher Rapp, *Beyond Protection: Invigorating Incentives for Sarbanes-Oxley Corporate and Securities Fraud Whistleblowers,* 87 Boston Univ. L. Rev. 91, 118-26 (2007)).

The Severance Agreement violates Dodd-Frank in two ways.

First, the carveout in Section 4 for interacting with government agencies forbade Ms. Wynn-Williams from recovering any money for reporting misconduct, including to the SEC. *See* Agreement, Section 4 ("You understand and agree that you may not recover any monetary benefit as a result of any claim brought on your behalf by any government agency."). That clause removes a critical incentive for employees to cooperate with government enforcement actions. It is exactly the kind of language in severance agreements that the SEC has found to be unlawful. *See*, *e.g.*, *HomeStreet Inc.,* Exchange Act Release No. 34-79844, 115 SEC Docket 18 (Jan. 19, 2017); *In the Matter of BlackRock, Inc.*, Exchange Act Release No. 34-79804, 115 SEC Docket 18 (Jan. 17, 2017); *BlueLinx Holdings, Inc*, Exchange Act Release No. 34-78528, 114 SEC Docket 15 (Aug. 10, 2016). The illegal contract thus had a chilling effect.

Second, the Severance Agreement violated the requirement to be unambiguous about employees' whistleblowing rights. Language that could confuse terminated employees about their whistleblowing rights violates federal securities laws, because it could reasonably "impede an individual from communicating directly with the Commission staff about a possible securities law violation." 17 C.F.R. § 240.21F-17(a); *see also In the Matter of D.E. Shaw & Co, L.P.*, Exchange Act Release No. 98641 (Sept. 29, 2023) (requiring employees to sign confidentiality agreements, which prohibited them from disclosing the company's confidential information to anyone outside the company unless authorized by the company or required by law or court order, is in violation of Rule 21F-17). This kind of illegality "taints the entire contract, and the entire transaction is

illegal and unenforceable" under Rule 21F-17.  *Birbrower, Montalbano, Condon & Frank v. Super. Ct.*, 949 P.2d 1, 12 (Cal. 1998).

The Severance Agreement, in both form and substance, discourages and impedes whistleblowers from coming forward.  The Severance Agreement—which Ms. Wynn-Williams was required to sign to obtain certain termination benefits—is permeated with language that reasonably confused Ms. Wynn-Williams about the scope of her ability to report illegal workplace conduct to the federal government, which renders the entire contract void.  For example, Section 11, which states that Ms. Wynn-Williams remains bound by the Confidential Information and Inventions Assignment Agreement ("CIIAA"), obscures the fact that employees have a non-waivable right to report confidential information to government agencies notwithstanding the CIIAA.  Ex. 2 at 5-6.  Additionally, Section 14 required Ms. Wynn-Williams to warrant that she had not already filed any complaint with any government agency to receive termination benefits including compensation under the severance agreement, which is also an unlawful impediment to SEC whistleblowers.  Ex. 2 at 6; *see D.E. Shaw*, Exchange Act Release No. 98641.

In addition, the non-waivable right to report illegal conduct has been intentionally phrased in a manner to confuse and frighten terminated employees, such as Ms. Wynn-Williams, while pointedly reminding them of Facebook's intent to enforce their confidentiality obligations.

These provisions pervade the Agreement and cannot be severed.  The entire contract, including the arbitration and non-disparagement provisions upon which the Interim Award is based, is thus void and unenforceable.

**B.    Meta Cannot Enforce Any Provisions of the Severance Agreement Because It Breached Its Obligations to Ms. Wynn-Williams**

Facebook failed to pay Ms. Wynn-Williams's expenses, approximately $230,000, thereby breaching the Severance Agreement.  It cannot now seek to enforce the arbitration and non-

10

disparagement provisions in the contract against Ms. Wynn-Williams.  It is a bedrock principle of contract law that "'[h]e who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed.'"  *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005) (quoting *Pry Corp. of Am. v. Leach*, 177 Cal. App. 2d 632, 639 (Cal. Ct. App. 1960)).

Under Section 8 of the Severance Agreement ("Final Expense Reimbursement Request"), Facebook was required to reimburse Ms. Wynn-Williams for the work-related expenses she incurred during her employment at the company.  It failed to do so, thereby breaching the contract.

In the months following her separation with the company, Ms. Wynn-Williams submitted receipts for reimbursement to Facebook.  Ex. 1 ¶¶ 25, 27.  From October 2017 to May 2018, due to the inaction from Facebook, Ms. Wynn-Williams and her then-counsel followed up repeatedly and diligently with both the expenses team and counsel at Facebook to ask about the delay in reimbursement.  Ex. 1 ¶ 30.  There were at least 50 email exchanges.  Ex. 1 ¶ 30.  During this period, Ms. Wynn-Williams could see within Facebook's reimbursement platform that most of the receipts had been cleared by the internal audit system and approved by external auditors, but she was never repaid.  Ex. 1 ¶¶ 29-32.  Despite the unreasonable delay, Facebook initially told her "to be patient," but it then stopped responding altogether in or around May 2018.  Ex. 1 ¶¶ 30-31; Ex. 3.  To date, Facebook/Meta has never reimbursed Ms. Wynn-Williams for roughly $230,000 of business expenses.  Ex. 1 ¶¶ 28, 32.

Because Facebook materially breached—and remains in breach of—the Severance Agreement, it is not permitted to bring this action seeking to enforce the same Agreement against Ms. Wynn-Williams.  The arbitrator need proceed no further; he should vacate the Interim Award on this basis alone.

C.      **Meta Waived Its Right to Force Victims of Sexual Harassment, Including Ms. Wynn-Williams, to Arbitrate Her Claims**

Prior to November 2018, Facebook had a long history of trying to silence people who experienced sexual harassment at the company, including Ms. Wynn-Williams.  For example, in September 2018, Joel Kaplan attended Brett Kavanaugh's confirmation hearing to support now-Justice Kavanaugh's nomination to the Supreme Court.  It was later confirmed that Mr. Kaplan did not take PTO to attend and was therefore acting in some official capacity for Facebook.  *See* Mike Isaac, *Rift Breaks Open at Facebook Over Kavanaugh Hearing*, N.Y. TIMES (Oct. 4, 2018). Following the events detailed in  Mike Isaac's NY Times article, on Saturday, October 6, Facebook's employment counsel Heidi Swartz reached out to the attorney who represented Ms. Wynn-Williams with respect to the Severance Agreement, citing Joel Kaplan and the news around his attendance at the hearing in support of Mr. Kavanaugh, and directing that Ms. Wynn-Williams be "reminded of her obligations related to non-disparagement and confidentiality."

In November 2018, however, Facebook announced that it was ending its policy of requiring employee sexual harassment claims be forced into private arbitration.  *See* Daisuke Wakabayashi, et al., *Facebook to Drop Forced Arbitration in Harassment Cases*, N.Y. TIMES (Nov. 9, 2018). Facebook was willing to forgo its ability to bring an arbitration for these claims because it said that "[t]his is a pivotal moment for our industry and corporate America more broadly. . . . We think this is the right thing to do and hope other companies do, too."  *Id.*  Facebook's public disavowal of forced arbitration was a clear and unequivocal waiver of its right to bring this arbitration action. Ms. Wynn Williams relied on that position in making her memoir and statements.  Now that Ms. Wynn-Williams has come forward with allegations of sexual harassment by senior executives at the company, Meta has decided that it is no longer interested in doing "the right thing" or acting

12

consistently with its own publicly stated policy. Instead, Meta is seeking to force Ms. Wynn-Williams into arbitration.

Waiver of the right to bring an arbitration will be found when two elements are met: "(1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right." *Hill v. Xerox Bus. Servs., LLC*, 59 F. 4th 457, 468 (9th Cir. 2023). "[T]he right to arbitrate, like any other contract right, can be waived, either expressly or by implication." *Thorup v. Dean Witter Reynolds, Inc.*, 225 Cal. Rptr. 521, 523 (Cal. Ct. App. 1986).

When Meta said it would no longer arbitrate, it gave up its right to pull Ms. Wynn-Williams into this forum. Meta explicitly announced that it would forgo the enforcement of arbitration clauses for sexual harassment claims. Enforcing this arbitration is inconsistent with that statement.

Meta also knew it had the right to compel arbitration before it waived it. As the party who drafted the Agreement—including the arbitration clause—Meta has known since 2017 that it had the ability to bring an arbitration against Ms. Wynn-Williams.

Meta waived any right to compel arbitration against Ms. Wynn-Williams when it announced publicly that it would not enforce arbitration clauses in separation agreements against former employees who bring claims of sexual harassment. Meta should be held to its promise, its policy, and its public statements—and the Interim Award should be vacated.

**D.      The Non-Disparagement Provision Violates Federal and State Laws**

The non-disparagement provision in Section 9 of the Severance Agreement is contrary to Dodd-Frank like the rest of the contract, *see supra*, and it violates numerous other laws. It prohibits Ms. Wynn-Williams—indefinitely—from making *any* voluntary statements that are "disparaging, critical or otherwise detrimental" to Meta, even if true. That has been the effect, as Ms. Wynn-Williams has been prevented from discussing her truthful memoir. If this provision is construed

13

as Meta intends (to prevent Ms. Wynn-Williams from truthfully discussing Meta's unlawful conduct in her memoir and elsewhere) then Section 9 runs afoul of both federal and state whistleblower protection laws.  Meta itself publicly avowed its commitment to these laws in a 2022 filing with the SEC, addressing its own shareholders: "[W]e do not require or encourage our personnel to remain silent about harassment or discrimination…[i]n addition we do not require our personnel to enter into employment agreements that include non-disparagement clauses that would prevent them from discussing unlawful workplace conduct."   Ex. 8 at 71.  That is exactly what Ms. Wynn-Williams has done: write about unlawful workplace conduct (amongst other things).

> **1.  The Non-Disparagement Provision Violates the National Labor Relations Act**

For nearly a century, the National Labor Relations Act ("NLRA") has given employees the right to criticize workplace conditions, including in communications with third parties.  29 U.S.C. § 157; *see McLaren Macomb and Local 40 RN Staff Council, Office and Professional Employees, International Union (OPEIU), AFL–CIO*, 372 NLRB No. 58, Case 07-CA-263041, at *7 (February 21, 2023) (NLRA "affords protection for employees who engage in communications with a wide range of third parties" in relation to a wide range of workplace conditions) (citing *NLRB v. Electrical Workers Local 1229 (Jefferson Standard Broadcasting Co.)*, 346 U.S. 464, 477 (1953)).  In its 2022 proxy statement, Meta affirmed its commitment to compliance with the NLRA.  Ex. 8 at 71.  Ms. Wynn-Williams has exercised her rights under the statute in telling her story of witnessing Meta's illegal conduct—including her supervisors' lies to Congress, violations of federal securities laws, and pervasive sexual harassment.  To the extent the non-disparagement clause infringes on that right, it, too, violates the NLRA.

"Conditioning the benefits under a severance agreement on the forfeiture of statutory rights" must be "*narrowly tailored* to respect the range of those rights."  *McLaren Macomb*, 372

14

NLRB No. 58, Case 07-CA-263041, at *10 (Feb. 21, 2023) (emphasis added). The non-disparagement provision in this case does not meet that standard. It has no time limitation, nor any legitimate business justification. Its purpose, instead, is to cast a "chilling effect" that precludes employees like Ms. Wynn-Williams from exercising their rights under the NLRA. *Id. at* *6. This is unlawful, and the Award should be vacated on this basis alone.

### 2. The Non-Disparagement Provision Violates California's Silenced No More Act

The non-disparagement provision also violates California's Silenced No More Act, which forbids any severance agreement "that prohibits the disclosure of information about unlawful acts in the workplace." Cal. Gov't Code § 12964.5 (West 2022). The plain language of Section 9 of the Agreement violates this statute.

In a 2022 proxy statement, Meta publicly affirmed its commitment to compliance with that law and even cited it to justify rejecting a shareholder resolution seeking a public report on the use of "concealment clauses"—like the one in Section 9—in Meta's employment and post-employment agreements. Ex. 8 at 70-71. Meta's board of directors claimed that the resolution was unnecessary because "[a]ll of our policies are intended to comply with the National Labor Relations Act . . . and the recently enacted California Silence No More Act [*sic*], which generally prohibits the use of non-disparagement clauses in employment agreements." Meta further stated: "[W]e do not require our personnel to enter into employment agreements that include non-disparagement clauses that would prevent them from discussing unlawful workplace conduct." Ex. 8 at 70-71.

Ms. Wynn-Williams justifiably relied on Meta's stated commitment to its shareholders (and to the SEC) that all its policies comply with legal obligations, including the Silenced No More Act, that prohibit enforcement of non-disparagement clauses.

15

### a. The Silenced No More Act invalidates Section 9 in the Agreement

The Silenced No More Act clarified that non-disparagement provisions in severance agreements are unenforceable if they "prohibit[] the disclosure of information about unlawful acts in the workplace." Cal. Gov't Code § 12964.5.

This Act is retroactive and applies to Ms. Wynn-Williams's Agreement. A statute applies retroactively if (1) there is "an express retroactivity provision," or (2) "it is very clear from extrinsic sources that the Legislature must have intended a retroactive application." *Gadda v. State Bar of Cal.*, 511 F.3d 933, 938 (9th Cir. 2007) (quoting *Myers v. Philip Morris Cos.,* 50 P.3d 751, 759 (Cal. 2002)) (cleaned up). Both are present here. For all but two provisions inapplicable to this case, the Silenced No More Act expressly states that it was "merely clarifying existing law," indicating retroactive application. *See* Cal. Civ. Proc. Code § 1001 (g) (West 2023) (stating that the Silenced No More Act "clarifies existing law" except in relation to settlement agreements under Section 1001(a)(3) and (a)(4)). The legislative history confirms this intent. After the bill had passed the Assembly Committee, but before it went to a full vote, the Committee report identified a "retroactivity issue" with Sections 1001(a)(3) and (a)(4) only—implying that the other sections were retroactive. *See* California Bill Analysis, Assembly Committee, 2021-2022 Regular Session, Senate Bill 331 (June 8, 2021), at 6.

Ms. Wynn-Williams's memoir sets out a host of Meta's illegal activities in the workplace. The Silenced No More Act "clarified the existing law" applicable to Ms. Wynn-Williams's Agreement, making clear that Meta cannot take away her right to disclose information about unlawful acts in the workplace. Accordingly, the non-disparagement provision in Section 9 is unlawful and void.

16

        **b.**        **Meta should be held to its commitment to compliance with the Silenced No More Act**

Meta guaranteed shareholders in 2022 that it was in compliance with the Silenced No More Act—and that it did not enforce non-disparagement agreements to prevent its employees from reporting unlawful conduct in the workplace, consistent with both the letter and the spirit of that statute. Ex. 8 at 70-71. Ms. Wynn-Williams relied on that guarantee. Meta's shareholders had clearly voiced concern about whether and to what extent Meta might be using non-disparagement clauses to conceal illegal conduct. At the time, Meta cited its compliance with the Silenced No More Act, and shareholders—including current and former employees like Ms. Wynn-Williams—had every reason to trust in them. Indeed, Ms. Wynn-Williams relied on that statement from Meta in writing her memoir. Now, Meta seeks to renege on its commitment to shareholders and the SEC made in 2022. It should not be permitted to do so.

**E.**        **The Non-Disparagement Provision Violates Public Policy and Should Not Be Enforced**

Ms. Wynn-Williams has come forward with first-hand accounts of, among other things, senior Facebook officials sexually harassing employees, secret negotiations with the Chinese Communist Party, lying to Congress, allowing a genocide in Myanmar, exploiting emotionally vulnerable teenage girls, and using arbitration proceedings—such as this one—to silence whistleblowers. Alarmed by these revelations and their potential impact on global public policy, officials with the United States Congress, the Parliament of the United Kingdom, and the Parliament of the European Union have reached out to speak with Ms. Wynn-Williams. Yet because these legislative bodies are not "responsible for enforcing a law on behalf of the government," the Interim Award, by its terms, prohibits Ms. Wynn-Williams from speaking with these officials. *See* Interim Award at 4 (quoting Section 4 of the Severance Agreement). Because

there is an overwhelming public policy interest both in Ms. Wynn-Williams's memoir and in ensuring that Ms. Wynn-Williams is permitted to have those discussions, the non-disparagement provision is not enforceable.

The Interim Award, quoting Section 9 of the Severance Agreement, prohibits Ms. Wynn-Williams from making "disparaging, critical or otherwise detrimental comments to any person or entity concerning [Meta]," its officers, or its products, services, or programs unless compelled by subpoena. This restriction is not limited to false or defamatory statements; rather, it applies to *any* comment "regardless of whether Ms. Wynn-Williams believes her statements are true or false." Interim Award at 3. Ms. Wynn-Williams's statements in her memoir are true, and she should not be prevented from truthfully sharing her story with interested legislatures.

This non-disparagement provision is unenforceable as a violation of public policy. California law has long recognized that contracts, or contract provisions, "though properly entered into in all other respects," will not be enforced if they are contrary to public policy. *Erhart v. BofI Holding, Inc.*, No. 15-cv-2287, 2017 WL 588390, at *6 (S.D. Cal. Feb. 14, 2017) (quoting *Kashani v. Tsann Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 540 (Cal. Ct. App. 2004)). This is the case if the interests of enforcing the contract are outweighed by the public policy interests against enforcement. *See id.* (quoting *Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070, 1082 (2003)); *see also* Restatement (Second) of Contracts § 178 (1981). Relevant public policies may be drawn from a variety of sources, including both federal and state statutes, regulations, and common law. *See Cariveau v. Halferty*, 83 Cal. App. 4th 126, 132 (Cal. Ct. App. 2000).

Several compelling public policy concerns weigh against enforcing the non-disparagement provision in the Agreement. First, legislators around the globe want to know about Ms. Wynn-Williams' experiences at Facebook so that they can develop national security and technology

18

policies based on full and accurate information, including with respect to China, Artificial Intelligence, and more.  Meta, understandably, does not want legislators to know what it's doing so that it can avoid effective regulation.  That is precisely why this non-disparagement provision is contrary to public policy.

Second, the public interest is harmed if Ms. Wynn-Williams is constrained from speaking publicly about corporate wrongdoing.  Ms. Wynn-Williams should not be robbed of her freedom to speak on issues of public concern—which the issues in her memoir (sexual harassment, secret negotiations with the Chinese Communist Party, amplifying hate speech, etc.) surely are.  The "right to fully … speak on matters of public concern has long been recognized to be a fundamental right of critical importance."  *Leonard v. Clark*, 12 F.3d 885, 891 (9th Cir. 1993).  Indeed, the Supreme Court has recognized "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  Non-disparagement clauses that impose contractual liability for speaking out about the very issues that led to her termination from Facebook and her SEC and DOJ whistleblower complaints are contrary to the public's well-established interest in fully-informed debate on public issues.  *See Overbey v. Mayor of Baltimore*, 930 F.3d 215, 225-26 (4th Cir. 2019) (finding enforcement of non-disparagement clause contrary to public policy).

In addition, "[b]oth California state and federal law . . . reflect the strong public policy in favor of protecting whistleblowers."[5] *Erhart*, 2017 WL 588390 at *9; *see, e.g.*, 29 U.S.C. § 660(c) (Occupational Safety and Health Act whistleblower provision); 31 U.S.C. § 5323(a)(5), (g), and (j) (Anti Money Laundering Act whistleblower provisions); 15 U.S.C. § 78u-6 (Dodd-Frank whistleblower provision); California Labor Code Section 1102.5(b).  Both federal and California

---

[5] The public policy may be either express or implied by the language of a statue or rule.  *Cariveau*, 83 Cal. App. 4th at 132.

law prohibit retaliation against whistleblowers who report wrongdoing to members or committees of Congress, among other bodies. *See Erhart*, 2017 WL 588390 at *15-16. If Meta is permitted to enforce the non-disparagement provision in the Severance Agreement, it will be able to accomplish precisely what these laws seek to prevent—concealment of its wrongdoing via threats and intimidation.

The general policy interest in the finality of dispute resolution is not enough to overcome these compelling public policies against enforcement of the non-disparagement provision in the Agreement. Numerous courts have held that a party seeking to enforce a contractual term must demonstrate that the public interest—not merely its own private interest—is better served by enforcement than by non-enforcement. *See Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390, 1399 (9th Cir. 1991) (holding that the interest in the settlement of litigation "cannot by itself outweigh a substantial public interest on the other side of the scales"); *United States v. Northrop Corp.*, 59 F.3d 953, 962 (9th Cir. 1995) (courts must "ascertain the reasons apart from the general interest in settling disputes that support enforcing the agreement"); *Cariveau*, 83 Cal. App. 4th at 136 (finding confidentiality provision in contract unenforceable where the "only interest appellant identifies in support of the contract term is the general policy in favor of promoting the settlement of disputes").

The public interest balance here tips sharply in Ms. Wynn-Williams's favor, as demonstrated by the interest in her evidence from U.S., UK, EU and other national and supra-national legislatures and regulatory bodies. The Interim Award must be vacated.

## CONCLUSION

For the foregoing reasons, and those to be addressed at any hearing on this matter, Ms. Wynn-Williams submits that the Interim Award must be vacated. Additionally, because she had

20

no notice of the prior emergency proceedings, and because the injunction imposes onerous restrictions that are harmful to her as well as contrary to public policy, Ms. Wynn-Williams requests that the Interim Award be suspended until her Motion to Vacate the Interim Award is resolved.

Respectfully submitted,

DATED: 3/18/2025

/s/ Courtney R. Forrest
Courtney R. Forrest
Matt Kaiser
Amelia J. Schmidt
Colby L. Moore
Kaiser PLLC
1099 14th Street, NW
8th Floor West
Washington, DC 20005
████████

21

# Exhibit H

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**Emergency International Arbitral Tribunal**

| | |
|---|---|
| Meta Platforms, Inc., *Claimant*, <br><br> v. <br><br> Sarah Wynn-Williams; Macmillan Publishers; Flatiron Books, <br><br> *Respondents.* | No. 01-25-0001-2843 |

**SARAH WYNN-WILLIAMS'S COMMENTS FOR ICDR REVIEW**

Following an administrative conference call held on March 19, 2025, the director of the International Centre for Dispute Resolution (1) instructed all parties to submit any additional comments requiring review by ICDR's Administrative Review Council ("the Council"), which determines whether the filing requirements in this case have been met, by March 21, 2025; and (2) invited Ms. Wynn-Williams specifically to submit any comments in response to Macmillan's Objection and Opposition to Appointment of Emergency Arbitrator ("Objections") and Meta's March 17, 2025 Response to those Objections ("Response") by the same date. Ms. Wynn-Williams respectfully submits the below comments in compliance with these directives.

**(1) Meta's Filings Should Be Rejected Because Meta Did Not Provide a Copy of the Demand to Ms. Wynn-Williams Simultaneously with Its Filing.**

Rule 4 of the American Arbitration Association Employment Rules ("Initiation of Arbitration") requires a claimant to file its written notice of intention to arbitrate ("Demand") and "[s]imultaneously provide a copy of the Demand to the other party." Rule 4.b.i.2. Meta did not comply with this rule, and its filing should be rejected for that reason alone.

On March 7, 2025, Meta filed a Demand for Arbitration against Ms. Wynn-Williams and her publishers concerning her forthcoming memoir. *See* Interim Award at 2. The Interim Award,

issued March 12, 2025, states that notice of arbitration was sent to Ms. Wynn-Williams's "last known email address." Interim Award at 1.  The email address to which Meta appears to have sent the Demand is inactive.  Ms. Wynn-Williams never received the Demand or any other arbitration documents or filings to the email accounts that Meta knows she uses.  *See* Ms. Wynn-Williams's Emergency Motion to Vacate Interim Award ("Motion to Vacate") at Ex. 1 (Declaration of Sarah Wynn-Williams) ("SWW Dec.") ¶¶ 2–24.  Ms. Wynn-Williams does not know how Meta received the Inactive Email, as she does not recall having used it in any communication with Meta.  SWW Dec. ¶¶ 4, 7–14.

Ms. Wynn-Williams's primary personal email account, referred to herein as "Primary Email,"[1] is the one that (i) she provided to Facebook when she received her offer of employment from Facebook; (ii) she provided Facebook during her employment; (iii) was on her employment file with Human Resources; (iv) was used during extensive email exchanges with Facebook staff, including about expense receipts; (v) is linked to her accounts on Meta products; (vi) senior Facebook employees (including Joel Kaplan) have used to email her personally; and (vii) Heidi Swartz, employment counsel at Meta, used to initiate contact with Ms. Wynn-Williams after she left Facebook, including to finalize the Severance Agreement.  SWW Dec. ¶¶ 6–13; Exs. 3–6 to Emergency Motion to Vacate.  Ms. Wynn-Williams did not receive the Demand at her Primary Email.  SWW Dec. ¶ 19.

---

[1] Filed alongside Ms. Wynn-Williams's Emergency Motion to Vacate Interim Award was an Emergency Motion for Protective Order, which is still pending.  Ms. Wynn-Williams's personal identifying information has been omitted from this document, but it may be found in her Emergency Motion to Vacate and exhibits thereto.

Further, Ms. Wynn-Williams had established a public webpage promoting her book, ██████████████████, before Meta filed its Demand.[2]  It contained an email address, ██████████████████ ("Webpage Email").  SWW Dec. ¶ 18.  Ms. Wynn-Williams did not receive the Demand at her Webpage Email.  SWW Dec. ¶ 19.

Moreover, Meta did not provide the Demand to the attorney who represented Ms. Wynn-Williams in the negotiation of the Severance Agreement.  SWW Dec. ¶¶ 22–24.

On the morning of March 13, 2025, Meta, through a private process server, personally delivered to Ms. Wynn-Williams a copy of the Interim Award only, along with a cover letter, at her personal residence in the United Kingdom.  SWW Dec. ¶ 2; Exhibit 7 to Emergency Motion to Vacate.  The process server did not deliver a copy of the Demand.  The same documents (cover letter and Interim Award) were emailed to the Webpage Email at 11:53 p.m. on March 12, 2025, but the Demand was not included.  Exhibits 9–10 to Emergency Motion to Vacate.

As of the time she signed her Declaration on March 18, 2025—11 days after Meta filed the Demand—Ms. Wynn-Williams still had not received a copy of it.  SWW Dec. ¶ 21.

Therefore, the Demand should be dismissed because Meta did not comply with the filing requirements in Rule 4.

**(2) The Council Should Defer Its Decision on Macmillan's Jurisdictional Arguments Until After the Resolution of Ms. Wynn-Williams's Emergency Motion to Vacate Interim Award.**

Resolving Ms. Wynn-Williams's Motion to Vacate should be top priority in this case, given the ongoing financial, emotional, and reputational harm the Interim Award is causing her.  Ms. Wynn-Williams fears that if either the Council or an arbitrator rejects Macmillan's Objections and compels Macmillan to arbitrate this dispute, Macmillan may seek to challenge that decision in

---

[2] This webpage has been replaced by a contact form to comply with the Interim Award.

3

court, which would result in a suspension of the arbitration proceedings. *See* Employment Rule 1 ("If . . . a party seeks judicial intervention with respect to a pending arbitration . . . the AAA will suspend arbitration for 60 days to permit the party to obtain a stay of arbitration from the court."). The Council must not permit that to occur, and it should defer its decision on Macmillan's jurisdictional objections until after the Motion to Vacate is resolved.

This will not result in a significant delay in administrative review. The Emergency Arbitrator has set a briefing schedule requiring Meta to submit its opposition to the Motion to Vacate by March 24 and for Ms. Wynn-Williams to submit her reply by March 26. Thus, it is likely that the Motion to Vacate will be resolved within the next week.

Respectfully submitted,

DATED: 3/21/2025

*/s/ Courtney R. Forrest*
Courtney R. Forrest
Matt Kaiser
Amelia J. Schmidt
Colby L. Moore
Kaiser PLLC
1099 14th Street, NW
8th Floor West
Washington, DC 20005



# Exhibit I

**AMERICAN ARBITRATION ASSOCIATION**
**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**EMPLOYMENT ARBITRATION DIVISION**

|  |  |
|---|---|
| Meta Platforms, Inc., | |
| *Claimant*, | **No. 01-25-0001-2843** |
| v. | |
| Sarah Wynn-Williams; Macmillan Publishers; Flatiron Books, | |
| *Respondents*. | |

**MACMILLAN'S SUPPLEMENTAL BRIEF PURSUANT TO**

**EMAIL FROM ERIN BRENNAN DATED MARCH 20, 2025**

As an administrative arm of the American Arbitration Association ("AAA"), the International Centre for Dispute Resolution ("ICDR") must determine, as a basic threshold matter, whether a nonsignatory to an arbitration agreement can be forced to continue participating in AAA/ICDR proceedings, or whether, following the nonsignatory's objection on jurisdictional grounds, the nonsignatory should be dismissed from further AAA/ICDR proceedings unless and until a court of competent jurisdiction rules that the nonsignatory is compelled to participate in the arbitration proceedings. Here, ***the facts and the law are clear and undisputed***: AAA/ICDR has no jurisdiction to decide its jurisdiction over putative respondents Macmillan Publishers and Flatiron Books (both DBAs for Macmillan Publishing Group, LLC) (collectively referred to herein as "Macmillan"), and Macmillan should be dismissed immediately and released from any further obligation to participate in these proceedings unless and until a court of competent jurisdiction rules otherwise.

The underlying facts are clear and undisputed. There is no dispute that Macmillan is ***not*** a signatory to the agreement apparently providing for arbitration between claimant Meta Platforms, Inc. ("Meta") and respondent Sarah Wynn-Williams. *See generally*

McKenna Decl., Ex. A-1. There also is no dispute that that agreement is governed by California law. *Id.* at §16(c).

Macmillan has consistently objected to, and continues to object to, AAA/ICDR's jurisdiction over Macmillan in this matter, including, critically, its jurisdiction to rule on its own jurisdiction over Macmillan. Under unambiguous California law, an arbitrator *may not* decide its own jurisdiction over a nonsignatory like Macmillan; *only* a court of competent jurisdiction can do that. *See Benaroya v. Willis*, 23 Cal. App. 5th 462, 464-465 (agreeing that "*only* the court, not the arbitrator, had authority to determine whether [nonsignatory to agreement to arbitrate] was compelled to arbitrate") (emphasis added), 469-470 (holding that "California case law is clear" that an arbitrator has no power to determine the rights and obligations of a nonsignatory to an arbitration agreement; a trial court has to make that decision in the first instance), 474-475 (failure to have trial court make such decision was *not* harmless error) (2018); *American Builder's Ass'n v. Au-Yang*, 226 Cal. App. 3d 170, 179 (1990) ("an arbitrator has no power to determine the rights and obligations of one who is not a party to the arbitration agreement. The question of whether a nonsignatory is a party to an arbitration agreement is one for the trial court in the first instance.") (citation omitted). Macmillan cited that exact authority in its Objection and Opposition filed with this body on March 11, 2025, at 2, and Meta had *zero* response to that clear authority in the papers that it filed on March 17, 2025, *see generally* Meta Response (filed 3/17/25). Meta's contention that "only" an arbitrator can decide jurisdiction in this matter is plainly wrong. *Id.* at 3-4. Contrary to Meta's contention, only a court of competent jurisdiction—and *not* AAA/ICDR—may determine whether AAA/ICDR has any jurisdiction over Macmillan.[1]

---

[1] Macmillan understands that, in some circumstances, *courts* will decide that nonsignatories may be brought into arbitration, but that does not change the threshold issue here: whether AAA/ICDR has the jurisdiction to decide its own jurisdiction. It does not. California law is crystal clear on that point, and Meta has not presented—because it cannot present—any legal authority to the contrary. And Meta's mere allegations of agency cannot be sufficient for

Meta and even AAA/ICDR insist that Macmillan only make objections that fit under AAA/ICDR's rules and rubric. Meta's Response (filed 3/17/25) at 3-5; Email from E. Brennan (Director ICDR), 3/20/25, 10:25 a.m. PT.  That is circular logic: Macmillan's whole point is that AAA/ICDR has no jurisdiction over Macmillan at all, and cannot decide its own question of jurisdiction; so perforce neither AAA, nor ICDR, and certainly not Meta can change the law, and force Macmillan to cabin or conform its objections to AAA/ICDR rules that Macmillan never agreed to be bound by. Macmillan has not agreed, and does not agree, that it is bound by AAA/ICDR's rules or standards.

But assuming *arguendo* that Macmillan is somehow limited to framing its objections as ICDR prefers (it is not), and as should be obvious from Macmillan's refrains, Macmillan's objections and grounds for challenge clearly fall under the "disqualification provided by applicable law" standard, which ICDR claims the authority to review. ICDR's ICDR Administrative Review Council "Review Standards" at 1. As set forth above and previously, under unambiguous and unrefuted ***law***, any and ***all*** ICDR and AAA arbitrators are disqualified from exercising any jurisdiction over Macmillan on this matter unless and until a court of competent jurisdiction says otherwise. Macmillan observes that, in the same document where ICDR reserves the ability to rule on arbitrator challenges based on "applicable law," it also disclaims the authority "to make any legal jurisdiction and/or arbitrability rulings or determinations." ICDR "Review Standards" at 1, 3. Setting aside the inherent tension in those assertions, one thing is abundantly clear: AAA/ICDR has ***zero*** authority under California law to decide its own jurisdiction over Macmillan here, and Meta has no response to that clear statement of law.

---

AAA/ICDR to decide its own jurisdiction over Macmillan. Meta cites no legal authority to support that position. If such naked allegations were sufficient to confer jurisdiction on an arbitrator, then they would always be used to circumvent the very basic rule that courts have the plenary and sole authority to decide threshold jurisdictional issues over a nonsignatory.

3

This is not a complicated issue, and it requires no complicated legal analysis. To the extent ICDR wants to stay within its own "Review Standards" it can do so under Macmillan's challenge based on "applicable law," which unambiguously supports Macmillan's positions. Regardless, the law is clear, and Meta's circular reasoning and AAA's internal rules do not and cannot change the law. Only a court of competent jurisdiction may decide the issue of AAA/ICDR's jurisdiction over Macmillan, as a nonsignatory, in this matter. AAA, ICDR and Meta cannot override *the law* by pointing to rules that Macmillan never agreed it had to follow.[2]

Macmillan must be dismissed immediately from these proceedings, and be relieved from any further need to participate in this process. Ms. Wynn-Willams's pending Motion to Vacate the Emergency Arbitrator's Interim Award is independent of Macmillan's request for immediate dismissal, which should be decided without any further delay.

Macmillan reserves all arguments, positions and remedies.

DATED:  March 21, 2025

Respectfully submitted,

/s/ Jean-Paul Jassy

JEAN-PAUL JASSY

KE

JA                              AN LLP
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone:

*Attorneys for Specially Appearing Respondent Macmillan Publishing Group, LLC*

---

[2] Macmillan also rejects any contention that AAA/ICDR may override California law and decide by fiat that it has the "power to rule," in the first instance, on its own jurisdiction over a nonsignatory like Macmillan. *Cf.* Meta Response (filed 3/17/25) at 4 (citing AAA Employment Arbitration Rules and Mediation Procedures, § 6(a)).

4

# Exhibit J

# AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

## ARBITRATION ANSWERING STATEMENT AND COUNTERCLAIM OR JOINDER/CONSOLIDATION REQUEST

| | |
|---|---|
| Name of Claimant: Meta Platforms, Inc. | Name of Representative (if known): Jonathan F. Cohn |
| Address: 1 Meta Way | Name of Firm (if applicable): Lehotsky Keller Cohn LLP |
| | Representative's Address: 200 Massachusetts Ave. NW, Suite 700 |

| | | | | | | |
|---|---|---|---|---|---|---|
| City: Menlo Park | State: CA | Zip Code: 94025 | City: Washington | State: DC | Zip Code: 20001 | |

| | | | |
|---|---|---|---|
| Phone No.: ▮▮▮ | Fax No.: | Phone No.: ▮▮▮ | Fax No.: |
| Email Address: | | Email Address: jon@lkcfirm.com | |

| | |
|---|---|
| AAA Case No. (if known): 01-25-0001-2843 | Filing a Counterclaim: ☑ Yes ☐ No<br>*If yes, please describe nature of counterclaim in space below.* |

Please answer Claimant's Demand for Arbitration (and describe your counterclaim, if applicable): *Attach additional pages as necessary.*

See attached

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?  ☑ Yes  ☐ No

☐ Joinder/Consolidation Request. Provide the contact information for parties to be joined, and the case number(s) if consolidation is requested, on a separate attachment.

| | |
|---|---|
| Dollar Amount of Claim or Counterclaim: $ To be proven at arbitration | Other Relief Sought:<br>☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs<br>☐ Punitive/ Exemplary ☑ Other Injunctive relief |

Filing Fee: (if any) $ 0     In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☑ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Hearing locale:     *(check one)* ☐ Agree to requested locale ☐ Objection to locale  Proposed alternative locale: San Fransisco, CA

Estimated time needed for hearings overall:     hours or 3     days

| | |
|---|---|
| Signature (may be signed by a representative): /s/ Courtney R. Forrest | Date: 4/22/2025 |
| Name of Respondent: Sarah Wynn-Williams | Name of Representative: Courtney R. Forrest |
| Address (to be used in connection with this case):<br>▮▮▮ | Name of Firm (if applicable): Kaiser PLLC |
| | Representative's Address: 1099 14th St NW, 8th Floor West |

| | | | | | |
|---|---|---|---|---|---|
| City: Washington | State: DC | Zip Code: 20005 | City: Washington | State: DC | Zip Code: 20005 |
| Phone No.: (▮▮▮ | Fax No.: (▮▮▮ | | Phone No.: ▮▮▮ | Fax No.: ▮▮▮ | |
| Email Address: contact through Representative | | | Email Address: ▮▮▮ | | |

**Please send a copy of this Answering Statement to all other case participants and the AAA. If you are filing a counterclaim, please include the appropriate Filing Fee, if any, per the applicable Rules.**

*Please visit our website at www.adr.org if you would like to file this online. If you have questions, please contact your AAA case representative. If you do not know who your representative is, please contact Customer Service at 1-800-778-7879 for assistance.*

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| Meta Platforms, Inc.,<br>　　*Claimant*,<br><br>v.<br><br>Sarah Wynn-Williams,<br><br>　　*Respondent*. | No. 01-25-0001-2843 |

**RESPONDENT SARAH WYNN-WILLIAMS'S ANSWER TO AMENDED DEMAND
AND COUNTERCLAIMS**

Respondent Sarah Wynn-Williams, by and through undersigned counsel, responds to Claimant Meta Platforms, Inc.'s Amended Demand for Arbitration ("Demand") as follows:

## INTRODUCTION

Meta Platforms, Inc. ("Meta") has brought this arbitration to silence Sarah Wynn-Williams, a whistleblower.

As explained in the Objections to Arbitrability of Meta's Claims filed with this Answer, among other things Meta has waived any right to arbitrate, the non-disparagement provision which forms the basis of its monetary demand is unenforceable, the Severance Agreement is void as to Ms. Wynn-Williams, and Meta, itself, has violated its non-disparagement obligations under the severance agreement. This arbitration is a continuation of Meta's abuse and a transparent effort to punish a whistleblower for telling the truth. It should not continue.

## FACTUAL BACKGROUND

Ms. Wynn-Williams was Facebook's[1] Director of Global Public Policy from 2011 to 2017. In that capacity, she worked directly with the company's top leadership, including Mark Zuckerburg, Sheryl Sandberg, and Joel Kaplan.

In the seven years she worked for Facebook, Ms. Wynn-Williams witnessed unlawful and other wrongful conduct, including lying to investors and Congress about Facebook's attempted entry into China; Facebook's failure to address critical issues brought to its attention that United

---

[1] After Ms. Wynn-Williams left Facebook, the company changed its name to Meta. Here, we use "Facebook" to refer to the company when describing things that happened when that was the company's name.

Nations investigators determined led to a genocide in Myanmar; Facebook's targeting of users when they were in emotionally vulnerable states; and sexual harassment at the company. These are all matters of public importance.

While working at Facebook, Ms. Wynn-Williams was sexually harassed by Mr. Kaplan, Facebook's then-Vice President of Global Policy and Ms. Wynn-Williams's manager. Ms. Wynn-Williams reported Mr. Kaplan's behavior, and Facebook Human Resources initiated an investigation. Shortly thereafter, Ms. Wynn-Williams was fired; Ms. Wynn-Williams and Facebook executed a Severance Agreement on or about September 6, 2017.

In April 2024, Ms. Wynn-Williams filed a whistleblower complaint with the Securities and Exchange Commission. On March 4, 2025, she filed a whistleblower complaint with the Department of Justice raising these issues, among others. On March 11, 2025, Ms. Wynn-Williams's memoir, *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism*, which is underpinned by these whistleblower complaints, was released in the United States by Flatiron Books, an imprint of Macmillan Publishers. Shortly after the book was announced and the filing of the whistleblower complaints became public, Meta started this arbitration.

## ANSWER

Ms. Wynn-Williams generally denies each and every allegation of the Demand, and the whole thereof, including each and every cause of action. Ms. Wynn-Williams further denies that Meta is entitled to the relief requested or any relief at all, denies that Meta is entitled to liquidated damages or civil penalties in any amount, denies that Meta is entitled to injunctive relief, and denies that Meta is entitled to attorneys' fees.

## AFFIRMATIVE DEFENSES

Ms. Wynn-Williams hereby states the following defenses to the Demand but does not assume the burden of proof on any such defense except as required by applicable law. She reserves the right to assert additional affirmative defenses or otherwise supplement this Answer upon discovery of facts or evidence rendering such action appropriate.

### First Affirmative Defense

The Demand fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Meta has asserted claims for relief that exceed the Arbitrator's jurisdiction.

### Third Affirmative Defense

Meta has waived its right to arbitrate the claims brought in the Demand through its intentional conduct inconsistent with its right to arbitrate, which includes its November 2018 statement announcing that it would no longer use forced arbitration where sexual harassment allegations are at issue.

2

### Fourth Affirmative Defense

The Severance Agreement is illegal, unenforceable, and contrary to public policy.

### Fifth Affirmative Defense

The Non-Disparagement Provision of the Severance Agreement is illegal and unenforceable because it violates federal and California law and is contrary to public policy.

### Sixth Affirmative Defense

Meta has waived its right to enforce the Non-Disparagement Provision of the Severance Agreement through its intentional conduct inconsistent with the right to enforce the provision, which includes Meta's Board's 2022 proxy statement to shareholders.

### Seventh Affirmative Defense

Meta cannot enforce the Severance Agreement because it materially breached the Severance Agreement first.

### Eighth Affirmative Defense

Meta has not pled fraud with sufficient particularity.

### Ninth Affirmative Defense

Meta suffered no damages by reason of the acts complained of in the Demand, or by any acts or omissions of Ms. Wynn-Williams.

### Tenth Affirmative Defense

Meta has suffered no damages for which Ms. Wynn-Williams is legally responsible.

### Eleventh Affirmative Defense

Meta's alleged damages, if any, are unsupported by any reasonable methodology, and not cognizable as a matter of law.

### Twelfth Affirmative Defense

Meta's alleged losses, if any, were caused by its own actions and inaction and, therefore, it is precluded from recovery.

### Thirteenth Affirmative Defense

Meta failed to mitigate its damages, if any.

### Fourteenth Affirmative Defense

Meta is not entitled to liquidated damages under the Severance Agreement; the liquidated damages provision is unenforceable because there is no reasonable relationship to anticipated actual damages.

### Fifteenth Affirmative Defense

Meta is not entitled to liquidated damages under the Confidential Agreement or tort claims. Section 16(f) of the Severance Agreement provides that liquidated damages are permitted

3

only for material violations of Sections 9, 10, and 12 of the Agreement, and the breach of Confidentiality Agreement and tort claims are not brought under any of those three sections.

### Sixteenth Affirmative Defense

Meta is not entitled to punitive damages, as it cannot prove by clear and convincing evidence malice, oppression, or fraud by Ms. Wynn-Williams.

### Seventeenth Affirmative Defense

Meta is not entitled to punitive damages on breach of contract claims.

### Eighteenth Affirmative Defense

Meta is not entitled to ownership of any part of the book, nor is it entitled to an order requiring the redaction and/or deletion of content from the book.

### Nineteenth Affirmative Defense

To the extent that Meta seeks equitable relief to force Ms. Wynn-Williams to alter that which is outside her control, Meta is not entitled to such relief.

### Twentieth Affirmative Defense

Any recovery on the Demand, and each cause of action therein, is barred because the Demand seeks remedies in excess of any amount actually owed to Meta.

### Twenty-First Affirmative Defense

Meta is not entitled to recover attorneys' fees.

### Twenty-Second Affirmative Defense

The Confidentiality Agreement is illegal and unenforceable, as it is unconscionable under California law.

### Twenty-Third Affirmative Defense

Meta's interpretation of the Non-Disparagement Clause is not consistent with the language of the Clause.

### Additional Affirmative Defenses Reserved

Ms. Wynn-Williams presently has insufficient knowledge or information upon which to form a belief as to whether she may have additional, as yet unstated, affirmative defenses available. She hereby gives notice that she intends to rely on other defenses that may become available or apparent during discovery proceedings in this matter and hereby reserves the right to amend the Answer and to assert any such affirmative defenses.

4

## **COUNTERCLAIM**

Ms. Wynn-Williams maintains that the entire Severance Agreement, and the non-disparagement provision specifically, are unenforceable; that Meta has waived its right to arbitrate all its asserted claims; and the arbitration clause is void for ambiguity. However, if the arbitrator concludes that a valid and enforceable Agreement exists, Meta has also breached the Agreement and did so before any alleged breach by Ms. Wynn-Williams.

In Section 9 of the Severance Agreement, Meta agreed "not to issue any internal or public statements or press releases concerning [Ms. Wynn-Williams], [her] employment with or departure from [Meta] containing disparaging, critical or otherwise detrimental comments concerning [Ms. Wynn-Williams]."

On March 5, 2025, *Careless People* and the whistleblower complaints that underpinned the memoir were announced. Meta immediately began disparaging Ms. Wynn-Williams as early as March 6, 2025, in violation of the Non-Disparagement Provision of the Severance Agreement. Numerous times since that date, Meta has disparaged, and continues to disparage, Ms. Wynn-Williams, in breach of its obligations under the Severance Agreement.

### **Count I:  Breach of Severance Agreement**

Meta and Ms. Wynn-Williams had a contractual relationship following the signing of the Severance Agreement. That Agreement provided that Meta agreed to not issue disparaging, critical, or otherwise detrimental public statements or press releases concerning Ms. Wynn-Williams, her employment with Meta, or her departure from Meta. Starting on March 6, 2025, and continuing repeatedly since, Meta and its employees have provided false and misleading public statements to the media and released documents and press releases that disparage Ms. Wynn-Williams and her departure from Meta, in violation of the terms of the Severance Agreement. Meta employees, similarly, have made disparaging statements about Ms. Wynn-Williams that were, on information and belief, at the behest of Meta and a part of a coordinated campaign by Meta. Ms. Wynn-Williams has suffered damages as a result of Meta's breach.

Therefore, Ms. Wynn-Williams is entitled to compensatory damages and injunctive and declaratory relief, as well as attorneys' fees and an order permanently enjoining Meta from further disparaging Ms. Wynn-Williams.

Respectfully submitted,

DATED: 4/22/2025

*/s/ Matt Kaiser*
Matt Kaiser
Courtney R. Forrest
Amelia J. Schmidt
Colby L. Moore
Kaiser PLLC
1099 14th Street, NW
8th Floor West
Washington, DC 20005

# Exhibit K

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| Meta Platforms, Inc., | No. 01-25-0001-2843 |
| *Claimant*, | |
| v. | |
| Sarah Wynn-Williams, | |
| *Respondent*. | |

## <u>OBJECTIONS TO ARBITRABILITY OF META'S CLAIMS</u>

Meta Platforms, Inc. ("Meta") has brought this arbitration to silence Sarah Wynn-Williams, a whistleblower who has filed complaints with both the Securities and Exchange Commission and the Department of Justice, and punish her for exposing Meta's illegal and wrongful conduct. Senator Charles Grassley recently recognized that Ms. Wynn-Williams "has absolutely done the right thing" and thanked her for her "courage and bravery for coming forward to Congress." Senator Charles E. Grassley, Chairman, United States Senate Committee on the Judiciary, Statement at Hearing of Subcommittee on Crime and Counterterrorism, A Time for Truth: Oversight of Meta's Foreign Relations and Representations to the United States Congress at 30:30–52 (Apr. 9, 2025).[1]

This arbitration is a transparent effort to punish a whistleblower for telling the truth. It should not continue.

---

[1] https://www.judiciary.senate.gov/committee-activity/hearings/a-time-for-truth-oversight-of-metas-foreign-relations-and-representations-to-the-united-states-congress

Meta's claims are not arbitrable. Under Rule 6(c) of the American Arbitration Association Employment Arbitration Rules, the Amended Demand ("Demand") should be dismissed in its entirety for four reasons.

First, the Severance Agreement is illegal and unenforceable. The Severance Agreement violates federal law that restricts the ability of companies like Meta to prevent whistleblowers from coming forward with information about corporate wrongdoing. Moreover, Ms. Wynn-Williams's non-disparagement obligations are void as a matter of public policy, particularly because—as the emergency arbitrator in this matter recently confirmed—it bars Ms. Wynn-Williams from speaking with democratically elected representatives in America and around the world about Meta's wrongdoing. As Senator Grassley separately stated in a letter to Mark Zuckerberg on April 14, 2025, "It's crucial that Meta ensures its employees can provide protected disclosures without illegal restrictions and bullying."  Letter from Senator Charles E. Grassley, Chair, United States Senate Committee on the Judiciary, to Mark Zuckerberg (Apr. 14, 2025).[2] "So that Congress may conduct objective and independent oversight of Meta's efforts to silence whistleblowers," *id.*, Congress will "be conducting a thorough investigation and ask Meta to fully cooperate." Statement of Senator Grassley at Subcommittee Hearing, *supra*.

 These defects contaminate the entire contract—these provisions cannot be severed from the agreement, and the agreement as a whole, including the arbitration clause, should not be enforced.

Second, Meta waived its right to arbitrate these claims years ago. Meta's Demand is based on a Severance Agreement which was executed in 2017. After the Severance Agreement was

---

[2] https://www.judiciary.senate.gov/press/rep/releases/grassley-to-zuckerberg-stop-the-secrecy-end-the-war-on-whistleblowers.

executed, Facebook[3] publicly announced in 2018 that it would no longer use forced arbitration where sexual harassment allegations are at issue. This clear public statement, which Ms. Wynn-Williams relied upon, waived any right to bring this arbitration. Meta should be required to keep its word and adhere to its own policy.

Third, Meta materially breached the Agreement. First, Meta was the first party to breach the non-disparagement provision. Starting on March 6, 2025, Meta and its employees have made numerous public statements disparaging Ms. Wynn-Williams, in violation of Section 9 of the Agreement. Second, Ms. Wynn-Williams submitted expenses which she was entitled to be reimbursed for under both Facebook's policies and the Agreement. Facebook never paid these expenses. Indeed, to date, it owes her approximately $310,000. Meta cannot pick and choose which portions of the Agreement to enforce; its material breaches render the arbitration clause unenforceable.

Finally, Section 11 of the Agreement—i.e., one of the provisions Meta relies on in its Amended Demand—incorporates a separate Confidential Information and Inventions Assignment Agreement (the "CIIAA") that provides for judicial resolution of disputes under it, not arbitration. This voids the arbitration clause for ambiguity.

## BACKGROUND

Sarah Wynn-Williams was Facebook's Director of Global Public Policy from 2011 to 2017. In that capacity, she worked directly with the company's top leadership, including Mark Zuckerberg, Sheryl Sandberg, and Joel Kaplan.

---

[3] Facebook changed its name to Meta in or around December 2021. In this Motion, we refer to the Claimant as "Facebook" when referring to events prior to that switch.

While working at Facebook, Ms. Wynn-Williams was sexually harassed by Mr. Kaplan, Facebook's then-Vice President of Global Policy and Ms. Wynn-Williams's manager. Ms. Wynn-Williams reported Mr. Kaplan's behavior, and Facebook Human Resources initiated an investigation. Shortly thereafter, Ms. Wynn-Williams was fired. Ms. Wynn-Williams and Facebook executed a Severance Agreement and Release on or about September 6, 2017.

In the seven years she worked for Facebook, Ms. Wynn-Williams witnessed illegal and wrongful conduct, including lying to investors and Congress about Facebook's concessions to the Chinese Communist Party as a part of its entry into China; Facebook's failure to address critical issues that led to a genocide in Myanmar; targeting emotionally vulnerable users with advertisements; and sexual harassment at the company. In April 2024, Ms. Wynn-Williams filed a whistleblower complaint with the Securities and Exchange Commission. Later, she filed a whistleblower complaint with the Department of Justice. Both complaints reported these issues, among others.

These complaints formed the basis of Ms. Wynn-Williams' memoir *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism.* This memoir and the filing of whistleblower complaints that underpinned them were made public on March 5. On March 7 Meta filed an arbitration demand and emergency request to enjoin Ms. Wynn-Williams and Macmillan from further promoting or disseminating the book, based on a claim that Ms. Wynn-Williams had breached the non-disparagement clause in the Agreement. An emergency arbitrator granted the request as to Ms. Wynn-Williams and issued an interim award on March 12, 2025.[4] On March 18,

---

[4] The emergency arbitrator declined to make any findings as to Macmillan, which objected to AAA jurisdiction over it. On March 24, 2025, the International Centre for Dispute Resolution issued an administrative decision that the filing requirements had not been met as to Macmillan, dismissing it from the arbitration.

2025, Ms. Wynn-Williams filed a motion to vacate the interim award, which the emergency arbitrator denied in an order on March 31, 2025 ("Order"). While the motion was pending, Meta submitted an Amended Demand for Arbitration on March 24, 2025, adding claims against Ms. Wynn-Williams for breach of the CIIAA, fraud, and conversion.

## OBJECTIONS TO ARBITRABILITY

Rule 6(c) of the AAA Rules provides that "[a] party must object . . . to the arbitrability of a claim . . . no later than the filing of the answering statement to the claim . . . that gives rise to the objection." Along with the answer to Meta's Amended Demand, Ms. Wynn-Williams objects to the arbitrability of this dispute for the following reasons.

**I.    The Arbitration Provision Is Unenforceable Because the Entire Agreement Is Illegal.**

The Severance Agreement contains numerous provisions that (1) violate the federal securities laws; (2) are otherwise void under federal and state public policy that encourages whistleblowers to report illegal workplace conduct; and (3) are otherwise unconscionable and void for vagueness. These illegal provisions cannot be severed from the contract. As Senator Grassley stated in his letter to Mark Zuckerberg of April 14 2025, "The tactics used by Meta are clearly aimed at silencing Ms. Wynn-Williams, a brave whistleblower who courageously testified in the face of Meta's threats at the Senate Judiciary Committee's Subcommittee on Crime and Counterterrorism on April 9, 2025." As a result, the entire contract – including the arbitration provision – is unenforceable.

The structure of the Agreement is not straightforward. Section 9 is the non-disparagement section, which is the basis for much of Meta's Demand. Section 9 is limited by Section 4, which permits but limits some claims to government agencies that enforce the law. Section 4 also limits Sections 5 (the general release provision), 12 (the provision that requires that Agreement itself be

5

confidential), and 13 (which requires Ms. Wynn-Williams to cooperate with Facebook in future litigation or related matters). Section 4 does not limit Section 11, which incorporates a separate confidentiality obligation and which is also a separate basis for some claims in Meta's Demand. This convoluted contractual structure is legally flawed for a number of reasons, as set forth below.

### A.    The Agreement Violates Federal Securities Laws

The Agreement is unenforceable because it illegally impedes whistleblowers, which violates federal securities laws. The Securities & Exchange Act prohibits "any action to impede an individual from communicating directly with the [Securities & Exchange Commission] staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement … with respect to such communications[.]" 17 C.F.R. § 240.21F-17(a) ("the Dodd-Frank Rule"). The Dodd-Frank Rule's "principal purpose" is to "promote effective enforcement of the Federal securities laws by providing incentives for persons with knowledge of misconduct to come forward and share their information with the Commission." *Securities Whistleblower Incentives and Protections*, 76 Fed. Reg. 34300-01, 34308 (June 13, 2011). The rule was adopted pursuant to Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Section 21F of the Exchange Act, and 15 U.S.C. § 78u-6, all of which established a whistleblower program.

The Severance Agreement violates the Dodd-Frank Rule in at least three ways: (1) Section 4 – which is a carve out to the non-disparagement clause to allow some reports to enforcement authorities – illegally requires whistleblowers to waive monetary recovery; (2) Section 11 is a separate confidentiality provision that incorporates the CIIAA but does not incorporate Section 4's carveout for limited whistleblowing; and (3) the agreement, taken as a whole, generally and plainly impedes whistleblowing.

## 1.     Section 4 Illegally Waives a Whistleblower's Right to Monetary Recovery

First, Section 4 forbade Ms. Wynn-Williams from recovering any money for reporting misconduct, including to the Securities and Exchange Commission. *See* Agreement, Section 4 ("[Y]ou understand and agree that you may not recover any monetary benefit as a result of any claim brought on your behalf by any government agency."). This prohibition on monetary recovery was a material term of the contract. Both Congress and the SEC have determined that a "critical component" of the SEC's whistleblower program is "the minimum payout that any individual could look towards in determining whether to take the enormous risk of blowing the whistle in calling attention to fraud." S-Rep. 111-76 at 181 (April 30, 2010); *see also* Jennifer M. Pacella, *Silencing Whistleblowers by Contract*, 55 Am. Bus. L.J. 261, 284 (2018) ("the incentive of a significant financial award" makes whistleblowers "likely to build their case as strongly as possible"). Removing that incentive violates the Dodd-Frank Rule.

Decisions of the SEC overwhelmingly support this.[5] The SEC has brought numerous enforcement actions against companies for exactly this kind of provision:

- *HomeStreet, Inc.,* Exchange Act Release No. 34-79844, 115 SEC Docket 18 (Jan. 19, 2017) (SEC found that a severance agreement provision violates Dodd-Frank Rule where it requires that statements to "any government agency with jurisdiction over the Company . . . shall be considered a waiver of any damages or monetary recovery therefrom");

- *In the Matter of BlackRock, Inc.*, Exchange Act Release No. 34-79804, 115 SEC Docket 18 (Jan. 17, 2017) (SEC found that a separation agreement that "require[ed] a departing employee to waive recovery of incentives for reporting misconduct available under,

---

[5] While no court has addressed this issue, that isn't surprising. It's obvious that requiring an employee to waive any money she might obtain in filing an SEC complaint removes a critical incentive for her to file such a complaint. Tellingly, no target of any SEC enforcement action has ever opted to litigate the issue before a federal judge: presumably, any that considered litigation knew it would lose.

among other things, the Dodd-Frank Act in exchange for receiving monetary separation payments" violated Dodd-Frank Rule);

- *BlueLinx Holdings Inc*, Exchange Act Release No. 34-78528, 114 SEC Docket 15 (Aug. 10, 2016) (SEC found that a severance agreement clause violated the Dodd-Frank Rule in stating "Employee understands and agrees that Employee is waiving the right to any monetary recovery in connection with any such complaint or charge that Employee may file with an administrative agency").

It is clear from the above cases that in 2016 and 2017—before the Severance Agreement here—the SEC had found language like the one in the Severance Agreement is illegal. Yet Facebook inserted the language anyway.[6]

### 2.    Section 11 Illegally Lacked a Whistleblowing Carveout

Section 11 of the Agreement also incorporated a confidentiality agreement that had no whistleblowing carveout. Meta relies on this provision in its claim against Ms. Wynn-Williams in this arbitration. Amended Demand at 6-7. This, too, is precisely the kind of contractual provision SEC has also found illegal in a severance agreement. *See SandRidge Energy, Inc.*, Exchange Act Release No. 34-79607, File No. 3-17739 (Dec. 20, 2016) (form separation agreement included a "Confidential Information" provision that required employees to agree "not to make any independent use of or disclose to any other person or organization, including any governmental agency, any of the Company's confidential, proprietary information unless [the employee] obtain[ed] the Company's prior written consent," with no carveout for whistleblowing). It obscures the fact that employees have a non-waivable right to report confidential information to government

---

[6] While none of the agreements at issue in these other enforcement actions made a distinction between cases brought by the government on a whistleblower's behalf—versus cases the government declined to prosecute—this is a distinction without a difference. If the provision is illegal, the provision is illegal. The entire purpose of the Dodd-Frank Rule is to incentivize whistleblowers to report misconduct, regardless of whether the government prosecutes the case or not.

agencies notwithstanding Section 11, the CIIAA, or any other confidentiality agreement.

**3.    The Agreement in Its Entirety Impedes Whistleblowing and Therefore Violates the Dodd-Frank Rule**

More broadly, with all of its provisions taken together, the Severance Agreement confused terminated employees about their whistleblowing rights. That violates federal securities laws, because it could reasonably "impede an individual from communicating directly with the Commission staff about a possible securities law violation." 17 C.F.R. § 240.21F-17(a). The Severance Agreement—which Ms. Wynn-Williams was required to sign to obtain certain termination benefits—is permeated with language that reasonably confused her about her ability to report illegal workplace conduct to the federal government. In addition to the illegal provisions in Sections 4 and 11, for example, Section 14 required Ms. Wynn-Williams to warrant that she had not already filed any complaint with any government agency to receive termination benefits including compensation under the severance agreement, which is also an unlawful impediment to SEC whistleblowers. Severance Agreement at 6; *see Two Sigma Investments, LP, et al.*, Exchange Act Release No. 34-102207, File No. 3-22418 (Jan. 16, 2025); *In the Matter of D.E. Shaw & Co, L.P.*, Exchange Act Release No. 34-98641, File No. 3-21775 (Sept. 29, 2023).

The SEC has not required a showing that a contractual provision actually discouraged any actual whistleblower from coming forward—but Ms. Wynn-Williams, in fact, was impeded for six years before coming forward. For six years, she believed that the provisions in her Severance Agreement, including Sections 4, 11, and 14, prevented her from reporting Facebook's unlawful conduct. For six years, that language had its intended and illegal effect. Facebook benefited from this. When Ms. Wynn-Williams filed her complaint with the SEC, the information was six years stale and the SEC's ability to investigate or take action was almost certainly diminished because of that passage of time.

9

### B.       The Non-Disparagement Provision Violates Public Policy

Moreover, the Non-Disparagement Provision cannot be enforced because it is contrary to public policy. It prohibits Ms. Wynn-Williams from making "disparaging, critical or otherwise detrimental comments to any person or entity concerning [Meta]," its officers, or its products, services, or programs unless compelled by subpoena. Applying this language, the current Interim Award, which purports to enforce the Non-Disparagement Provision, applies to *any* comment "regardless of whether Ms. Wynn-Williams believes her statements are true or false." Interim Award at 4.

Ms. Wynn-Williams has come forward with true first-hand accounts of, among other things, senior Facebook officials sexually harassing employees, secret negotiations with the Chinese Communist Party, sharing artificial intelligence technology with the Chinese Communist Party, lying to Congress, facilitating a genocide in Myanmar, and exploiting emotionally vulnerable teenage girls. Officials with the United States Congress and other legislatures have reached out to speak with her—and yet, as the emergency arbitrator recently held, the Severance Agreement prohibits her from speaking with them without risking draconian penalties. Order at 11-12.

California law has long recognized that contracts, or contract provisions, will not be enforced if they are contrary to public policy. *Erhart v. BofI Holding, Inc.*, No. 15-cv-2287, 2017 WL 588390, at *6 (S.D. Cal. Feb. 14, 2017) (quoting *Kashani v. Tsann Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 540 (Cal. Ct. App. 2004)). Relevant public policies may be drawn from a variety of sources, including both federal and state statutes, regulations, and common law. *See Cariveau v. Halferty*, 83 Cal. App. 4th 126, 132 (Cal. Ct. App. 2000).

10

Several compelling public policy concerns weigh against enforcing the non-disparagement provision in the Agreement.

First, the "right to fully … speak on matters of public concern has long been recognized to be a fundamental right of critical importance." *Leonard v. Clark*, 12 F.3d 885, 891 (9th Cir. 1993); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (recognizing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ."). The issues in Ms. Wynn-Williams's whistleblower complaints filed with the Department of Justice and Securities and Exchange Commission and her memoir address rampant corporate wrongdoing (sexual harassment, secret negotiations with the Chinese Communist Party and lying to Congress about it, amplifying hate speech, etc.) and are matters of public concern and central to the public's well-established interest in fully-informed debate on public issues. *See Overbey v. Mayor of Baltimore*, 930 F.3d 215, 225-26 (4th Cir. 2019) (finding enforcement of non-disparagement clause contrary to public policy).

In addition, "[b]oth California state and federal law . . . reflect the strong public policy in favor of protecting whistleblowers."[7] *Erhart*, 2017 WL 588390 at *9; *see, e.g.*, 29 U.S.C. § 660(c) (Occupational Safety and Health Act whistleblower provision); 31 U.S.C. § 5323(a)(5), (g), and (j) (Anti-Money Laundering Act whistleblower provisions); 15 U.S.C. § 78u-6 (Dodd-Frank whistleblower provision); Cal. Gov't Code § 12964.5(a)–(b) (non-disparagement agreements silencing employees about unlawful acts are "contrary to public policy"); Cal. Labor Code § 1102.5(b) (prohibiting retaliation against whistleblowers); Cal. Civil Code § 1670.11 (contract provisions prohibiting testimony before a legislature about misconduct are unenforceable); Cal.

---

[7] The public policy may be either express or implied by the language of a statue or rule. *Cariveau*, 83 Cal. App. 4th at 132.

Civil Code § 47.1(a)–(b) (prohibiting defamation suits based on communications regarding sexual assault, harassment, or discrimination). Both federal and California law prohibit retaliation against whistleblowers who report wrongdoing to members or committees of Congress, among other bodies. *See Erhart*, 2017 WL 588390 at *15-16. As Senator Grassley summarized, "It's crucial that Meta ensures its employees can provide protected disclosures without illegal restrictions and bullying." Letter from Senator Grassley to Zuckerberg, *supra*. If Meta is permitted to enforce the non-disparagement provision in the Severance Agreement, it will be able to accomplish precisely what these laws seek to prevent—concealment of its wrongdoing via threats and intimidation.

The public interest balance here outweighs any other interest, including any interest in the finality of dispute resolution. *See, e.g., Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390, 1399 (9th Cir. 1991) (holding that the interest in the settlement of litigation "cannot by itself outweigh a substantial public interest on the other side of the scales"); *United States v. Northrop Corp.*, 59 F.3d 953, 962 (9th Cir. 1995) (courts must "ascertain the reasons apart from the general interest in settling disputes that support enforcing the agreement"); *Cariveau*, 83 Cal. App. 4th at 136 (finding confidentiality provision in contract unenforceable where the "only interest appellant identifies in support of the contract term is the general policy in favor of promoting the settlement of disputes"). Ms. Wynn-Williams should be permitted to continue speaking on these urgent matters of public concern. The Non-Disparagement Provision is void as a matter of public policy and should not be enforced.

12

**C.    Section 11 Violates California Law's Prohibition on Waiver of Obligation to Post Bond**

Not only does Section 11 violate the federal securities laws, but it is also unconscionable under California law. Section 11(f) of the CIIAA incorporated in Section 11 provides that:

> I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore agree that the Company will be entitled to seek extraordinary relief in court, including but not limited to temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security.

Severance Agreement, Section 11(f).[8] California law is clear that such nonmutual provisions that allow one party to waive a bond are substantively unconscionable. *See Alberto v. Cambrian Homecare*, 91 Cal. App. 5th 482, 492-93 (Cal. Ct. App. 2023); *Lange v. Monster Energy Co.*, 46 Cal. App. 5th 436, 451 (Cal. Ct. App. 2020). Section 11 is also void under California law for this reason.

**D.    The Entire Agreement, Including the Arbitration Clause, Is Illegal**

The entire agreement is void, and the arbitration provision with it. "If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced." *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 124 (2000); *see also* CAL. CIV. CODE § 1598. The central purpose of the Severance Agreement is clear: to discourage whistleblowers from reporting illegal activity. Indeed, Meta started this arbitration just days after Ms. Wynn-Williams filed her whistleblower complaint with the Department of Justice. Its provisions violate federal securities laws, *see* Section II.A, and are unconscionable under federal and California law. *See* Sections II.B, II.C. "Removing the unconscionability of this Agreement would require either the severance of several provisions or the addition of several terms to mitigate

---

[8] As discussed in Section IV *infra*, this provision also voids the arbitration clause.

the offending provisions, neither of which are permitted." *Durruthy v. Charter Commc'ns, LLC*, No. 20–CV–1374–W–MSB, 2020 WL 6871048, at *13 (S.D. Cal. Nov. 23, 2020) (citing *Armendariz,* 6 P.3d at 697).

In *Armendariz*, the California Supreme Court found that an arbitration clause in an otherwise permissible employment agreement could not be severed because "[a]n employer will not be deterred from routinely inserting such a deliberately illegal clause . . . if it knows that the worst penalty for such illegality is the severance of the clause after the employee has litigated the matter." 24 Cal. 4th at 124 n.13. That is precisely what Meta presumes to seek in merely severing the illegal portions of its agreement. That should not be permitted. Because the Severance Agreement was an illegal impediment to whistleblowers under SEC regulations and federal and California state public policy, it cannot be enforced against Ms. Wynn-Williams, including the arbitration clause.

## II.     Meta Has Waived Its Right to Arbitration

Prior to her termination, Ms. Wynn-Williams reported internally to Facebook HR that she was sexually harassed by a Meta executive. On November 9, 2018, Facebook publicly announced that it would no longer use forced arbitration where sexual harassment allegations are at issue. Lori Goler, a Facebook vice president, was quoted in the *New York Times* describing this decision as "a pivotal moment for our industry and corporate America more broadly." *See* Daisuke Wakabayashi, et al., *Facebook to Drop Forced Arbitration in Harassment Cases*, N.Y. TIMES (Nov. 9, 2018).[9] Meta has clearly and unequivocally waived its right to arbitrate its claims against Ms. Wynn-Williams as a result.

---

[9] https://www.nytimes.com/2018/11/09/technology/facebook-arbitration-harassment.html.

14

"[T]he right to arbitrate, like any other contract right, can be waived, either expressly or by implication." *Thorup v. Dean Witter Reynolds, Inc.*, 180 Cal. App. 3d 228, 234 (Cal. Ct. App. 1986). Waiver is established where (1) "the waiving party knew of the contractual right" and (2) "intentionally relinquished or abandoned it." *Quach v. California Commerce Club, Inc.*, 16 Cal. 5th 562, 584 (2024).[10] Meta clearly knew of, and expressly waived, its right to arbitrate here.

The first element of waiver is not in dispute. As the party that drafted the Agreement—including the arbitration clause—Meta has known since 2017 that it had the ability to bring an arbitration against Ms. Wynn-Williams. It also knew in 2017 Ms. Wynn-Williams had accused a Facebook executive, Joel Kaplan, of sexual harassment. And Meta has admitted that it specifically prepared the non-disparagement provision to silence those sexual harassment claims. *See* Application for Emergency Relief at 3-4; Amended Demand at 3.

A year later, in the fall of 2018, Facebook told Ms. Wynn-Williams that it continued to be especially aware of its Agreement with her. In September 2018, Joel Kaplan attended Brett Kavanaugh's confirmation hearing to support the latter's nomination to the Supreme Court. A focal point of that hearing was Professor Christine Blasey Ford's allegation that Kavanaugh had sexually assaulted her. Two days later, after the *New York Times* reported about Mr. Kaplan's presence at the hearing, Facebook's employment counsel Heidi Swartz reached out to Ms. Wynn-Williams's attorney, directing that Ms. Wynn-Williams be reminded of her obligations related to non-disparagement and confidentiality. The timing of that communication cannot have been a coincidence. Facebook was concerned that Ms. Wynn-Williams would speak publicly about Mr.

---

[10] The California Supreme Court recently clarified in *Quach* that it's unnecessary to show reliance to show that arbitration has been waived. 16 Cal. 5th at 585. However, Ms. Wynn-Williams did, in fact, rely on Meta's public commitments.

Kaplan's sexual harassment, and it signaled a clear intent to use its non-disparagement clause to silence those claims.

The second element of waiver is also clearly met. Indeed, it is difficult to imagine a more express waiver of the arbitration clause than the one Facebook made just weeks after Ms. Swartz's outreach: a public announcement in the *New York Times* in November 2018. *See* Wakabayashi, *Facebook to Drop Forced Arbitration in Harassment Cases*. Facebook was willing to forgo its ability to bring an arbitration where these claims are an issue because "[t]his is *a pivotal moment* for our industry and corporate America more broadly. . . . *We think this is the right thing to do and hope other companies do, too*" (emphases added). This clearly was "conduct that is so inconsistent with an intent to enforce the contractual right as to lead a reasonable factfinder to conclude that [Meta] had abandoned it." *Quach*, 16 Cal. 5th at 584 (citing *Lynch v. California Coastal Com.*, 3 Cal 5th 470, 475 (2017)). Meta got the benefit of appearing to be a good corporate actor by swearing off arbitration. It should not be permitted to backslide now. If not forcing former employees into arbitration is "the right thing to do" then Meta should be required to do it here.

Indeed, at least one California federal court has held that such public announcements of policies is also repudiation of a contractual term by a party. *See Hendricks v. Aetna Life Ins. Co.*, 344 F.R.D. 237, 243 (C.D. Cal. 2023) (insurance company's statements on its own public website that certain treatments reflected "unequivocal manifestation of. . . unwillingness to perform" and plaintiffs seeking coverage of those treatments were not required to exhaust administrative appeals under insurance plan before filing claims) (quoting Richard A. Lord, *Williston on Contracts*, § 39:40. Facebook's announcement, too, expressly repudiated its agreement. *See Cinel v. Bana*, 206 Cal.App.4th 1383, 1390 (Cal. Ct. App. 2012) (arbitration agreements may be "expressly

16

repudiate[d]") (quotation and citation omitted); *see also Quach*, 16 Cal. 5th at 583-84 ("waiver" encompasses multiple state law contract defenses).

Moreover, Meta's past conduct is consistent with its waiver of a right to arbitrate. Other former Meta employees have both filed SEC complaints and written books, but Meta has not sought to force them into arbitration nor enforced non-disparagement clauses against them *See, e.g.,* Ryan Mac and Cecilia Kang, "Whistle-Blower Says Facebook 'Chooses Profits Over Safety,'" *New York Times* (last updated June 23, 2023) (quoting Frances Haugen, author of *The Power of One*);[11] Julia Carrie Wong, "How Facebook Let Fake Engagement Distort Global Politics: A Whistleblower's Account," *The Guardian* (Apr. 12, 2021) (interview with Sophie Zhang).[12] While Meta's aggressive retaliation against Ms. Wynn-Williams is inescapably because her reports of illegal conduct and sexual harassment at Meta are so damning, Meta should be required to play by the same rules it announced it would follow. Ms. Wynn-Williams reasonably relied both on Meta's public statements and its subsequent actions consistent with its announcement.

Now that Ms. Wynn-Williams has come forward and filed Whistleblower complaints with both the Securities and Exchange Commission and the Department of Justice that include allegations of sexual harassment, Meta has decided that it is no longer interested in doing "the right thing" or acting consistently with its own publicly stated policy. Instead, Meta is seeking to force Ms. Wynn-Williams into arbitration. Meta should be held to its promise, its policy, and its public statements, and its Demand should be dismissed.

---

[11] https://www.nytimes.com/2021/10/03/technology/whistle-blower-facebook-frances-haugen.html.

[12] https://www.theguardian.com/technology/2021/apr/12/facebook-fake-engagement-whistleblower-sophie-zhang.

17

**III.    Meta Cannot Enforce the Arbitration Provision of the Severance Agreement Because It Breached Its Obligations to Ms. Wynn-Williams**

Meta cannot enforce the arbitration provision in the Agreement because it breached its obligations to Ms. Wynn-Williams in two ways, prior to any alleged violations by her.

First, in Section 9 of the Severance Agreement, Meta agreed "not to issue any internal or public statements or press releases concerning [Ms. Wynn-Williams], [her] employment with or departure from [Meta] containing disparaging, critical or otherwise detrimental comments concerning [Ms. Wynn-Williams]." On March 5, 2025, *Careless People* and the whistleblower complaints that underpinned the memoir were announced. Meta immediately began disparaging Ms. Wynn-Williams. As early as March 6, 2025, and continuing repeatedly since that date, Meta and its employees have provided false and misleading public statements to the media and released documents and press releases that disparage Ms. Wynn-Williams and her departure from Meta, in violation of the Non-Disparagement Provision of the Agreement. Meta cannot enforce an agreement it has no intention of honoring.

 Second, Facebook failed to pay expenses Ms. Wynn-Williams incurred during her time at the company, which totaled approximately $310,000. This, in turn, breached the Severance Agreement. It cannot now seek to enforce the arbitration provisions in the Severance Agreement against Ms. Wynn-Williams. It is a bedrock principle of contract law that "'[h]e who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed.'" *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1010 (9th Cir. 2005) (quoting *Pry Corp. of Am. v. Leach*, 177 Cal. App. 2d 632, 639 (Cal. Ct. App. 1960)).

Under Section 8 of the Severance Agreement ("Final Expense Reimbursement Request"), Facebook was required to reimburse Ms. Wynn-Williams for the work-related expenses she incurred during her employment at the company. In the months following her separation from the

18

company, Ms. Wynn-Williams submitted receipts for reimbursement to Facebook. In addition to repeatedly following up with the expenses team and counsel at Facebook regarding the delay in reimbursement, which included at least fifty emails exchanged relating to the expenses, Ms. Wynn-Williams could see within Facebook's reimbursement platform that most of the receipts had been cleared by the internal audit system and approved by external auditors, but she was never repaid. Furthermore, Facebook's conduct and assurances were consistent with the approach that it owed Ms. Wynn-Williams reimbursement for expenses; Meta's Chief Employment Counsel Heidi Swartz explicitly told Ms. Wynn-Williams through her counsel throughout April and early May 2018 that she was personally working through processing the requests and approving the expenses. Despite these assurances, Facebook stopped responding altogether in or around May 2018. To date, Facebook/Meta has never reimbursed Ms. Wynn-Williams for roughly $310,000 of business expenses.

Because Facebook materially breached—and remains in breach of—the Severance Agreement, it is not permitted to enforce the arbitration provision of the Severance Agreement against Ms. Wynn-Williams.

**IV.    The Arbitration Clause is Void for Ambiguity Because Section 11 Clearly Contemplates Judicial Resolution; Alternatively, Meta's Section 11 Claims, at Minimum, Are Not Arbitrable.**

The CIIAA which is incorporated into Section 11 of the Agreement—which, again, Meta relies on in its Amended Demand—specifically provided that any disputes under it would be resolved by a court and not by an arbitrator. It states: "I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, ***and therefore agree that the Company will be entitled to seek extraordinary relief in court***." Severance Agreement, Exhibit A, Section 11(f) (emphasis added). This voids the arbitration clause entirely under the Severance

19

Agreement, because it creates ambiguity about whether the arbitration agreement "'clearly and unmistakably' reserve[s] to the arbitrator the issue of whether the arbitration agreement was enforceable." *Baker v. Osborne Dev. Corp.*, 159 Cal. App. 4th 884, 893-94 (Cal. Ct. App. 2008) (arbitration clause ambiguous and unenforceable where the contract contained a separate provision referring to resolution of severability issues by a court) (quoting *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002)); *see also Jack v. Ring LLC*, 91 Cal. App. 5th 1186, 1201 (Cal. Ct. App. 2023) (same). The allegations undergirding Meta's Section 11 claims are essentially the same as its other claims against Ms. Wynn-Williams: that in whistleblowing about Meta's conduct she spoke out in violation of her severance agreement and misappropriated confidential information in the process. Because it is clear that the Section 11 claims must be judicially resolved, these claims have not been agreed to be resolved by an arbitrator. *See Baker,* 159 Cal. App. 4th at 893 ("[W]hether a particular dispute is arbitrable is a threshold issue to be decided by the court 'unless the parties clearly and unmistakably provide otherwise.'") (quoting *Howsam,* 537 U.S. at 83).

## CONCLUSION

For all of the foregoing reasons, Ms. Wynn-Williams respectfully objects to the arbitrability of Meta's claims and therefore requests that Meta's Amended Demand for Arbitration be dismissed.

Respectfully submitted,

DATED:  4/22/2025

*/s/ Matt Kaiser*
Matt Kaiser
Courtney R. Forrest
Amelia J. Schmidt
Colby L. Moore
Kaiser PLLC
1099 14th Street, NW
8th Floor West
Washington, DC 20005



21

# Exhibit L

**quinn emanuel** trial lawyers | los angeles

██████████ 10th Floor, Los Angeles, California 90017 | ██ ████████ ██ ████████

WRITER'S DIRECT DIAL NO.
█████████

WRITER'S EMAIL ADDRESS
████████████████████

July 21, 2025

**VIA E-MAIL**

Marcus Salvato Quintanilla, Esq.
c/o Erin Brennan
Director ICDR
American Arbitration Association
████████████████████
Los Angeles, California 90017
███████████████

Re:    *Meta Platforms, Inc. v. Sarah Wynn-Williams*

Dear Arbitrator Quintanilla:

Respondent Sarah Wynn-Williams respectfully submits this letter brief in opposition to Claimant Meta Platforms, Inc.'s ("Meta") July 17, 2025, letter brief regarding the scope of discovery in this arbitration.[1]   At the outset, Respondent acknowledges that she intends to challenge the enforceability of several provisions in the severance agreement—including the arbitration provision, the non-disparagement provision, and the liquidated damages provision. Respondent understands that Meta intends to enforce these provisions to the letter.  It is therefore surprising that, before the arbitration even gets started, *Meta* is seeking to avoid its discovery obligations under the severance agreement by claiming that section 16(d) (the "Arbitration Provision"), *which Meta drafted*—and which plainly states that the Federal Rules of Civil Procedure ("FRCP") govern the scope of discovery in this arbitration—should not be enforced as

---

[1]  As stated previously and consistently since the outset of this case, Respondent objects to arbitral jurisdiction on the grounds that the arbitration clause contained in the severance agreement is unenforceable.  Respondent submits this letter brief to preserve her rights in this arbitration, but is not waiving her right to challenge the arbitrability of this dispute in court and/or in this arbitration. Respondent has refrained from filing a court action challenging arbitral jurisdiction and seeking declaratory and injunctive relief solely because the parties are engaged in ongoing settlement discussions.

**quinn emanuel urquhart & sullivan, llp**

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | HAMBURG | HONG KONG | HOUSTON | LONDON |
LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO |
SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

written.  Meta's arguments rely on inapposite caselaw and ignore the Arbitration Provision's unambiguous language.

The Arbitration Provision states: "The arbitrator shall administer and conduct any discovery *in accordance with the Federal Rules of Civil Procedure* or any other discovery required by state laws in arbitration proceedings."  (Emphasis added).  Arbitration agreements, like any contract, are interpreted according to their plain terms.  *See EFund Cap. Partners v. Pless*, 150 Cal. App. 4th 1311, 1322 (2007) ("In interpreting an unambiguous contractual provision we are bound to give effect to the plain and ordinary meaning of the language used by the parties."). FRCP 26(b)(1) allows parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Plainly, conducting discovery "in accordance with the Federal Rules of Civil Procedure" includes the standard for discoverability set forth in Rule 26(b)(1).

Even if the Arbitration Provision were ambiguous (it is not), it was drafted by Meta, and California has codified the principle that contract language should be interpreted against the drafter.  Cal. Civ. Code § 1654 ("[T]he language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.").  While Meta now argues that the Arbitration Provision only requires the arbitrator to follow the "style and manner of federal discovery," but not Rule 26(b)(1)'s standard for discoverability, Meta chose not to include such limiting language in the Provision.  Meta's ex-post attempt to limit the broad application of the FRCP that it chose to include in the Provision should be rejected.

Indeed, California courts routinely find that contracts providing that the FRCP shall govern discovery in arbitration are enforceable, and these decisions do not differentiate between applying the scope of the FRCP versus the discovery mechanisms of the FRCP.  *See, e.g.*, *Hernandez v. Sohen Entrps., Inc.*, 102 Cal. App. 5th 222, 231, 241-42 (2024) (FRCP governs arbitration discovery based on parties' agreement); *Morgan v. Xerox Corp.*, 2013 WL 2151656, at *5 (E.D. Cal. May 16, 2013) (rejecting argument that FRCP provision made arbitration agreement unconscionable because federal discovery is too broad); *see also Colon-Perez v. Sec. Indus. Specialists, Inc.*, 108 Cal. App. 5th 403, 412 (2025) (FRCP applies in arbitration if "expressly reference[d]" in arbitration agreement).

Meta's arguments are meritless.  *First*, Meta incorrectly contends that the AAA discovery rules override the parties' agreement to use the FRCP in arbitration.  But Meta cites not a single case supporting this position; rather, it cites only inapposite federal cases outside of California that did not apply California law and have no controlling or persuasive effect here.  They involve situations where the arbitration agreements at issue placed *limitations* on discovery in arbitration, not expansions of available discovery.  In *Kotch v. Clear Channel Broad., Inc.*, 2004 WL 483502, at *3 (S.D. Fla. Mar. 8, 2004), despite noting AAA Rule 1's "adverse material inconsistency" language, the court actually *upheld* an arbitration agreement that limited the parties to three depositions, stating that "courts have rejected similar arguments that such discovery limitations render an arbitration agreement unenforceable."  And California courts have expressly disagreed with the holding in *Wilks v. Pep Boys*, 241 F. Supp. 2d 860, 864-65 (M.D. Tenn. 2003).  *See Ontiveros v. DHL Express (USA), Inc.*, 164 Cal. App. 4th 494, 511 n.12 (2008), *disapproved of on other grounds by Ramirez v. Charter Commc'ns, Inc.*, 16 Cal. 5th 478 (2024) (rejecting adverse

2

material inconsistency argument between discovery standard in arbitration agreement and AAA Rule 1); *Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 720 (2004) ("[T]he adverse material inconsistency cannot make the AAA discovery provisions trump the limits on discovery that [the employer] deliberately established in the [arbitration agreement].").

*Second*, Meta argues that "even if the Federal Rules of Civil Procedure were to apply, they would not require setting aside the AAA limitations on discovery." Of course they do. If the FRCP govern discovery, as the Arbitration Provision provides, then the FRCP—*not the AAA rules*—govern discovery. *See CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 n.1 (9th Cir. 2017) ("Because arbitration is a creation of contract, arbitration agreements may provide arbitrators greater discovery powers with respect to the parties bound by such agreements.") (citing *Life Receivables Tr. v. Syndicate 102 at Lloyd's of London*, 549 F.3d 210, 217 (2d Cir. 2008)). Only one set of rules can govern here, and the Arbitration Provision says that set of rules is the FRCP. Under the FRCP, arbitrators, like federal judges, can effectively manage discovery by ensuring that it is "proportional to the needs of the case." But here, neither party has yet propounded discovery, and no disputes have arisen, but if and when they do, the Arbitrator can surely determine whether the discovery sought is consistent with the FRCP and "proportional to the needs of the case."

*Third*, Meta erroneously contends that the Arbitration Provision merely provides that, "*if* the Arbitrator allows a particular type of discovery, such as interrogatories or requests for admissions, it should be done in the style and manner of federal discovery." That is a tortured reading indeed. The Provision simply does not say or suggest that. The plain language of the Provision broadly mandates that discovery in this arbitration be conducted in accordance with the FRCP, period.

Contrary to Meta's argument, the FRCP can still apply even if an arbitrator is limited in authorizing some third-party discovery.[2] This limitation requires no "unwritten clause" in the Arbitration Provision. Indeed, "arbitration agreements may provide arbitrators greater discovery powers with respect to the parties bound by such agreements." *CVS Health Corp.,* 878 F.3d at 706 n.1. There is no contradiction in such propositions—the FRCP can apply even while the arbitrator may be limited in some respects for jurisdictional reasons.

*Finally*, public policy supports enforcing the unambiguous terms of the Arbitration Provision. It is California public policy to enforce the plain language of contracts. *See Addiego v. Hill*, 238 Cal. App. 2d 842, 846-47 (1965) ("Parties have the right to make such agreements. The law refuses to read into contracts anything by way of implication except upon grounds of obvious necessity."); Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").

Allowing discovery in accordance with the FRCP is not inconsistent with expediency, either. The parties have already agreed to discovery deadlines, and the Arbitrator has set a merits

---

[2]  The AAA rules themselves provide the arbitrator with authority to order most types of discovery. Rule 9 of the AAA Employment Rules state: "The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise."

hearing date. Assuming this arbitration moves forward to discovery, if Meta produces discovery timely, the parties should be able to meet the deadlines. Meta's speculation that discovery in accordance with the FRCP will result in a less "expedient" arbitration is baseless, and largely within its control. In any event, courts have rejected Meta's specific concern that discovery under the FRCP would lead to unlimited discovery. *Morgan*, 2013 WL 2151656, at *5 ("Plaintiff's contention that discovery is potentially unlimited simply does not hold water."). Discovery under the FRCP must still be relevant and proportional to the needs of the case. And whatever the interest in expediency of arbitration, the Supreme Court has recognized that allowing parties to "specify by contract the rules under which the arbitration will be conducted . . . is fully consistent with the FAA's goals." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 469 (1989).

For these reasons, Meta's arguments in favor of discovery limitations should be rejected.

Respectfully submitted,

Stephen Broome

cc:     Matt Hosen, Esq. ███████████████
        Dustin Hartuv, Esq. ███████████████

4

# Exhibit M

**LEHOTSKY KELLER COHN LLP**

200 Massachusetts Ave. NW
Washington, DC 20001
Jonathan F. Cohn
jon@lkcfirm.com

March 5, 2026

**VIA E-MAIL**

Marcus Quintanilla
Arbitrator

██████████████████

███████████████████

███████████████████

      RE:    *Meta Platforms, Inc. v. Sarah Wynn-Williams*, No. 01-25-0001-2843

Dear Arbitrator Quintanilla:

We write on behalf of Claimant Meta Platforms, Inc., to notify you of Respondent Sarah Wynn-Williams' ongoing and flagrant violations of the Interim Award through the continued promotion of her book "Careless People." Respondent has participated in a series of events designed to promote and sell her book—during the very period when she has failed to meaningfully participate in this arbitration or identify replacement counsel. Claimant respectfully requests that you set another status hearing in this matter, and order Respondent to show cause why she should not be sanctioned for those intentional violations and to provide additional information to Claimant and you regarding her conduct.

The Interim Award has been in place for nearly a year. After concluding that "Claimant has established a likelihood of success on the merits of its contractual non-disparagement claim against Respondent Wynn-Williams, and that immediate and irreparable loss will result in the absence of emergency relief," the Emergency Arbitrator specifically enjoined Wynn-Williams and entities she controls "from further promoting *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism* on a book tour or otherwise." Interim Award at 3-4.

Despite the clear terms of the Interim Award, Respondent is actively promoting her book. Claimant recently learned Respondent participated in promotional events on,

at least, February 23, February 25, March 2, and March 3. *See* Cohn Decl. Exs. A-F. She has at least one additional event planned for March 6. *See* Cohn Decl. Ex. G.

These events are plainly designed to promote her book. Respondent has appeared at bookstores selling her book for events prominently featuring her book. Photographs from Respondent's events are publicly available:

 

Cohn Decl. Ex. E at 2-3.

2



Cohn Decl. Ex. D at 3.

The promotional materials also prominently feature Respondent's book:



Cohn Decl. Ex. A at 1.

Attendees are encouraged to buy the book with their tickets: "Buy your tickets today! . . . [T]here is a Ticket & Book option which includes a copy of Careless People by Sarah Wynn-Williams." *Id*. at 2.

3

Respondent is intentionally violating the Interim Award while failing to meaningfully engage in this matter. Respondent has notice that "compliance with the Interim Award" requires her to "stop[] promoting" her book. Emergency Motion to Vacate Interim Award at 3. And there is no doubt that the Interim Award remains in full force and effect. *See* Order Denying Respondent Wynn-Williams' Emergency Motion to Vacate Interim Award. Indeed, the materials promoting these events expressly acknowledge "ongoing legal restrictions," including "a ruling against Sarah . . . preventing her from promoting the book." Cohn Decl. Ex. A at 2, Ex. G at 2.

The fact that Respondent represents she will refrain from directly "speaking about her book" does not bring her conduct into compliance with the Interim Award. Cohn Decl. Ex. G at 2. Promoting her book with a wink and a nod violates the Interim Award no less than an express oral request to purchase the book would. Respondent may not "further promot[e]" her book "on a book tour or otherwise." Interim Award at 4. Nor may she "amplify[] in any forum all such previous 'disparaging, critical or otherwise detrimental comments.'" *Id.* That of course includes using the Interim Award itself as a mechanism to promote her book. *See* Ex. A at 2.

It is now clear why Respondent has not had time to hire counsel or meaningfully participate in the arbitration process: She has made an intentional choice to go on a promotion tour for her book in violation of the Interim Award. Respondent's conduct is contemporaneous with her publishers' release of a paperback version of the book on February 26. Cohn Decl. Ex. H at 9. Respondent's publisher has admitted to operating "in an aura of secrecy" and trying to avoid "potential attempts to quash" the book. *Id.* at 5-6. Accordingly, Claimant respectfully requests you order a status hearing and that Respondent be ordered to show cause why she should not be sanctioned for violating the Interim Award and, in fact, using that Award to promote her book. Given these ongoing violations, Claimant further requests that Respondent provide Claimant and you with the following information:

- The number of her books sold at these promotional events;
- The content of any remarks made by Respondent at these events, including any scripts, notes, or draft questions and answers;
- Payments she received related to these events, including from book sales related to these events;
- All contracts between Respondent and her publishers regarding the book; and
- All communications and documents exchanged with her publishers or the hosts of these events regarding her appearance at the events.

4

Respectfully submitted,


*/s/ Jonathan F. Cohn*


Jonathan F. Cohn

Enclosure

cc:    Sarah Wynn-Williams
       Will Thompson
       Mary Miller
       Mathew Rosengart
       Alex Linhardt

5

# Exhibit N

| | |
|---|---|
| **From:** | Sarah Wynn-Williams |
| **To:** | Marcus Quintanilla |
| **Cc:** | Will Thompson; ICDR Erin Brennan; Rosengart, Mathew S. (Shld-LA-LT); Linhardt, Alex L. (Shld-LA-LT); Kemple, Mark D. (Shld-LA-LT-Labor-EmpLaw); Jon Cohn; Mary Miller; Alexis Swartz |
| **Subject:** | Re: Meta v Sarah Wynn-Williams |
| **Date:** | Friday, March 6, 2026 2:36:38 PM |

Dear Arbitrator Quintanilla

Thank you for your email.

I have read the Claimant's letter and exhibits. I write to provide my preliminary observations for you, mindful that I am currently self-represented in this hearing.

Firstly, the Claimant's state that I have been engaged with "ongoing and flagrant violations of the Interim Award." I engaged in five speaking engagements only. I have no further public speaking engagements so there is no basis to claim an "ongoing" or concurrent issue.

Secondly, the Claimant has not presented any evidence of a violation as there is no violation. I was invited to speak at five small and curated events, in which I spoke about contemporary issues only. I did not – as the Claimant's exhibits show – violate the severance agreement, mention the book, or otherwise promote the book. For your information, the discussions were on the future of the internet (on issues such as the British government's approach to regulation of online services), Artificial Intelligence (including issues to do with large model providers, of whom OpenAI and Anthropic are the only actors the public are aware of) and the use of digital technology in warfare (a topic in which I have unique expertise from my ongoing work in technology after I left the Claimant). This is what the events were billed as covering and did cover.

Thirdly, the Claimant seems to be aware that I did not breach the Severance Agreement or Interim Award. They suggest I did so by "a wink and a nod". I do not know what a "wink or a nod" means but they do not provide evidence even for that. The highest they put matters is a photo of me with a book in the background. Of course, when I am speaking those that host the event may refer to the book. I cannot control third parties beyond telling them of my legal restrictions before I agree to speak. I was very deliberate to avoid any discussion of the Claimant to ensure there was no breach and did so.

Fourthly, if the Claimant was so concerned about these events they could have come to you before now. These five events have been promoted for a while and transparently so. There has been nothing clandestine about these speaking engagements because I understand I am allowed to speak on wider topics within my expertise. The Claimant is only coming to you after the event because they knew from the promotional material of the events that I would not be in breach of the Interim Award or the Severance Agreement. The  material was clear that I would not be speaking in any way that violated the Interim Award, and I followed the contours of that rigorously. The Claimant's evidence is speculative at best.

Finally, I am unclear what "sanctions" the Claimant seeks as they do not detail them. I do not have any further public speaking engagements. Nevertheless, such a threat of sanctions is alarming for me and suggests that the Claimant is attempting to police my behaviour and restrict me even when I am *expressly not* discussing the Claimant nor otherwise engaging in conduct that may breach the severance agreement or Interim Award. I am an expert on technology issues and as such speak about technology issues. I have stuck to the Interim Award strictly for a year, at great personal impact. That has not been easy, but I have done it. The Claimant now comes to you to complain about a speculative and unevidenced breach.

I am further concerned that the Claimant is attempting to leverage the fact that their questions to me in discovery led to me being self-represented. Any discussion of sanctions in the absence of counsel would be very difficult and unfair for me, as it would involve legal discussions. To face repercussions of any sort without representation would be very detrimental. In contrast, there is no detriment to the Claimant in me securing counsel before any such hearing as I currently have no public engagements. Contrary to the Claimant's suggestion that I have not sought to instruct new counsel; I have spent a considerable amount of my own time doing so. This has been challenging due to the extent of the Claimant's legal representation/conflicts. I have made significant progress. I have identified counsel who has confirmed that they do not have a conflict and am in the process of establishing instructions with them. I would in fact hope to have counsel in place by the end of next week / early the week after. That is not a process that should be rushed given what has transpired before.

With that in mind, I would ask that any hearing is held until once I have my counsel in place. As before, there is no prejudice to the Claimant.

I am being as open with you and the Claimant as I can be through this email. In light of these matters, I would ask that any hearing is listed for when I have counsel. That hearing can then also address the future progression of the arbitration, which would be a more resourceful use of your and the Claimant's time.

Yours sincerely

Sarah Wynn-Williams

On Fri, Mar 6, 2026 at 12:41 AM Marcus Quintanilla <█████████████████> wrote:

> Thank you, Mr. Thompson.
>
> Receipt confirmed.
>
> Ms. Wynn-Williams, please submit any written response that you deem appropriate by midnight (Pacific Time) tomorrow, March 6, 2026.
>
> The Parties are also requested to confirm their availability for a status conference to be held by Zoom from 12:00

pm to 12:30 pm (Pacific Time) on Monday, March 9, 2026.

Please confirm receipt of this email at your earliest opportunity.



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

Admitted: California, Texas, New York

**From:** Will Thompson <will@lkcfirm.com>
**Sent:** Thursday, March 5, 2026 12:20:55 PM
**To:** Marcus Quintanilla <​████████████████████​>; Sarah Wynn-Williams <s​██████████████​>
**Cc:** ICDR Erin Brennan <██████████████ rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** RE: Meta v Sarah Wynn-Williams

Arbitrator Quintanilla,

Attached please find a letter from counsel for Meta regarding the Interim Award.

Best regards,

Will

**Will Thompson** | Lᴇʜᴏᴛsᴋʏ Kᴇʟʟᴇʀ Cᴏʜɴ | █████████

---

**From:** Marcus Quintanilla████████████████████
**Sent:** Wednesday, February 25, 2026 8:48 AM
**To:** Sarah Wynn-Williams <s​██████████████​>
**Cc:** ICDR Erin Brennan <██████████████████ rosengartm@gtlaw.com; linhardta@gtlaw.com; kemplem@gtlaw.com; Will Thompson <will@lkcfirm.com>; Drew Waldbeser <drew@lkcfirm.com>; Todd Disher <todd@lkcfirm.com>; Jon Cohn <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Ms. Wynn-Williams:

No worries at all. You are right to clarify.

You have understood correctly.

All the best,



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

Admitted: California, Texas, New York

**From:** Sarah Wynn-Williams                                    >
**Sent:** Wednesday, February 25, 2026 4:54:58 AM
**To:** Marcus Quintanilla <
**Cc:** ICDR Erin Brennan <                              rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email.

Just so I am sure, I take your email to mean that the matter will proceed as set out in your email of 20 February that:

1. The case-management dates and the timetable in Procedural Order No. 2 will not be altered.
2. The matter will proceed with me acting "in propria persona". I understand that to mean self-represented but please do confirm.
3. If and when I do instruct new counsel, they should make their formal appearance, and subsequent communications will be made through them.
4. There will be no follow-up status conference scheduled this week.

Sorry to follow up to confirm but I thought it best to be sure of the status.

Yours sincerely

Sarah

On Tue, Feb 24, 2026 at 8:07 PM Marcus Quintanilla <                              wrote:

Thank you, Ms. Wynn-Williams.

We will proceed as currently planned.

All the best.



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

Admitted: California, Texas, New York

---

**From:** Sarah Wynn-Williams█████████████
**Sent:** Monday, February 23, 2026 10:12:09 PM
**To:** Marcus Quintanilla <████████████████
**Cc:** ICDR Erin Brennan <█████████████████████@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email and apologies again for the mix up. I will provide my contact details to the ICDR.

By way of update, I can confirm that I have reached out to multiple lawyers and law firms, both large and boutique. I am finding that those firms are, whatever their size, conflicted. This is unexpected but based on the responses I think it stems from the size and scope of Meta's interests.

I am waiting on responses from a significant number of attorneys and among those I hope will receive a positive response. I also continue to reach out to new attorneys. As this matter requires a high level of trust from me and skill (and to avoid repeating the experience with Quinn), I want to be thorough and thoughtful with the process of selecting my new representative. It is important that I get the selection right. I believe that this measured approach will ultimately lead to the best outcome for all parties and the arbitration process.

I can confirm my agreement that neither party has yet made its document production to the other.

Finally, for my part I do not think we need to reschedule the status conference but I am happy to do so if you feel it is necessary or in any way helpful.

Yours sincerely

Sarah

On Fri, Feb 20, 2026 at 7:04 PM Marcus Quintanilla ████████████████████wrote:

> Dear Ms. Wynn-Williams:
>
> Thank you for your email.
>
> We waited for you to join the status conference for about 10 minutes and also tried to reach out to you by telephone, although we did not have a telephone number for you on file. (Ms. Brennan also has no record of your call to her.) I regret that there seems to have been a breakdown in communications.
>
> In any case, nothing transpired at the status conference, except that counsel for Meta confirmed that neither party has yet made its document production to the other. (If you disagree with that statement, please let me

know.)

As I explained during the hearing, it appears that the remaining case-management dates lie reasonably in the future, and that, at this point, there is no cause to alter the procedural timetable set forth in Procedural Order No. 2.

I would ask that, not later than Monday, February 23, you advise all case participants whether you have obtained replacement counsel to represent you in the arbitration. If not, we will note in the case file that you are proceeding in propria persona. At that point, you should provide the ICDR with your telephonic contact information. If you have secured counsel, they should make their formal appearance, and subsequent communications will be made through them.

In view of the apparent mixup with the hearing link, I will be happy to schedule a follow-up status conference next week if you would like that. Please let me know your preference with your next communication.

All the best,



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

Admitted: California, Texas, New York

---

**From:** Sarah Wynn-Williams
**Sent:** Friday, February 20, 2026 10:38:51 AM
**To:** ICDR Erin Brennan
**Cc:** Marcus Quintanilla                                    rosengartm@gtlaw.com <rosengartm@gtlaw.com>;
linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com
<will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com
<jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Regarding this, I never received any connecting/dial in details. I tried to contact Erin on the number below but there was no response/answer.

It is now late in the UK and my childcare is finishing (as I thought our status conference would have concluded by now).

Please let me know if I have somehow missed the connecting details, a thorough search of spam folders etc has not revealed anything.

Kind regards,

Sarah

On Wed, Feb 18, 2026 at 5:28 PM ICDR Erin Brennan ███████████████ wrote:

Thank you all, I will distribute the connecting details shortly.

Best,

Erin

**ICDR Erin Brennan**
Director ICDR

███████████████████

adr.org | icdr.org | aaaicdrfoundation.org
Explore 100 Years of AAA

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

**From:** Sarah Wynn-Williams ███████████████
**Sent:** Wednesday, February 18, 2026 8:42 AM
**To:** Marcus Quintanilla < ███████████████
**Cc:** rosengartm@gtlaw.com; linhardta@gtlaw.com; kemplem@gtlaw.com; will@lkcfirm.com; drew@lkcfirm.com; todd@lkcfirm.com; jon@lkcfirm.com; ICDR Erin Brennan ███████████
**Subject:** Re: Meta v Sarah Wynn-Williams

_____

—

*** External E-Mail – Use Caution ***

—

Dear Mr Quintanilla,

My apologies for the delay, confirming that I am available on the date and time you have suggested.

Kind regards,

Sarah Wynn-Williams

On Tue, Feb 17, 2026 at 7:32 PM Marcus Quintanilla < ███████████████ > wrote:

Ms. Wynn-Williams:

I don't believe I received confirmation of your availability.

My apologies if I missed it.

Best,

---

**From:** rosengartm@gtlaw.com <rosengartm@gtlaw.com>
**Sent:** Monday, February 16, 2026 10:35 AM
**To:** ██████████████████████████████████████████
██ ████████████████████████████████████; linhardta@gtlaw.com <linhardta@gtlaw.com>;
kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com
<drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; ████████████████
██████████████
**Subject:** Re: Meta v Sarah Wynn-Williams

Thank you, Mr. Quintanilla.

On behalf of Meta, we are available on the date and at the time below.

Respectfully yours,

**Mathew S. Rosengart**

National Co-Chair, Media & Entertainment Litigation
Greenberg Traurig, LLP
View GT Biography

> On Feb 13, 2026, at 11:10 AM, Marcus Quintanilla < ████████████████████ > wrote:
>
> Thank you, Ms. Wynn-Williams.
>
> Receipt confirmed.
>
> At this point, I think it appropriate to set a status conference for one week from today: February 20, 2026, at 10:00 a.m. (Pacific). Hopefully, by that time, you will have secured counsel.
>
> I would ask that both sides confirm their availability for a short videoconference on that date and time. Once I've received confirmation, the ICDR will schedule the conference.
>
> All the best,
>
> <Outlook-zerozbxe.png>

**From:** Sarah Wynn-Williams █████████████████████
**Sent:** Friday, February 13, 2026 8:09 AM
**To:** Marcus Quintanilla ████████████████████
**Cc:** linhardta@gtlaw.com <linhardta@gtlaw.com>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; █████████████████████████
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

As requested, I am writing to update you on my progress with new representation.

Over the last four days I have made enquiries with lawyers. Unfortunately, some of the lawyers I have approached have previously acted or are currently acting for Meta. I am anticipating further responses early next week.

I will keep you and the representatives for Meta updated.

Yours sincerely,

Sarah Wynn-Williams

On Tue, Feb 10, 2026 at 1:44 AM Marcus Quintanilla <████████████████████ wrote:

> Dear Ms. Wynn-Williams:
>
> Thank you for your note.
>
> Please update me and all case participants not later than this Friday, February 13, 2026, at 5:00 p.m. (Pacific Time). If you have not secured counsel by then, we will schedule a status conference to address the path forward.
>
> All the best.
>
> <Outlook-zmxr5hmw.png>
>
> ---
>
> **From:** Sarah Wynn-Williams ██████████████████
> **Sent:** Monday, February 9, 2026 12:28 PM
> **To:** Marcus Quintanilla <████████████████
> **Cc:** linhardta@gtlaw.com <linhardta@gtlaw.com>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; ████████████████████
> **Subject:** Re: Meta v Sarah Wynn-Williams
>
> Dear Arbitrator Quintanilla

Case 4:26-cv-06341-KAW    Document 28-1    Filed 07/06/26    Page 166 of 411

As requested, I am providing an update regarding my search for new counsel.

The weekend has been spent identifying potential firms and evaluating their suitability for this matter. Due to the nature of my situation, it is a priority for me to ensure that any firm under consideration performs an exhaustive conflict check and a comprehensive due diligence review. I intend to be incredibly thorough in this process to ensure, to the extent that I can, that I do not face the  same conflict problem again.

I will continue to keep both you and counsel for the Respondent updated as I move through these next steps.

Yours sincerely

Sarah Wynn-Williams

On Sat, Feb 7, 2026 at 2:13 AM Marcus Quintanilla <███████████████████> wrote:

> Thank you, Mr. Linhardt.
>
> Receipt confirmed.
>
> Under the circumstances, the current discovery response deadline is vacated.
>
> A new date will have to be set, and we will have to consider implications for other case-management dates. However, given that the Merits Hearing is not scheduled until the fall, it is my expectation that all or most of the remaining case-management dates can be salvaged.
>
> Ms. Wynn-Williams:
>
> Please proceed with utmost diligence and inform us, not later than Monday, February 9, when you anticipate securing replacement counsel for your representation in this arbitration.  My preference will be for your new counsel to enter his appearance and then to meet and confer with the attorneys for the Respondent with respect to case-management dates and related matters, and then for counsel to report back to me.  But if there is an appreciable delay in identifying replacement counsel, I will convene a status conference so that we can discuss these issues in real time.
>
> SO ORDERED.
>
> <Image.jpeg>
>
> ---
>
> **From:** linhardta@gtlaw.com <linhardta@gtlaw.com>
> **Sent:** Friday, February 6, 2026 12:43:54 PM

**To:** rosengartm@gtlaw.com <rosengartm@gtlaw.com>; ████████████████████
████████████████████████

**Cc:** ████████████████████████████ kemplem@gtlaw.com <kemplem@gtlaw.com>;
will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com
<todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; ████████████████████████

**Subject:** RE: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla,

Further to the below, please see the attached response on behalf of Meta.

Respectfully yours,

**Alex Linhardt**
**Shareholder**

Greenberg Traurig, LLP
1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
T +1 310.586.7822  | F +1 310.586.7800  | C +1 310.924.4794
linhardta@gtlaw.com  |  www.gtlaw.com  | View GT Biography

**From:** Rosengart, Mathew S. (Shld-LA-LT) <rosengartm@gtlaw.com>
**Sent:** Friday, February 6, 2026 9:37 AM
**To:** ████ ████████████████████████
**Cc:** ████████████████████████████████ Kemple, Mark D. (Shld-LA-LT-Labor-EmpLaw)
<kemplem@gtlaw.com>; Linhardt, Alex L. (Shld-LA-LT) <linhardta@gtlaw.com>; will@lkcfirm.com;
drew@lkcfirm.com; todd@lkcfirm.com; jon@lkcfirm.com; ████████████████
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Mr. Quintanilla,

Just as a brief update, we are finalizing our response and will send it shortly.  As we had to consult
internally, with your permission, it might be a bit more than 24 hours but we will send it as soon as
possible today.

Thank you.

**Mathew S. Rosengart**

National Co-Chair, Media & Entertainment Litigation

Greenberg Traurig, LLP

View GT Biography

> On Feb 5, 2026, at 11:06 AM, Marcus Quintanilla ████████████████████████
> wrote:

**\*EXTERNAL TO GT\***

Thank you, Ms. Wynn-Williams.

Receipt confirmed.

I would ask that counsel for Respondent provide any comments to the request within the next 24 hours.

All the best,

<Image.jpeg>

---

**From:** Sarah Wynn-Williams <█████████████████████>
**Sent:** Thursday, February 5, 2026 10:41 AM
**To:** ████████████████████████████████████████
**Cc:** rosengartm@gtlaw.com <rosengartm@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; ██████████████████ ████████████████
**Subject:** Meta v Sarah Wynn-Williams

**Meta v Sarah Wynn-Williams**

**Case No. 01-25-0001-2843**

My representatives in this matter, Quinn Emanuel Urquhart & Sullivan LLP ('Quinn'), have informed me that they are conflicted and must therefore withdraw as my representatives. Quinn have filed notices to withdraw.

I am now without representation in the arbitration due to those questions put by Meta. I am mindful however that there is a deadline for exchange of documents for tomorrow, February 6, 2026. With respect, you will appreciate that I will be unable to meet that deadline owing to the withdrawal of my legal representatives.

I would request your agreement to a stay of the proceedings while I secure new representation. I am left as a litigant in person and feel very exposed, given the complexities of the issues and the serious impact of the proceedings on my life. Not least, the extended period of the proceedings mean I remain under an

embargo which prevents my ability to speak freely. I have already commenced that search for new representation, and would hope to have new counsel as soon as possible. I simply ask for further time until I can instruct new counsel.

I accept that any stay would be mutual between the parties, despite the prejudice that causes me. There is no prejudice to however to Meta in this request for the proceedings to be stayed.

Should you wish to discuss this matter, please do not hesitate to contact me.

Yours sincerely

Sarah Wynn-Williams

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate the information.

# Exhibit O

**From:** linhardta@gtlaw.com 📎
**Subject:** RE: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures
**Date:** April 7, 2026 at 8:25 AM
**To:** ▮▮▮▮▮▮▮   pselendy@selendygay.com,  jselendy@selendygay.com,  cobrien@selendygay.com, cstoughton@selendygay.com
**Cc:** rosengartm@gtlaw.com,  kemplem@gtlaw.com,  jon@lkcfirm.com,  will@lkcfirm.com,  mary@lkcfirm.com

Ravi,

We can speak at 8 p.m. UK time. I'll circulate a Zoom link.

**Alex Linhardt**
Shareholder

Greenberg Traurig, LLP
1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
T ▮▮▮▮▮▮
linhardta@gtlaw.com  |  www.gtlaw.com  |  View GT Biography

---

**From:** Ravi Naik ▮▮▮▮▮▮▮
**Sent:** Monday, April 6, 2026 11:54 PM
**To:** Linhardt, Alex L. (Shld-LA-LT) <linhardta@gtlaw.com>; pselendy <pselendy@selendygay.com>; jselendy <jselendy@selendygay.com>; cobrien@selendygay.com; cstoughton@selendygay.com
**Cc:** Rosengart, Mathew S. (Shld-LA-LT) <rosengartm@gtlaw.com>; Kemple, Mark D. (Shld-LA-LT-Labor-EmpLaw) <kemplem@gtlaw.com>; jon@lkcfirm.com; will@lkcfirm.com; mary@lkcfirm.com
**Subject:** Re: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Alex

We are available at 8pm UK time today. Please confirm if that works for you. If that works, please circulate a conference call link.

If not, please provide alternate times and dates. Or ideally, please confirm if you client is amenable to the short extension of time our client has requested so as to avoid the unnecessary time and costs associated with a call.

Regards

_____

Ravi Naik
   *Legal Director*

A   W     O
▮▮▮▮▮▮▮▮
www.awo.legal

Based in the UK

—
AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd, HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
https://www.awo.agency/regulatory-information/

---

**From:** linhardta@gtlaw.com <linhardta@gtlaw.com>
**Sent:** Monday, April 6, 2026 5:40:12 PM
**To:** pselendy <pselendy@selendygay.com>; jselendy <jselendy@selendygay.com>; cobrien@selendygay.com <cobrien@selendygay.com>; cstoughton@selendygay.com <cstoughton@selendygay.com>; Ravi Naik <▮▮▮▮▮▮▮
**Cc:** rosengartm@gtlaw.com <rosengartm@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; jon@lkcfirm.com <jon@lkcfirm.com>; will@lkcfirm.com <will@lkcfirm.com>; mary@lkcfirm.com <mary@lkcfirm.com>
**Subject:** FW: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Counsel,

We are available to meet and confer this afternoon pacific time pursuant to the Arbitrator's email.

**Alex Linhardt**
Shareholder

Greenberg Traurig, LLP
1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
T +1 ▮▮▮▮▮
linhardta@gtlaw.com  |  www.gtlaw.com  |  View GT Biography

---

**From:** Marcus Quintanilla <▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, April 3, 2026 1:51 PM
**To:** Ravi Naik <▮▮▮▮▮▮▮>; Will Thompson <will@lkcfirm.com>; ▮▮▮▮▮▮▮▮▮ Rosengart, Mathew S. (Shld-LA-LT) <rosengartm@gtlaw.com>
**Cc:** pselendy <pselendy@selendygay.com>; jselendy <jselendy@selendygay.com>; Claire O'Brien <cobrien@selendygay.com>; Corey Stoughton <cstoughton@selendygay.com>
**Subject:** Re: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

**Subject:** Re: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Dear Mr. Naik:

Thank you for your message.

If Respondent believes that Claimant has misrepresented the record in any way, she may provide her alternative account (and chronology) in her responsive papers.

As for the due date of her response, I would ask that counsel meet and confer in an effort to work this out consensually. Any agreed-upon extension should be modest, considering that the response date was set substantially into the future, in order to accommodate a likely substitution of counsel.

All the best,



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

Admitted: California, Texas, New York

---

**From:** Ravi Naik <███████████>
**Sent:** Friday, April 3, 2026 12:36:47 PM
**To:** Marcus Quintanilla <████████████        Will Thompson <will@lkcfirm.com>; ████████ rosengartm@gtlaw.com <rosengartm@gtlaw.com>
**Co:** pselendy <pselendy@selendygay.com>; jselendy <jselendy@selendygay.com>; Claire O'Brien <cobrien@selendygay.com>; Corey Stoughton <cstoughton@selendygay.com>
**Subject:** Re: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Dear Arbitrator Quintanilla

I can confirm that we have received the declaration of Cohn. In considering the declaration, we noticed:

1. The letter from the Claimant of 5 March 2026 is not included. I would request that the Claimant amend the declaration to include a copy of that letter (as enclosed for reference)
2. The correspondence from the Respondent is not in chronological order, nor is ordered to reflect the sequence of correspondence between the parties. I would request the Claimant to amend the declaration to ensure that the correspondence between the parties is a full sequential run.

I can also confirm that our client has instructed US counsel, Selendy Gay. I am pleased to copy this email to lawyers from Selendy Gay, as follows:

- Philippe Selendy pselendy@selendygay.com
- Jennifer Selendy jselendy@selendygay.com
- Claire O'Brien cobrien@selendygay.com
- Corey Stoughton cstoughton@selendygay.com

As Selendy Gay have just been instructed, Respondent would request a short extension of time for her response to the application to allow Selendy Gay to read into the papers and get up to speed on instructions. We would suggest 14 days would be sufficient. The proceedings would not be prejudiced by the short extension, nor would there be any prejudice to the Claimant.

We trust this request is uncontroversial but please do let me know if you have any questions.

Yours sincerely

Ravi

---

Ravi Naik
*Legal Director*

A W    O

www.awo.legal

Based in the UK

—

AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd, HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
https://www.awo.agency/regulatory-information/

---

**From:** Marcus Quintanilla <████████████████████████>
**Date:** Tuesday, 31 March 2026 at 00:14
**To:** Ravi Naik <██████████, Will Thompson <will@lkcfirm.com>, ████████████████████, "rosengartm@gtlaw.com" <rosengartm@gtlaw.com>
**Subject:** Re: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Thank you, Mr. Naik.

At this point, have you received the complete submission?

Also, will you be proceeding as Respondent's counsel, or shall we expect a substitution of counsel in the coming days.

As discussed at our status conference, it is not my intent to allow changes of counsel to affect the existing briefing schedule.

All the best,



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

Admitted: California, Texas, New York

---

**From:** Ravi Naik <█████████
**Sent:** Monday, March 30, 2026 8:03:37 AM
**To:** Will Thompson <will@lkcfirm.com>; ████████████████
**Cc:** Marcus Quintanilla ████████████████████
**Subject:** Re: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Dear Will

I can confirm that this link has worked and I now have the Cohn declaration.

Yours sincerely

Ravi

_____

Ravi Naik
  *Legal Director*



www.awo.legal

Based in the UK

AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd,
HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
https://www.awo.agency/regulatory-information/

---

**From:** Will Thompson <will@lkcfirm.com>
**Date:** Monday, 30 March 2026 at 15:26
**To:** Ravi Naik <​████████████████████████​>
**Cc:** Marcus Quintanilla <███████████████
**Subject:** RE: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Ravi,

This time I did get an error message for your email address, so I'm assuming you didn't receive the message immediately below with the declaration attached. This link should allow you to download the Cohn declaration:
https://sharesync.serverdata.net/us3/s/A3kxye2WuU4Qy3q2zEevuN003ebbc7

Password: ██████████

If you run into any other problems, feel free to call me. My number is below.

Best,
Will

**Will Thompson | LEHOTSKY KELLER COHN | 2**███████

---

**From:** Will Thompson
**Sent:** Monday, March 30, 2026 9:15 AM
**To:** Ravi Naik <████████████████████
**Cc:** Marcus Quintanilla <████████████████████
**Subject:** RE: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Ravi,

I am attaching the Cohn declaration to this email. My apologies for any confusion. I didn't get an error message for your email address, so I assumed you had everything from the original email on Friday.

You should also have access to each filing through the AAA system. Just to be sure, though, I will also work on a transfer link.

Best,
Will

**Will Thompson | LEHOTSKY KELLER COHN | 2**███████

**From:** Ravi Naik ███████████
**Sent:** Monday, March 30, 2026 9:09 AM
**To:** Will Thompson <will@lkcfirm.com>; ██████████████ g
**Cc:** Marcus Quintanilla ████████████████
**Subject:** Re: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Dear Mr Thomas

I can confirm that we did not receive the Cohn declaration. Please provide that by email (or a transfer link) as a matter of urgency.

Yours sincerely

Ravi

_____

Ravi Naik
  *Legal Director*


A  W    O
███████████
www.awo.legal

Based in the UK

AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd, HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
https://www.awo.agency/regulatory-information/


**From:** Will Thompson <will@lkcfirm.com>
**Date:** Saturday, 28 March 2026 at 00:49
**To:** '██████████████████
**Cc:** Ravi Naik <███████████
**Subject:** FW: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Ms. Brennan,

I got an error message saying that your inbox couldn't receive my original email because the attachments were too large, so I'm sending you the attachments in multiple emails. This email should have the application, the Thomas declaration, and the error message. The next email should have the Cohn declaration.

I'm not copying the entire thread to avoid filling everyone else's inbox, but I'm copying Respondent's counsel in the spirit of transparency.

Thanks,
Will

Will Thompson | LEHOTSKY KELLER COHN | ██████████

**From:** Will Thompson
**Sent:** Friday, March 27, 2026 7:31 PM
**To:** 'Marcus Quintanilla' <████████████████; ICDR Erin Brennan ██████████████>; Ravi Naik <███████████>; rosengartm@gtlaw.com
**Cc:** ████████████████████>; linhardta@gtlaw.com; kemplem@gtlaw.com; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** RE: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Arbitrator Quintanilla,

The attached application and declarations were uploaded through the AAA system, but I am attaching them here to ensure that there are no issues with everyone having timely access to the filings.

Best regards,
Will

Will Thompson | LEHOTSKY KELLER COHN | ██████████

**From:** Marcus Quintanilla <████████████████
**Sent:** Thursday, March 12, 2026 4:40 PM
**To:** ICDR Erin Brennan██████████████ Ravi Naik <███████████>; Will Thompson <will@lkcfirm.com>; rosengartm@gtlaw.com
**Cc:** ████████████████████>; linhardta@gtlaw.com; kemplem@gtlaw.com; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** Re: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Thanks, Erin.

And thanks to counsel for their confirmations.



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**



Admitted: California, Texas, New York

**From:** ICDR Erin Brennan <█████████>
**Sent:** Thursday, March 12, 2026 2:08:43 PM
**To:** Ravi Naik █████████; Marcus Quintanilla <█████████; Will Thompson <will@lkcfirm.com>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; ICDR Erin Brennan <█████████>
**Cc:** █████████; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** RE: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Dear Arbitrator Quintanilla,

I am confirming receipt of the below on behalf of the ICDR. I will upload the correspondence to the Webfile as well.

I further would like to confirm that Ms. Wynn-Williams has provided her updated contact information and telephone number, as was requested.

Thank you!

Best,

Erin

**ICDR Erin Brennan**
Director ICDR

American Arbitration Association
International Centre for Dispute Resolution
█████████ Los Angeles, CA 90017

adr.org | icdr.org | aaaicdrfoundation.org
**Explore 100 Years of AAA**

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

**From:** Ravi Naik █████████
**Sent:** Thursday, March 12, 2026 1:28 PM
**To:** Marcus Quintanilla <█████████ Will Thompson <will@lkcfirm.com>; rosengartm@gtlaw.com; ICDR Erin Brennan <█████████
**Cc:** swynnwilliams <█████████; linhardta@gtlaw.com; kemplem@gtlaw.com; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** Re: Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

**\*\*\* External E-Mail – Use Caution \*\*\***

Dear Arbitrator Quintanilla

Thank you for your email and for your time today. I write to confirm receipt on behalf of the Respondent.

I remain open to conferring with the Claimant's representatives. I can be contacted on this email address. My phone number is also in the signature to this email.

Yours sincerely

Ravi

_____

Ravi Naik
  *Legal Director*

A W    O
█████████

www.awo.legal

Based in the UK

—

AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd, HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
https://www.awo.agency/regulatory-information/

**From:** Marcus Quintanilla █████████
**Date:** Thursday, 12 March 2026 at 20:02
**To:** Will Thompson <will@lkcfirm.com>, Ravi Naik <█████████, "rosengartm@gtlaw.com" <rosengartm@gtlaw.com>, █████████
**Cc:** █████████, "linhardta@gtlaw.com" <linhardta@gtlaw.com>, "kemplem@gtlaw.com" <kemplem@gtlaw.com>, Jon Cohn <jon@lkcfirm.com>, Mary Miller <mary@lkcfirm.com>, Alexis Swartz <alexis@lkcfirm.com>
**Subject:** Meta v Wynn-Williams — Order re: Briefing on Respondent's Alleged Non-Compliance with Interim Measures

Dear Colleagues:

This will memorialize the status conference that we conducted starting at noon today and ending at 12:42 PM (Pacific Time).

Messrs. Rosengart and Thompson appeared as principal representatives for Meta.

Mr. Naik appeared as principal representative for Ms. Wynn-Williams.

After a fruitful discussion, the following points were agreed:

First, not later than March 27, 2026, at 6 PM (Pacific Time), Meta will submit any application for relief in connection with the pending allegations of Respondent's noncompliance with the Emergency Arbitrator's interim measures.

That deadline has been set in view of Respondent's efforts to secure new (or additional) arbitration counsel, which, Mr. Naik advised, is imminent. The expectation is that the period from now until the due date of Claimant's application will be sufficient to permit counsel to meet and confer and engage in consensual information exchange and to potentially narrow the relief sought in Claimant's application.

Second, Respondent's Opposition to the application will be due not later than April 10 at 6 PM (Pacific Time). Absent a compelling showing of good cause, that deadline will apply whether or not Respondent obtains a substitution of counsel.

Third, on the strength of Ms. Wynn-Williams's prior communications, and assurances by Mr. Naik, it is understood that Respondent will not engage in activities comparable to those at issue in Claimant's current allegations until Claimant's application is resolved.

IT IS SO ORDERED.

---

**From:** Marcus Quintanilla ███████████████████ >
**Sent:** Monday, March 9, 2026 12:10 PM
**To:** Will Thompson <will@lkcfirm.com>; Ravi Naik < ████████ >; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; ███████████████████
**Cc:** ███████████████████ >; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

No problem, Mr. Thompson, and thank you for your note.

Let's set this status conference for noon (Pacific) this Thursday.

Ms. Brenna:

Please circulate the invite/link.

Our primary focus will be to discuss any motion practice likely to follow from Claimant's latest allegations, a timetable for same, and related matters. I will also expect an update on whether and when Respondent anticipates a substitution of counsel.

All the best,

---

**From:** Will Thompson <will@lkcfirm.com>
**Sent:** Monday, March 9, 2026 11:59:58 AM
**To:** Marcus Quintanilla ███████████████████ >; rosengartm@gtlaw.com <rosengartm@gtlaw.com>;
**Cc:** ███████████████████ linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** RE: Meta v Sarah Wynn-Williams

Arbitrator Quintanilla,

Yes, Claimant is willing to move forward on Thursday. Sorry for the earlier miscommunication, which was my fault.

Best regards,
Will

**Will Thompson | Lehotsky Keller Cohn** ███████████

---

**From:** Marcus Quintanilla < ███████████████████ >
**Sent:** Monday, March 9, 2026 1:43 PM
**To:** Ravi Naik < ██████████ ; rosengartm@gtlaw.com ██████████
**Cc:** ███████████████████ Will Thompson <will@lkcfirm.com>; linhardta@gtlaw.com; kemplem@gtlaw.com; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Colleagues:

Is Claimant willing to move forward on Thursday, notwithstanding Mr. Rosengart's unavailability?

---

**From:** Ravi Naik ███████████

**Sent:** Monday, March 9, 2026 11:01:06 AM
**To:** rosengartm@gtlaw.com <rosengartm@gtlaw.com>; ███████████████████
**Cc:** ███████████████████
will@lkcfirm.com <will@lkcfirm.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>;
jon@lkcfirm.com <jon@lkcfirm.com>; mary@lkcfirm.com <mary@lkcfirm.com>; alexis@lkcfirm.com <alexis@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear all

I am unavailable on Friday.

Mr Thomas for the Claimant has confirmed his firm are available on Thursday (see enclosed email), as has Arbitrator Quintanilla. If that does work for the ICDR, please do let us have times for Thursday.

Yours sincerely

Ravi

---

Ravi Naik
*Legal Director*

A   W    O

████████████

www.awo.legal

Based in the UK

---

AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd, HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
https://www.awo.agency/regulatory-information/

---

**From:** "rosengartm@gtlaw.com" <rosengartm@gtlaw.com>
**Date:** Monday, 9 March 2026 at 17:57
**To:** ███████████████████
**Cc:** "███████████████████ Ravi Naik ███████████
<███████████████m>, "will@lkcfirm.com" <will@lkcfirm.com>, "linhardta@gtlaw.com" <linhardta@gtlaw.com>,
"kemplem@gtlaw.com" <kemplem@gtlaw.com>, "jon@lkcfirm.com" <jon@lkcfirm.com>, "mary@lkcfirm.com" <mary@lkcfirm.com>,
"alexis@lkcfirm.com" <alexis@lkcfirm.com>, "███████████████████
**Subject:** Re: Meta v Sarah Wynn-Williams

Thank you.  Can you please advise as to Mr. Quintanilla's availability this Friday?

**Mathew S. Rosengart**

National Co-Chair, Media & Entertainment Litigation
Greenberg Traurig, LLP
View GT Biography

On Mar 9, 2026, at 1:52 PM, ICDR Erin Brennan ███████████████ > wrote:
Dear Party Representatives and Arbitrator Quintanilla,

  I am confirming receipt of the emails below and will postpone the status conference for today on the file. I will await further confirmation for rescheduling the conference.

I also wanted to note that I will add Mr. Naik for the file, until we receive updated information on counsel.

I also wanted to clarify contact information for Ms. Wynn Williams, currently the email address for the file is ███████████████████ while  in this email chain is ███████████████ We invite for Ms. Wynn Williams to clarify her preferred contact information and provide her telephone number as previously requested by the arbitrator.

Finally, I invite any of the Party Representatives to provide any updates for the service list and webfile.

Many thanks!

Best,

Erin

**ICDR Erin Brennan**
Director ICDR

American Arbitration Association
International Centre for Dispute Resolution
██████████████ Los Angeles, CA 90017

adr.org | icdr.org | aaaicdrfoundation.org
**Explore 100 Years of AAA**

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

**From:** rosengartm@gtlaw.com <rosengartm@gtlaw.com>
**Sent:** Monday, March 9, 2026 10:40 AM
**To:** ▮
**Co:** ▮▮▮m; will@lkcfirm.com; ICDR Erin Brennan <▮▮▮>, linhardta@gtlaw.com; kemplem@gtlaw.com; jon@lkcfirm.com; mary@lkcfirm.com; alexis@lkcfirm.com
**Subject:** Re: Meta v Sarah Wynn-Williams

**\*\*\* External E-Mail – Use Caution \*\*\***

Thank you. I will be on a plane Thursday but am generally available anytime on Friday.

**Mathew S. Rosengart**

National Co-Chair, Media & Entertainment Litigation
Greenberg Traurig, LLP
View GT Biography

On Mar 9, 2026, at 12:06 PM, Marcus Quintanilla <m▮▮▮> wrote:

**\*EXTERNAL TO GT\***

Thank you, Mr. Naik.

The status conference should conducted as soon as possible, but I understand the scheduling issue.

I would ask that Claimant's counsel indicate their availability for the Thursday time slot you have suggested.

All the best,

<Image.jpeg>

---

**From:** Ravi Naik <▮▮▮>
**Sent:** Monday, March 9, 2026 7:41:51 AM
**To:** Marcus Quintanilla ▮▮▮>; ▮▮▮
**Co:** Will Thompson <will@lkcfirm.com>; ICDR Erin Brennan <▮▮▮
rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email and for agreeing for me to appear for Ms. Wynn-Williams in the status conference.

I am afraid I am unavailable today due to an ongoing matter in the Court of Appeal in England. The hearing is expected to conclude on Thursday.

May I suggest the conference is listed for Thursday to ensure my attendance. I can be available from 17:00 to 19:30 (UK time), which is 09:00 – 12:30 California time.

Please do let me know if Thursday works for you and if so, what time would work within my window of availability.

Should you need, I can be contacted on +447966143682.

Yours sincerely

Ravi

_____

Ravi Naik
*Legal Director*

A  W    O
▮▮▮
www.awo.legal

Based in the UK

AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd, HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
https://www.awo.agency/regulatory-information/

**From:** Marcus Quintanilla <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Date:** Monday, 9 March 2026 at 13:13
**To:** swynnwilliams <s▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>, Ravi Naik ▮▮▮▮▮▮▮▮
**Cc:** Will Thompson <will@lkcfirm.com>, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>, "rosengartm@gtlaw.com" <rosengartm@gtlaw.com>, "linhardta@gtlaw.com" <linhardta@gtlaw.com>, "kemplem@gtlaw.com" <kemplem@gtlaw.com>, Jon Cohn <jon@lkcfirm.com>, Mary Miller <mary@lkcfirm.com>, Alexis Swartz <alexis@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Ms. Wynn-Williams:

Thank you for your email.

Yes, it will be perfectly fine for Mr. Naik to appear for you. If possible, you should also attend.

What time do you become available this evening?
<image001.jpg>

---

**From:** Sarah Wynn-Williams ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, March 9, 2026 5:55 AM
**To:** Marcus Quintanilla ▮▮▮▮▮▮▮▮▮▮    Ravi Naik▮▮▮▮▮▮▮▮▮▮
**Cc:** Will Thompson <will@lkcfirm.com>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email.

I think it is important for me to be represented in any hearing or conference. While I finalise instructions for my new counsel in the arbitration proceedings, can I please ask that my English lawyer, Ravi Naik, represents me. In addition, childcare commitments mean that I am not available at 7pm this evening.

I have copied Ravi into this email so he can engage directly.

Yours sincerely,

Sarah Wynn-Williams

On Sat, 7 Mar 2026 at 00:54, Marcus Quintanilla <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮> wrote:

Dear Ms. Wynn-Williams and Counsel:

The status conference set for this coming Monday will take place as scheduled. (I do not read in Ms. Wynn-Williams's comments anything suggesting her personal unavailability.)

At the status conference, we will not entertain argument on the merits of Claimant's request for sanctions, but I will seek to better understand the factual context, and I anticipate setting a schedule for the orderly handling of next steps.

Based on the materials currently of record, the authenticity of which Ms. Wynn-Williams does not dispute, Claimant's allegations are by no means trivial.

At the status conference, Ms. Wynn-Williams can also provide an update on when she expects counsel to appear on her behalf. At present, she remains self-represented.

IT IS SO ORDERED.

---

**From:** Sarah Wynn-Williams <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Sent:** Friday, March 6, 2026 2:36 PM
**To:** Marcus Quintanilla ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** Will Thompson <will@lkcfirm.com>; ICDR Erin Brennan ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email.

I have read the Claimant's letter and exhibits. I write to provide my preliminary observations for you, mindful that I am currently self-represented in this hearing.

Firstly, the Claimant's state that I have been engaged with "ongoing and flagrant violations of the Interim Award." I engaged in five speaking engagements only. I have no further public speaking engagements so there is no basis to claim an "ongoing" or concurrent issue.

Secondly, the Claimant has not presented any evidence of a violation as there is no violation. I was invited to speak at five small and curated events, in which I spoke about contemporary issues only. I did not – as the Claimant's exhibits show – violate the severance

Case 4:26-cv-06341-KAW    Document 28-1    Filed 07/06/26    Page 180 of 411

agreement, mention the book, or otherwise promote the book. For your information, the discussions were on the future of the internet (on issues such as the British government's approach to regulation of online services), Artificial Intelligence (including issues to do with large model providers, of whom OpenAI and Anthropic are the only actors the public are aware of) and the use of digital technology in warfare (a topic in which I have unique expertise from my ongoing work in technology after I left the Claimant). This is what the events were billed as covering and did cover.

Thirdly, the Claimant seems to be aware that I did not breach the Severance Agreement or Interim Award. They suggest I did so by "a wink and a nod". I do not know what a "wink or a nod" means but they do not provide evidence even for that. The highest they put matters is a photo of me with a book in the background. Of course, when I am speaking those that host the event may refer to the book. I cannot control third parties beyond telling them of my legal restrictions before I agree to speak. I was very deliberate to avoid any discussion of the Claimant to ensure there was no breach and did so.

Fourthly, if the Claimant was so concerned about these events they could have come to you before now. These five events have been promoted for a while and transparently so. There has been nothing clandestine about these speaking engagements because I understand I am allowed to speak on wider topics within my expertise. The Claimant is only coming to you after the event because they knew from the promotional material of the events that I would not be in breach of the Interim Award or the Severance Agreement. The material was clear that I would not be speaking in any way that violated the Interim Award, and I followed the contours of that rigorously. The Claimant's evidence is speculative at best.

Finally, I am unclear what "sanctions" the Claimant seeks as they do not detail them. I do not have any further public speaking engagements. Nevertheless, such a threat of sanctions is alarming for me and suggests that the Claimant is attempting to police my behaviour and restrict me even when I am *expressly not* discussing the Claimant nor otherwise engaging in conduct that may breach the severance agreement or Interim Award. I am an expert on technology issues and as such speak about technology issues. I have stuck to the Interim Award strictly for a year, at great personal impact. That has not been easy, but I have done it. The Claimant now comes to you to complain about a speculative and unevidenced breach.

I am further concerned that the Claimant is attempting to leverage the fact that their questions to me in discovery led to me being self-represented. Any discussion of sanctions in the absence of counsel would be very difficult and unfair for me, as it would involve legal discussions. To face repercussions of any sort without representation would be very detrimental. In contrast, there is no detriment to the Claimant in me securing counsel before any such hearing as I currently have no public engagements. Contrary to the Claimant's suggestion that I have not sought to instruct new counsel, I have spent a considerable amount of my own time doing so. This has been challenging due to the extent of the Claimant's legal representation/conflicts. I have made significant progress. I have identified counsel who has confirmed that they do not have a conflict and am in the process of establishing instructions with them. I would in fact hope to have counsel in place by the end of next week / early the week after. That is not a process that should be rushed given what has transpired before.

With that in mind, I would ask that any hearing is held until once I have my counsel in place. As before, there is no prejudice to the Claimant.

I am being as open with you and the Claimant as I can be through this email. In light of these matters, I would ask that any hearing is listed for when I have counsel. That hearing can then also address the future progression of the arbitration, which would be a more resourceful use of your and the Claimant's time.

Yours sincerely

Sarah Wynn-Williams

On Fri, Mar 6, 2026 at 12:41 AM Marcus Quintanilla ██████████████ wrote:

> Thank you, Mr. Thompson.
>
> Receipt confirmed.
>
> Ms. Wynn-Williams, please submit any written response that you deem appropriate by midnight (Pacific Time) tomorrow, March 6, 2026.
>
> The Parties are also requested to confirm their availability for a status conference to be held by Zoom from 12:00 pm to 12:30 pm (Pacific Time) on Monday, March 9, 2026.
>
> Please confirm receipt of this email at your earliest opportunity.
>
> <image001.jpg>
>
> ---
>
> **From:** Will Thompson <will@lkcfirm.com>
> **Sent:** Thursday, March 5, 2026 12:20:55 PM
> **To:** Marcus Quintanilla <██████████████>; Sarah Wynn-Williams <██████████████>
> **Cc:** ICDR Erin Brennan <██████████████ rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
> **Subject:** RE: Meta v Sarah Wynn-Williams
>
> Arbitrator Quintanilla,
>
> Attached please find a letter from counsel for Meta regarding the Interim Award.
>
> Best regards,
>
> Will
>
> **Will Thompson | Lehotsky Keller Cohn |** 2██████

**From:** Marcus Quintanilla <▮▮▮▮▮▮▮▮▮▮▮▮>
**Sent:** Wednesday, February 25, 2026 8:48 AM
**To:** Sarah Wynn-Williams <▮▮▮▮▮▮▮▮▮▮▮m>
**Cc:** ICDR Erin Brennan <▮▮▮▮▮▮▮▮▮▮▮▮▮▮; rosengartm@gtlaw.com; linhardta@gtlaw.com; kemplem@gtlaw.com; Will Thompson <will@lkcfirm.com>; Drew Waldbeser <drew@lkcfirm.com>; Todd Disher <todd@lkcfirm.com>; Jon Cohn <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Ms. Wynn-Williams:

No worries at all. You are right to clarify.

You have understood correctly.

All the best,

<image001.jpg>

---

**From:** Sarah Wynn-Williams <▮▮▮▮▮▮▮▮▮▮▮▮>
**Sent:** Wednesday, February 25, 2026 4:54:58 AM
**To:** Marcus Quintanilla <▮▮▮▮▮▮▮▮
**Cc:** ICDR Erin Brennan ▮▮▮▮▮▮▮▮▮▮▮▮; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email.

Just so I am sure, I take your email to mean that the matter will proceed as set out in your email of 20 February that:

1. The case-management dates and the timetable in Procedural Order No. 2 will not be altered.
2. The matter will proceed with me acting "in propria persona". I understand that to mean self-represented but please do confirm.
3. If and when I do instruct new counsel, they should make their formal appearance, and subsequent communications will be made through them.
4. There will be no follow-up status conference scheduled this week.

Sorry to follow up to confirm but I thought it best to be sure of the status.

Yours sincerely

Sarah

On Tue, Feb 24, 2026 at 8:07 PM Marcus Quintanilla ▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

Thank you, Ms. Wynn-Williams.

We will proceed as currently planned.

All the best,

**From:** Sarah Wynn-Williams ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, February 23, 2026 10:12:09 PM
**To:** Marcus Quintanilla <▮▮▮▮▮
**Cc:** ICDR Erin Brennan <▮▮▮▮▮▮▮▮▮▮▮▮>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>;
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email and apologies again for the mix up. I will provide my contact details to the ICDR.

By way of update, I can confirm that I have reached out to multiple lawyers and law firms, both large and boutique. I am finding that those firms are, whatever their size, conflicted. This is unexpected but based on the responses I think it stems from the size and scope of Meta's interests.

I am waiting on responses from a significant number of attorneys and among those I hope will receive a positive response. I also continue to reach out to new attorneys. As this matter requires a high level of trust from me and skill (and to avoid repeating the experience with Quinn), I want to be thorough and thoughtful with the process of selecting my new representative. It is important that I get the selection right. I believe that this measured approach will ultimately lead to the best outcome for all parties and the arbitration process.

I can confirm my agreement that neither party has yet made its document production to the other.

Finally, for my part I do not think we need to reschedule the status conference but I am happy to do so if you feel it is necessary or in any way helpful.

Yours sincerely

Sarah

On Fri, Feb 20, 2026 at 7:04 PM Marcus Quintanilla <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮> wrote:

> Dear Ms. Wynn-Williams:
>
> Thank you for your email.
>
> We waited for you to join the status conference for about 10 minutes and also tried to reach out to you by telephone, although we did not have a telephone number for you on file. (Ms. Brennan also has no record of your call to her.) I regret that there seems to have been a breakdown in communications.
>
> In any case, nothing transpired at the status conference, except that counsel for Meta confirmed that neither party has yet made its document production to the other. (If you disagree with that statement, please let me know.)
>
> As I explained during the hearing, it appears that the remaining case-management dates lie reasonably in the future, and that, at this point, there is no cause to alter the procedural timetable set forth in Procedural Order No. 2.
>
> I would ask that, not later than Monday, February 23, you advise all case participants whether you have obtained replacement counsel to represent you in the arbitration. If not, we will note in the case file that you are proceeding in propria persona. At that point, you should provide the ICDR with your telephonic contact information. If you have secured counsel, they should make their formal appearance, and subsequent communications will be made through them.

In view of the apparent mixup with the hearing link, I will be happy to schedule a follow-up status conference next week if you would like that.  Please let me know your preference with your next communication.

All the best,

<image001.jpg>

---

**From:** Sarah Wynn-Williams ██████████████████ >
**Sent:** Friday, February 20, 2026 10:38:51 AM
**To:** ICDR Erin Brennan <██████████████ >
**Cc:** Marcus Quintanilla <█████████████████████; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Regarding this, I never received any connecting/dial in details. I tried to contact Erin on the number below but there was no response/answer.

It is now late in the UK and my childcare is finishing (as I thought our status conference would have concluded by now).

Please let me know if I have somehow missed the connecting details, a thorough search of spam folders etc has not revealed anything.

Kind regards,

Sarah

On Wed, Feb 18, 2026 at 5:28 PM ICDR Erin Brennan <██████████████ > wrote:

> Thank you all, I will distribute the connecting details shortly.
>
> Best,
>
> Erin
>
> **ICDR Erin Brennan**
> Director ICDR
>
> American Arbitration Association
> International Centre for Dispute Resolution
> ████████████████████, Los Angeles, CA 90017
>
> adr.org | icdr.org | aaaicdrfoundation.org
> **Explore 100 Years of AAA**
>
> The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.
>
> **From:** Sarah Wynn-Williams ████████████████████

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate the information.

# Exhibit P

**AMERICAN ARBITRATION ASSOCIATION**
**EMPLOYMENT ARBITRATION DIVISION**

| | |
|---|---|
| In the Matter of the Arbitration between | |
| Meta Platforms, Inc., | Arbitration Case No.: 01-25-0001-2843 |
| *Claimant/Counterclaim Respondent,* | Arbitrator: Hon. Marcus Salvato Quintanilla |
| v. | |
| Sarah Wynn-Williams, | |
| *Respondent/Counterclaimant.* | |

**CLAIMANT META PLATFORMS, INC.'S**
**APPLICATION FOR SANCTIONS**

Claimant Meta Platforms, Inc., respectfully submits this application for sanctions against Respondent Sarah Wynn-Williams for violations of the Interim Award.

**INTRODUCTION**

On March 12, 2025, this tribunal issued an Interim Award prohibiting Respondent from "further promoting" her book, *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism*, "on a book tour or otherwise." Cohn Decl. Ex. A at 4 ("Interim Award"). Despite having notice of this straightforward command, Respondent repeatedly promoted her book through personal appearances at bookstores. In February and March 2026, Respondent spoke at several events where her book was prominently displayed and promoted. Promotional materials for these events offered the book for sale and even used the Interim Award as a mechanism to promote the book. And despite recently telling Claimant and this tribunal that she "ha[s] no further public speaking engagements," Respondent is slated to appear at a major literary festival as a featured speaker alongside two other prominent critics of Claimant.

Respondent's defense for these flagrant and knowing violations of the Interim Award is that she cannot "control third parties." But this application for sanctions is based on Respondent's own conduct, including her decision to appear at events designed to promote sales of her book—all scheduled to coincide with the release of a paperback version of the book. Sanctions are therefore warranted, not because third-party bookstores held events promoting Respondent's book, but because Respondent personally participated in the promotional events—conduct that squarely falls within and violates the Interim Award.

To enforce its Interim Award and ensure the integrity of this arbitral process, the tribunal should exercise its authority to impose monetary sanctions on Respondent.

## BACKGROUND

### I.  The Emergency Arbitrator prohibited Respondent from promoting her book.

When Claimant learned that Respondent intended to release a book disparaging Claimant, it sought emergency relief in this tribunal, in accordance with the parties' Severance Agreement. *See* App. for Emergency Relief at 5. After extensive briefing and argument, the Emergency Arbitrator found that Claimant had established a likelihood of success on its claim that Respondent had breached her Severance Agreement, and issued an Interim Award enjoining Respondent's conduct. Interim Award at 3. The Interim Award prohibits Respondent from "further promoting *Careless People* . . . on a book tour or otherwise," "from further publishing or distributing *Careless People*," and "to the extent within [Respondent's] control, from amplifying . . . in any forum all such previous 'disparaging, critical or otherwise detrimental comments." Interim Award at 4.

On March 18, 2025, Respondent moved to vacate the award. *See* Respondent's Mot. to Vacate Interim Award. On March 31, 2025, in a detailed, well-reasoned opinion, the emergency

2

arbitrator denied Respondent's motion to vacate. *See* Order on Mot. to Vacate Interim Award. The Interim Award remains in place today.

## II. Respondent violated the Interim Award by promoting her book throughout the UK in February and March 2026.

On March 3, 2026, Claimant learned that Respondent was scheduled to speak that day at a Waterstones bookstore—a U.K. national chain similar to Barnes & Noble—in Manchester, England. *See* Cohn Decl. Ex. B. In researching that event, Claimant discovered that Respondent had participated in other similar events on February 23, February 25, as well as March 2. *See* Cohn Decl. Ex. C-F. She was also scheduled to participate in another event on March 6. *See* Cohn Decl. Ex. G.

These events were scheduled on the heels of the book's paperback release in late February 2026. *See* Cohn Decl. Ex. C at 1 ("We are thrilled to welcome Sarah Wynn-Williams to Waterstones Nottingham to celebrate the release of the paperback edition of Careless People."). Each event has been hosted by a large national bookstore that sells her book. The ads for the events and many of the events themselves featured the book, often with Respondent nearby.

 

Cohn Decl. Ex. H at 1-3.



Cohn Decl. Ex. H at 4.



Cohn Decl. Ex. I at 3.

Sometimes the photo of the book was displayed side by side with a photo of Respondent in event promotional materials.



Cohn Decl. Ex. E at 1.

The events included "Ticket & Book" options by which an attendee could purchase a copy of *Careless People* with the ticket to the event. Cohn Decl. Ex. D at 2 (February 23 event promoting "Ticket & Book option which includes a copy of Careless People by Sarah Wynn-Williams"); Cohn Decl. Ex. F at 2 (February 25 event promoting "Book and ticket option" that "include[d] a copy of *Careless People*").

And the promotional materials for these events used the Interim Award itself to promote the book. For example, the March 6 event description, advertised as "Sarah Wynn-Williams CARELESS PEOPLE," includes a description of the book—noting it is "hugely praised" and "bestselling," but that "Meta secured a ruling . . . on publication day preventing [Respondent] from promoting the book:"



Cohn Decl. Ex. G at 1-2.

## III. Respondent misled the Arbitrator and Claimant about additional planned events to promote *Careless People*.

On March 5, 2026, Claimant submitted a letter to the Arbitrator that detailed Respondent's violations and asked Respondent to provide Claimant and this tribunal with information about the promotional events, including the number of her books sold at the events; the content of her remarks; payments received; and contracts and communications between her, her publishers, and hosts of the events regarding her appearance at the events. *See* Claimant March 5 Ltr. at 4. Respondent's response, sent the night of March 6—apparently shortly after that day's promotional event ended—stated that she "engaged in five speaking engagements only" and "ha[s] no further public speaking engagements so there is no basis to claim an 'ongoing' or concurrent issue" and "ha[s] no public engagements." Cohn Decl. Ex. J at 1.

6

Following the status conference held by this tribunal on March 12, Claimant learned that Respondent is slated to speak at the Hay Festival, a world-renowned, global festival for literature and the arts. *See* Cohn Decl. Ex. K. Respondent will appear at this prominent literary festival for a talk with Carole Cadwalladr, the British investigative journalist primarily known for her negative coverage of Claimant, and Tim Wu, another known critic of Claimant, to speak as someone "who understand[s] Big Tech from the inside." Cohn Decl. Ex. K. Although Claimant does not have extensive information about Respondent's event at the Hay Festival the event's promotional materials include a direct link to "Browse the Festival Bookshop," Cohn Decl. Ex. K, which offers *Careless People* for sale:



*See* Cohn Decl. Ex. L.[1]

---

[1] Claimant also learned that despite representing to this tribunal that she has "no public engagements," Respondent appeared as the Keynote Speaker at the Enterprise GC 2026 conference in London on March 9-10, speaking as "the author of the #1 New York Times bestseller Careless People." Cohn Decl. Ex. M. And Respondent's appearance at the Hay Festival was publicly

7

**IV. Respondent refused to provide relevant information about her promotional activities.**

Claimant has consistently sought information relevant to these events from Respondent. In its March 5, 2026, letter, Claimant requested specific information that would allow this tribunal to assess the extent of Respondent's wrongdoing. Claimant March 5 Ltr. at 4. Claimant reiterated that request during the March 12 status conference. Counsel then met and conferred over email and videoconference, but Respondent has refused to substantively respond to Claimant's request for information. *See generally* Cohn Decl. Ex. N. Respondent has not provided a single document to Claimant. Respondent has refused to provide any information about how she came to appear at these promotional events. She insists she has no contracts with the event hosts, *e.g.*, Cohn Decl. Ex. O at 1, and refuses to provide the contract with her publisher, which might cast light on how Respondent expected to promote her book before these proceedings began, Cohn Decl. Ex. O at 1 (first refusing to provide publisher contracts because Claimant requested that information "in th[e] discovery process"); Cohn Decl. Ex. P at 2 (then refusing to provide publisher contracts because they "cannot have any bearing" on her violations of the Interim Award). She also refuses to provide any documents or communications: (1) in which she was invited to participate in these events, (2) that described the events to her, or (3) in which she agreed to participate in the events. Cohn Decl. Ex. O at 2 (asserting the request is "unnecessary" and "overly broad" because it "relates to third parties"); Cohn Decl. Ex. P at 2 (asserting that because Respondent "was not involved" in planning the events, "[n]o such documents or communication relating to these requests can therefore exist"). With respect to the Hay Festival, the only information Respondent provided is that the event does not "reference the book *in any way*." Cohn Decl. Ex. Q at 2 (emphasis in original).

---

reported on March 9. *See* Emma Loffhagen, *Gisèle Pelicot and Nazanin Zaghari-Ratcliffe among Hay Festival 2026 speakers*, The Guardian (Mar. 9, 2026), https://perma.cc/67KT-3LHF.

As directed by this tribunal and in an attempt to engage with Respondent, counsel for Claimant proposed a meet and confer, which took place on March 23. *See* Cohn Decl. Ex. N at 2-3. Respondent's counsel confirmed Respondent would not produce any material in response to Claimant's requests. *See* Cohn Decl. Ex. N at 2-3. Respondent's counsel otherwise would not answer whether Respondent was in possession of contracts with the publishers; whether those contracts might say something about her promotional obligations for the book; or whether Respondent has any pertinent written communications about the events. *See* Cohn Decl. Ex. N at 2-3. In Respondent's view, Claimant has offered "no evidence of a violation" and otherwise failed to satisfy *its* disclosure obligations regarding Respondent's violations of the Interim Award— despite Claimant's previous submission to this tribunal and the fact that Claimant has no unique information about the promotional events Respondent personally attended. Cohn Decl. Ex. R at 2. Respondent's only request—made that morning shortly before the meet-and-confer—asked for material "relating to [Claimant's counsel] taking recording of an event." Cohn Decl. Ex. R at 2. Counsel for Claimant explained there were no recordings, only the first-hand knowledge of an attorney who attended the March 6 event, as well as a photograph—which depicts Respondent again appearing with the book. Cohn Decl. Ex. N at 3; *see* Thomas Decl. Ex. 1 at 1. Claimant provided Respondent with that photograph on March 23. Cohn Decl. Ex. N at 3; *see also* Thomas Decl. Ex. 1 at 1.[2]

---

[2] Respondent's counsel also refused to provide an update on Respondent's search for California counsel, despite his prior representation on March 12 that retention was "imminent." *See* Mar. 12, 2026 Order; *see also* Cohn Decl. Ex. N at 3.

**ARGUMENT**

**I.  Respondent violated the Interim Award and apparently intends to continue doing so.**

Respondent knowingly and intentionally violated the Interim Award. The Interim Award is clear: It "enjoins" Respondent "from further promoting" her book "on a book tour or otherwise" and from "distributing" her book. Interim Award at 3-4. There is nothing ambiguous about the Interim Award's prohibitions, and Respondent has acknowledged that the Interim Award requires her to "stop[] promoting" her book. Respondent's Emergency Mot. to Vacate Interim Award at 3.

Despite having notice of the Interim Award, Respondent subsequently participated in a coordinated effort to continue promoting her book. Respondent attended multiple promotional events that (1) coincide with the release of the paperback version of her book, (2) take place in bookstores selling her book, and (3) prominently featured the paperback version of her book. Those event descriptions likewise promoted the book by referring to the Interim Award Meta "secured . . . on publication day preventing [Respondent] from promoting the book." Cohn Decl. Ex. E at 2.

Claimant does not seek to hold Respondent responsible for the actions of third parties she cannot control.[3] But Respondent can control herself. She voluntarily (1) served as the speaker attracting audience members who purchased a ticket and her book in the same transaction, (2) posed for photographs featuring her book, which were later distributed online as further promotional materials, (3) appeared on stages with physical copies and photographs of her book, and (4) allowed her name, image, and likeness to be used in materials promoting the events and her book. Cohn Decl. Exs. B-I. Worse, Respondent apparently intends to continue violating the

---

[3] While Claimant does not dispute that there are certain third parties outside Respondent's control, the Interim Award enjoins not just Respondent but also "her agents, servants, employees, attorneys, and any other person(s) or entities for which she controls." Interim Award at 3.

Interim Award by participating in an upcoming literary festival where her book is being promoted for sale. *See* Cohn Decl. Exs. K-L.

Respondent contends that she did not "mention the book" at these events, Cohn Decl. Ex. J at 1, but Respondent applies an unreasonably strict interpretation of the prohibitions of the Interim Award. As a matter of common sense, promoting a book includes participating in an event featuring that book, where advertising for the event includes photos of the book, some attendees have purchased the book along with their tickets, and the rest can buy the book at the store hosting the event.

Respondent does not deny that she knew the nature of these events before she participated. Her steadfast refusal to explain what happened, or to otherwise produce any evidence relating to this topic, strongly suggests she knew ahead of time that the events were designed to promote her book. She certainly has offered no other explanation for why she agreed to participate in these events with no apparent compensation beyond whatever she receives from book sales. Cohn Decl. Ex. O at 1. But even if Respondent did not know how the first event would promote her book, she certainly knew by the end of that event. And yet, she kept participating in them, knowing her attendance would violate the Interim Award. After at least five events, Respondent cannot credibly deny responsibility for her continued participation. And if Respondent has an explanation for her conduct, she should provide it to this tribunal.

The reality is Respondent has no legitimate explanation for her knowing violations of the Interim Award. But to the extent she continues to fail to meaningfully engage with Claimant or the proceedings related to this dispute, this tribunal at the very least should draw an adverse inference from her failure to produce any communications related to her participation, or otherwise explain it. Tribunals have long applied "the venerable rule that a factfinder may draw an adverse

11

inference when a party fails to produce highly probative evidence that it could readily obtain if in fact such evidence exists." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 36 (2024). Under California law:

> In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case.

Cal. Evid. Code § 413. If the documents supported her story, she would have produced them. That she refused to produce anything speaks volumes.

## II. This tribunal should impose monetary sanctions.

Monetary sanctions are necessary to vindicate the authority of this tribunal. If the Interim Award is to serve its purpose and prevent irreparable harm to Claimant, repeated and intentional violations cannot be consequence-free. There is no doubt that the parties' contract and principles of law authorize imposition of appropriate monetary sanctions here.

### A. Sanctions are necessary to enforce the Interim Award.

The integrity of the arbitral process requires parties to follow arbitral orders. The only way to ensure compliance is to ensure non-compliance is costly for violators. For this reason, Claimant respectfully requests that the tribunal order Respondent to pay: (1) $1,500 per violation of the Interim Award, (2) Claimant's reasonable attorneys' fees and costs incurred in investigating and responding to Respondent's violations of the Interim Award; and (3) any revenues she derived from her violations. This would be consistent with California law on monetary sanctions, prevent Respondent from benefiting from her violations of the Interim Award, and ensure Claimant is not unduly burdened with costs stemming from Respondent's violations of the Interim Award.

At the March 12 status conference, Respondent suggested that the tribunal should delay consideration of these issues so that it can determine compliance with the Interim Award as part

12

of the merits hearing on Respondent's breaches of contract. That would conflate two issues that must be left separate: (1) sanctions for violations of an injunction and (2) damages for breach of contract (a determination to be made at the merits hearing, not now).

The propriety of sanctions for violating the Interim Award does not depend on the outcome of the merits hearing on contract issues. Just as "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings," *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947), so too for the Interim Award. Respondent's position violates "the established doctrine that persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." *GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 386 (1980).

Thus, even if Respondent eventually prevailed at the merits hearing (Claimant is confident she will not), that would not justify her sanctionable conduct in the meantime. A party must obey an injunction while it is in force, even if the injunction is later set aside. *See United Mine Workers of Am.*, 330 U.S. at 294 ("Violations of an order are punishable as criminal contempt even though the order is set aside on appeal.").

Otherwise, interim awards and preliminary injunctions would serve no purpose. If the only consequence Respondent faced for violating the Interim Award was the same monetary liability she would have faced in the absence of the Interim Award, then the Interim Award would have no marginal effect. But interim awards are meant to prevent irreparable harm even when the enjoined party feels confident it will eventually prevail on the merits. Thus, "[p]ersons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the

13

order is ultimately ruled incorrect." *Maness v. Meyers*, 419 U.S. 449, 458 (1975). There is therefore no reason to delay adjudication of the issue of sanctions.

### B.  This tribunal has authority to impose monetary sanctions.

Imposition of sanctions is well within the arbitrator's authority. First, the Severance Agreement's arbitration provision expressly authorizes the arbitrator to grant "injunctions and other relief" in any dispute arising out of the agreement. App. for Emergency Relief, McKenna Decl. Ex. A-1, § 16(d). Necessarily included in that power is the power to enforce such an award. Second, the Severance Agreement incorporates the AAA Employment Rules. *Id.* § 16(c), (d). Under AAA Employment Rule 39(d), an arbitrator may "grant any remedy or relief that would have been available to the parties had the matter been heard in court," which would include sanctions and other relief to enforce an injunction.[4]

### 1.  The contractual power to issue an injunction includes the power to enforce that injunction.

Arbitrators can issue sanctions under their "inherent authority to police the arbitration process and fashion appropriate remedies to effectuate this authority." *Hamstein Cumberland Music Group v. Williams*, 532 F. App'x 538, 543 (5th Cir. 2013) (per curiam) (rejecting the argument "that the arbitrator was not empowered to issue sanctions"). The authority to sanction is necessary to effectuate—and therefore included in—the arbitrator's power to grant "injunctions and other relief" under the Severance Agreement. *See, e.g.*, 2A C.J.S. Agency § 149 ("Agency powers that are incidental to those expressly granted will be implied insofar as they are necessary to carrying the express powers into effect[.]"); *Seagate Tech. LLC v. W. Digit. Corp.*, 854 N.W.2d 750, 754, 762-63 (Minn. 2014).

---

[4] The 2009 AAA Employment Arbitration Rules and Mediation Procedures apply. *See* Procedural Order 1.

In *Seagate*, the Minnesota Supreme Court recognized an arbitrator's authority to impose sanctions. Like the clause here, the arbitration clause there provided that "[t]he arbitrator may grant injunctions or other relief." *See id.* at 762. Punitive sanctions, the court reasoned, qualify as "relief" within the meaning of the arbitration clause because they redress misconduct and benefit the opposing party. *Id.* (citing *Relief*, Black's Law Dictionary 1482 (10th ed. 2014) (defining relief as "[t]he redress or benefit, esp[ecially] equitable in nature (such as an injunction or specific performance), that a party asks of a court")). *Seagate* aligns with the more general rule that arbitrators may provide any relief "rationally related" to the contract. *See also Advanced Micro Devices, Inc. v. Intel Corp.*, 9 Cal. 4th 362, 382 (1994).

### 2. The AAA Employment Rules and California law also authorize this tribunal to impose sanctions.

The Severance Agreement also authorizes sanctions by incorporating the AAA Employment Rules. Under the Employment Rules, the arbitrator is empowered to "grant any remedy or relief that would have been available to the parties had the matter been heard in court including awards of attorney's fees and costs, in accordance with applicable law." AAA Employment R. 39(d); *see also* R. 32. Again, in *Seagate*, where the arbitration clause likewise incorporated the 2009 AAA Employment Rules, the court recognized the arbitrator's sanction authority. 854 N.W.2d at 763.

Even more, incorporated California law authorizes sanctions for violations of an injunction. Under California law, every court has the power to "compel obedience to its judgments, orders, and process, and to the orders of a judge out of court, in an action or proceeding pending therein," Cal. Civ. Proc. Code § 128(a)(4); *see also* Cal. Civ. Proc. Code § 177(b) ("compel obedience to the officer's lawful orders as provided in this code"). Because a California court could sanction

15

Respondent's violation of a preliminary injunction, this tribunal can sanction her violation of the Interim Award.

In terms of specific sanctions, courts certainly have the power to impose specific monetary sanctions, disgorge profits, and shift attorneys' fees when they sanction litigants. California law gives judges "the power to impose reasonable money sanctions, not to exceed fifteen hundred dollars ($1,500), notwithstanding any other provision of law, payable to the court, for any violation of a lawful court order by a person, done without good cause or substantial justification." Cal. Civ. Proc. Code § 177.5. "[U]se of profits as a measure for the contempt sanction is hardly a novel proposition." *Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004 (9th Cir. 2004). And "[t]he Court has discretion to 'decide whether an award of fees and expenses is appropriate as a remedial measure.'" *Black Lives Matter L.A. v. City of Los Angeles*, No. 2:20-cv-05027, 2026 WL 414801, at *4 (C.D. Cal. Jan. 15, 2026) (quoting *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985)).

California courts recognize that arbitrators can exercise these same powers. In *David v. Abergel*, the parties' arbitration agreement gave the arbitrator the power to "grant any remedy or relief to which a party is entitled under California law." 46 Cal. App. 4th 1281, 1282-83 (1996). The arbitrator imposed substantial monetary sanctions, which the California Court of Appeal upheld because the court "presume[d] [the parties] meant what they said" when granting the arbitrator power to award "any remedy or relief" available under California law. *Id.* at 1283; *see also Bak v. MCL Fin. Grp., Inc.*, 170 Cal. App. 4th 1118, 1121 (2009) (affirming confirmation of arbitral award and rejecting argument that "the arbitrators exceeded their powers by ordering [the appellant] to pay $7,500 in sanctions as a result of his conduct during a prehearing dispute over the production of documents"); *WFP Sec., Inc. v. Davis*, No. B244528, 2014 WL 1465181, at *10

16

(Cal. Ct. App. Apr. 15, 2014) ("The propriety of the arbitrators' decision to impose a discovery sanction is not subject to judicial review.").

### III. This tribunal should order Respondent to disclose relevant information.

Though the publicly available evidence is sufficient to demonstrate Respondent's sanctionable conduct, information in her possession is necessary to determine the extent to which she profited from her violations of the Interim Award. Because Respondent has failed to provide that information to either Claimant or the tribunal, Claimant cannot yet quantify its request for disgorgement. But based on Respondent's own previous representation to this tribunal, promoting her book does affect her income. *See* Mot. to Vacate Interim Award at 3 (claiming that not "promoting or speaking about her" book "is causing her ongoing financial losses"). Claimant therefore respectfully requests that Respondent be ordered to produce the contract with her publishers that establishes her compensation and answer questions about income associated with these events, including from the sale of books related to these events.

The additional information that Respondent has withheld is primarily relevant to the extent of her culpability. The tribunal certainly could order Respondent to provide that information, but at this stage, the simpler course is to draw an adverse inference from Respondent's failure to explain herself. If the documentary evidence in her possession made her conduct appear more reasonable, she surely would have shared it before now.

### RELIEF REQUESTED

For the reasons given, Claimant respectfully requests:

1. Monetary sanctions of $1,500 per past event that violated the Interim Award ($7,500 total);
2. Claimant's reasonable attorney's fees in responding to Respondent's violations of the Interim Award; and
3. Disgorgement of any money Respondent made from these events, including from book sales, to be determined based on information Respondent should be ordered to disclose.

Dated: March 27, 2026

Respectfully submitted.

*/s/ Mathew S. Rosengart*

Mathew S. Rosengart
Mark D. Kemple
Alex Linhardt
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

*Attorneys for Claimant*

*/s/ Jonathan F. Cohn*

Jonathan F. Cohn
Mary Elizabeth Miller
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
jon@lkcfirm.com

William T. Thompson
Alexis Swartz
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735

Drew F. Waldbeser
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Meredith R. Pottorff
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206

*Attorneys for Claimant*

18

**American Arbitration Association**

In the Matter of the Arbitration between

Meta Platforms, Inc.,

    *Claimant/Counterclaim Respondent*,

v.

Sarah Wynn-Williams,

    *Respondent/Counterclaimant.*

Arbitration Case No.: 01-25-0001-2843

Arbitrator: Hon. Marcus Salvato Quintanilla

**DECLARATION OF JONATHAN F. COHN**

I, Jonathan F. Cohn hereby declare as follows:

1.    I am a Partner at Lehotsky Keller Cohn LLP and counsel representing Claimant Meta in this arbitration. I am a member in good standing of the bar of the State of New York.

2.    I respectfully submit this declaration in support of Claimant Meta's Application for Sanctions.

3.    Attached hereto as **Exhibit A** is a true and correct copy of the March 12, 2025 Interim Award.

4.    Attached hereto as **Exhibit B** is a PDF and screenshot of a webpage promoting a March 3, 2026, event with Respondent, taken from https://stayhappening.com/e/reclaiming-the-internet-sarah-wynn-williams-at-waterstones-deansgate-E118SAU3V0PXA.

5.    Attached hereto as **Exhibit C** is a PDF of a post from an Instagram Account "waterstonesnotts" promoting February 25, March 2, and March 3, 2026 events with Respondent, taken from https://www.instagram.com/p/DTxnlRdjQy3/.

1

6. Attached hereto as **Exhibit D** is a PDF and screenshot of a webpage promoting a February 23, 2026, event with Respondent, taken from https://www.eventbrite.co.uk/e/sarah-wynn-williams-in-conversation-with-nicola-sturgeon-tickets-1981011648167.

7. Attached hereto as **Exhibit E** are screenshots of a post from an Instagram Account "blackwelledin" promoting a February 23, 2026, event with Respondent, taken from https://www.instagram.com/p/DT2vz1PCC0A/?hl=en.

8. Attached hereto as **Exhibit F** is a PDF and screenshot of a webpage promoting a February 25, 2026, event with Respondent, taken from https://www.eventbrite.co.uk/e/sarah-wynn-williams-armando-iannucci-at-conway-hall-wc1-tickets-1981015000193.

9. Attached hereto as **Exhibit G** is a PDF and screenshot of a webpage promoting a March 6, 2026, event with Respondent, taken from https://www.eventbrite.co.uk/e/sold-out-sarah-wynn-williams-careless-people-with-stephanie-merritt-tickets-1980362540669.

10. Attached hereto as **Exhibit H** are screenshots of a post from an Instagram Account "oliviapetter" promoting a March 2, 2026, event with Respondent, taken from https://www.instagram.com/p/DVZTe9sjaKC/?img_index=3.

11. Attached hereto as **Exhibit I** are screenshots of a post from an Instagram Account "thetalkingheads_podcast" promoting a February 25, 2026, event with Respondent, taken from https://www.instagram.com/p/DVPDCCSjD9O/.

12. Attached hereto as **Exhibit J** is a PDF of a March 6, 2026 email providing Respondent's response to Claimant's March 5, 2026 letter.

13. Attached hereto as **Exhibit K** is a PDF of a webpage promoting Respondents slated speaking event at the Hay Festival, taken from https://www.hayfestival.com/p-25476-tim-wu-and-sarah-wynn-williams-talk-to-carole-cadwalladr.aspx.

2

14.     Attached hereto as **Exhibit L** is a PDF taken from the 2026 Hay Festival Bookshop, taken from https://uk.bookshop.org/lists/hay-festival-2026?new-list-page=true&page=4.

15.     Attached hereto as **Exhibit M** is a PDF taken from a post by Legal 500 on LinkedIn, taken from https://www.linkedin.com/posts/legal500_enterprisegc-inhousecounsel-legalleadership-activity-7422609465386008577-JdFA.

16.     Attached hereto as **Exhibit N** is a PDF of emails exchanged between Claimant's and Respondent's counsel from March 17, 2026 to March 26, 2026.

17.     Attached hereto as **Exhibit O** is a PDF of a March 18, 2026 letter sent by Respondent's counsel to Claimant's counsel.

18.     Attached hereto as **Exhibit P** is a PDF of a March 20, 2026 letter sent by Respondent's counsel to Claimant's counsel.

19.     Attached hereto as **Exhibit Q** is a PDF of a March 25, 2026 letter sent by Respondent's counsel to Claimant's counsel.

20.     Attached hereto as **Exhibit R** is a PDF of a March 23, 2026 letter sent by Respondent's counsel to Claimant's counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 27, 2026, in Dublin, Ireland.

*/s/ Jonathan F. Cohn*

Jonathan F. Cohn
jon@lkcfirm.com
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001
T: ████████

3

# Exhibit A

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
Emergency International Arbitral Tribunal

Meta Platforms, Inc.,

    *Claimant,*

v.

Sarah Wynn-Williams; Macmillan
Publishers; Flatiron Books,

    *Respondents.*

No. 01-25-0001-2843

## INTERIM AWARD

I, Nicholas A. Gowen, the undersigned Emergency Arbitrator, having been designated in accordance with the arbitration agreement entered into between the parties and dated September 06, 2017, and having been duly sworn, and having duly heard the proofs and allegation of the parties, do hereby, award as follows:

The International Centre for Dispute Resolution ("ICDR"), the international division of the American Arbitration Association ("AAA"), appointed the undersigned pursuant to Section O-2 of the Optional Rules for Emergency Measures of Protection of the AAA Employment Arbitration Rules to rule on Claimant's application for emergency relief. The Optional Rules were incorporated into the parties' arbitration agreement.

This dispute arises between Claimant, Meta Platforms, Inc. (represented by Lehotsky Keller Cohn LLP & Greenberg Traurig LLP) and Respondents, Sarah Wynn-Williams (having failed to appear after notice was provided by email sent to her last known email address); and Macmillian Publishers and Flatiron Books (collectively, "Macmillian")[1] (represented by Jassy Vick Carolan LLP, but objecting to the jurisdiction of the ICDR/AAA), and governed by the

---

[1] According to their counsel, both are DBAs for Macmillian Publishing Group, LLC.

1

arbitration agreement between Claimant and Respondent Wynn-Williams found in the Severance Agreement dated September 06, 2017.

## CLAIMANT'S APPLICATION FOR EMERGENCY RELIEF

On March 7, 2025, Claimant filed an Emergency Motion seeking interim and emergency measures pursuant to AAA Employment Rule 0-4 concerning the publication of *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism*. On March 10, 2025, the Emergency Arbitrator was appointed and scheduled an emergency telephonic hearing with the parties to occur on March 11, 2025 at 3:15 p.m. (CT) / 4:15 p.m. (ET). On March 11, 2025, the Emergency Arbitrator held the telephonic hearing. Claimant, through its counsel, appeared and presented oral argument. Respondent Wynn-Williams did not appear, despite notice being provided by email. Respondent Macmillian, through its counsel, did specially appear (while preserving its objections to jurisdiction) and was provided the opportunity to be heard, and argued, among other points, that the Emergency Arbitrator did not have jurisdiction over Respondent Macmillian, and that Respondent Macmillian should not be specifically named in this award.

On March 12, 2025 at 11:16 a.m. (ET), the Emergency Arbitrator informed the parties that he would provide Respondent Wynn-Williams additional time until 9:00 a.m. (ET) on March 13, 2025 to file any written objection to Claimant's Motion. Shortly thereafter at 12:19 p.m. (ET), Claimant provided the Arbitrator and the parties additional evidence regarding Respondent Wynn-Williams knowledge of the proceedings. On the morning of March 12, 2025, Respondent Wynn-Williams apparently appeared on a popular podcast where she discussed her book and Claimant's attempts to "shut this book down." The Emergency Arbitrator will consider Claimant's March 12 submission of the podcast's partial transcript as a further exhibit in support of its Emergency

2

Motion. Accordingly, the Emergency Arbitrator finds that Respondent Wynn-Williams is on notice of this emergency proceeding.

The Emergency Arbitrator will not wait to issue a ruling until after 9:00 a.m. (ET) on March 13, 2025, as that delay is unnecessary, and strikes his March 12 order.

### EMERGENCY ARBITRATOR'S FINDINGS

The Emergency Arbitrator finds that he has jurisdiction over the dispute between the signatory parties, Claimant and Respondent Wynn-Williams.

The Emergency Arbitrator finds that Respondent Wynn-Williams received reasonable notice and a reasonable opportunity to be heard but did not appear at the emergency hearing. Accordingly, the Arbitrator determines that Rule O-3 has been satisfied.

The Emergency Arbitrator makes no factual findings as to Respondent Macmillian.

The Emergency Arbitrator finds that, after reviewing the briefs and hearing oral argument, Claimant has established a likelihood of success on the merits of its contractual non-disparagement claim against Respondent Wynn-Williams, and that immediate and irreparable loss will result in the absence of emergency relief.

For the reasons stated above, I award as follows:

### INTERIM AWARD

The Emergency Arbitrator grants the Claimant's application for emergency relief and enjoins Respondent Wynn-Williams, her agents, servants, employees, attorneys, and any other person(s) or entities for which she controls as follows:

1. from making orally, in writing, or otherwise any "disparaging, critical or otherwise detrimental comments to any person or entity concerning [Meta], its officers, directors or employees; the products, services or programs provided or to be provided by [Meta];

3

the business affairs, operation, management or the financial condition of [Meta]; or the circumstances surrounding [her] employment and/or separation of employment from [Meta]," except as permitted by Sections 4 and 9 of the Severance Agreement and regardless of whether Ms. Wynn-Williams believes her statements are true or false;

2.  from further promoting *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism* on a book tour or otherwise, including with respect to electronic and audio versions of the book;

3.  to the extent within Respondent Wynn-Williams' control, from further publishing or distributing *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism*, including with respect to electronic and audio versions of the book;

4.  to the extent within Respondent Wynn-Williams' control, from amplifying or repeating in any forum all such previous "disparaging, critical or otherwise detrimental comments," regardless of whether Ms. Wynn-Williams believes her statements are true or false;

5.  to the extent within Respondent Wynn-Williams' control, retract all such previous "disparaging, critical or otherwise detrimental comments" from all forums, including online, on which they appear.

Nothing in this order shall be construed to "prevent or prohibit" Respondent Wynn-Williams from "filing a claim with a federal, state, or local government agency that is responsible for enforcing a law on behalf of the government," as authorized by Section 4 of the Severance Agreement. Nothing in this order shall be construed to "deter or prevent" Respondent Wynn-

4

Williams from "cooperating with or providing information to such a governmental agency during the course of its investigation or during litigation," as authorized by Section 4 of the Severance Agreement. *Id.* And nothing in this order shall be construed to prohibit Respondent Wynn-Williams from giving "any testimony … truthfully under oath or as required by any other legal proceeding," as authorized by Section 9 of the Severance Agreement.

The Emergency Arbitrator's fees shall be borne by Claimant, pursuant to the terms of the arbitration agreement.

This Interim Award shall be binding on the parties and shall remain in effect until and unless modified or vacated by the merits tribunal, once appointed.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the recognition and Enforcement of Foreign Arbitral Awards, this Interim Award was made in Los Angeles, California, United States of America.

Dated: March 12, 2025

Nicholas A. Gowen,
Emergency Arbitrator

State of Illinois       )
                        )  SS:
County of Cook          )

I, Nicholas A. Gowen, do hereby affirm upon my oath as Emergency Arbitrator that I am the individual described in and who executed this instrument, which is my Interim Award.

3/12/2025

Date

Nicholas A. Gowen, Emergency Arbitrator

5

State of Illinois       )
                        )   SS:

County of Cook       )

On this 12th day of March, 2025, before me personally came and appeared Nicholas A. Gowen, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____

Notary Public

OFFICIAL SEAL
GRACIELA BALDERAS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 5/30/2025

6

# Exhibit B

 Click on allow to subscribe to notifications
Stay updated with the latest happenings on our site

Later        Allow

# Reclaiming the Internet: Sarah Wynn-Williams at Waterstones Deansgate

**TUE MAR 03 2026 AT 06:30 PM TO 07:30 PM UTC+00:00**

**Waterstones | Manchester**

 Publisher/Host
**Waterstones**

↥ share



Advertisement

ADVERTISEMENT

Sarah Wynn-Williams joins us to share her thoughts and invite engagement on an urgent conversation: how did we lose control of the Internet?

**About this Event**

**Sarah Wynn-Williams'** *Careless People* was one of the non-fiction sensations of 2025. A hugely praised - and award winning - bestselling account of Sarah's time as Global Policy Director at Facebook, Meta secured a ruling against Sarah on publication day preventing her from promoting the book, or indeed saying anything critical or 'otherwise detrimental' about Meta. Due to these ongoing legal restrictions, Sarah is barred from speaking about her book or from saying anything negative about her former employer.

Instead, Sarah will join us to share her thoughts and invite engagement on a wider, more urgent conversation: how did we lose control of the Internet, and is it possible to reclaim it? How can we protect children's online safety in the age of AI? From the decay of the online world to the new geopolitics of AI, as power shifts from governments to platforms, this is a rare chance to hear from a woman who has stood at the nexus of global diplomacy and big-tech power—and lived to share the tale at great personal cost.

**Due to the ongoing legal restrictions, Sarah isn't able to sign copies of** *Careless People*.

Agenda

🕐: 06:00 PM
**Doors**
🕐: 06:30 PM - 07:30 PM
**Talk + Audience Q&A**

Advertisement
ADVERTISEMENT

**Event Venue & Nearby Stays**

◉ Waterstones, 91 Deansgate, Manchester, United Kingdom



## Discover more events by tags:

Technology in Manchester    Artificial-intelligence in Manchester

Data-science in Manchester    Machine-learning in Manchester

Cyber-security in Manchester    Virtual-reality in Manchester    Journalism in Manchester

Books in Manchester    Writing in Manchester    Education in Manchester

Nonprofit in Manchester

## Ask AI if this event suits you:

ChatGPT    Perplexity    Claude

# **Exhibit C**



**waterstonesnotts** • Follow
Waterstones Nottingham

**waterstonesnotts** 9w
We are thrilled to welcome Sarah Wynn-Williams to Waterstones Nottingham to celebrate the release of the paperback edition of Careless People. Join us on Monday 2nd March at 6:30pm.

Sarah Wynn-William's Careless People was one of the non-fiction sensations of 2025. A hugely praised - and award winning - bestselling account of Sarah's time as Global Policy Director at Facebook, Meta secured a ruling against Sarah on publication day preventing her from promoting the book, or indeed saying anything critical or 'otherwise detrimental' about Meta.

Due to these ongoing legal restrictions, Sarah is barred from speaking about her book or from saying anything negative about her former employer. Instead, Sarah will join us to share her thoughts

♡ 22

January 21

Log in to like or comment.

---

More posts from waterstonesnotts

See more posts

Meta   About   Blog   Jobs   Help   API   Privacy   Consumer Health Privacy   Terms   Locations   Instagram Lite   Meta AI   Threads   Contact Uploading & Non-Users   Meta Verified

English ∨   © 2026 Instagram from Meta

# Exhibit D

 

Q  ◉ Overland Park  Q    Find Events    Create E





**ⓘ EVENT ENDED**

↑  ♡

# Sarah Wynn-Williams in conversation with Nicola Sturgeon

**Sales ended**
Mon, Feb 23 • 7 pm

Explore similar events

 Blackwell's
By **Edinburgh South Bridge**

Follow

◉ Nicolson Square Venues • Edinburgh, Edinburgh

▦ Monday, Feb 23 from 7 pm to 8 pm

## Overview

Join Sarah Wynn-Williams as she talks to Nicola Sturgeon

Join **Sarah Wynn-Williams** on **Monday 23rd February, 7pm** at **Nicolson Square Venues** as she talks to **Nicola Sturgeon.**

ℹ️ EVENT ENDED

# Sarah Wynn-Williams in conversation with Nicola Sturgeon

 By Blackwell's Edinburgh South Bridge        Follow

📍 Nicolson Square Venues · Edinburgh, Edinburgh

🗓 Monday, Feb 23 from 7 pm to 8 pm

## Overview

Join Sarah Wynn-Williams as she talks to Nicola Sturgeon

Join **Sarah Wynn-Williams** on **Monday 23rd February, 7pm** at **Nicolson Square Venues** as she talks to **Nicola Sturgeon**.

Sarah Wynn-William's Careless People was one of the non-fiction sensations of 2025. A hugely praised - and award winning - bestselling account of Sarah's time as Global Policy Director at Facebook, Meta secured a ruling against Sarah on publication day preventing her from promoting the book, or indeed saying anything critical or 'otherwise detrimental' about Meta. Due to these ongoing legal restrictions, Sarah is barred from speaking about her book or from saying anything negative about her former employer. Instead, Sarah will join us to share her thoughts and invite engagement on a wider, more urgent conversation: how did we lose control of the Internet, and is it possible to reclaim it? How can we protect children's online safety in the age of AI? From the decay of the online world to the new geopolitics of AI, as power shifts from governments to platforms, this is a rare chance to hear from a woman who has stood at the nexus of global diplomacy and big-tech power—and lived to share the tale at great personal cost.

**Book your tickets today!**

-

**Tickets are £9** and there is a Ticket & Book option which includes a copy of Careless People by Sarah Wynn-Williams. Due to legal restrictions Sarah will be unable to sign copies of her book.

.If you have any concerns about accessibility, please do get in touch and we will do our best to accommodate your needs.

Refunds are reviewed on a case-by-case basis, we are unable to offer a refund after the event.

For more information please contact the Blackwell's events team on 0131 622 8222 or matthew.land@waterstones.com

**Read less**

# Exhibit E

# Instagram

Log In    **Sign Up**



 **blackwelledin** · Follow     ···

 **blackwelledin** 5w
Join Sarah Wynn-Williams on Monday 23rd February at 7pm as she talks to Nicola Sturgeon.

*Venue to be announced*

Sarah Wynn-William's Careless People was one of the non-fiction sensations of 2025. A hugely praised - and award winning - bestselling account of Sarah's time as Global Policy Director at Facebook, Meta secured a ruling against Sarah on publication day preventing her from

      

January 23

Log in to like or comment.

**More posts from blackwelledin**

*Instagram*

Log In     **Sign Up**



 **blackwelledin** · Follow     ···

secured a ruling against Sarah on publication day preventing her from promoting the book, or indeed saying anything critical or 'otherwise detrimental' about Meta.

Due to these ongoing legal restrictions, Sarah is barred from speaking about her book or from saying anything negative about her former employer. Instead, Sarah will join us to share her thoughts and invite engagement on a wider, more urgent conversation: how did we lose control of the Internet, and is it

       

January 23

Log in to like or comment.

More posts from **blackwelledin**

# Instagram

Log In    **Sign Up**



 **blackwelledin** · Follow    ···

former employer. Instead, Sarah will join us to share her thoughts and invite engagement on a wider, more urgent conversation: how did we lose control of the Internet, and is it possible to reclaim it? How can we protect children's online safety in the age of AI? From the decay of the online world to the new geopolitics of AI, as power shifts from governments to platforms, this is a rare chance to hear from a woman who has stood at the nexus of global diplomacy and big-tech power—and lived to share the tale at great personal cost.

      

January 23

Log in to like or comment.

More posts from **blackwelledin**

# Exhibit F

  eventbrite 🔍   📍 Overland Park   🔍   **Find Events**    **Create**



# Waterstones Events

Visit waterstones.com/events to find more events in your area, including:

Author talks, Quizzes, Book groups, Film screenings, Storytimes & Activities for children, Signings and more ...

ℹ️ **EVENT ENDED**

# Sarah Wynn-Williams & Armando Iannucci at Conway Hall, WC1

**Sales ended**
Wed, Feb 25 • 7:... pm

**Explore similar events**

 By **Waterstones**    **Follow**

📍 Conway Hall • London, England
📅 Wednesday, Feb 25 at 7:30 pm

**View all event details**

 **EVENT ENDED**



# Sarah Wynn-Williams & Armando Iannucci at Conway Hall, WC1

 By **Waterstones**     Follow

⊙ Conway Hall · London, England

▤ Wednesday, Feb 25 at 7:30 pm

**Sales ended**
Wed, Feb 25 · 7:30 pm

**Explore similar events**

## Overview

Sarah Wynn-Williams & Armando Iannucci discuss: how did we lose control of the Internet, and is it possible to reclaim it?

Sarah Wynn-Williams's *Careless People* was one of the non-fiction sensations of 2025. A hugely praised - and award winning - bestselling account of Sarah's time as Global Policy Director at Facebook, Meta secured a ruling against Sarah on publication day preventing her from promoting the book or indeed saying anything critical or 'otherwise detrimental' about Meta.

Due to these ongoing legal restrictions, Sarah is barred from speaking about her book or from saying anything negative about her former employer. Instead, Sarah will join in conversation with **Armando Iannucci** on a wider, more urgent subject: how did we lose control of the Internet, and is it possible to reclaim it?

From the decay of the online world to the new geopolitics of AI, as power shifts from governments to platforms, this is a rare chance to hear from a woman who has stood at the nexus of global diplomacy and big-tech power—and lived to share the tale at great personal cost.

Please note: Book and ticket option includes a copy of *Careless People* (RRP. £10.99) available for collection at the event. Due to the ongoing legal restrictions, Sarah is not able to sign copies of *Careless People*.

**Read less**

# Exhibit G

 eventbrite     🔍     📍  Overland Park     🔍     Find Events     Create



**⊘ SOLD OUT**     **⏳ SALES END SOON**                    ⬆️    ♡

# *SOLD OUT* Sarah Wynn-Williams CARELESS PEOPLE with Stephanie Merritt

| | |
|---|---|
| **Sold out** Fri, Mar 6 • 5:30 pm | Explore similar events |

 Blackwell's, By **Broad Street Oxford**          Follow

📍 Blackwell's Bookshop • Oxford, England

📅 Friday, Mar 6 from 5:30 pm to 6:30 pm

## Overview

Join us for an evening with Sarah Wynn-Williams at Blackwell's Oxford in conversation with Stephanie Merritt.

**Careless People**
Sarah Wynn-Williams's Careless

SOLD OUT    ⧖ SALES END SOON

# *SOLD OUT* Sarah Wynn-Williams CARELESS PEOPLE with Stephanie Merritt

 By Blackwell's, Broad Street Oxford    Follow

⊙ Blackwell's Bookshop · Oxford, England

▦ Friday, Mar 6 from 5:30 pm to 6:30 pm

Sold out
Fri, Mar 6 · 5:30 pm

**Explore similar events**

## Overview

Join us for an evening with Sarah Wynn-Williams at Blackwell's Oxford in conversation with Stephanie Merritt.

Careless People
Sarah Wynn-Williams's Careless People was one of the non-fiction sensations of 2025. A hugely praised - and award winning - bestselling account of Sarah's time as Global Policy Director at Facebook, Meta secured a ruling against Sarah on publication day preventing her from promoting the book, or indeed saying anything critical or 'otherwise detrimental' about Meta.

Due to these ongoing legal restrictions, Sarah is barred from speaking about her book or from saying anything negative about her former employer. Instead, Sarah will join us to share her thoughts and invite engagement on a wider, more urgent conversation: how did we lose control of the Internet, and is it possible to reclaim it? From the decay of the online world to the new geopolitics of AI, as power shifts from governments to platforms, this is a rare chance to hear from a woman who has stood at the nexus of global diplomacy and big-tech power—and lived to share the tale at great personal cost.

Sarah Wynn-Williams

Sarah Wynn-Williams is a former New Zealand diplomat and international lawyer. She joined Facebook after pitching a job and worked there for many years, ultimately becoming director of global public policy. After leaving the company, she has continued to work on tech policy, including artificial intelligence.

Stephanie Merritt

Stephanie Merritt is the author of 14 books, including the bestselling Elizabethan historical crime series written as SJ Parris, which has sold over a million copies in the UK. She is a former Deputy Literary Editor of The Observer, where she continues to contribute articles on books and current affairs, and has written for a variety of other newspapers and magazines. She appears regularly on Radio 4 and as chair and presenter at literary and arts festivals, including the Hay, Cheltenham and Edinburgh book festivals. Her most recent novel is Traitor's Legacy, which was a Sunday Times Top 10 bestseller.

 Read less

# Exhibit H

# Instagram

Log In     **Sign Up**




**oliviapetter** ✔ • Follow
Waterstones Nottingham

• • •

**oliviapetter** ✔ Edited • 21h
What a privilege it was to interview
Sarah Wynn-Williams this evening
@waterstonesnotts – books like this
don't come around very often,
particularly ones that lead to gagging
orders that silence their authors. In
fear of getting this post shadow
banned, I'll refrain from naming
Sarah's former employer or going into
her allegations, which speak for
themselves (read the book!). I'm
grateful to live in a world where
women like Sarah are holding the

♡ 51   💬 3   ✈

21 hours ago

Comments on this post have been limited.

**More posts from** oliviapetter

Instagram    Log In    Sign Up



**oliviapetter**  • Follow
Waterstones Nottingham

employer or going into her allegations, which speak for themselves (read the book!). I'm grateful to live in a world where women like Sarah are holding the most powerful people to account, often at their own expense, in the name of exposing the insidious underbelly of the tech companies that define and dictate our lives. There are plenty of reasons to be optimistic. And Sarah's book is most certainly one of them. Read it and see for yourself. Given we couldn't speak directly about the book or its contents due to the gagging order, our conversation centred around how AI firms are shaping global policies, the tech industry's hypocrisy with regards to parenting, 'feminism' being exposed as internalised misogyny, and whether AI really does hate women, alongside so much else. Thank you for having me @panmacmillan 📚

 51    3

22 hours ago

Comments on this post have been limited.



**oliviapetter** ✓ • Follow

Waterstones Nottingham



**oliviapetter** ✓ Edited • 1d

What a privilege it was to interview Sarah Wynn-Williams this evening @waterstonesnotts – books like this don't come around very often, particularly ones that lead to gagging orders that silence their authors. In fear of getting this post shadow banned, I'll refrain from naming Sarah's former employer or going into her allegations, which speak for themselves (read the book!). I'm grateful to live in a world where women like Sarah are holding the most powerful people to account, often at their own expense, in the name of exposing the insidious underbelly of the tech companies that define and dictate our lives. There are plenty of reasons to be optimistic. And Sarah's book is most certainly one of them. Read it and see for

 51   3

1 day ago

Comments on this post have been limited.



**oliviapetter** ✔ • Follow
Waterstones Nottingham

• • •



**oliviapetter** ✔ Edited • 1d
What a privilege it was to interview
Sarah Wynn-Williams this evening
@waterstonesnotts – books like this
don't come around very often,
particularly ones that lead to gagging
orders that silence their authors. In
fear of getting this post shadow
banned, I'll refrain from naming
Sarah's former employer or going into
her allegations, which speak for
themselves (read the book!). I'm
grateful to live in a world where
women like Sarah are holding the
most powerful people to account,
often at their own expense, in the
name of exposing the insidious
underbelly of the tech companies that
define and dictate our lives. There are
plenty of reasons to be optimistic.
And Sarah's book is most certainly
one of them. Read it and see for

♡ 51    💬 3    ▽                    🔖

1 day ago

Comments on this post have been limited.

# Exhibit I

# Instagram

Log In    Sign Up



**thetalkingheads_podcast** · Follow ···

**thetalkingheads_podcast** 4d
Thanks to @waterstones for a great evening listening to a conversation driven by @armando.iannucci with the magnificent Sarah Wynn-Williams! For someone who has worked at the summit of tech, minded of some pretty hairy moments and even hairier consequences if in the hands of bad actors Sarah's continued cautious optimism towards the future of tech was thought provoking. Although we are in an age where there is a dissipation of accuracy and a paradigm of attention politics it's a

♡ 7  ◯  ▷                                    🔖

4 days ago

Log in to like or comment.

**More posts from thetalkingheads_podcast**



**thetalkingheads_podcast** • Follow  •••

evening listening to a conversation driven by @armando.iannucci with the magnificent Sarah Wynn-Williams! For someone who has worked at the summit of tech, minded of some pretty hairy moments and even hairier consequences if in the hands of bad actors Sarah's continued cautious optimism towards the future of tech was thought provoking. Although we are in an age where there is a dissipation of accuracy and a paradigm of attention politics it's a reminder of how the conversations around tech need to be much more sophisticated. Sarah's Careless People is most certainly worthy of a read that I have personally enjoyed. From the outset she takes you on her personal journey with humour ...even through some exceptionally testing times, her intellect beams between the chapters and she consistently reflects on her own accountability.

 7

4 days ago

Log in to like or comment.





thetalkingheads_podcast · Follow ···

thetalkingheads_podcast  5d
Thanks to @waterstones for a great evening listening to a conversation driven by @armando.iannucci with the magnificent Sarah Wynn–Williams! For someone who has worked at the summit of tech, minded of some pretty hairy moments and even hairier consequences if in the hands of bad actors Sarah's continued cautious optimism towards the future of tech was thought provoking. Although we are in an age where there is a dissipation of accuracy and a paradigm of attention politics it's a reminder of how the conversations around tech need to be much more sophisticated. Sarah's Careless People is most certainly worthy of a read that I have personally enjoyed. From the outset she takes you on her personal journey with humour ...even through some exceptionally testing times, her intellect beams between the chapters

♡ 7    ○    ▽                                   ◻

5 days ago

Log in to like or comment.

# Exhibit J

| | |
|---|---|
| **From:** | Sarah Wynn-Williams <s███████████████████ |
| **Sent:** | Friday, March 6, 2026 5:36 PM |
| **To:** | Marcus Quintanilla |
| **Cc:** | Will Thompson; ICDR Erin Brennan; rosengartm@gtlaw.com; linhardta@gtlaw.com; kemplem@gtlaw.com; Jon Cohn; Mary Miller; Alexis Swartz |
| **Subject:** | Re: Meta v Sarah Wynn-Williams |

Dear Arbitrator Quintanilla

Thank you for your email.

I have read the Claimant's letter and exhibits. I write to provide my preliminary observations for you, mindful that I am currently self-represented in this hearing.

Firstly, the Claimant's state that I have been engaged with "ongoing and flagrant violations of the Interim Award." I engaged in five speaking engagements only. I have no further public speaking engagements so there is no basis to claim an "ongoing" or concurrent issue.

Secondly, the Claimant has not presented any evidence of a violation as there is no violation. I was invited to speak at five small and curated events, in which I spoke about contemporary issues only. I did not – as the Claimant's exhibits show – violate the severance agreement, mention the book, or otherwise promote the book. For your information, the discussions were on the future of the internet (on issues such as the British government's approach to regulation of online services), Artificial Intelligence (including issues to do with large model providers, of whom OpenAI and Anthropic are the only actors the public are aware of) and the use of digital technology in warfare (a topic in which I have unique expertise from my ongoing work in technology after I left the Claimant). This is what the events were billed as covering and did cover.

Thirdly, the Claimant seems to be aware that I did not breach the Severance Agreement or Interim Award. They suggest I did so by "a wink and a nod". I do not know what a "wink or a nod" means but they do not provide evidence even for that. The highest they put matters is a photo of me with a book in the background. Of course, when I am speaking those that host the event may refer to the book. I cannot control third parties beyond telling them of my legal restrictions before I agree to speak. I was very deliberate to avoid any discussion of the Claimant to ensure there was no breach and did so.

Fourthly, if the Claimant was so concerned about these events they could have come to you before now. These five events have been promoted for a while and transparently so. There has been nothing clandestine about these speaking engagements because I understand I am allowed to speak on wider topics within my expertise. The Claimant is only coming to you after the event because they knew from the promotional material of the events that I would not be in breach of the Interim Award or the Severance Agreement. The  material was clear that I would not be speaking in any way that violated the Interim Award, and I followed the contours of that rigorously. The Claimant's evidence is speculative at best.

Finally, I am unclear what "sanctions" the Claimant seeks as they do not detail them. I do not have any further public speaking engagements. Nevertheless, such a threat of sanctions is alarming for me and suggests that the Claimant is attempting to police my behaviour and restrict me even when I am *expressly not* discussing the Claimant nor otherwise engaging in conduct that may breach the severance agreement or Interim Award. I am an expert on technology issues and as such speak about technology issues. I have stuck to the Interim Award strictly for a year, at great personal impact. That has not been easy, but I have done it. The Claimant now comes to you to complain about a speculative and unevidenced breach.

I am further concerned that the Claimant is attempting to leverage the fact that their questions to me in discovery led to me being self-represented. Any discussion of sanctions in the absence of counsel would be very difficult and unfair for me, as it would involve legal discussions. To face repercussions of any sort without representation would be very detrimental. In contrast, there is no detriment to the Claimant in me securing counsel before any such hearing as I currently have no public engagements. Contrary to the Claimant's suggestion that I have not sought to instruct new counsel; I have spent a considerable amount of my own time doing so. This has been challenging due to the extent of the

1

Claimant's legal representation/conflicts. I have made significant progress. I have identified counsel who has confirmed that they do not have a conflict and am in the process of establishing instructions with them. I would in fact hope to have counsel in place by the end of next week / early the week after. That is not a process that should be rushed given what has transpired before.

With that in mind, I would ask that any hearing is held until once I have my counsel in place. As before, there is no prejudice to the Claimant.

I am being as open with you and the Claimant as I can be through this email. In light of these matters, I would ask that any hearing is listed for when I have counsel. That hearing can then also address the future progression of the arbitration, which would be a more resourceful use of your and the Claimant's time.

Yours sincerely

Sarah Wynn-Williams

On Fri, Mar 6, 2026 at 12:41 AM Marcus Quintanilla ███████████████████████ wrote:

Thank you, Mr. Thompson.

Receipt confirmed.

Ms. Wynn-Williams, please submit any written response that you deem appropriate by midnight (Pacific Time) tomorrow, March 6, 2026.

The Parties are also requested to confirm their availability for a status conference to be held by Zoom from 12:00 pm to 12:30 pm (Pacific Time) on Monday, March 9, 2026.

Please confirm receipt of this email at your earliest opportunity.



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

---

**From:** Will Thompson <will@lkcfirm.com>
**Sent:** Thursday, March 5, 2026 12:20:55 PM
**To:** Marcus Quintanilla <███████████████████████>; Sarah Wynn-Williams ████████████████
**Cc:** ICDR Erin Brennan ███████████████; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** RE: Meta v Sarah Wynn-Williams

Arbitrator Quintanilla,

Attached please find a letter from counsel for Meta regarding the Interim Award.

2

Best regards,

Will

Will Thompson | LEHOTSKY KELLER COHN | ███████████

---

**From:** Marcus Quintanilla <███████████████████████>
**Sent:** Wednesday, February 25, 2026 8:48 AM
**To:** Sarah Wynn-Williams ███████████████
**Cc:** ICDR Erin Brennan <█████████████>; rosengartm@gtlaw.com; linhardta@gtlaw.com; kemplem@gtlaw.com; Will Thompson <will@lkcfirm.com>; Drew Waldbeser <drew@lkcfirm.com>; Todd Disher <todd@lkcfirm.com>; Jon Cohn <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Ms. Wynn-Williams:

No worries at all. You are right to clarify.

You have understood correctly.

All the best,



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**
████████████████████
████████████████████
Admitted: California, Texas, New York

---

**From:** Sarah Wynn-Williams ██████████████
**Sent:** Wednesday, February 25, 2026 4:54:58 AM
**To:** Marcus Quintanilla ████████████████

3

**Cc:** ICDR Erin Brennan <▮▮▮▮▮▮▮▮▮▮▮; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email.

Just so I am sure, I take your email to mean that the matter will proceed as set out in your email of 20 February that:

1. The case-management dates and the timetable in Procedural Order No. 2 will not be altered.
2. The matter will proceed with me acting "in propria persona". I understand that to mean self-represented but please do confirm.
3. If and when I do instruct new counsel, they should make their formal appearance, and subsequent communications will be made through them.
4. There will be no follow-up status conference scheduled this week.

Sorry to follow up to confirm but I thought it best to be sure of the status.

Yours sincerely

Sarah

On Tue, Feb 24, 2026 at 8:07 PM Marcus Quintanilla <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

> Thank you, Ms. Wynn-Williams.
>
> We will proceed as currently planned.
>
> All the best,

4



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

Admitted: California, Texas, New York

---

**From:** Sarah Wynn-Williams <                              >
**Sent:** Monday, February 23, 2026 10:12:09 PM
**To:** Marcus Quintanilla                              >
**Cc:** ICDR Erin Brennan <                              >; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email and apologies again for the mix up. I will provide my contact details to the ICDR.

By way of update, I can confirm that I have reached out to multiple lawyers and law firms, both large and boutique. I am finding that those firms are, whatever their size, conflicted. This is unexpected but based on the responses I think it stems from the size and scope of Meta's interests.

I am waiting on responses from a significant number of attorneys and among those I hope will receive a positive response. I also continue to reach out to new attorneys. As this matter requires a high level of trust from me and skill (and to avoid repeating the experience with Quinn), I want to be thorough and thoughtful with the process of selecting my new representative. It is important that I get the selection right. I believe that this measured approach will ultimately lead to the best outcome for all parties and the arbitration process.

I can confirm my agreement that neither party has yet made its document production to the other.

Finally, for my part I do not think we need to reschedule the status conference but I am happy to do so if you feel it is necessary or in any way helpful.

Yours sincerely

Sarah

On Fri, Feb 20, 2026 at 7:04 PM Marcus Quintanilla ███████████████████████████ > wrote:

Dear Ms. Wynn-Williams:

Thank you for your email.

We waited for you to join the status conference for about 10 minutes and also tried to reach out to you by telephone, although we did not have a telephone number for you on file. (Ms. Brennan also has no record of your call to her.) I regret that there seems to have been a breakdown in communications.

In any case, nothing transpired at the status conference, except that counsel for Meta confirmed that neither party has yet made its document production to the other. (If you disagree with that statement, please let me know.)

As I explained during the hearing, it appears that the remaining case-management dates lie reasonably in the future, and that, at this point, there is no cause to alter the procedural timetable set forth in Procedural Order No. 2.

I would ask that, not later than Monday, February 23, you advise all case participants whether you have obtained replacement counsel to represent you in the arbitration. If not, we will note in the case file that you are proceeding in propria persona. At that point, you should provide the ICDR with your telephonic contact information. If you have secured counsel, they should make their formal appearance, and subsequent communications will be made through them.

In view of the apparent mixup with the hearing link, I will be happy to schedule a follow-up status conference next week if you would like that. Please let me know your preference with your next communication.

All the best,



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

Admitted: California, Texas, New York

---

**From:** Sarah Wynn-Williams ▮▮▮▮▮▮▮▮▮▮▮▮ >
**Sent:** Friday, February 20, 2026 10:38:51 AM
**To:** ICDR Erin Brennan ▮▮▮▮▮▮▮▮▮
**Cc:** Marcus Quintanilla ▮▮▮▮▮▮▮▮▮▮▮▮▮ rosengartm@gtlaw.com <rosengartm@gtlaw.com>;
linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com
<will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>;
jon@lkcfirm.com <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Regarding this, I never received any connecting/dial in details. I tried to contact Erin on the number below but there was no response/answer.

It is now late in the UK and my childcare is finishing (as I thought our status conference would have concluded by now).

Please let me know if I have somehow missed the connecting details, a thorough search of spam folders etc has not revealed anything.

Kind regards,

Sarah

On Wed, Feb 18, 2026 at 5:28 PM ICDR Erin Brennan ▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

7

Thank you all, I will distribute the connecting details shortly.

Best,

Erin

**ICDR Erin Brennan**
Director ICDR

American Arbitration Association
International Centre for Dispute Resolution
████████████████████████ Los Angeles, CA 90017
████████████████████████

adr.org | icdr.org | aaaicdrfoundation.org
**Explore 100 Years of AAA**

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me im reply email and destroy all copies of the transmittal. Thank you.

**From:** Sarah Wynn-Williams <████████████████████
**Sent:** Wednesday, February 18, 2026 8:42 AM
**To:** Marcus Quintanilla <████████████████████████
**Cc:** rosengartm@gtlaw.com; linhardta@gtlaw.com; kemplem@gtlaw.com; will@lkcfirm.com; drew@lkcfirm.com; todd@lkcfirm.com; jon@lkcfirm.com; ████████████████████████
**Subject:** Re: Meta v Sarah Wynn-Williams

**\*\*\* External E-Mail – Use Caution \*\*\***

Dear Mr Quintanilla,

My apologies for the delay, confirming that I am available on the date and time you have suggested.

Kind regards,

8

Sarah Wynn-Williams

On Tue, Feb 17, 2026 at 7:32 PM Marcus Quintanilla ███████████████████████████ > wrote:

Ms. Wynn-Williams:

I don't believe I received confirmation of your availability.

My apologies if I missed it.

Best,

---

**From:** rosengartm@gtlaw.com <rosengartm@gtlaw.com>
**Sent:** Monday, February 16, 2026 10:35 AM
**To:** ████████████████████████████████
**Cc:** ███████████████████████████ >; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; ████████████████████████
**Subject:** Re: Meta v Sarah Wynn-Williams

Thank you, Mr. Quintanilla.

On behalf of Meta, we are available on the date and at the time below.

9

Respectfully yours,

**Mathew S. Rosengart**

National Co-Chair, Media & Entertainment Litigation
Greenberg Traurig, LLP
View GT Biography

On Feb 13, 2026, at 11:10 AM, Marcus Quintanilla
██████████████████████████ wrote:

Thank you, Ms. Wynn-Williams.

Receipt confirmed.

At this point, I think it appropriate to set a status conference for one week from today: February 20, 2026, at 10:00 a.m. (Pacific).  Hopefully, by that time, you will have secured counsel.

I would ask that both sides confirm their availability for a short videoconference on that date and time.  Once I've received confirmation, the ICDR will schedule the conference.

All the best,

<Outlook-zerozbxe.png>

10

**From:** Sarah Wynn-Williams █████████████████████
**Sent:** Friday, February 13, 2026 8:09 AM
**To:** Marcus Quintanilla █████████████████████
**Cc:** linhardta@gtlaw.com <linhardta@gtlaw.com>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; ██████████████████ █████████████ >
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

As requested, I am writing to update you on my progress with new representation.

Over the last four days I have made enquiries with lawyers. Unfortunately, some of the lawyers I have approached have previously acted or are currently acting for Meta. I am anticipating further responses early next week.

I will keep you and the representatives for Meta updated.

Yours sincerely,

Sarah Wynn-Williams

On Tue, Feb 10, 2026 at 1:44 AM Marcus Quintanilla < ██████████████████████████ > wrote:

Dear Ms. Wynn-Williams:

Thank you for your note.

Please update me and all case participants not later than this Friday, February 13, 2026, at 5:00 p.m. (Pacific Time). If you have not secured

11

counsel by then, we will schedule a status conference to address the path forward.

All the best,

<Outlook-zmxr5hmw.png>

---

**From:** Sarah Wynn-Williams <span style="background:black">████████████</span>
**Sent:** Monday, February 9, 2026 12:28 PM
**To:** Marcus Quintanilla <span style="background:black">████████████</span>
**Cc:** linhardta@gtlaw.com <linhardta@gtlaw.com>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; <span style="background:black">████████████</span>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

As requested, I am providing an update regarding my search for new counsel.

The weekend has been spent identifying potential firms and evaluating their suitability for this matter. Due to the nature of my situation, it is a priority for me to ensure that any firm under consideration performs an exhaustive conflict check and a comprehensive due diligence review. I intend to be incredibly thorough in this process to ensure, to the extent that I can, that I do not face the same conflict problem again.

I will continue to keep both you and counsel for the Respondent updated as I move through these next steps.

Yours sincerely

Sarah Wynn-Williams

12

On Sat, Feb 7, 2026 at 2:13 AM Marcus Quintanilla
< ████████████████████ > wrote:

Thank you, Mr. Linhardt.

Receipt confirmed.

Under the circumstances, the current discovery response deadline is vacated.

A new date will have to be set, and we will have to consider implications for other case-management dates. However, given that the Merits Hearing is not scheduled until the fall, it is my expectation that all or most of the remaining case-management dates can be salvaged.

Ms. Wynn-Williams:

Please proceed with utmost diligence and inform us, not later than Monday, February 9, when you anticipate securing replacement counsel for your representation in this arbitration. My preference will be for your new counsel to enter his appearance and then to meet and confer with the attorneys for the Respondent with respect to case-management dates and related matters, and then for counsel to report back to me. But if there is an appreciable delay in identifying replacement counsel, I will convene a status conference so that we can discuss these issues in real time.

SO ORDERED.

<Image.jpeg>

13

From: linhardta@gtlaw.com <linhardta@gtlaw.com>
Sent: Friday, February 6, 2026 12:43:54 PM
To: rosengartm@gtlaw.com <rosengartm@gtlaw.com>; ███████████████████
████████████████████
Cc: ██████████████████████████████; kemplem@gtlaw.com
<kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com
<drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com
<jon@lkcfirm.com>; ████████████████████
Subject: RE: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla,

Further to the below, please see the attached response on behalf of Meta.

Respectfully yours,

**Alex Linhardt**
**Shareholder**

Greenberg Traurig, LLP
1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
T +1 ███████████████████4
linhardta@gtlaw.com  |  www.gtlaw.com  |  View GT Biography

From: Rosengart, Mathew S. (Shld-LA-LT) <rosengartm@gtlaw.com>
Sent: Friday, February 6, 2026 9:37 AM
To: Marcus Quintanilla ██████████████████████
Cc: Sarah Wynn-Williams <swynnwilliams@gmail.com>; Kemple, Mark D. (Shld-LA-LT-Labor-
EmpLaw) <kemplem@gtlaw.com>; Linhardt, Alex L. (Shld-LA-LT) <linhardta@gtlaw.com>;
will@lkcfirm.com; drew@lkcfirm.com; todd@lkcfirm.com; jon@lkcfirm.com;
████████████████████
Subject: Re: Meta v Sarah Wynn-Williams

14

Dear Mr. Quintanilla,

Just as a brief update, we are finalizing our response and will send it shortly. As we had to consult internally, with your permission, it might be a bit more than 24 hours but we will send it as soon as possible today.

Thank you.

**Mathew S. Rosengart**

National Co-Chair, Media & Entertainment Litigation

Greenberg Traurig, LLP

[View GT Biography](#)

> On Feb 5, 2026, at 11:06 AM, Marcus Quintanilla
> <███████████████████> wrote:
>
> **\*EXTERNAL TO GT\***
>
> Thank you, Ms. Wynn-Williams.
>
> Receipt confirmed.
>
> I would ask that counsel for Respondent provide any comments to the request within the next 24 hours.
>
> All the best,
>
> <Image.jpeg>

15

**From:** Sarah Wynn-Williams <​█████████████████>
**Sent:** Thursday, February 5, 2026 10:41 AM
**To:**████████████████████████████████████
**Cc:** rosengartm@gtlaw.com <rosengartm@gtlaw.com>;
kemplem@gtlaw.com <kemplem@gtlaw.com>; linhardta@gtlaw.com
<linhardta@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>;
drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com
<todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>;
████████████████████████████████████

**Subject:** Meta v Sarah Wynn-Williams

**Meta v Sarah Wynn-Williams**

**Case No. 01-25-0001-2843**

My representatives in this matter, Quinn Emanuel Urquhart &
Sullivan LLP ('Quinn'), have informed me that they are conflicted
and must therefore withdraw as my representatives. Quinn have
filed notices to withdraw.

I am now without representation in the arbitration due to those
questions put by Meta. I am mindful however that there is a
deadline for exchange of documents for tomorrow, February 6,
2026. With respect, you will appreciate that I will be unable to meet
that deadline owing to the withdrawal of my legal representatives.

I would request your agreement to a stay of the proceedings while
I secure new representation. I am left as a litigant in person and feel

16

very exposed, given the complexities of the issues and the serious impact of the proceedings on my life. Not least, the extended period of the proceedings mean I remain under an embargo which prevents my ability to speak freely. I have already commenced that search for new representation, and would hope to have new counsel as soon as possible. I simply ask for further time until I can instruct new counsel.

I accept that any stay would be mutual between the parties, despite the prejudice that causes me. There is no prejudice to however to Meta in this request for the proceedings to be stayed.

Should you wish to discuss this matter, please do not hesitate to contact me.

Yours sincerely

Sarah Wynn-Williams

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate the information.

# Exhibit K



Shop    Events    Log in

Festivals    Projects    Education    News    Anytime    Support Us

**Event 402**



*Conversation*

## Tim Wu and Sarah Wynn-Williams talk to Carole Cadwalladr

*The Power of Tech*

**Sunday 31 May 2026, 2.30pm – Discovery Stage**

How much power is too much power? Step into the heart of the Big Tech debate with Tim Wu, Columbia Law School Professor of Law, Science and Technology, and Sarah Wynn-Williams, former Facebook Director of Global Public Policy, in conversation with investigative journalist Carole Cadwalladr, the reporter who exposed the Cambridge Analytica scandal.

This candid discussion pulls back the curtain on the unprecedented influence of social media, the hidden forces shaping our online lives, and the urgent questions about democracy, privacy and accountability in the digital age. A rare opportunity to hear from the people who understand Big Tech from the inside – and to confront the forces shaping the future of society.

**Sponsored by Phoenix Asset Management**

**Price: £18.00**

— | 1 | + | Add to Basket

*Booking fees are calculated at 5% per order, with a minimum charge of £3.50 and capped at a maximum of £10.*

 Browse the Festival Bookshop

 Share

     

Join Us    About Us    Jobs    Sponsors & Partners    Press & Media    Shop    Contact Us

©2026 Hay Festival    Site Map    Legal Notices    Website by Weblingo

# Exhibit L

You appear to be in the United States 🇺🇸 Click here to switch to our US website.



**Hay Festival**
Powered by Bookshop.org

Choose a Bookshop    Sign In

Ebooks    Gift Cards    Bestsellers    SIGNED + Pre-Orders    Books of the Month    Fiction ⌄    Non-Fiction ⌄    Children's ⌄    Selections ⌄    Highlights ⌄    Bookloop

£4,954,859.34 generated for local bookshops ⓘ

## Hay Festival 2026

By Hay Festival

Escape the day-to-day with Hay Festival 2026. For open books and open minds, taking place 21–31 May in the booktown of Hay-on-Wye, Wales. Discover more. Earlybird events are OUT NOW with the full programme to follow in March.

    

**Careless People**
Sarah Wynn-Williams
📱 Paperback
£10.99
**£10.44**

**The Age of Extraction**
Tim Wu
📱 Hardback
£25.00
**£23.75**

**The Library of Ancient Wisdom**
Selena Wisnom
📱 Hardback
£30.00
**£28.50**

**The Power of Anxiety**
Dr Sian Williams
📱 Paperback
£14.99
**£14.24**

**The Battle of the Beams**
Tom Whipple
📱 Paperback
£10.99
**£10.44**

ADD TO BASKET    ADD TO BASKET    ADD TO BASKET    ADD TO BASKET    ADD TO BASKET

    

**Jan Morris**
Sara Wheeler
📱 Hardback
£25.00
**£23.75**

**Men in Love**
Irvine Welsh
📱 Paperback
£9.99
**£9.49**

**Men in Love**
Irvine Welsh
📱 Hardback
£20.00
**£19.00**

**Ungrounding**
Eyal Weizman
📱 Hardback
£25.00
**£23.75**

**Does my Bum Look Big in This?**
Arabella Weir
📱 Paperback
£10.99
**£10.44**

PRE-ORDER    PRE-ORDER    ADD TO BASKET    PRE-ORDER    ADD TO BASKET

    

**Always Winning**
Ashley Walters, Chris Isaie
📱 Paperback
£10.99
**£10.44**

**The Emperor of Gladness**
Ocean Vuong
📱 Paperback
£9.99
**£9.49**

**Queen Elizabeth II**
Hugo Vickers
📱 Hardback
£28.00
**£26.60**

**Prophecy**
Carissa Veliz
📱 Hardback
£30.00
**£28.50**

**Slags**
Emma Jane Unsworth
📱 Paperback
£9.99
**£9.49**

PRE-ORDER    PRE-ORDER    PRE-ORDER    PRE-ORDER    ADD TO BASKET

  

**Chain Reaction**
Ijeoma Uchegbu
📱 Hardback
£22.00
**£20.90**

**Ultra-Processed People**
Chris van Tulleken
📱 Paperback
£11.99
**£11.39**

**Noisy Valley**
Myfanwy Tristram
📱 Paperback
£14.99
**£14.24**

**Hard Place**
Gab Torr
📱 Hardback
£16.99
**£16.14**

**Friends of Dorothy**
Sandi Toksvig
📱 Paperback
£9.99
**£9.49**

PRE-ORDER    ADD TO BASKET    PRE-ORDER    PRE-ORDER    ADD TO BASKET

   

**The News from Dublin**
Colm Toibin
📱 Hardback
£20.00
**£19.00**

**Adolescence: The Scripts**
Jack Thorne, Stephen Graham
📱 Paperback
£18.99
**£18.04**

**Maryville**
Joelle Taylor
Hardback
£14.99
**£14.24**

**A Private Man**
Stephanie Sy-Quia
Hardback
£16.99
**£16.14**

**Esther is Now Following You**
Tanya Sweeney
Hardback
£16.99
**£16.14**

PRE-ORDER    ADD TO BASKET    ADD TO BASKET    ADD TO BASKET    ADD TO BASKET

First    Prev    1    2    3    4    5    6    7    8    9    10    11    12    13    14    15    Next    Last

**Read your Bookshop.org ebooks anytime, anywhere with the free Bookshop.org apps for iOS and Android.**

**Shop our shelves**
Fiction
Non-fiction
Ebooks
Bestsellers
Children's

**Recommendation lists**
Books of the Month
SIGNED + Pre-Order
Bestselling ebooks

**About us**
About Bookshop.org
Become an affiliate
Bookshop for authors

**Help**
Support centre
Ebook FAQs
Gift cards
Contact

**Get our book recs sent to your inbox!**

SIGN UP

By signing up for email promos & updates, you agree to Bookshop.org's Privacy Notice and Terms of Use.

FOLLOW US

 Trustpilot

TrustScore **4.8**

© 2026 Bookshop.org. All Rights Reserved    Terms of Use    Digital Terms of Use    Manage Cookies    Privacy Notice    UK/EN

Get 5% Off

# Exhibit M



**Top Content**   **People**   **Learning**   **Jobs**   **Games**   |   Sign in   Join now

## Legal 500's Post



**Legal 500**
166,509 followers
1mo

Enterprise GC 2026 – Keynote Speaker Announced

We're thrilled to announce Sarah Wynn-Williams as a keynote speaker at Enterprise GC 2026!

Sarah is the author of the #1 New York Times bestseller Careless People and former Director of Global Public Policy at Meta. A former lawyer and diplomat, she brings unparalleled insight from the intersection of law, technology, and global power.

With artificial intelligence reshaping geopolitical competition, Sarah will share an inside view of how technological power is influencing governments, corporations, and global institutions, and what this means for accountability, governance, and risk.

Her keynote promises a timely and thought-provoking close to the conference for senior in-house legal leaders navigating rapid change and increasing scrutiny.

🔗 Find out more and reserve your place [https://lnkd.in/drHP3PKx]

#EnterpriseGC #InHouseCounsel #LegalLeadership #CorporateLaw #AIandLaw



24

Like            Comment            Share

To view or add a comment, **sign in**

---

166,509 followers

View Profile            + Connect

### More from this author


**What's New: March 2026**
Legal 500 · 3w

**What's New: February 2026**
Legal 500 · 1mo


**What's New: January 2026**
Legal 500 · 2mo

### Explore content categories

Career    Productivity    Finance

Soft Skills & Emotional Intelligence

Project Management    Education

Show more ⌄

---

© 2026   About   Accessibility   User Agreement   Privacy Policy   Your California Privacy Choices   Cookie Policy   Copyright Policy   Brand Policy   Guest Controls

Community Guidelines   Language

# Exhibit N

| | |
|---|---|
| **From:** | linhardta@gtlaw.com |
| **Sent:** | Thursday, March 26, 2026 5:53 PM |
| **To:** | ████████ |
| **Cc:** | Jon Cohn; Will Thompson; Mary Miller; rosengartm@gtlaw.com; kemplem@gtlaw.com; ████████████ |
| **Subject:** | RE: Meta Platforms, Inc. v. Sarah Wynn-Williams |

Ravi,

Your latest letter further underscores that Respondent is not seriously engaging with this process. We will not respond point by point to the misstatements and inaccuracies in your latest letter. As instructed by the arbitrator, Meta has met and conferred in good faith—both through our call on Monday, which *we* initiated, and through our detailed emails responding to the baseless positions taken by Ms. Wynn-Williams.

The Interim Award is clear and speaks for itself, as does our initial letter to the arbitrator about your client's violations of the Interim Award. Your suggestion that your client needs our side to provide more information to you about your client's *own* misconduct and violations concerning the events in which she promoted the book is absurd.

It is clear that further back and forth will not be productive. We will proceed with filing our application.

**Alex Linhardt**
**Shareholder**

Greenberg Traurig, LLP
1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
T +1 ██████████████████████████
linhardta@gtlaw.com  |  www.gtlaw.com  |  View GT Biography

---

**From:** Ravi Naik ████████████ >
**Sent:** Wednesday, March 25, 2026 6:21 AM
**To:** Linhardt, Alex L. (Shld-LA-LT) <linhardta@gtlaw.com>
**Cc:** jon@lkcfirm.com; will@lkcfirm.com; mary@lkcfirm.com; Rosengart, Mathew S. (Shld-LA-LT) <rosengartm@gtlaw.com>; Kemple, Mark D. (Shld-LA-LT-Labor-EmpLaw) <kemplem@gtlaw.com>; Lucie Audibert ████████████
**Subject:** Re: Meta Platforms, Inc. v. Sarah Wynn-Williams

Alex, all

See enclosed letter.

Regards

_____

Ravi Naik

1

*Legal Director*



[www.awo.legal](http://www.awo.legal)

Based in the UK

AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd,
HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
https://www.awo.agency/regulatory-information/

---

**From:** "linhardta@gtlaw.com" <linhardta@gtlaw.com>
**Date:** Tuesday, 24 March 2026 at 01:22
**To:** Ravi Naik ██████████ >
**Cc:** "jon@lkcfirm.com" <jon@lkcfirm.com>, "will@lkcfirm.com" <will@lkcfirm.com>, "mary@lkcfirm.com"
<mary@lkcfirm.com>, "rosengartm@gtlaw.com" <rosengartm@gtlaw.com>, "kemplem@gtlaw.com"
<kemplem@gtlaw.com>, Lucie Audibert ██████████████████ >
**Subject:** RE: Meta Platforms, Inc. v. Sarah Wynn-Williams

Ravi,

Thank you for the call this morning and for the letter sent shortly before the call. We write to memorialize our conversation and respond to the statements in your letter.

During our call, you would not tell us whether Ms. Wynn-Williams is in possession of contracts with the publishers and would not tell us what those contracts might say about her promotional obligations for her book. These contracts are important to assessing Ms. Wynn-Williams' violations of the Interim Award, including her promotional obligations in connection with the recent release of the paperback edition of the book. During the call, you also refused to tell us whether Ms. Wynn-Williams has any written communications about the events (e.g., texts or emails). We noted that Ms. Wynn-Williams has, to date, not provided a single document in connection with our requests, and you confirmed that Ms. Wynn-Williams currently refuses to produce any documents.

You repeatedly stated that Meta had shown "no evidence of a violation," but you could not and did not address the evidence (including photographs) already submitted to the Arbitrator. It is irrefutable that Meta has submitted evidence showing your client attended multiple events to promote the book, speaking at length on stage next to displayed copies of the book. Upon reviewing our submission, the Arbitrator wrote: "Based on the materials currently of record, the authenticity of which Ms. Wynn-Williams does not dispute, Claimant's allegations are by no means trivial." At the last hearing, the Arbitrator stated, correctly, that Meta had established a *prima facie* case. Frankly, we doubt the Arbitrator or any other reasonable person would agree with your statement that "[t]he declaration of Mr. Cohn attached to the letter contained no evidence of a violation." (3/23/24 Letter at p. 2.) As the Arbitrator said, "We're going to be exercising common sense here." Simply repeating that you do not believe Meta's multiple photographs and descriptions of her promotional events constitute "evidence" is neither helpful nor credible. Nor is it relevant to whether your client has responsive information bearing on those events.

You also incorrectly stated that Meta had not satisfied its alleged disclosure obligations. We are of course willing to engage with you to efficiently resolve this dispute, but Meta obviously has no unique information about the events your client personally attended and participated in. As we noted during the call, we are trying to assess your client's seemingly baseless and counterintuitive defenses (e.g., that she can't control how third parties promote or

2

market books at her events), but your client has provided no documents or information that support those defenses or rebut the evidence we've submitted to the Arbitrator.

This morning, for the first time, you articulated a request for material "relating to [Meta's counsel] taking recording of an event." Meta should not have to provide Ms. Wynn-Williams with information about her *own* promotional events. Nonetheless, we noted on the call that we have no recordings of the events and have never represented that we had recordings of the events. We have only the first-hand knowledge of an attorney who attended one event on March 6 and observed Ms. Wynn-Williams promoting the book, as well as a photograph of Ms. Wynn-Williams appearing with the book (attached). Again, we do not know why we would need to describe Ms. Wynn-Williams' own events to her. Nonetheless, because Ms. Wynn-Williams has not been transparent about her speaking obligations, we further note that she has an event scheduled at the Hay Festival for May 31, 2026 with Carole Cadwalladr, and we intend to apprise the Arbitrator of that undisclosed event.

Finally, you refused to answer our question as to the status of Ms. Wynn-Williams' search for California counsel. You represented during the Status Conference Hearing that your client was within days of retaining counsel. The Arbitrator stated in his March 12, 2026 order that the deadlines had "been set in view of Respondent's efforts to secure new (or additional) arbitration counsel, which, Mr. Naik advised, is imminent." We repeat our request for a status update as to Ms. Wynn-Williams' new counsel.

Thank you,

**Alex Linhardt**
**Shareholder**

Greenberg Traurig, LLP
1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
T +1 ████████████████████
linhardta@gtlaw.com  |  www.gtlaw.com  |  View GT Biography

---

**From:** Ravi Naik < ████████████ >
**Sent:** Monday, March 23, 2026 7:22 AM
**To:** Linhardt, Alex L. (Shld-LA-LT) <linhardta@gtlaw.com>
**Cc:** jon@lkcfirm.com; will@lkcfirm.com; mary@lkcfirm.com; Rosengart, Mathew S. (Shld-LA-LT) <rosengartm@gtlaw.com>; Kemple, Mark D. (Shld-LA-LT-Labor-EmpLaw) <kemplem@gtlaw.com>; Lucie Audibert ████████████████████ >
**Subject:** Re: Meta Platforms, Inc. v. Sarah Wynn-Williams

Alex

See enclosed letter.

A diary note for 4pm UK time will follow.

Regards

_____

Ravi Naik
*Legal Director*

A    W        O
████████████

3



[www.awo.legal](www.awo.legal)

Based in the UK

AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd,
HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
[https://www.awo.agency/regulatory-information/](https://www.awo.agency/regulatory-information/)

---

**From:** "[linhardta@gtlaw.com](linhardta@gtlaw.com)" <[linhardta@gtlaw.com](linhardta@gtlaw.com)>
**Date:** Friday, 20 March 2026 at 23:43
**To:** Ravi Naik ███████████████
**Cc:** "[jon@lkcfirm.com](jon@lkcfirm.com)" <[jon@lkcfirm.com](jon@lkcfirm.com)>, "[will@lkcfirm.com](will@lkcfirm.com)" <[will@lkcfirm.com](will@lkcfirm.com)>, "[mary@lkcfirm.com](mary@lkcfirm.com)"
<[mary@lkcfirm.com](mary@lkcfirm.com)>, "[rosengartm@gtlaw.com](rosengartm@gtlaw.com)" <[rosengartm@gtlaw.com](rosengartm@gtlaw.com)>, "[kemplem@gtlaw.com](kemplem@gtlaw.com)"
<[kemplem@gtlaw.com](kemplem@gtlaw.com)>
**Subject:** RE: Meta Platforms, Inc. v. Sarah Wynn-Williams

Ravi,

Ms. Wynn-Williams' latest responses still provide no information about her book appearances violating the Interim Award. Her position seems to be that she knows nothing about at least five promotional events she personally attended, planned for, and participated in—a position that is clearly false and untenable. Indeed, she concedes that she has responsive documents, including contracts with publishers and communications about the events, but will not provide them or any portion of them. At the very least, your client should be willing to immediately provide the documents and communications (1) in which she was invited to participate in these events, (2) that described the events to her, and (3) in which she agreed to participate.

Notwithstanding that your client does not appear to be acting or responding in good faith, we agree to conduct a call on Monday at 4:00 or 4:30 p.m. Please let us know which you prefer and we will circulate a link.

Thank you,


**Alex Linhardt**
**Shareholder**

Greenberg Traurig, LLP
1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
T +███████ ████████████
[linhardta@gtlaw.com](linhardta@gtlaw.com) | [www.gtlaw.com](www.gtlaw.com) | View GT Biography

---

**From:** Ravi Naik ███████████████
**Sent:** Friday, March 20, 2026 7:54 AM
**To:** Linhardt, Alex L. (Shld-LA-LT) <[linhardta@gtlaw.com](linhardta@gtlaw.com)>
**Cc:** [jon@lkcfirm.com](jon@lkcfirm.com); [will@lkcfirm.com](will@lkcfirm.com); [mary@lkcfirm.com](mary@lkcfirm.com); Rosengart, Mathew S. (Shld-LA-LT)
<[rosengartm@gtlaw.com](rosengartm@gtlaw.com)>; Kemple, Mark D. (Shld-LA-LT-Labor-EmpLaw) <[kemplem@gtlaw.com](kemplem@gtlaw.com)>
**Subject:** Re: Meta Platforms, Inc. v. Sarah Wynn-Williams

Dear Alex, all

See enclosed letter.

Alex – Apologies for the misspelling of your name on our letter of 18 March. Corrected in the enclosed and will be moving forward.

Yours sincerely

Ravi

_____

Ravi Naik
   *Legal Director*

A  W    O



[www.awo.legal](http://www.awo.legal)

Based in the UK

—

AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd,
HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
[https://www.awo.agency/regulatory-information/](https://www.awo.agency/regulatory-information/)

---

**From:** "linhardta@gtlaw.com" <linhardta@gtlaw.com>
**Date:** Thursday, 19 March 2026 at 20:13
**To:** Ravi Naik
**Cc:** "jon@lkcfirm.com" <jon@lkcfirm.com>, "will@lkcfirm.com" <will@lkcfirm.com>, "mary@lkcfirm.com" <mary@lkcfirm.com>, "rosengartm@gtlaw.com" <rosengartm@gtlaw.com>, "kemplem@gtlaw.com" <kemplem@gtlaw.com>
**Subject:** RE: Meta Platforms, Inc. v. Sarah Wynn-Williams

Ravi,

Ms. Wynn-Williams' responses to our requests for information are clearly inadequate and not credible:

(i) As to the first request, Ms. Wynn-Williams must have possession, custody, or control over data showing how many of her books were sold at the promotional events. Regardless of whether she has actual possession of the data, she should be able to easily obtain it and we are entitled to it.

(ii) As to the second request for the content of her remarks, Ms. Wynn-Williams did not confirm whether she has possession, custody, or control over any audio or video recordings of the events, or whether any such recordings were made. Please advise.

(iii) As to the fourth request for contracts between Ms. Wynn-Williams and her publishers, your client cannot avoid disclosure by saying that she will provide the information only in connection with long-pending discovery requests that have been delayed by her own search for new counsel and Quinn Emanuel's belated inevitable withdrawal. Our moving papers are due shortly, and we need these contracts immediately. It should be easy for Ms. Wynn-Williams simply to provide us with copies of these contracts, and she has not even attempted to assert a legitimate objection because there is none.

5

(iv) As to the fifth request for documents and communications regarding the events, the request is not overbroad. It is hard to think of information that would be more relevant to determining Ms. Wynn-Williams' purpose and activities at these events than her communications with the publishers and hosts about the events. Ms. Wynn-Williams has also directly put these documents at issue because one of her central (specious) defenses is that she allegedly does not control the activities of the third-party publishers and hosts who promote her book. That being said, and in the spirit of good faith, we are willing to narrow this request to (a) documents and communications referencing the book (or "Careless People"), including but not limited to how the book would be featured, displayed, discussed, or promoted; and (b) documents and communications related to how the events might, would, or did affect book sales.

We also ask that Ms. Wynn-Williams verify her responses under penalty of perjury.

As to the protective order, our understanding is that Ms. Wynn-Williams currently refuses to stipulate to the entry of any protective order, which would allow Meta to provide its discovery responses.

Finally, as you know, our application to the Arbitrator is due on March 27th, and we do not have much time to resolve these issues before the Arbitrator's intervention will be required. Waiting until next week will not allow us to meaningfully meet and confer per the instruction of the Arbitrator. Please confirm a time tomorrow.

Thank you,

**Alex Linhardt**
**Shareholder**

Greenberg Traurig, LLP
1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
T +1 █████████████████████████
linhardta@gtlaw.com | www.gtlaw.com | View GT Biography

---

**From:** Ravi Naik ████████████████ |>
**Sent:** Wednesday, March 18, 2026 5:21 AM
**To:** Linhardt, Alex L. (Shld-LA-LT) <linhardta@gtlaw.com>
**Cc:** jon@lkcfirm.com; will@lkcfirm.com; mary@lkcfirm.com; Rosengart, Mathew S. (Shld-LA-LT) <rosengartm@gtlaw.com>; Kemple, Mark D. (Shld-LA-LT-Labor-EmpLaw) <kemplem@gtlaw.com>
**Subject:** Re: Meta Platforms, Inc. v. Sarah Wynn-Williams

**\*EXTERNAL TO GT\***

Dear Alex

Thank you for your email. Dealing with each issue in turn:

1. Document requests

Our client's answers to your client's request for information are in the enclosed letter.

2. Protective Order

The Protective Order as you have drafted includes consideration of California and US law. You know that we cannot advise our client on US or California law. As such, our client will need lawyers who are qualified in California to advise her on the terms. Our client will therefore only be able to revert on these terms once she has received appropriate advice from counsel competent to advise on Californian law.

3. <u>Conference call</u>

Consistent with the request from the Arbitrator to have a conference call, we would be able to offer the following days and times (all UK times):

1. Monday 24 March: 4pm – 5pm
2. Tuesday 25 March: 4pm – 530pm
3. Wednesday 26 March: 3pm – 6pm

We look forward to hearing from you

Yours sincerely

Ravi

———————————————————

Ravi Naik
  *Legal Director*

A    W    O

███████████████

www.awo.legal

Based in the UK

—

AWO is the trading name for the following companies: HNK Legal Ltd, HNK Litigation Ltd, HNK Data Consulting Ltd, AWO Belgium BV and AWO Australia Pty Ltd
https://www.awo.agency/regulatory-information/

**From:** "linhardta@gtlaw.com" <linhardta@gtlaw.com>
**Date:** Tuesday, 17 March 2026 at 06:51
**To:** Ravi Naik ███████████████
**Cc:** "jon@lkcfirm.com" <jon@lkcfirm.com>, "will@lkcfirm.com" <will@lkcfirm.com>, "mary@lkcfirm.com" <mary@lkcfirm.com>, "rosengartm@gtlaw.com" <rosengartm@gtlaw.com>, "kemplem@gtlaw.com" <kemplem@gtlaw.com>
**Subject:** Meta Platforms, Inc. v. Sarah Wynn-Williams

Ravi,

Further to the status conference of last week please confirm that Ms. Wynn-Williams will be producing the documents and information requested on Page 4 of our March 5, 2026 letter to the Arbitrator. We are available to meet and confer today or tomorrow, but please note that if we do not receive these materials this week, we will seek all further appropriate relief from the Arbitrator.

Separately, we are attaching a protective order for your review given that you are counsel of record and to continue moving the case forward while Ms. Wynn-Williams seeks to retain California counsel. We sent this draft to Quinn Emanuel on January 30, 2026—six weeks ago—and we need to finalize this now to move forward with discovery in the case. We have been prepared to serve our discovery responses and produce documents but cannot do so until entry of the protective order.

7

As noted, we are available to discuss any of the above at your convenience.

Thank you,

**Alex Linhardt**
**Shareholder**

Greenberg Traurig, LLP
1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
T +1 ███████████████
linhardta@gtlaw.com  |  www.gtlaw.com  |  View GT Biography

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate the information.

8

# Exhibit O

A  W     O

RECIPIENT
**Alex Linhardt**
*Shareholder*
Greenberg Traurig, LLP

LETTER BEFORE CLAIM

DATE
18 March 2026

OUR REF: RN:156

SENDER
Ravi Naik
*Legal Director*



London E2 8JF



www.awo.legal

Dear Mr Linhart

*Meta Platforms, Inc. v. Sarah Wynn-Williams*
No. 01-25-0001-2843

We write further to your letter of 5th March 2026 and email of 17th March 2026.

Our client responds to your request for information as follows:

   i.    Request: The number of her books sold at these promotional events.

       Answer: Our client does not have this information.

   ii.    Request: The content of any remarks made by Respondent at these events, including any scripts, notes, or draft questions and answers

       Answer: Our client did not maintain a record of what she said at the events. Our client does not have records of her "scripts, notes, or draft questions and answers".

   iii.    Request: Payments she received related to these events, including from book sales related to these events

       Answer: Our client did not receive any payment for these events.

   iv.    Request: All contracts between Respondent and her publishers regarding the book

       Answer: There were no contracts for the events in question. The contracts between our client and publishers regarding the book are questions that your client has raised in the discovery process and our client will provide her answers to those questions in that discovery process.

A.W.O IS THE TRADING NAME
OF HNK LITIGATION LIMITED (12303177)

REGULATED BY THE SOLICITORS REGULATORY
AUTHORITY SRA NUMBER: 666285

A  W        O

    v.      Request: All communications and documents exchanged with her publishers or the hosts of these events regarding her appearance at the events.

           Answer: This request is unnecessary to determine the issues between the parties in respect of the events. The request is overly broad and disproportionate given (i) it relates to third parties and (ii) the alleged breaches can only arise from what was said or done by our client at the events.

We trust that this is sufficient for you to narrow your request and withdraw your client's suggested (and unspecified) request for "sanctions".

Yours faithfully


**AWO**

2

# **Exhibit P**

A  W      O

RECIPIENT
**Alex Linhardt**
*Shareholder*
Greenberg Traurig, LLP

LETTER BEFORE CLAIM

DATE
20 March 2026

OUR REF: RN:156

SENDER
Ravi Naik
*Legal Director*



London E2 8JF

www.awo.legal

Dear Mr Linhardt
*Meta Platforms, Inc. v. Sarah Wynn-Williams*
No. 01-25-0001-2843

We write in response to your email of 19th March 2026 ('your email'). We address each issue in turn.

1.  Requests for information
    Using the numbering from your email, our client responds as follows:

    i.   Request: Ms. Wynn-Williams must have possession, custody, or control over data showing how many of her books were sold at the promotional events.  Regardless of whether she has actual possession of the data, she should be able to easily obtain it and we are entitled to it.

         Answer: Our client does not "have possession, custody, or control over data". You have no basis to suggest she "must". As the exhibits to your letter of 5th March 2026 demonstrate, the events were organised by independent bookshops. Your client is as able to access this information by contacting those bookshops. Our client does not know who to contact.

    ii.  Request: Ms. Wynn-Williams did not confirm whether she has possession, custody, or control over any audio or video recordings of the events, or whether any such recordings were made.  Please advise.

         Answer: Our client does not have "possession, custody, or control over any audio or video recordings of the events." Our client does not know if recordings were made but she is not aware of any recordings having been made.

A.W.O IS THE TRADING NAME
OF HNK LITIGATION LIMITED (12303177)

REGULATED BY THE SOLICITORS REGULATORY
AUTHORITY SRA NUMBER: 666285

A  W     O

iii.    Summary of request: Contracts between Respondent and her publishers regarding the book.

Answer: There were no contracts for the events. The contract for the book cannot have any bearing on whether our client is in breach the interim award as the interim award post-dates any such contract. Further, any alleged breach of that award is a question of fact. The ability of your client to evidence a factual breach will depend on what was said or done by our client at the events. The contract between our client and publishers regarding the book is accordingly irrelevant to the allegations your client has raised relating to the events.

iv.    Summary of request: Documents and communications regarding the events: (a) referencing the book (or "Careless People"), including but not limited to how the book would be featured, displayed, discussed, or promoted; and (b) related to how the events might, would, or did affect book sales.

Answers:

(a)    Our client welcomes your client's attempt to narrow the request so that it relates to the issues in dispute. The words "including but not limited to" does however maintain the unacceptable breadth of your initial request. Our client can confirm that she does not have documents and communications about the "how the book would be featured, displayed, discussed, or promoted" at the events.

(b)    Our client does not have documents and communications about how "the events might, would, or did affect book sales."

For context, our client has told you that she was not involved in the organisation or planning of the events. No such documents or communication relating to these requests can therefore exist. The Interim Award is also a matter of public record.

Finally, your client will be aware that the order from Arbitrator Quintanilla for consensual information exchange was mutual. Our client has complied with requests made to her. Your client has not complied.

Please confirm when your client will comply with their requirement of information exchange. Such information should be provided in advance of our conference call for it to be effective.

2.  Protective Order
You state that our client "refuses to stipulate to the entry of any protective order". Your characterisation is inaccurate. Our client has not refused. Your client is requested to consider Mr Naik's email of 18th March in which the correct position of our client is set out.

A W   O

3. <u>Conference call and next steps</u>

You have demanded a call today. It may not surprise you to hear that we do not have capacity for a call today.

You state that "we do not have much time to resolve these issues before the Arbitrator's intervention will be required." We are unclear what you mean by "Arbitrator's intervention".

You further complain about the time your client now has available. For context, Mr Naik provided his number to all parties immediately following the status conference of 12th March, yet you did not attempt to call him. You rather waited until 17th March to follow up. You further waited almost two working days before responding to our letter and email 18th March 2026. The cause of any delay cannot therefore be laid at our client.

We provided you with a list of dates for a call by email on 18th March 2026. We can offer increased times before your deadline to accommodate you:

1. Monday 24 March: 3pm – 5pm
2. Tuesday 25 March: 4pm – 530pm
3. Wednesday 26 March: 3pm – 6pm

Should you be able to do the Monday call, that would leave you with four working days before your deadline to file your client's application. Your client is asked to comply with your ordered duty of information exchange before any such call for that call to be effective.

Yours faithfully

**AWO**

# Exhibit Q

# A W O

**RECIPIENT**
**Alex Linhardt**
*Shareholder*
Greenberg Traurig, LLP

LETTER

**DATE**
25 March 2026

**OUR REF:** RN:156

**SENDER**
Ravi Naik
*Legal Director*



London E2 8JF



www.awo.legal

Dear Mr Linhardt
*Meta Platforms, Inc. v. Sarah Wynn-Williams*
No. 01-25-0001-2843

We write in response to your email of 23rd March 2026. Addressing the relevant parts in turn:

Our client's disclosure

1.  You state that "Ms. Wynn-Williams currently refuses to produce any documents." That is demonstrably incorrect. Our client has replied to each of your twelve separate requests for information. You are referred to the letters of 18th, 20th and 23rd March from our client. Those letters contain complete answers to the repeated and repetitive requests in your email of 23rd March.

2.  The Arbitrator's order invited the parties to "meet and confer and engage in consensual information exchange and to potentially narrow the relief sought in Claimant's application". Our client has met her obligations.

3.  Your client's position seems to be that because their case is based on speculation and hearsay at its highest, it is for our client to make out the allegations made by your client. That is wrong.

Your client's disclosure

4.  You now provide, 12 days after the Arbitrator's order, the further disclosure. We do not understand your statement that your client had "satisfied its alleged disclosure obligations" given the late service of material that has been in its possession since 6th March.

5.  The evidence you have given is provided without any explanation or supporting declaration. The evidence you have provided however contradicts the following statement of Mr. Rosengart in the status conference:

A.W.O IS THE TRADING NAME
OF HNK LITIGATION LIMITED (12303177)

REGULATED BY THE SOLICITORS REGULATORY
AUTHORITY SRA NUMBER: 666285

A  W      O

> *"I can tell you that my colleagues attended an event in Oxford and we have photos of [the Respondent] herself holding the book. She is promoting the book at these events."*

The evidence you have provided is one photo of our client next to a table on which a single copy of the book sits. Your position seems to be that our client cannot be *near* a copy of the book, which would mean that she is not allowed into any bookshop (or indeed, anywhere where her book could be sold[1]). **Please clarify if that is your client's position**. If not, please explain what this evidence is meant to demonstrate and what your client's position is.

6.  Given the statement of Mr. Rosengart, we know that colleagues from the London office of Greenberg Traurig attended the event with the purpose of obtaining evidence of what our client said and did at the event. No such material has been provided, presumably as the lawyers were unable to note a breach of the Interim Award. The evidence from the lawyers from Greenberg Traurig is nevertheless exculpatory for our client. We accordingly require the following:

    a.  The names of the individuals.
    b.  A statement from those individuals about what they heard and saw.
    c.  All notes, memos and records they have taken from the event. Any suggestion that such notes could be privileged would not be tenable given Mr. Rosengart's statement that the evidence was collated with a view to service in these proceedings.

7.  Please provide this material <u>by return</u>. If you refuse to provide the material, please explain why. We will request the Arbitrator to make appropriate inferences if your client refuses to provide this material.

    <u>Hay Festival</u>
8.  Our client is not required to give prior notice of all speaking engagements, and you provide no legal basis for her to do so. The facts of the *Hay Festival* are as follows:

    a.  The Hay Festival event does not violate the Interim Award. The Hay Festival event does not address your client nor reference the book *in any way* (notwithstanding the fundamental issue that a reference to the book in promotional material by a third party cannot itself constitute a violation of the Interim Award). The promotional material for the Hay Event is clear to that end: https://www.hayfestival.com/p-25476-tim-wu-and-sarah-wynn-williams-talk-to-carole-cadwalladr.aspx.[2]
    b.  Given the topic of the Hay Festival event and lack of any reference to the book, it does not constitute an activity

---

[1] Given our client's book is a number 1 best seller, that could conceivably extend to airports, train stations, shopping centres, supermarkets etc. resulting in her being unable to leave her house.

[2] As the Hay Festival is public and promoted, we do not understand your reference to our client not being "transparent" nor your reference to the event being "undisclosed". It is pubic and available.

A  W       O

"comparable to those at issue in Claimant's current allegations" so cannot breach the Arbitrator's Interim Order of 12th March[3].

9. The Hay Festival event is expressly billed as a conversation about the "power of tech". As your client will know, the Arbitrator confirmed at the status conference that our client is permitted to speak on matters in her expertise. Our client does not need to reference your client in a contemporary discussion about the power of technology. Your client cannot and should not police our client's speech.

10. Your position seems to be that our client needs your or your client's approval for *any* public appearance even if there is no reference to your client. **Please confirm by return if that is your client's position.** If not, please clarify the basis on which our client is to inform you or the Arbitrator about that event or any comparable event.

11. You state that you will "appraise the Arbitrator" of the event. We are unclear why your client would want to trouble the Arbitrator of such an irrelevant event but if you do, we will rely on this letter and the relevant promotional material in response.

12. We also put you on notice that our client will rely on this correspondence in respect to the allegations for the historic events, as your position supports our client's concerns about your attempts to overextend the Interim Award.

We look forward to receiving the material request by return and no later than close of business PT on 25th March 2026.

Yours faithfully

**AWO**

---

[3] The Arbitrator's Order of 12 March 2026 was temporary

3

# Exhibit R

# A W    O

**RECIPIENT**
**Alex Linhardt**
*Shareholder*
Greenberg Traurig, LLP

<span style="color:red">LETTER BEFORE CLAIM</span>

**DATE**
23 March 2026

**OUR REF:** RN:156

**SENDER**
Ravi Naik
*Legal Director*



London E2 8JF

www.awo.legal

Dear Mr Linhardt
*Meta Platforms, Inc. v. Sarah Wynn-Williams*
No. 01-25-0001-2843

We write in response to your email of 20th March. Responding to the issues in turn:

1. You state that the letters from our client of 18th and 20th March "still provide no information about her book appearances violating the Interim Award." Our client did not violate the Interim Award. It is for your client to evidence their allegations of violations. Your client has been unable to do so.

2. You state that our client's "position seems to be that she knows nothing about at least five promotional events she personally attended, planned for, and participated in". You provide no evidence to suggest that attending, planning for, or participating in such an event is a violation.

3. The claims made by your client lack evidentiary support despite (i) our client's request for that evidence from you and (ii) the order from the Arbitrator of 12th March that you provide such evidence. Repeatedly asserting what your client wants the position to be does not make that position out. Rather, your client's lack of evidence is the key issue. If our client's position is "clearly false and untenable" your client would have evidence to rebut her position. They have not provided any evidence.

4. You state that our client "concedes that she has responsive documents, including contracts with publishers and communications about the events, but will not provide them or any portion of them." Your position is misplaced. No such concession has been made by our client, nor do you point to one. Your position on contracts for the events is also peculiar. Your client is invited to read the letters from our client of 18th and 20th March, in which she expressly confirms that there are no

A.W.O IS THE TRADING NAME
OF HNK LITIGATION LIMITED (12303177)

REGULATED BY THE SOLICITORS REGULATORY
AUTHORITY SRA NUMBER: 666285

A  W      O

**contracts for the events.** We are surprised to have to repeat this for the third time.

5. You state that our client "does not appear to be acting or responding in good faith". You provide no evidence for this statement. Stepping back and looking at the facts:

   a. **Your client**: Your client filed a letter with the Arbitrator on 5th March. That letter asserted "ongoing and flagrant violations" by our client. No evidence was contained in the letter to support those allegations. The declaration of Mr Cohn attached to the letter contained no evidence of a violation. The allegations raised by your client was undermined by the paucity of evidence provided. Your client nevertheless sought unspecified "sanctions" against our client. Those "sanctions" remain unexplained and your client has still not provided any evidence of a breach to date.

   b. **Our client:** Our client responded to the Arbitrator by email on 6th March. In that email, our client provided a full and frank explanation of the events and her role within them. Our client has provided detailed and frank responses to the far-reaching discovery requests made by your client by letters of 18th and 20th March. In response, your client has filed further and increasingly vague requests. Those further requests suggest your client is aware that they are unable to make out a violation, as evidenced by your email of 20th March and the curious suggestion that it is for our client to provide "information about her book appearances violating the Interim Award." In contrast, the Arbitrator requested that your client provide information to our client for our client *to understand the basis* for the allegations being levied against her. Our client reminded you of that need to provide information by our letter of 20 March 2026. You did not respond to that point.

6. Taken together, the record is clear as to which party is engaging in the process.

7. Our client confirms that she does not have "documents and communications" in the three categories you have requested. Our client however is concerned by your client's failure to comply with their information obligations. Your client must provide further and better particulars, including evidence. Our client therefore repeats her reminder to you of your ordered duty of information. That would include, for instance, the material Mr Rosengart referred to in the status conference relating to his colleagues taking recording of an event. Should your client refuse to provide this material, **please confirm in writing** so we can put the Arbitrator on notice of your client's non-compliance.

In the continued absence of information from your client, we are unsure what utility a conference call will have. We nevertheless will provide a diary note

2

A  W      O

with a video conference link for 16:00 UK time to discuss the state of the allegations made by your client and how to dispose of this matter.

Yours faithfully

**AWO**

**AMERICAN ARBITRATION ASSOCIATION**
**EMPLOYMENT ARBITRATION DIVISION**

| | |
|---|---|
| In the Matter of the Arbitration between<br><br>Meta Platforms, Inc.,<br><br>  *Claimant/Counterclaim Respondent,*<br><br>v.<br><br>Sarah Wynn-Williams,<br><br>  *Respondent/Counterclaimant.* | Arbitration Case No.: 01-25-0001-2843<br><br>Arbitrator: Hon. Marcus Salvato Quintanilla |

**DECLARATION OF ANNABEL THOMAS IN SUPPORT OF CLAIMANT META PLATFORMS, INC.'S APPLICATION FOR SANCTIONS**

I, Annabel Thomas, do hereby declare:

1. I am an attorney and shareholder at the London office of Greenberg Traurig, LLP, attorneys of record for Claimant Meta Platforms, Inc. ("Meta"). I make this declaration in support of Meta's Application for Sanctions. I have personal knowledge of the facts set forth below, and if called as a witness, I could and would competently attest to them.

2. On 6 March 2026, I attended Respondent Sarah Wynn-Williams' event at Blackwell's in Oxford. During the event, I took a photograph, a true and correct copy of which is attached hereto as **Exhibit 1**, showing Ms. Wynn-Williams speaking while seated next to a displayed copy of her book.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed in London, England on the 27th day of March, 2026.

_____
Annabel Thomas

1

# Exhibit 1



# **Exhibit Q**

**AMERICAN ARBITRATION ASSOCIATION**
**EMPLOYMENT ARBITRATION DIVISION**

| |
|---|
| In the Matter of the Arbitration between<br><br>META PLATFORMS, INC.,<br><br>       Claimant/Counterclaim Respondent,<br><br>       v.<br><br>SARAH WYNN-WILLIAMS,<br><br>       Respondent/Counterclaimant. |

Arbitration Case No.: 01-25-0001-2834

Arbitrator: Hon. Marcus Salvato Quintanilla

**RESPONDENT/COUNTERCLAIMANT SARAH WYNN-WILLIAMS'S OPPOSITION
TO META PLATFORMS, INC.'S APPLICATION FOR SANCTIONS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ........................................................................................................................3

ARGUMENT ..............................................................................................................................8

I.      The Interim Award Violates the First Amendment ...............................................9

II.     Meta Has Not Carried Its Burden to Demonstrate That Ms. Wynn-Williams Has Violated an Enforceable Interpretation of the Interim Award ...........................................12

III.    Section 177.5's Safe Harbor Applies and Precludes Sanctions.........................................15

IV.     California Law Does Not Permit Meta's Requested Form of Sanctions ...........................16

V.      The Arbitrator Should Revisit and Dissolve the Interim Award .......................................17

CONCLUSION...........................................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
    824 F.3d 858 (9th Cir. 2016) .........................................................................................11

*Bak v. MCL Fin. Grp., Inc.*,
    170 Cal. App. 4th 1118 (2009) .....................................................................................16

*Butler v. Superior Ct. In and For Alameda Cnty.*,
    178 Cal.App.2d 763 (1960) ...........................................................................................15

*Corbett v. Hayward Dodge, Inc.*,
    119 Cal. App. 4th 915 (2004) .......................................................................................12

*David v. Abergel*,
    46 Cal. App. 4th 1281 (1996) .......................................................................................16

*Evans v. Evans*,
    162 Cal. App. 4th 1157 (2008) ..................................................................................9, 10

*Ferlauto v. Hamsher*,
    74 Cal. App. 4th 1394 (1999) .........................................................................................9

*Hill v. Xerox Bus. Servs., LLC*,
    59 F. 4th 457 (9th Cir. 2023) ........................................................................................19

*In the Matter of BlackRock, Inc.*,
    Securities  Exchange Act of 1934, Release No. 34-79804, 115 SEC Docket
    5758 (Jan. 17, 2017).......................................................................................................18

*In the Matter of BlueLinx Holdings Inc.*,
    Securities Exchange Act of 1934, Release No. 34-78528, 114 S.E.C. Docket
    4599 (Aug. 10, 2016).......................................................................................................18

*In the Matter of D.E. Shaw & Co, L.P.*,
    Securties Exchange Act of 1934, Release No. 98641 (Sep. 29, 2023) ....................................18

*In the Matter of Homestreet, Inc and Darrel Van Amen,*
    Securities Exchange Act of 1934,  Release No. 34-79844, 115 SEC Docket 18
    (Jan. 19, 2017)................................................................................................................18

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*,
    12 F. Supp. 2d 1035 (C.D. Cal. 1998) ........................................................................9, 10

*Jerry's Famous Deli, Inc. v. Papanicolaou*,
    383 F.3d 998 (9th Cir. 2004) ................................................................................16

*Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert*,
    194 Cal. App. 4th 519 (2011) ...............................................................9, 10, 11, 12

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995)................................................................................................11

*Meta Platforms, Inc.*,
    No. 19-CA-312724, 2024 WL 3469667 (July 19, 2024)........................................17

*New.Net, Inc. v. Lavasoft*,
    356 F.Supp.2d 1071 (C.D. Cal. 2003) ...............................................................9, 10

*Olmstead v. Arthur J. Gallagher & Co.*,
    32 Cal. 4th 804 (2004) ...........................................................................................17

*People v. Kareem A.*,
    46 Cal. App. 5th 58 (2020) ....................................................................................15

*Sagonowsky v. Kekoa*,
    6 Cal. App. 5th 1142 (2016) ..................................................................................17

*Seykora v. Superior Ct.*,
    232 Cal. App. 3d 1075 (Ct. App. 1991), *reh'g denied and opinion modified*
    (Aug. 23, 1991) ......................................................................................................15

*Sorensen v. Superior Ct. of Santa Barbara Cnty.*,
    269 Cal. App. 2d 73 (Ct. App.), *amended*, 276 Cal. App. 2d 131 (Ct. App.
    1969) .......................................................................................................................11

*Thorup v. Dean Witter Reynolds, Inc.*,
    180 Cal. App. 3d 228 (1986) .................................................................................19

*U.S. v. Holtzman*,
    762 F.2d 720 (9th Cir. 1985) .................................................................................11

*WFP Sec., Inc. v. Davis*,
    2014 WL 1465181 (Cal. Ct. App. Apr. 15, 2014) .................................................16

*Winikow v. Superior Ct.*,
    82 Cal. App. 4th 719 (2000) ..................................................................................15

**Statutes**

29 U.S.C. §§ 151-169 .......................................................................................................17

Cal. Gov't Code § 12964.5 ...............................................................................................18

California Procedural Code Section §177.5........................................................8, 15, 16

H.R. 4713, 11th Cong. §922 (2010)...............................................................17

**Other Authorities**

17 C.F.R. § 240.21F-17(a) ...........................................................17, 18

76 Fed. Reg. 34300 .......................................................................18

Respondent and Counterclaimant Sarah Wynn-Williams respectfully submits this response to Meta Platforms, Inc.'s ("Meta") application for sanctions (the "Application").

**PRELIMINARY STATEMENT**

Ms. Wynn-Williams has fully complied with her understanding of the Interim Award in every respect. As a public policy expert with wide-ranging and sought-after experience rooted in professional activities before and after her time at Meta, Ms. Wynn-Williams regularly receives invitations to speak publicly on matters of general import (like digital warfare, artificial intelligence, and government regulation of the internet). Before each such engagement, Ms. Wynn-Williams informed the organizers that she could not speak about her book or about Meta, and the uncontroverted evidence before this tribunal is that she has never done so. Ms. Wynn-Williams did not understand the Interim Award to prohibit her participation in those engagements because it does not (and could not).

This motion arises not because Ms. Wynn-Williams violated this tribunal's order but because Meta is encountering the self-inflicted fate of all censorship campaigns: public outrage. On the day Ms. Wynn-Williams's 2025 memoir, *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism*, was published, Meta secured an *ex parte* order from the emergency arbitrator in this matter enjoining Ms. Wynn-Williams from taking specific actions with respect to the promotion of the book (the "Interim Award"). After learning of the Interim Award—via a process server that Meta could have but declined to use to provide her notice of the original arbitration demand and hearing that resulted in that Interim Award—Ms. Wynn-Williams immediately sought vacatur. While Ms. Wynn-Williams respectfully maintains that the Interim Award is invalid, she has scrupulously adhered to its scope. Meanwhile, the reading public, including the third parties whose actions Meta lays at Ms. Wynn-Williams's feet, responded passionately to the resonating truth of Ms. Wynn-Williams's story. The memoir became a #1 New York Times

Bestseller and the subject of considerable public discussion not because of Ms. Wynn-Williams's actions—and certainly not any of the activities challenged in the Application, all of which took place nearly a year later—but because of its true and compelling message and Meta's concerted effort to silence it.

Meta has failed to demonstrate that sanctions are appropriate (or even permissible) here. First, the Interim Award raises serious First Amendment concerns that render it invalid or—at a minimum—require this tribunal to interpret it in a manner that forecloses Meta's effort to sanction Ms. Wynn-Williams. Any interpretation that prohibits Ms. Wynn-Williams from engaging in the conduct Meta challenges in its Application runs headlong into these constitutional principles. Second, Meta has not carried its burden of proving that Ms. Wynn-Williams's own conduct violates the Interim Award. Third, sanctions are inappropriate where Ms. Wynn-Williams engaged in that conduct with substantial justification or valid excuse. These constitutional and interpretive concerns, along with Ms. Wynn-Williams's attempts to ensure that her own behavior did not violate the Interim Award, demonstrate such a valid excuse here. Fourth, the types of sanctions Meta seeks are categorically unavailable under the statutory authority Meta cites. Finally, this tribunal should take this opportunity to revisit the emergency arbitrator's decision on the Interim Award and dissolve it.

Ultimately, this tribunal should see the Application for what it is: buyer's remorse. Meta's attempt to silence Ms. Wynn-Williams has only amplified her story—not by causing her to "flagrant[ly] violat[e]" the Interim Award as Meta wrongly contends, but by making it inevitable that the subjects she is forbidden from speaking about are the topic of others' conversations, notwithstanding Ms. Wynn-Williams's own adherence to the Interim Award. The Application should be denied.

2

**BACKGROUND**

Sarah Wynn-Williams spent six years—2011 to 2017—as Facebook's Director of Global Public Policy. During her time at Facebook, Ms. Wynn-Williams was sexually harassed by two executives, including her direct supervisor Joel Kaplan, Facebook's Vice President of Global Policy. Ms. Wynn-Williams reported this harassment and, shortly thereafter, Facebook fired her. Facebook presented Ms. Wynn-Williams with the Severance Agreement in exchange for agreeing to continue her healthcare benefits (among other compensation). As a new mother, Ms. Wynn-Williams had no choice but to sign.

On March 6, 2025, Meta's counsel sent *Careless People*'s publishers Flatiron Books and Macmillan Publishers (together the "Publishers") a letter suggesting (falsely) that Ms. Wynn-Williams and her publishers could be subject to defamation liability simply for declining to give Meta an advance copy of the book or allowing Meta to verify fact-checking processes. *See* Decl. of Ravi Naik ("Naik Decl.") Ex. A (Meta March 6, 2025 Ltr. to Publishers). Meta's contention at that time was that the Publishers "intend[ed] to imminently publish a book that may contain false statements regarding Meta Platforms, Inc., Mark Zuckerberg, Joel Kaplan, Sheryl Sandberg, and other current or former Meta employees." *Id.* at 1. Meta's March 6 letter did not mention Ms. Wynn-Williams at all, nor did it reference any severance agreement, non-disparagement clause, or arbitration provision.

One day later, on March 7, 2025, Meta filed this arbitration demand along with an application for emergency relief. Meta sought relief not only against Ms. Wynn-Williams but also against the Publishers, who are not parties to the severance agreement and therefore not bound by the arbitration provision purportedly giving rise to jurisdiction over this proceeding. Meta also sought relief that was far broader than the assertions it had made in its letter just a day before, asking the emergency arbitrator to order that Ms. Wynn-Williams and the Publishers "refrain from

3

making 'disparaging, critical or otherwise detrimental comments' about Meta and its employees and leadership, cease promotion of such disparaging comments, and retract disparaging comments already made." Application for Emergency Relief at 1. Included in Meta's requested order was an injunction against publishing *Careless People* at all. Application for Emergency Relief at 10.

The emergency arbitrator scheduled a hearing on Meta's application for emergency relief for March 11. Meta failed to provide Ms. Wynn-Williams notice of that hearing, instead sending notice to just one of the two email addresses that Meta had on file for Ms. Wynn-Williams. Although Meta knew (1) that Ms. Wynn-Williams had provided a different email address to Meta when she received her offer of employment, (2) that Meta had used this different email address to communicate with Meta throughout her time there, (3) that Meta employees had used this different email address to communicate with Ms. Wynn-Williams (including to negotiate and finalize the severance agreement at issue in this Arbitration), and (4) that this different email address was even connected to Ms. Wynn-Williams's Meta product accounts, Meta declined to use that known email address to provide Ms. Wynn-Williams with notice of the March 11 hearing. Mot. to Vacate Interim Award at 5. Meta also declined to send notice to the email address published on Ms. Wynn-Williams's own website, which Ms. Wynn-Williams monitors, or to Ms. Wynn-Williams's physical address in London, through a process server or otherwise.

Lacking notice of the hearing on Meta's application, Ms. Wynn-Williams did not appear at that hearing, nor did she receive notice of the emergency arbitrator's offer to hear Ms. Wynn-Williams on that application for a short period of time thereafter. On March 12, 2025, the emergency arbitrator granted Meta's application, issuing the Interim Award enjoining Ms. Wynn-Williams along with "her agents, servants, employees, attorneys, and any other person(s) or entities [] she controls":

4

1.    [F]rom making orally, in writing, or otherwise any 'disparaging, critical or otherwise detrimental comments to any person or entity concerning [Meta], its officers, directors or employees; the products, services or programs provided or to be provided by [Meta]; the business affairs, operation, management or the financial condition of [Meta]; or the circumstances surrounding [her] employment and/or separation of employment from [Meta],' except as permitted by Sections 4 and 9 of the Severance Agreement and regardless of whether Ms. Wynn-Williams believes her statements are true or false;

2.    [F]rom further promoting *Careless People* [] on a book tour or otherwise, including with respect to electronic and audio versions of the book;

3.    [T]o the extent within Respondent Wynn-Williams'[s] control, from further publishing or distributing *Careless People* [], including with respect to electronic and audio versions of the book;

4.    [T]o the extent within Respondent Wynn-Williams'[s] control, from amplifying or repeating in any forum all such previous 'disparaging, critical or otherwise detrimental comments,' regardless of whether Ms. Wynn-Williams believes her statements are true or false;

5.    [T]o the extent within Respondent Wynn-Williams'[s] control, retract all such previous 'disparaging, critical or otherwise detrimental comments' from all forums, including online, on which they appear.

Interim Award at 3-4.

Only then did Meta set out to ensure Ms. Wynn-Williams received notice of these proceedings. On March 13, 2025, Meta sent a threatening letter and a process server to Ms. Wynn-Williams's home address to deliver the Interim Award, a reliable method that Meta had not previously used. Just five days later, Ms. Wynn-Williams filed a motion to vacate the Interim Award on March 18, 2025. The emergency arbitrator denied that motion on March 31, 2025.

Over the intervening year, Ms. Wynn-Williams—who had a successful career as a public policy expert and diplomat even before her time at Facebook or the publication of *Careless People*—has accepted invitations to participate in conversations on public affairs in public forums, and has offered her opinions on topics within her expertise, conduct the Interim Award does not

5

prohibit.[1]  Despite Meta's concession that its agents attended at least one of these events, the un-

controverted evidence in the record—including the testimony of Meta's own counsel, who at-

tended at least one of the events specifically for the purpose of gathering evidence of a breach—is

that Ms. Wynn-Williams confined her remarks to contemporary issues, such as the future of the

internet, artificial intelligence, and the use of digital technology in warfare, and judiciously

avoided speaking about Meta or her book.  Naik Decl. Ex. C.

For example, Meta's own record shows that Ms. Wynn-Williams attended the following

events without discussing *Careless People* or Meta:

- February 23, 2026, regarding internet regulation.  Cohn Decl. Ex. D.  Promotional materials for the event explicitly note Ms. Wynn-Williams will not discuss *Careless People* or Meta. *See* Cohn Decl. Exs. D, E.

- February 25, 2026, regarding internet regulation.  Cohn Decl. Ex. F.  Promotional materials for the event explicitly note Ms. Wynn-Williams will not discuss *Careless People* or Meta. *See* Cohn Decl. Ex. F.

- March 2, 2026, regarding internet regulation.  Cohn Decl. Ex. C.  Promotional materials for the event explicitly note Ms. Wynn-Williams will not discuss *Careless People* or Meta. *See* Cohn Decl. Ex. C.

- March 3, 2026, regarding "how AI firms are shaping global policies, the tech industry's hypocrisy with regards to parenting, 'feminism' being exposed as internali[z]ed misogyny, and whether AI really does hate women."  *See* Cohn Decl. Ex. H.  Promotional materials for the event explicitly note Ms. Wynn-Williams will not discuss *Careless People* or Meta. *See* Cohn Decl. Ex. C.

- March 6, 2026, regarding internet regulation.  Cohn Decl. Ex. C.  Promotional materials for the event explicitly note Ms. Wynn-Williams will not discuss *Careless People* or Meta. See Cohn Decl. Ex. G.

- March 9, 2026, at the Enterprise GC 2026 conference in London, England for which the promotional materials state Ms. Wynn-Williams will discuss technological power's

---

[1] In fact, that conduct falls within an exception to the non-disparagement provision, which excludes "good faith expressions of opinion or competitive comparisons involving [Meta] that are not disparaging and are offered in the scope of your future employment or business ventures."

influence and "what this means for accountability, governance, and risk." Cohn. Decl. Ex. M.

Meta also attacks Ms. Wynn-Williams's future speaking engagements, specifically as a speaker at an event at the upcoming Hay Festival. Ms. Wynn-Williams's event and role at the Hay Festival does not mention either Meta or the book. Meta claims, however, that the planned engagement would be a violation of the Interim Award because the Hay Festival maintains a separate page where visitors can purchase copies of books, including *Careless People*, and because other invitees have been critical of Meta. Application at 7.

On March 5, 2026, claiming that Ms. Wynn-Williams was nevertheless in "flagrant violation" of the Interim Award, Meta demanded that Ms. Wynn-Williams provide detailed information including "[t]he number of her books sold" at the events, the "content of any remarks" she made, and the payments she received for them. Naik Decl. Ex. B at 1, 4. On March 6, Ms. Wynn-Williams responded via email, noting that she had carefully confined her remarks at these event to the issues of digital warfare, artificial intelligence, and governmental regulation of the internet. Naik Decl. Ex. C. On March 12, the parties appeared at a status conference before this tribunal at which the Arbitrator confirmed that Ms. Wynn-Williams is permitted to speak about certain matters within her area of expertise, including those she had identified in the March 6 email. Naik Decl. ¶ 6. Also at the March 12 status conference, counsel for Meta stated "I can tell you that my colleagues attended an event in Oxford and we have photos of [Ms. Wynn-Williams] herself holding the book. She is promoting the book at these events." Naik Decl. Ex. G at 1-2. Despite this averment, Meta filed no such evidence in support of the Application. On March 18, 2026, Ms. Wynn-Williams responded through counsel, stating that she (1) did not have access to the number of books sold at the events in question, (2) did not keep a record of her remarks at them, and

7

(3) received no payment for her appearances.  Naik Decl. Ex. D at 1.  These facts are totally consistent with the Interim Award.

## ARGUMENT

The Arbitrator should deny the Application for at least five reasons.  First, Meta's Application fully exposes that the Interim Award is a presumptively invalid prior restraint on speech, raising serious First Amendment issues that neither Meta nor the emergency arbitrator has contended with (but must, especially before considering the imposition of sanctions).  *See infra* Section I.  The fact that Meta attempts to base this sanctions motion on the provision of the Interim Award prohibiting Ms. Wynn-Williams from promoting *Careless People* demonstrates that the Award's vague and overbroad proscriptions unreasonably chill protected speech.  At a minimum, that is a reason to interpret it judiciously and deny the Application.  Second, Meta has not carried its burden to prove that Ms. Wynn-Williams violated any enforceable interpretation of any provision of the Interim Award.  *See infra* Section II.  Third, regardless of whether Meta could prove a violation of the Interim Award (it cannot), the safe harbor of California Procedural Code Section 177.5, the statute Meta cites for purported sanctions authority here, precludes sanctions.[2]  *See infra* Section III.  Fourth, California law does not permit the form or quantum of sanctions that Meta seeks.  *See infra* Section IV.  Finally, the emergency arbitrator erred in denying Ms. Wynn-Williams's motion to vacate the Interim Award.  *See infra* Section V.  Respectfully, the Arbitrator should take this opportunity to revisit the emergency arbitrator's opinion on the motion to vacate and dissolve the Interim Award.

---

[2] California law controls this arbitration.  *See* Procedural Order No. 1 at 11.

8

## I.    The Interim Award Violates the First Amendment

Under both the California and federal constitutions, injunctions are prior restraints and presumptively invalid if they prohibit speech before any adjudication that the particular statement itself is unprotected.[3]  *See Evans v. Evans*, 162 Cal. App. 4th 1157, 1168 (2008); *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1071, 1089-90 (C.D. Cal. 2003) (collecting cases); *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1049 (C.D. Cal. 1998) (dismissing a claim for injunctive relief prohibiting defendant from "disseminating or publishing further false, defamatory or disparaging information" because "such an injunction would necessarily precede an adequate determination that a particular statement by defendant was false, defamatory or disparaging").[4]  The Interim Award does not include a finding (let alone an adjudication) that any particular portion of *Careless People* or any particular statement Ms. Wynn-Williams intends to make or promote would be unprotected speech in violation of the non-disparagement provision in the Severance Agreement.  Interim Award at 3-4.  Indeed, the Interim Award does not include any findings

---

[3] Private arbitrators cannot disregard constitutional limits.  Under Employment Arbitration Rule 39(d), Meta may receive only a "remedy, relief, or outcome that the parties could have received in court ... in accordance with applicable law," which here includes the constitutional restrictions governing prior restraints.  Moreover, any award that contravenes those constitutional principles would be unenforceable when reduced to judgment in court, even if theoretically it could be issued in arbitration in the first instance. *See Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert*, 194 Cal. App. 4th 519, 533 (2011).

[4] The non-disparagement clause in the Severance Agreement does not alter the analysis.  Under California law, any purported contractual waiver of First Amendment rights must be "voluntar[y]," "clear and compelling," and unambiguously cover the specific speech at issue. *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1400 (1999).  The Interim Award makes no such findings.  Nor does it adjudicate whether any statements are "disparaging, critical or otherwise detrimental," which would be necessary even if a valid waiver existed.  Indeed, the Interim Award ignores a critical qualifier in the Severance Agreement clarifying that the non-disparagement provision is expressly "not intended to restrict [Ms. Wynn-Williams's] good faith expressions of opinion or competitive comparisons involving [Meta] that are not disparaging and are offered in the scope of [Ms. Wynn-Williams's] future employment or business ventures."  Arbitration Demand, Ex. A (Severance Agreement) at 5.

9

as to the content of *Careless People* at all. *Id.* The Interim Award is therefore a prior restraint on Ms. Wynn-Williams's speech, including in its prohibition that she refrain from making "disparaging, critical or otherwise detrimental comments to any person or entity concerning [Meta]" and that she refrain from "further promoting *Careless People* [] on a book tour or otherwise." *Id.*

As such a prior restraint, the Interim Award is presumptively invalid and could only ever be valid if "necessary" to promote a "compelling interest." *Evans*, 167 Cal. App. 4th at 1167. The Interim Award contains no such finding—nor even any analysis of the First Amendment implications of its provisions. That alone establishes that the Interim Award is invalid and unenforceable. No California state or federal court has ever held that such a prior restraint on unadjudicated speech meets this stringent standard. To the contrary, those courts regularly and consistently hold that they do not. *See Evans*, 162 Cal. App. 4th at 1169; *New.Net, Inc.*, 356 F.Supp.2d at 1089-90; *Kelly Sutherlin*, 194 Cal. App. 4th at 533 (holding even post-adjudication arbitration order must be "couched in the narrowest terms that will accomplish the pin-pointed objective" and must be "tailored as precisely as possible to the exact needs of the case").

Meta's application directly implicates these serious state and federal constitutional issues and conclusively establishes how the Interim Award chills core protected speech. For example, Meta attacks Ms. Wynn-Williams based on her planned appearance at an event at the Hay Festival. Meta bases this contention solely on the availability of *Careless People* on the Hay Festival online store and the fact that some *other* speakers at *other* Hay Festival events have in *other* prior appearances been critical of Meta. Application at 6-7. As this establishes, Meta's construction of the Interim Award's proscription on "promotion" operates as positive obligation to police others' conduct as a condition of exercising Ms. Wynn-Williams's First Amendment right to speak.

10

It would force Ms. Wynn-Williams to prevent others she does not control from using her name or likeness, even if she has no control or ability to prevent them, again as a condition of exercising her right to speak. These positive obligations operate as functional prior restraints, and the risk that her required proactive efforts might fail and expose her to sanctions creates an impermissible and unjustifiable chilling effect, threatening both Ms. Wynn-Williams's constitutional rights and her ability to pursue her professional activities as a technology and public policy expert.[5] That is not an outcome that the Interim Award is designed to produce. For this reason alone, the Arbitrator should decline to enforce the Interim Award—and certainly not to impose sanctions as Meta invites this tribunal to do.

At minimum, the Interim Award must be interpreted to avoid these issues and any ambiguity resolved in favor of Ms. Wynn-Williams. *Kelly Sutherlin*, 194 Cal. App. 4th at 533; *see also Sorensen v. Superior Ct. of Santa Barbara Cnty.*, 269 Cal. App. 2d 73, 78 (Ct. App.), *amended*, 276 Cal. App. 2d 131 (Ct. App. 1969); *U.S. v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985) ("[A]ll ambiguities or inconsistencies [in an injunction] are resolved in favor of the person subject to the injunction."). Such an interpretation is readily available: "promote" is an active verb, describing conduct by which a person actively advances, advocates for, or draws attention to something—in this case, the book *Careless People*. A person promotes a book by speaking about it, recommending it, encouraging others to buy it, reading from it, etc.[6] "Promote" does not necessarily describe

---

[5] As discussed *supra* n.4, even the Severance Agreement's non-disparagement clause recognizes this reality, clarifying that its scope is not intended to impede Ms. Wynn-Williams's ongoing business activities.

[6] Notably, even this more limited interpretation raises serious First Amendment concerns. Such advocacy for the book—encouraging others to engage with its viewpoint or adopt its reasoning—is core expressive activity protected by the First Amendment. *See, e.g., Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 868 (9th Cir. 2016); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995).

the act of being present to speak about other issues at a location where the book is on display and/or where others are promoting it, particularly when the evidence establishes that the speaker scrupulously avoided mentioning the book or the company that is the subject of the book. Anything more—and certainly the generalized restriction on Ms. Wynn-Williams's ability to speak in public or attend events organized by others that Meta's construction produces—goes beyond the appropriately tailored interpretation necessary to accomplish the Interim Award's purported objective and instead unreasonably chills Ms. Wynn-Williams's protected speech. *Kelly Sutherlin*, 194 Cal. App. 4th at 533. The First Amendment cannot tolerate that interpretation, and it is a construction that this tribunal disavowed at the March 12 status conference.

## II.    Meta Has Not Carried Its Burden to Demonstrate That Ms. Wynn-Williams Has Violated an Enforceable Interpretation of the Interim Award

Meta bears the burden of proving Ms. Wynn-Williams violated any enforceable interpretation of the Interim Award. *Corbett v. Hayward Dodge, Inc.*, 119 Cal. App. 4th 915, 926 (2004). To establish such a violation, at a minimum, Meta must prove that (1) Ms. Wynn-Williams herself or others that she controls have (2) taken affirmative action to promote *Careless People*. Meta fails to do so.

Meta first seeks to establish Ms. Wynn-Williams's liability by blaming her for the actions of third parties. Meta claims that Ms. Wynn-Williams served as the speaker for events offering attendees the option to purchase a copy of *Careless People* along with their ticket, Application at 5; appeared in photos or onstage where someone else held or had placed a copy or image of *Careless People*, Application at 3; and failed to prevent third parties she does not control from using her name, image, and likeness alongside images of *Careless People* to promote an event, Application at 5, 10. But Meta does not even attempt to establish that Ms. Wynn-Williams had the right to control any of these third parties. Meta does not contend that she directed any of these venues

12

to sell her book as part of their events (or that she even knew these sales were occurring). Nor does Meta contend that Ms. Wynn-Williams had any right to direct third parties not to hold a copy of her book in a photo or place a copy of that book on a stage. Nor does Meta contend that Ms. Wynn-Williams had any right to control whether a third party used a photo of her or her book—both of which are the subject of dozens of publicly available image files—in their own promotional materials. And despite its March 12 promise to this tribunal, *see* Naik Decl. Ex. G at 1-2, Meta has not provided any "photos of [Ms. Wynn-Williams] herself holding the book" at any of these events. *Id.* The silence of its own counsel, who attended the Oxford event specifically for the purpose of gathering evidence of a breach, is the most eloquent testimony available. Her actions thus fall squarely outside the plain text of the Interim Award.

Recognizing this weakness, Meta advances a scattershot array of theories for why Ms. Wynn-Williams herself has violated the Interim Award. Each fails. Meta contends that Ms. Wynn-Williams violated the Interim Award by serving as a speaker who "attract[ed] audience members" to these events. Application at 10. But the uncontroverted evidence in the record is that Ms. Wynn-Williams has never been involved in developing or disseminating the promotional material for these events and never mentioned Meta or her book at any of these events. Naik Decl. Ex. C at 1. The Interim Award does not (and cannot) prevent Ms. Wynn-Williams, an in-demand public policy expert, from speaking generally on matters within her expertise where she does not specifically reference Meta or her book.

Meta next contends that the photographs Ms. Wynn-Williams appears in "were later distributed online as further promotional materials" for *Careless People*. Application at 10. Meta cites to a single photograph published on the individual Instagram account of an author named Olivia Petter. *Id.* (citing Cohn Decl. Ex. H). But Meta does not identify how this or any other

13

photograph was allegedly "later distributed ... as further promotional materials." *Id.* Meta does not (and cannot) contend that Ms. Wynn-Williams used any of those photographs herself in any way (let alone as "promotional materials"), nor does Meta contend that she directed or had a right to control any aspect of their later distribution.

Though Meta disavows seeking to hold Ms. Wynn-Williams to account for the actions of third parties, its effort to cast Ms. Wynn-Williams's independent conduct as "promotion by a wink and a nod," is unworkable and leads to absurd results. Meta seeks to use the Interim Award to deputize Ms. Wynn-Williams against her will and force her to police the conduct of those around her on Meta's behalf. On Meta's construction, Ms. Wynn-Williams cannot:

- Speak at any literary festival, irrespective of what she says or does, because festival bookshops routinely stock and promote the books of speakers and/or organizers may choose to reference the fact that she has written the book in promotional materials;

- Appear at any professional or policy conference, because organizers may choose to reference her book in promotional materials as a credential; or

- Speak on a panel alongside other people who are known to be critical of Meta.

As discussed, Meta's invocation of Ms. Wynn-Williams's (planned) attendance at the Hay Festival neatly illustrates this point. Meta contends that the mere fact that the Hay Festival website allows visitors to purchase books (including *Careless People*) turns her attendance at Hay into an act of promotion in breach of the Interim Award. If this tribunal accepts that contention, Ms. Wynn-Williams would be prohibited from pursuing her professional activities.

These are inevitable consequences that arise from an interpretation of the Interim Award that is impossible to comply with in practice. That interpretation was rejected by this tribunal during the March 12 status conference and for good reason. Ms. Wynn-Williams attends many events, and she cannot control the actions of all the third parties present at them. That she may nevertheless attend without violating the Interim Award is manifest in both the Arbitrator's

14

confirmation at the March 12 status conference that Ms. Wynn-Williams is permitted to speak about matters within her area of expertise; and the Severance Agreement itself—from which the Award flows and which it purports to uphold—whose non-disparagement clause was expressly *"not intended to restrict [Respondent's] good faith expressions of opinion or competitive comparisons involving [Claimant] that are not disparaging and are offered in the scope of your future employment or business ventures."* Arbitration Demand, Ex. A (Severance Agreement) at 5. Consistent with this agreement, Meta has failed to prove that Ms. Wynn-Williams took any action in violation of the Interim Award.

### III.    Section 177.5's Safe Harbor Applies and Precludes Sanctions

Regardless of whether Meta can show that Ms. Wynn-Wiliams violated a constitutionally permissible interpretation of the Interim Award (it cannot), the Arbitrator may not impose sanctions under section 177.5 if there is good cause or substantial justification. Ms. Wynn-Williams need provide only a "valid excuse" for her actions. *See* Cal. Proc. Code § 177.5.; *see also People v. Kareem A.*, 46 Cal. App. 5th 58, 78 (2020). Ms. Wynn-Williams need not demonstrate objective good faith or subjectively honest mistake (though she has) or any of the other more "onerous" standards "imposed by" other California sanctions provisions. *Seykora v. Superior Ct.*, 232 Cal. App. 3d 1075, 1081 (Ct. App. 1991), *reh'g denied and opinion modified* (Aug. 23, 1991).

Regardless of whether this tribunal found Ms. Wynn-Williams violated the Interim Award (she did not), due to the ambiguity of the Interim Award and for the reasons stated above regarding the serious First Amendment implications of Meta's Application, she would have done so with good cause or substantial justification and sanctions would be unjustified. *Butler v. Superior Ct. In and For Alameda Cnty.*, 178 Cal.App.2d 763, 765 (1960) (ambiguity in an injunction should be "resolved in favor of the accused"); *Winikow v. Superior Ct.*, 82 Cal. App. 4th 719, 726 (2000)

(Section 177.5 imposes sanctions only where there is "a knowing violation of a valid order of the court *without* good cause or substantial justification") (emphasis added).

## IV.    California Law Does Not Permit Meta's Requested Form of Sanctions

Meta's burden and safe harbor considerations aside, the relief Meta seeks is contrary to law and entirely inappropriate.  Section 177.5 by its plain text provides for a capped $1,500 fee "payable to the court"—not the party seeking sanctions—and nowhere provides for disgorgement or an award of attorneys' fees to the seeking party.  Meta cites no authority at all for its assertion that disgorgement is available as a sanction under the statutory structure of Section 177.5 that it invokes.  Rather, the cases Meta cites make clear that California courts confine themselves to the types of sanctions awards specifically enumerated in California statutes.  Application at 16-17 (citing *David v. Abergel*, 46 Cal. App. 4th 1281, 1283 (1996) (affirming sanctions of $75,000 in attorneys' fees under Cal. Civ. Proc. Code § 128.5 for filing frivolous claim); *Bak v. MCL Fin. Grp., Inc.*, 170 Cal. App. 4th 1118, 1127 (2009) (affirming sanctions of $7,500 for discovery violation under Colorado law); *WFP Sec., Inc. v. Davis,* 2014 WL 1465181, at *10 (Cal. Ct. App. Apr. 15, 2014) (affirming exclusion of witness as sanction for discovery violations)).  Meta contends, incorrectly, that "use of profits as a measure for the contempt sanction is hardly a novel proposition," and that courts have inherent authority to issue such sanctions.  Application at 16 (quoting *Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004 (9th Cir. 2004)).[7]  California law is crystal clear: "[A] court does not have inherent power to impose monetary sanctions

---

[7] *Jerry's Famous Deli*—a federal case not relying on California sanctions statutes—is the only case Meta cites to support its disgorgement sanctions request.  383 F.3d at 1004.  Meta omits key context: "disgorgement of profits is a traditional ***trademark*** remedy" in federal court.  *Id.*  It says nothing about sanctions in this contract case under California state law.

payable to an opposing party or counsel." *Sagonowsky v. Kekoa*, 6 Cal. App. 5th 1142, 1153 n.9 (2016).

Meta's lack of statutory authority to support its claim for attorneys' fees is similarly fatal. Under California Supreme Court precedent, "trial courts may not award attorney fees as a sanction for misconduct unless they do so pursuant to statutory authority or an agreement of the parties." *Olmstead v. Arthur J. Gallagher & Co.*, 32 Cal. 4th 804, 809 (2004).  Meta has identified neither.

## V.     The Arbitrator Should Revisit and Dissolve the Interim Award

Respectfully, the emergency arbitrator erred in rejecting Ms. Wynn-Williams's arguments that the Severance Agreement and its arbitration and non-disparagement provisions are unenforceable and that Ms. Wynn-Williams lacked a reasonable opportunity to be heard on those issues under AAA Employment Rule O-3 before entry of the Interim Award.  Meta's motion for sanctions confirms the validity of several of these points and provides an opportunity for the Arbitrator to correct this error.

*First*, as Ms. Wynn-Williams argued in her motion to vacate the Interim Award, the Severance Agreement is unlawful and unenforceable because it violates at least four provisions of federal and California law.  Indeed, the non-disparagement provision of the Severance Agreement is unenforceable as an unfair labor practice under the National Labor Relations Act (the "NLRA"), 29 U.S.C. §§ 151-169.  The National Labor Relations Board ("NLRB") reached this exact conclusion in July of 2024, invalidating substantively identical non-disparagement clauses in thousands of Facebook severance agreements executed in 2022 and 2023. *Meta Platforms, Inc.*, No. 19-CA-312724, 2024 WL 3469667 (July 19, 2024).  The non-disparagement provision is also unenforceable because it violates both the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), H.R. 4713, 11th Cong. § 922 (2010), and the Securities and Exchange Act ("Exchange Act"), 17 C.F.R. § 240.21F-17(a), which seek to "provid[e] incentives for persons with

17

knowledge of misconduct to come forward and share their information with the Commission." Securities Whistleblower Incentives and Protections, 76 Fed. Reg. 34300-01, 34308 (June 13, 2011).[8] The provision violates Dodd-Frank and the Exchange Act by preventing Ms. Wynn-Williams from recovering any money from reporting misconduct: precisely the kind of language the SEC has found unlawful. *See, e.g.*, *HomeStreet, Inc.*, Exchange Act Release No. 34-79844, 115 SEC Docket 18 (Jan. 19, 2017); *In the Matter of BlackRock, Inc.*, Exchange Act Release No. 34-79804, 115 SEC Docket 5758 (Jan. 17, 2017); *BlueLinx Holdings, Inc.*, Exchange Act Release No. 34-78528, 114 S.E.C. Docket 4599 (Aug. 10, 2016). The non-disparagement provision further violates Dodd-Frank and the Exchange Act by its ambiguous whistleblower protections that leave employees confused about their rights and could "impede an individual from communicating directly with the Commission staff about a possible securities law violation." 17 C.F.R. § 240.21F-17(a); *see also D.E. Shaw & Co, L.P.*, Exchange Act Release No. 98641 (Sep. 29, 2023) (finding confidentiality agreements that prohibit any disclosure of confidential information outside the company without written consent violate Rule 21F-17).

The provision also violates California's Silenced No More Act, Cal. Gov't Code § 12964.5, which explains that non-disparagement provisions in severance agreements are unenforceable if they "prohibit[] the disclosure of information about unlawful acts in the workplace." *Id.* at § 12964.5(b). Meta publicly conceded this point: it claimed in its 2022 proxy statement that a resolution to publicly report on "concealment clauses" like this one was unnecessary because "[a]ll of our policies are intended to comply with the National Labor Relations Act ... and the recently enacted California Silence No More Act [sic], which generally prohibits the use of non-

---

[8] Ms. Wynn-Williams did in fact file a 78-page whistleblower complaint with the Commission in 2024.

disparagement clauses in employment agreements." Mot. to Vacate Interim Award Ex. 8 at 75. Meta further stated: "[W]e do not require our personnel to enter into employment agreements that include non-disparagement clauses that would prevent them from discussing unlawful workplace conduct." *Id.* Despite its public guarantees, Meta attempts to enforce its unlawful non-disparagement clause against Ms. Wynn-Williams and silence her speech regarding Meta's unlawful workplace conduct.

*Second*, for the reasons Ms. Wynn-Williams stated in her motion to vacate the Interim Award, Meta cannot seek enforcement of the Severance Agreement against Ms. Wynn-Williams. Meta has waived its right to force arbitration of these claims. *See* Mot. to Vacate Interim Award at 12-13. "[T]he right to arbitrate … can be waived, either expressly or by implication, *Thorup v. Dean Witter Reynolds, Inc.*, 180 Cal. App. 3d 228, 234 (1986), and waiver of that right requires "(1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right." *Hill v. Xerox Bus. Servs., LLC*, 59 F. 4th 457, 468 (9th Cir. 2023). In November 2018, Facebook announced that it would no longer force arbitration for employee sexual harassment claims. Mot. to Vacate Interim Award at 12. When Meta publicly renounced forced arbitration against sexual harassment claimants it waived its ability to force Ms. Wynn-Williams into arbitration. Ms. Wynn-Williams relied on these public statements, and Meta cannot now demand arbitration of these claims arising out of Ms. Wynn-Williams's allegations of sexual harassment. *Id.*

*Finally*, Ms. Wynn-Williams lacked "a reasonable opportunity ... to be heard" under AAA Employment Rule O-3 before the emergency arbitrator issued the Interim Award—she was not heard at all. Meta represented to the emergency arbitrator that it provided notice of the hearing on its application for emergency relief to the email address ████████████████████ and that

19

this was the best available contact information for Ms. Wynn-Williams. That was false. Meta had access to, but declined to use, another email address for Ms. Wynn-Williams that Meta knew was more recently used because Meta had used that very email address to communicate with Ms. Wynn-Williams with regard to her Severance Agreement. As Meta itself later conceded, Ms. Wynn-Williams's website contains a different email address for Ms. Wynn-Williams, which was publicly available information that both Meta and its counsel could and should have easily identified. Opp. to Mot. to Vacate Interim Award at 3 n.1. Instead, Meta used an eight-year-stale email address from Ms. Wynn-Williams's contact card as a Meta employee, information that Meta knew had not been updated since her departure in 2017. Ms. Wynn-Williams no longer has access to this email address, and for that reason has used an alternative email address for many years, including in hundreds of email exchanges with Meta employees and their employment counsel. Mot. to Vacate Interim Award at 5. This was a bad faith attempt to ensure that Meta could secure the Interim Award in *ex parte* fashion. Indeed, once Meta accomplished this goal, Meta used more reliable means to ensure Ms. Wynn-Williams quickly received actual notice of the Interim Award itself: the day after the Interim Award was issued, Meta had a copy of it and a threatening letter physically served on Ms. Wynn-Williams at her home address in London. In doing so, Meta demonstrated it was perfectly capable of providing her with actual notice of its motion for an interim award one week earlier. Meta did not make use of that more reliable contact information earlier because it did not want to risk providing Ms. Wynn-Williams with actual notice of an imminent hearing. But once it had secured that Interim Award, Meta's calculus changed. It was now critical for Meta to ensure that Ms. Wynn-Williams received actual notice of the Interim Award as quickly as possible to constrain actions that Meta deemed adverse to its own interests.

20

Meta's false claim that Ms. Wynn-Williams admitted actual notice of the hearing on the Interim Award during a March 12 podcast—on which the emergency arbitrator relied—does not change that result. During that podcast taping, Ms. Wynn-Williams stated that she was aware that Meta was attempting to "shut this book down." Order on Mot. to Vacate Interim Award at 7. This was true: less than a week earlier, on March 6, Meta's counsel had sent Ms. Wynn-Williams's publishers a letter full of hyperbolic assertions about the state of American defamation law in an attempt to intimidate those publishers into shelving the book. That March 6 letter included no reference to any arbitration demand or emergency application even though Meta would proceed to file both just a day later.

For all of these reasons, the emergency arbitrator erred in denying Ms. Wynn-Williams's motion to vacate the Interim Award. Respectfully, the Arbitrator should take this opportunity to correct that error and dissolve the Interim Award.

## CONCLUSION

For the reasons set forth above, the Application should be denied.

21

Dated:  New York, NY          Respectfully submitted,
       April 17, 2026

                    SELENDY GAY PLLC

             By:    /s/         *Philippe Z. Selendy*
                    Philippe Z. Selendy
                    Jennifer M. Selendy
                    Claire E. O'Brien
                    Corey Stoughton
                    Drake Reed
                    SELENDY GAY PLLC
                    1290 Avenue of the Americas
                    New York, New York 10104
                    Tel: ▮▮▮▮▮▮▮
                    pselendy@selendygay.com
                    jselendy@selendygay.com
                    cobrien@selendygay.com
                    cstoughton@selendygay.com
                    dreed@selendygay.com

                    Ravi Naik
                    AWO
                    ▮▮▮▮▮▮▮▮▮▮▮▮▮
                    London E2 8JF
                    Tel: ▮▮▮▮▮▮▮

                    *Attorneys for Respondent/Counterclaimant Sarah Wynn-Williams.*

22

**AMERICAN ARBITRATION ASSOCIATION**
**EMPLOYMENT ARBITRATION DIVISION**

In the Matter of the Arbitration between

META PLATFORMS, INC.,

      Claimant/Counterclaim Respondent,

      v.

SARAH WYNN-WILLIAMS,

      Respondent/Counterclaimant.

Arbitration Case No.: 01-25-0001-2834

Arbitrator: Hon. Marcus Salvato Quintanilla

**DECLARATION OF RAVI NAIK**

I, Ravi Naik, do hereby declare:

1. I am counsel to the Respondent. While Respondent has sought long-term replacement US counsel to act for her in this Arbitration, I have advised and represented her in that regard.

2. I respectfully submit this declaration in opposition to Claimant Meta's Application for Sanctions.

3. Attached hereto as **Exhibit A** is a true and correct copy of Claimant's letter to Flatiron Books and Macmillan Publishers on 6 March 2025.

4. Attached hereto as **Exhibit B** is a true and correct copy of Claimant's letter to the Arbitrator of 5 March 2026.

5. Attached hereto as **Exhibit C** is a true and correct copy of Ms. Wynn-William's email to the Arbitrator dated 6 March 2026, in which Ms. Wynn-Williams wrote to the Arbitrator explaining three areas on which she was speaking.

6. On 12 March 2026, a status conference was held, at which the Arbitrator confirmed that Ms. Wynn-Williams was permitted to speak on at least those three issues, which are (1) the future of the internet, (2) artificial Intelligence, and (3) the use of digital technology in warfare.

7. Attached hereto as **Exhibit D** is a true and correct copy of my firm's letter to Claimant's counsel of 18 March 2026.

8. Attached hereto as **Exhibit E** is a true and correct copy of my firm's letter to Claimant's counsel of 20 March 2026.

9. Attached hereto as **Exhibit F** is a true and correct copy of my firm's letter to Claimant's counsel of 23 March 2026.

10. Attached hereto as **Exhibit G** is a true and correct copy of my firm's letter to Claimant's counsel of 25 March 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 17, 2026.

*/s/ Ravi Naik*

Ravi Naik
AWO

London E2 8JF
Tel:

# **EXHIBIT A**

# LEHOTSKY KELLER COHN LLP

200 Massachusetts Ave. NW
Washington, DC 20001
Jonathan F. Cohn
jon@lkcfirm.com

March 6, 2025

**VIA EMAIL**

Deb Futter, President and Publisher
Megan Lynch, Executive Vice President and Publisher
Flatiron Books
120 Broadway St.
New York, NY 10271



Yassy Okamoto, General Counsel
Poppy North, Publicity Director
Kimberley Nyamhond, Senior Publicity Manager
Macmillan Publishers
120 Broadway St.
New York, NY 10271



      RE:    Publication of False Statements about Meta

Dear All:

Yesterday it came to our attention through public reports that Flatiron Books and Macmillan Publishers ("you") intend to imminently publish a book that may contain false statements regarding Meta Platforms, Inc., Mark Zuckerberg, Joel Kaplan, Sheryl Sandberg, and other current or former Meta employees. On behalf of our client, we demand that you not publish any false and defamatory information.

We do not have a copy of the book, and you have made no attempt to verify any of its content with Meta. But the promotional materials you prepared to publicize this

book's release strongly suggest that it will contain overheated, false, and potentially defamatory allegations.

Your failure to properly investigate these allegations demonstrates your knowing disregard for the truth. This former employee was terminated in 2017, and an investigation at that time found she made false claims. Meta is the subject of many books, and publishers typically seek to corroborate facts with us in advance of publication. That did not happen here. *See, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 900 (9th Cir. 1992) (noting a jury could "conclude that the publisher failed to conduct an investigation because it was already pretty much aware of the falsity").

The First Amendment does not protect defamatory statements. Accordingly, this letter places you on notice that Meta will take all appropriate legal action, including the commencement of litigation, against you and others associated with the book, exposing you and others to substantial monetary damages, in response to any false statements, characterizations, or implications.

Under well-established defamation principles, you would be liable for any false and defamatory claims presented as fact. It is equally clear that publication of misleading information gives rise to liability for defamation since the incomplete presentation of facts implies a false assertion of fact. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) (incomplete facts can imply actionable false assertion of fact). The act of publishing unverified or reckless allegations—without making any attempt to verify their accuracy with us—will expose all involved parties to significant legal consequences. *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (noting liability for libel where "inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [] charges").

We encourage you to discuss these serious issues with your client before the book is released publicly. Additionally, we ask that you provide us with a copy of the book before publication so that we can review it and inform you of any content that needs to be revised. Please also describe what fact-checking process you engaged in, if any. Finally, we demand an assurance that the book will not contain any false or defamatory information. Needless to say, the failure to cooperate will demonstrate actual malice and reckless disregard for the truth.

Meta reserves all rights. Please contact me as soon as possible so that we can discuss how to proceed.

2

Sincerely,


/s/ *Jonathan F. Cohn*


Jonathan F. Cohn

# **EXHIBIT B**

**LEHOTSKY KELLER COHN LLP**

200 Massachusetts Ave. NW
Washington, DC 20001
Jonathan F. Cohn
jon@lkcfirm.com

March 5, 2026

**VIA E-MAIL**

Marcus Quintanilla
Arbitrator

██████████████

██████████████

██████████████

      RE:   *Meta Platforms, Inc. v. Sarah Wynn-Williams*, No. 01-25-0001-2843

Dear Arbitrator Quintanilla:

We write on behalf of Claimant Meta Platforms, Inc., to notify you of Respondent Sarah Wynn-Williams' ongoing and flagrant violations of the Interim Award through the continued promotion of her book "Careless People." Respondent has participated in a series of events designed to promote and sell her book—during the very period when she has failed to meaningfully participate in this arbitration or identify replacement counsel. Claimant respectfully requests that you set another status hearing in this matter, and order Respondent to show cause why she should not be sanctioned for those intentional violations and to provide additional information to Claimant and you regarding her conduct.

The Interim Award has been in place for nearly a year. After concluding that "Claimant has established a likelihood of success on the merits of its contractual non-disparagement claim against Respondent Wynn-Williams, and that immediate and irreparable loss will result in the absence of emergency relief," the Emergency Arbitrator specifically enjoined Wynn-Williams and entities she controls "from further promoting *Careless People: A Cautionary Tale of Power, Greed, and Lost Idealism* on a book tour or otherwise." Interim Award at 3-4.

Despite the clear terms of the Interim Award, Respondent is actively promoting her book. Claimant recently learned Respondent participated in promotional events on,

at least, February 23, February 25, March 2, and March 3. *See* Cohn Decl. Exs. A-F. She has at least one additional event planned for March 6. *See* Cohn Decl. Ex. G.

These events are plainly designed to promote her book. Respondent has appeared at bookstores selling her book for events prominently featuring her book. Photographs from Respondent's events are publicly available:

 

Cohn Decl. Ex. E at 2-3.



Cohn Decl. Ex. D at 3.

The promotional materials also prominently feature Respondent's book:



Cohn Decl. Ex. A at 1.

Attendees are encouraged to buy the book with their tickets: "Buy your tickets today! . . . [T]here is a Ticket & Book option which includes a copy of Careless People by Sarah Wynn-Williams." *Id*. at 2.

3

Respondent is intentionally violating the Interim Award while failing to meaningfully engage in this matter. Respondent has notice that "compliance with the Interim Award" requires her to "stop[] promoting" her book. Emergency Motion to Vacate Interim Award at 3. And there is no doubt that the Interim Award remains in full force and effect. *See* Order Denying Respondent Wynn-Williams' Emergency Motion to Vacate Interim Award. Indeed, the materials promoting these events expressly acknowledge "ongoing legal restrictions," including "a ruling against Sarah . . . preventing her from promoting the book." Cohn Decl. Ex. A at 2, Ex. G at 2.

The fact that Respondent represents she will refrain from directly "speaking about her book" does not bring her conduct into compliance with the Interim Award. Cohn Decl. Ex. G at 2. Promoting her book with a wink and a nod violates the Interim Award no less than an express oral request to purchase the book would. Respondent may not "further promot[e]" her book "on a book tour or otherwise." Interim Award at 4. Nor may she "amplify[] in any forum all such previous 'disparaging, critical or otherwise detrimental comments.'" *Id.* That of course includes using the Interim Award itself as a mechanism to promote her book. *See* Ex. A at 2.

It is now clear why Respondent has not had time to hire counsel or meaningfully participate in the arbitration process: She has made an intentional choice to go on a promotion tour for her book in violation of the Interim Award. Respondent's conduct is contemporaneous with her publishers' release of a paperback version of the book on February 26. Cohn Decl. Ex. H at 9. Respondent's publisher has admitted to operating "in an aura of secrecy" and trying to avoid "potential attempts to quash" the book. *Id.* at 5-6. Accordingly, Claimant respectfully requests you order a status hearing and that Respondent be ordered to show cause why she should not be sanctioned for violating the Interim Award and, in fact, using that Award to promote her book. Given these ongoing violations, Claimant further requests that Respondent provide Claimant and you with the following information:

- The number of her books sold at these promotional events;
- The content of any remarks made by Respondent at these events, including any scripts, notes, or draft questions and answers;
- Payments she received related to these events, including from book sales related to these events;
- All contracts between Respondent and her publishers regarding the book; and
- All communications and documents exchanged with her publishers or the hosts of these events regarding her appearance at the events.

4

Respectfully submitted,

/s/ Jonathan F. Cohn

Jonathan F. Cohn

Enclosure

cc:     Sarah Wynn-Williams
       Will Thompson
       Mary Miller
       Mathew Rosengart
       Alex Linhardt

# EXHIBIT C

**From:** Sarah Wynn-Williams
**Sent:** Friday, March 06, 2026 2:36 PM
**To:** Marcus Quintanilla
**Cc:** Will Thompson; ICDR Erin Brennan; rosengartm@gtlaw.com; linhardta@gtlaw.com; kemplem@gtlaw.com; Jon Cohn; Mary Miller; Alexis Swartz
**Subject:** Re: Meta v Sarah Wynn-Williams

*** External E-Mail – Use Caution ***

Dear Arbitrator Quintanilla

Thank you for your email.

I have read the Claimant's letter and exhibits. I write to provide my preliminary observations for you, mindful that I am currently self-represented in this hearing.

Firstly, the Claimant's state that I have been engaged with "ongoing and flagrant violations of the Interim Award." I engaged in five speaking engagements only. I have no further public speaking engagements so there is no basis to claim an "ongoing" or concurrent issue.

Secondly, the Claimant has not presented any evidence of a violation as there is no violation. I was invited to speak at five small and curated events, in which I spoke about contemporary issues only. I did not – as the Claimant's exhibits show – violate the severance agreement, mention the book, or otherwise promote the book. For your information, the discussions were on the future of the internet (on issues such as the British government's approach to regulation of online services), Artificial Intelligence (including issues to do with large model providers, of whom OpenAI and Anthropic are the only actors the public are aware of) and the use of digital technology in warfare (a topic in which I have unique expertise from my ongoing work in technology after I left the Claimant). This is what the events were billed as covering and did cover.

Thirdly, the Claimant seems to be aware that I did not breach the Severance Agreement or Interim Award. They suggest I did so by "a wink and a nod". I do not know what a "wink or a nod" means but they do not provide evidence even for that. The highest they put matters is a photo of me with a book in the background. Of course, when I am speaking those that host the event may refer to the book. I cannot control third parties beyond telling them of my legal restrictions before I agree to speak. I was very deliberate to avoid any discussion of the Claimant to ensure there was no breach and did so.

Fourthly, if the Claimant was so concerned about these events they could have come to you before now. These five events have been promoted for a while and transparently so. There has been nothing clandestine about these speaking engagements because I understand I am allowed to speak on wider topics within my expertise. The Claimant is only coming to you after the event because they knew from the promotional material of the events that I would not be in breach of the Interim Award or the Severance Agreement. The material was clear that I would not be speaking in any way that violated the Interim Award, and I followed the contours of that rigorously. The Claimant's evidence is speculative at best.

Finally, I am unclear what "sanctions" the Claimant seeks as they do not detail them. I do not have any further public speaking engagements. Nevertheless, such a threat of sanctions is alarming for me and suggests that the Claimant is attempting to police my behaviour and restrict me even when I am *expressly not* discussing the Claimant nor otherwise engaging in conduct that may breach the severance agreement or Interim Award. I am an expert on technology issues and as such speak about technology issues. I have stuck to the Interim Award strictly for a year, at great personal impact. That has not been easy, but I have done it. The Claimant now comes to you to complain about a speculative and unevidenced breach.

I am further concerned that the Claimant is attempting to leverage the fact that their questions to me in discovery led to me being self-represented. Any discussion of sanctions in the absence of counsel would be very difficult and unfair for me, as it would involve legal discussions. To face repercussions of any sort without representation would be very detrimental. In contrast, there is no detriment to the Claimant in me securing counsel before any such hearing as I currently have no public engagements. Contrary to the Claimant's suggestion that I have not sought to instruct new counsel; I have spent a considerable amount of my own time doing so. This has been challenging due to the extent of the Claimant's legal representation/conflicts. I have made significant progress. I have identified counsel who has confirmed that they do not have a conflict and am in the process of establishing instructions with them. I would in fact hope to have counsel in place by the end of next week / early the week after. That is not a process that should be rushed given what has transpired before.

With that in mind, I would ask that any hearing is held until once I have my counsel in place. As before, there is no prejudice to the Claimant.

I am being as open with you and the Claimant as I can be through this email. In light of these matters, I would ask that any hearing is listed for when I have counsel. That hearing can then also address the future progression of the arbitration, which would be a more resourceful use of your and the Claimant's time.

Yours sincerely

Sarah Wynn-Williams

On Fri, Mar 6, 2026 at 12:41 AM Marcus Quintanilla < ███████████████████ > wrote:

> Thank you, Mr. Thompson.
>
> Receipt confirmed.
>
> Ms. Wynn-Williams, please submit any written response that you deem appropriate by midnight (Pacific Time) tomorrow, March 6, 2026.
>
> The Parties are also requested to confirm their availability for a status conference to be held by Zoom from 12:00 pm to 12:30 pm (Pacific Time) on Monday, March 9, 2026.

Please confirm receipt of this email at your earliest opportunity.

signatureImage

---

**From:** Will Thompson <will@lkcfirm.com>
**Sent:** Thursday, March 5, 2026 12:20:55 PM
**To:** Marcus Quintanilla ████████████████████; Sarah Wynn-Williams <████████████████>
**Cc:** ICDR Erin Brennan <████████████ rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; Jon Cohn <jon@lkcfirm.com>; Mary Miller <mary@lkcfirm.com>; Alexis Swartz <alexis@lkcfirm.com>
**Subject:** RE: Meta v Sarah Wynn-Williams

Arbitrator Quintanilla,

Attached please find a letter from counsel for Meta regarding the Interim Award.

Best regards,

Will

**Will Thompson** | LEHOTSKY KELLER COHN | ████████

---

**From:** Marcus Quintanilla <████████████████████>
**Sent:** Wednesday, February 25, 2026 8:48 AM
**To:** Sarah Wynn-Williams ████████████████████
**Cc:** ICDR Erin Brennan <████████████>; rosengartm@gtlaw.com; linhardta@gtlaw.com; kemplem@gtlaw.com; Will Thompson <will@lkcfirm.com>; Drew Waldbeser <drew@lkcfirm.com>; Todd Disher <todd@lkcfirm.com>; Jon Cohn <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Ms. Wynn-Williams:

No worries at all. You are right to clarify.

You have understood correctly.

All the best,

signatureImage

**From:** Sarah Wynn-Williams <█████████████████>
**Sent:** Wednesday, February 25, 2026 4:54:58 AM
**To:** Marcus Quintanilla <█████████████████>
**Cc:** ICDR Erin Brennan <█████████████████>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email.

Just so I am sure, I take your email to mean that the matter will proceed as set out in your email of 20 February that:

1. The case-management dates and the timetable in Procedural Order No. 2 will not be altered.
2. The matter will proceed with me acting "in propria persona". I understand that to mean self-represented but please do confirm.
3. If and when I do instruct new counsel, they should make their formal appearance, and subsequent communications will be made through them.
4. There will be no follow-up status conference scheduled this week.

Sorry to follow up to confirm but I thought it best to be sure of the status.

Yours sincerely

Sarah

On Tue, Feb 24, 2026 at 8:07 PM Marcus Quintanilla <█████████████████> wrote:

> Thank you, Ms. Wynn-Williams.
>
> We will proceed as currently planned.
>
> All the best,
>
>
> ---
>
> **From:** Sarah Wynn-Williams █████████████████
> **Sent:** Monday, February 23, 2026 10:12:09 PM
> **To:** Marcus Quintanilla <█████████████████>
> **Cc:** ICDR Erin Brennan <█████████████████>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>
> **Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

Thank you for your email and apologies again for the mix up. I will provide my contact details to the ICDR.

By way of update, I can confirm that I have reached out to multiple lawyers and law firms, both large and boutique. I am finding that those firms are, whatever their size, conflicted. This is unexpected but based on the responses I think it stems from the size and scope of Meta's interests.

I am waiting on responses from a significant number of attorneys and among those I hope will receive a positive response. I also continue to reach out to new attorneys. As this matter requires a high level of trust from me and skill (and to avoid repeating the experience with Quinn), I want to be thorough and thoughtful with the process of selecting my new representative. It is important that I get the selection right. I believe that this measured approach will ultimately lead to the best outcome for all parties and the arbitration process.

I can confirm my agreement that neither party has yet made its document production to the other.

Finally, for my part I do not think we need to reschedule the status conference but I am happy to do so if you feel it is necessary or in any way helpful.

Yours sincerely

Sarah

On Fri, Feb 20, 2026 at 7:04 PM Marcus Quintanilla ███████████████ > wrote:

> Dear Ms. Wynn-Williams:
>
> Thank you for your email.
>
> We waited for you to join the status conference for about 10 minutes and also tried to reach out to you by telephone, although we did not have a telephone number for you on file. (Ms. Brennan also has no record of your call to her.) I regret that there seems to have been a breakdown in communications.
>
> In any case, nothing transpired at the status conference, except that counsel for Meta confirmed that neither party has yet made its document production to the other. (If you disagree with that statement, please let me know.)
>
> As I explained during the hearing, it appears that the remaining case-management dates lie reasonably in the future, and that, at this point, there is no cause to alter the procedural timetable set forth in Procedural Order No. 2.
>
> I would ask that, not later than Monday, February 23, you advise all case participants whether you have obtained replacement counsel to represent you in the arbitration. If not, we will note in the case file that you are proceeding in propria persona. At that point, you should provide the ICDR with your telephonic contact information. If you have secured counsel, they should make their formal appearance, and subsequent communications will be made through them.
>
> In view of the apparent mixup with the hearing link, I will be happy to schedule a follow-up status conference next week if you would like that. Please let me know your preference with your next communication.

All the best,

![signatureImage]

**From:** Sarah Wynn-Williams ███████████
**Sent:** Friday, February 20, 2026 10:38:51 AM
**To:** ICDR Erin Brennan ██████████
**Cc:** Marcus Quintanilla ████████████████████████; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>
**Subject:** Re: Meta v Sarah Wynn-Williams

Regarding this, I never received any connecting/dial in details. I tried to contact Erin on the number below but there was no response/answer.

It is now late in the UK and my childcare is finishing (as I thought our status conference would have concluded by now).

Please let me know if I have somehow missed the connecting details, a thorough search of spam folders etc has not revealed anything.

Kind regards,

Sarah

On Wed, Feb 18, 2026 at 5:28 PM ICDR Erin Brennan ██████████████ > wrote:

Thank you all, I will distribute the connecting details shortly.

Best,

Erin

**ICDR Erin Brennan**
Director ICDR

American Arbitration Association
International Centre for Dispute Resolution
█████████████████████ Los Angeles, CA 90017
T: ████████████████████████
adr.org | icdr.org | aaaicdrfoundation.org
Explore 100 Years of AAA

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by

reply email and destroy all copies of the transmittal. Thank you.

**From:** Sarah Wynn-Williams ██████████████
**Sent:** Wednesday, February 18, 2026 8:42 AM
**To:** Marcus Quintanilla ███████████████████
**Cc:** rosengartm@gtlaw.com; linhardta@gtlaw.com; ████████████████████████████

**Subject:** Re: Meta v Sarah Wynn-Williams

**\*\*\* External E-Mail – Use Caution \*\*\***

Dear Mr Quintanilla,

My apologies for the delay, confirming that I am available on the date and time you have suggested.

Kind regards,

Sarah Wynn-Williams

On Tue, Feb 17, 2026 at 7:32 PM Marcus Quintanilla ████████████████████ > wrote:

> Ms. Wynn-Williams:
>
> I don't believe I received confirmation of your availability.
>
> My apologies if I missed it.
>
> Best,
>
> ___
>
> **From:** rosengartm@gtlaw.com <rosengartm@gtlaw.com>
> **Sent:** Monday, February 16, 2026 10:35 AM
> **To:** ██████████████████████
> **Cc:** ██████████████████████ linhardta@gtlaw.com <linhardta@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; ████████████████████
> **Subject:** Re: Meta v Sarah Wynn-Williams
>
> Thank you, Mr. Quintanilla.
>
> On behalf of Meta, we are available on the date and at the time below.

Respectfully yours,

**Mathew S. Rosengart**

National Co-Chair, Media & Entertainment Litigation
Greenberg Traurig, LLP
View GT Biography

On Feb 13, 2026, at 11:10 AM, Marcus Quintanilla <███████████████████> wrote:

Thank you, Ms. Wynn-Williams.

Receipt confirmed.

At this point, I think it appropriate to set a status conference for one week from today: February 20, 2026, at 10:00 a.m. (Pacific). Hopefully, by that time, you will have secured counsel.

I would ask that both sides confirm their availability for a short videoconference on that date and time. Once I've received confirmation, the ICDR will schedule the conference.

All the best,

<Outlook-zerozbxe.png>

**From:** Sarah Wynn-Williams, ████████████████████
**Sent:** Friday, February 13, 2026 8:09 AM
**To:** Marcus Quintanilla ████████████████████
**Cc:** linhardta@gtlaw.com <linhardta@gtlaw.com>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; ████████████████████
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

As requested, I am writing to update you on my progress with new representation.

Over the last four days I have made enquiries with lawyers. Unfortunately, some of the lawyers I have approached have previously acted or are currently acting for Meta. I am anticipating further responses early next week.

I will keep you and the representatives for Meta updated.

Yours sincerely,

Sarah Wynn-Williams

On Tue, Feb 10, 2026 at 1:44 AM Marcus Quintanilla ▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

Dear Ms. Wynn-Williams:

Thank you for your note.

Please update me and all case participants not later than this Friday, February 13, 2026, at 5:00 p.m. (Pacific Time).  If you have not secured counsel by then, we will schedule a status conference to address the path forward.

All the best,

<Outlook-zmxr5hmw.png>

---

**From:** Sarah Wynn-Williams ▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, February 9, 2026 12:28 PM
**To:** Marcus Quintanilla ▮▮▮▮▮▮▮▮▮▮
**Cc:** linhardta@gtlaw.com <linhardta@gtlaw.com>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; ▮▮▮▮▮▮▮▮▮▮
**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla

As requested, I am providing an update regarding my search for new counsel.

The weekend has been spent identifying potential firms and evaluating their suitability for this matter. Due to the nature of my situation, it is a priority for me to ensure that any firm under consideration performs an exhaustive conflict check and a comprehensive due diligence review. I intend to be incredibly thorough in this process to ensure, to the extent that I can, that I do not face the  same conflict problem again.

I will continue to keep both you and counsel for the Respondent updated as I move through these next steps.

Yours sincerely

Sarah Wynn-Williams

On Sat, Feb 7, 2026 at 2:13 AM Marcus Quintanilla <▮▮▮▮▮▮▮▮▮▮▮▮> wrote:

Thank you, Mr. Linhardt.

Receipt confirmed.

Under the circumstances, the current discovery response deadline is vacated.

A new date will have to be set, and we will have to consider implications for other case-management dates. However, given that the Merits Hearing is not scheduled until the fall, it is my expectation that all or most of the remaining case-management dates can be salvaged.

Ms. Wynn-Williams:

Please proceed with utmost diligence and inform us, not later than Monday, February 9, when you anticipate securing replacement counsel for your representation in this arbitration.  My preference will be for your new counsel to enter his appearance and then to meet and confer with the attorneys for the Respondent with respect to case-management dates and related matters, and then for counsel to report back to me.  But if there is an appreciable delay in identifying replacement counsel, I will convene a status conference so that we can discuss these issues in real time.

SO ORDERED.

<Image.jpeg>

---

**From:** linhardta@gtlaw.com <linhardta@gtlaw.com>
**Sent:** Friday, February 6, 2026 12:43:54 PM
**To:** rosengartm@gtlaw.com <rosengartm@gtlaw.com>; ███████████████
<███████████████████████
**Cc:** ███████████████████████████████████ kemplem@gtlaw.com <kemplem@gtlaw.com>; will@lkcfirm.com <will@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; █████████████████████
**Subject:** RE: Meta v Sarah Wynn-Williams

Dear Arbitrator Quintanilla,

Further to the below, please see the attached response on behalf of Meta.

Respectfully yours,

**Alex Linhardt**
**Shareholder**

Greenberg Traurig, LLP
1840 Century Park East
Suite 1900 | Los Angeles, CA 90067-2121
T ███████████████████
linhardta@gtlaw.com  |  www.gtlaw.com  |  View GT Biography

**From:** Rosengart, Mathew S. (Shld-LA-LT) <rosengartm@gtlaw.com>
**Sent:** Friday, February 6, 2026 9:37 AM
**To:** Marcus Quintanilla ████████████████████
**Cc:** Sarah Wynn-Williams ██████████████████████ Kemple, Mark D. (Shld-LA-LT-Labor-EmpLaw)

&lt;kemplem@gtlaw.com&gt;; Linhardt, Alex L. (Shld-LA-LT) &lt;linhardta@gtlaw.com&gt;; will@lkcfirm.com; drew@lkcfirm.com; todd@lkcfirm.com; jon@lkcfirm.com; ▓▓▓▓▓▓▓▓ g

**Subject:** Re: Meta v Sarah Wynn-Williams

Dear Mr. Quintanilla,

Just as a brief update, we are finalizing our response and will send it shortly. As we had to consult internally, with your permission, it might be a bit more than 24 hours but we will send it as soon as possible today.

Thank you.

**Mathew S. Rosengart**

National Co-Chair, Media & Entertainment Litigation

Greenberg Traurig, LLP

View GT Biography

> On Feb 5, 2026, at 11:06 AM, Marcus Quintanilla &lt;▓▓▓▓▓▓▓▓▓▓▓▓▓▓&gt; wrote:
>
> **\*EXTERNAL TO GT\***
>
> Thank you, Ms. Wynn-Williams.
>
> Receipt confirmed.
>
> I would ask that counsel for Respondent provide any comments to the request within the next 24 hours.
>
> All the best,
>
> &lt;Image.jpeg&gt;
>
> ---
>
> **From:** Sarah Wynn-Williams ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ &gt;
> **Sent:** Thursday, February 5, 2026 10:41 AM
> **To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
> **Cc:** rosengartm@gtlaw.com &lt;rosengartm@gtlaw.com&gt;; kemplem@gtlaw.com &lt;kemplem@gtlaw.com&gt;; linhardta@gtlaw.com &lt;linhardta@gtlaw.com&gt;; will@lkcfirm.com &lt;will@lkcfirm.com&gt;; drew@lkcfirm.com &lt;drew@lkcfirm.com&gt;; todd@lkcfirm.com &lt;todd@lkcfirm.com&gt;; jon@lkcfirm.com &lt;jon@lkcfirm.com&gt;; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓
> **Subject:** Meta v Sarah Wynn-Williams

**Meta v Sarah Wynn-Williams**

**Case No. 01-25-0001-2843**

My representatives in this matter, Quinn Emanuel Urquhart & Sullivan LLP ('Quinn'), have informed me that they are conflicted and must therefore withdraw as my representatives. Quinn have filed notices to withdraw.

I am now without representation in the arbitration due to those questions put by Meta. I am mindful however that there is a deadline for exchange of documents for tomorrow, February 6, 2026. With respect, you will appreciate that I will be unable to meet that deadline owing to the withdrawal of my legal representatives.

I would request your agreement to a stay of the proceedings while I secure new representation. I am left as a litigant in person and feel very exposed, given the complexities of the issues and the serious impact of the proceedings on my life. Not least, the extended period of the proceedings mean I remain under an embargo which prevents my ability to speak freely. I have already commenced that search for new representation, and would hope to have new counsel as soon as possible. I simply ask for further time until I can instruct new counsel.

I accept that any stay would be mutual between the parties, despite the prejudice that causes me. There is no prejudice to however to Meta in this request for the proceedings to be stayed.

Should you wish to discuss this matter, please do not hesitate to contact me.

Yours sincerely

Sarah Wynn-Williams

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate the information.

# EXHIBIT D

A W    O

RECIPIENT
**Alex Linhardt**
*Shareholder*
Greenberg Traurig, LLP

LETTER BEFORE CLAIM

DATE
18 March 2026

OUR REF: RN:156

SENDER
Ravi Naik
*Legal Director*



Gorsuch Pl
London E2 8JF

www.awo.legal

Dear Mr Linhart
Meta Platforms, Inc. v. Sarah Wynn-Williams
No. 01-25-0001-2843

We write further to your letter of 5ᵗʰ March 2026 and email of 17ᵗʰ March 2026.

Our client responds to your request for information as follows:

   i.   Request: The number of her books sold at these promotional events.

      Answer: Our client does not have this information.

   ii.   Request: The content of any remarks made by Respondent at these events, including any scripts, notes, or draft questions and answers

      Answer: Our client did not maintain a record of what she said at the events. Our client does not have records of her "scripts, notes, or draft questions and answers".

   iii.   Request: Payments she received related to these events, including from book sales related to these events

      Answer: Our client did not receive any payment for these events.

   iv.   Request: All contracts between Respondent and her publishers regarding the book

      Answer: There were no contracts for the events in question. The contracts between our client and publishers regarding the book are questions that your client has raised in the discovery process and our client will provide her answers to those questions in that discovery process.

A.W.O IS THE TRADING NAME
OF HNK LITIGATION LIMITED (12303177)
REGULATED BY THE SOLICITORS REGULATORY
AUTHORITY SRA NUMBER: 666285

A  W        O

v.  Request: All communications and documents exchanged with her publishers or the hosts of these events regarding her appearance at the events.

Answer: This request is unnecessary to determine the issues between the parties in respect of the events. The request is overly broad and disproportionate given (i) it relates to third parties and (ii) the alleged breaches can only arise from what was said or done by our client at the events.

We trust that this is sufficient for you to narrow your request and withdraw your client's suggested (and unspecified) request for "sanctions".

Yours faithfully


**AWO**

2

# EXHIBIT E

A  W        O

RECIPIENT
**Alex Linhardt**
*Shareholder*
Greenberg Traurig, LLP

<span style="color:red">LETTER BEFORE CLAIM</span>

DATE
20 March 2026

OUR REF: RN:156

SENDER
Ravi Naik
*Legal Director*



London E2 8JF



www.awo.legal

Dear Mr Linhardt
*Meta Platforms, Inc. v. Sarah Wynn-Williams*
No. 01-25-0001-2843

We write in response to your email of 19th March 2026 ('your email'). We address each issue in turn.

1. <u>Requests for information</u>
   Using the numbering from your email, our client responds as follows:

   i.   Request: Ms. Wynn-Williams must have possession, custody, or control over data showing how many of her books were sold at the promotional events.  Regardless of whether she has actual possession of the data, she should be able to easily obtain it and we are entitled to it.

        Answer: Our client does not "have possession, custody, or control over data". You have no basis to suggest she "must". As the exhibits to your letter of 5th March 2026 demonstrate, the events were organised by independent bookshops. Your client is as able to access this information by contacting those bookshops. Our client does not know who to contact.

   ii.  Request: Ms. Wynn-Williams did not confirm whether she has possession, custody, or control over any audio or video recordings of the events, or whether any such recordings were made.  Please advise.

        Answer: Our client does not have "possession, custody, or control over any audio or video recordings of the events." Our client does not know if recordings were made but she is not aware of any recordings having been made.

A.W.0 IS THE TRADING NAME
OF HNK LITIGATION LIMITED (12303177)

REGULATED BY THE SOLICITORS REGULATORY
AUTHORITY SRA NUMBER: 666285

A  W        O

iii. Summary of request: Contracts between Respondent and her publishers regarding the book.

Answer: There were no contracts for the events. The contract for the book cannot have any bearing on whether our client is in breach the interim award as the interim award post-dates any such contract. Further, any alleged breach of that award is a question of fact. The ability of your client to evidence a factual breach will depend on what was said or done by our client at the events. The contract between our client and publishers regarding the book is accordingly irrelevant to the allegations your client has raised relating to the events.

iv. Summary of request: Documents and communications regarding the events: (a) referencing the book (or "Careless People"), including but not limited to how the book would be featured, displayed, discussed, or promoted; and (b) related to how the events might, would, or did affect book sales.

Answers:

(a) Our client welcomes your client's attempt to narrow the request so that it relates to the issues in dispute. The words "including but not limited to" does however maintain the unacceptable breadth of your initial request. Our client can confirm that she does not have documents and communications about the "how the book would be featured, displayed, discussed, or promoted" at the events.

(b) Our client does not have documents and communications about how "the events might, would, or did affect book sales."

For context, our client has told you that she was not involved in the organisation or planning of the events. No such documents or communication relating to these requests can therefore exist. The Interim Award is also a matter of public record.

Finally, your client will be aware that the order from Arbitrator Quintanilla for consensual information exchange was mutual. Our client has complied with requests made to her. Your client has not complied.

Please confirm when your client will comply with their requirement of information exchange. Such information should be provided in advance of our conference call for it to be effective.

2. <u>Protective Order</u>
You state that our client "refuses to stipulate to the entry of any protective order". Your characterisation is inaccurate. Our client has not refused. Your client is requested to consider Mr Naik's email of 18th March in which the correct position of our client is set out.

2

A  W      O

3. <u>Conference call and next steps</u>

You have demanded a call today. It may not surprise you to hear that we do not have capacity for a call today.

You state that "we do not have much time to resolve these issues before the Arbitrator's intervention will be required." We are unclear what you mean by "Arbitrator's intervention".

You further complain about the time your client now has available. For context, Mr Naik provided his number to all parties immediately following the status conference of 12th March, yet you did not attempt to call him. You rather waited until 17th March to follow up. You further waited almost two working days before responding to our letter and email 18th March 2026. The cause of any delay cannot therefore be laid at our client.

We provided you with a list of dates for a call by email on 18th March 2026. We can offer increased times before your deadline to accommodate you:

1. Monday 24 March: 3pm – 5pm
2. Tuesday 25 March: 4pm – 530pm
3. Wednesday 26 March: 3pm – 6pm

Should you be able to do the Monday call, that would leave you with four working days before your deadline to file your client's application. Your client is asked to comply with your ordered duty of information exchange before any such call for that call to be effective.

Yours faithfully

**AWO**

# EXHIBIT F

A  W    O

**RECIPIENT**
**Alex Linhardt**
*Shareholder*
Greenberg Traurig, LLP

<span style="color:red">LETTER BEFORE CLAIM</span>

**DATE**
23 March 2026

**OUR REF: RN:156**

**SENDER**
Ravi Naik
*Legal Director*



London E2 8JF



www.awo.legal

Dear Mr Linhardt
*Meta Platforms, Inc. v. Sarah Wynn-Williams*
No. 01-25-0001-2843

We write in response to your email of 20th March. Responding to the issues in turn:

1.  You state that the letters from our client of 18th and 20th March "still provide no information about her book appearances violating the Interim Award." Our client did not violate the Interim Award. It is for your client to evidence their allegations of violations. Your client has been unable to do so.

2.  You state that our client's "position seems to be that she knows nothing about at least five promotional events she personally attended, planned for, and participated in". You provide no evidence to suggest that attending, planning for, or participating in such an event is a violation.

3.  The claims made by your client lack evidentiary support despite (i) our client's request for that evidence from you and (ii) the order from the Arbitrator of 12th March that you provide such evidence. Repeatedly asserting what your client wants the position to be does not make that position out. Rather, your client's lack of evidence is the key issue. If our client's position is "clearly false and untenable" your client would have evidence to rebut her position. They have not provided any evidence.

4.  You state that our client "concedes that she has responsive documents, including contracts with publishers and communications about the events, but will not provide them or any portion of them." Your position is misplaced. No such concession has been made by our client, nor do you point to one. Your position on contracts for the events is also peculiar. Your client is invited to read the letters from our client of 18th and 20th March, in which she expressly confirms that there are no

A.W.O IS THE TRADING NAME
OF HNK LITIGATION LIMITED (12303177)

REGULATED BY THE SOLICITORS REGULATORY
AUTHORITY SRA NUMBER: 666285

A W    O

**contracts for the events.** We are surprised to have to repeat this for the third time.

5. You state that our client "does not appear to be acting or responding in good faith". You provide no evidence for this statement. Stepping back and looking at the facts:

   a. **Your client**: Your client filed a letter with the Arbitrator on 5th March. That letter asserted "ongoing and flagrant violations" by our client. No evidence was contained in the letter to support those allegations. The declaration of Mr Cohn attached to the letter contained no evidence of a violation. The allegations raised by your client was undermined by the paucity of evidence provided. Your client nevertheless sought unspecified "sanctions" against our client. Those "sanctions" remain unexplained and your client has still not provided any evidence of a breach to date.

   b. **Our client:** Our client responded to the Arbitrator by email on 6th March. In that email, our client provided a full and frank explanation of the events and her role within them. Our client has provided detailed and frank responses to the far-reaching discovery requests made by your client by letters of 18th and 20th March. In response, your client has filed further and increasingly vague requests. Those further requests suggest your client is aware that they are unable to make out a violation, as evidenced by your email of 20th March and the curious suggestion that it is for our client to provide "information about her book appearances violating the Interim Award." In contrast, the Arbitrator requested that your client provide information to our client for our client *to understand the basis* for the allegations being levied against her. Our client reminded you of that need to provide information by our letter of 20 March 2026. You did not respond to that point.

6. Taken together, the record is clear as to which party is engaging in the process.

7. Our client confirms that she does not have "documents and communications" in the three categories you have requested. Our client however is concerned by your client's failure to comply with their information obligations. Your client must provide further and better particulars, including evidence. Our client therefore repeats her reminder to you of your ordered duty of information. That would include, for instance, the material Mr Rosengart referred to in the status conference relating to his colleagues taking recording of an event. Should your client refuse to provide this material, **please confirm in writing** so we can put the Arbitrator on notice of your client's non-compliance.

In the continued absence of information from your client, we are unsure what utility a conference call will have. We nevertheless will provide a diary note

A  W        O

with a video conference link for 16:00 UK time to discuss the state of the allegations made by your client and how to dispose of this matter.


Yours faithfully


**AWO**

# EXHIBIT G

A  W      O

RECIPIENT
**Alex Linhardt**
*Shareholder*
Greenberg Traurig, LLP

LETTER

DATE
25 March 2026

OUR REF: RN:156

SENDER
Ravi Naik
*Legal Director*



London E2 8JF



www.awo.legal

Dear Mr Linhardt
*Meta Platforms, Inc. v. Sarah Wynn-Williams*
No. 01-25-0001-2843

We write in response to your email of 23rd March 2026. Addressing the relevant parts in turn:

Our client's disclosure

1. You state that "Ms. Wynn-Williams currently refuses to produce any documents." That is demonstrably incorrect. Our client has replied to each of your twelve separate requests for information. You are referred to the letters of 18th, 20th and 23rd March from our client. Those letters contain complete answers to the repeated and repetitive requests in your email of 23rd March.

2. The Arbitrator's order invited the parties to "meet and confer and engage in consensual information exchange and to potentially narrow the relief sought in Claimant's application". Our client has met her obligations.

3. Your client's position seems to be that because their case is based on speculation and hearsay at its highest, it is for our client to make out the allegations made by your client. That is wrong.

Your client's disclosure

4. You now provide, 12 days after the Arbitrator's order, the further disclosure. We do not understand your statement that your client had "satisfied its alleged disclosure obligations" given the late service of material that has been in its possession since 6th March.

5. The evidence you have given is provided without any explanation or supporting declaration. The evidence you have provided however contradicts the following statement of Mr. Rosengart in the status conference:

A.W.O IS THE TRADING NAME
OF HNK LITIGATION LIMITED (12303177)

REGULATED BY THE SOLICITORS REGULATORY
AUTHORITY SRA NUMBER: 666285



A  W      O

> *"I can tell you that my colleagues attended an event in Oxford and we have photos of [the Respondent] herself holding the book. She is promoting the book at these events."*

The evidence you have provided is one photo of our client next to a table on which a single copy of the book sits. Your position seems to be that our client cannot be *near* a copy of the book, which would mean that she is not allowed into any bookshop (or indeed, anywhere where her book could be sold[1]). **Please clarify if that is your client's position**. If not, please explain what this evidence is meant to demonstrate and what your client's position is.

6. Given the statement of Mr. Rosengart, we know that colleagues from the London office of Greenberg Traurig attended the event with the purpose of obtaining evidence of what our client said and did at the event. No such material has been provided, presumably as the lawyers were unable to note a breach of the Interim Award. The evidence from the lawyers from Greenberg Traurig is nevertheless exculpatory for our client. We accordingly require the following:

   a. The names of the individuals.
   b. A statement from those individuals about what they heard and saw.
   c. All notes, memos and records they have taken from the event. Any suggestion that such notes could be privileged would not be tenable given Mr. Rosengart's statement that the evidence was collated with a view to service in these proceedings.

7. Please provide this material <u>by return</u>. If you refuse to provide the material, please explain why. We will request the Arbitrator to make appropriate inferences if your client refuses to provide this material.

<u>Hay Festival</u>

8. Our client is not required to give prior notice of all speaking engagements, and you provide no legal basis for her to do so. The facts of the *Hay Festival* are as follows:

   a. The Hay Festival event does not violate the Interim Award. The Hay Festival event does not address your client nor reference the book *in any way* (notwithstanding the fundamental issue that a reference to the book in promotional material by a third party cannot itself constitute a violation of the Interim Award). The promotional material for the Hay Event is clear to that end: https://www.hayfestival.com/p-25476-tim-wu-and-sarah-wynn-williams-talk-to-carole-cadwalladr.aspx.[2]
   b. Given the topic of the Hay Festival event and lack of any reference to the book, it does not constitute an activity

---

[1] Given our client's book is a number 1 best seller, that could conceivably extend to airports, train stations, shopping centres, supermarkets etc. resulting in her being unable to leave her house.

[2] As the Hay Festival is public and promoted, we do not understand your reference to our client not being "transparent" nor your reference to the event being "undisclosed". It is pubic and available.

A  W         O

"comparable to those at issue in Claimant's current allegations" so cannot breach the Arbitrator's Interim Order of 12th March[3].

9.  The Hay Festival event is expressly billed as a conversation about the "power of tech". As your client will know, the Arbitrator confirmed at the status conference that our client is permitted to speak on matters in her expertise. Our client does not need to reference your client in a contemporary discussion about the power of technology. Your client cannot and should not police our client's speech.

10. Your position seems to be that our client needs your or your client's approval for *any* public appearance even if there is no reference to your client. **Please confirm by return if that is your client's position.** If not, please clarify the basis on which our client is to inform you or the Arbitrator about that event or any comparable event.

11. You state that you will "appraise the Arbitrator" of the event. We are unclear why your client would want to trouble the Arbitrator of such an irrelevant event but if you do, we will rely on this letter and the relevant promotional material in response.

12. We also put you on notice that our client will rely on this correspondence in respect to the allegations for the historic events, as your position supports our client's concerns about your attempts to overextend the Interim Award.

We look forward to receiving the material request by return and no later than close of business PT on 25th March 2026.

Yours faithfully

**AWO**

---

[3] The Arbitrator's Order of 12 March 2026 was temporary

3

# Exhibit R

Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104

Selendy|Gay

Philippe Z. Selendy
Partner

pselendy@selendygay.com

April 20, 2026

<u>Via E-mail</u>

Marcus Quintanilla
Arbitrator



> **Re:** *Meta Platforms, Inc. v. Sarah Wynn-Williams*, Case No. 01-25-0001-2843

Arbitrator Quintanilla,

I write on behalf of Respondent Sarah Wynn-Williams in the above-referenced arbitration to provide the information you requested in your April 18 Order in advance of the videoconference scheduled for April 22, 2026.

## I.    Cited Authority

I enclose with this letter a ZIP file of the authorities cited in Ms. Wynn-Williams's Opposition to Meta's Application for Sanctions (the "Opposition" and Meta's associated Application for Sanctions the "Application").

## II.    Hay Festival

Ms. Wynn-Williams confirms that her appearance at the Hay Festival is currently scheduled for May 31, 2026.

## III.    Status of Discovery

The Arbitrator has adjourned all deadlines for discovery in this matter. Previously, pursuant to agreement of the parties, February 6 was the mutual deadline to serve discovery responses to already-served discovery requests, and March 16 was the deadline to serve any further requests. On February 5, this tribunal vacated the deadlines while Ms. Wynn-Williams secured replacement counsel. Ms. Wynn-Williams has not received any

Arbitrator Marcus Quintanilla
April 20, 2026

discovery responses from Meta and has served none. Ms. Wynn-Williams's replacement counsel is reviewing Meta's proposed protective order for any discovery that may be produced and expects to have revisions. Before any discovery is produced in this matter, an appropriate and mutually agreeable protective order should be in place, and all discovery obligations should be reciprocal. Once the parties have agreed to a protective order, they can and should meet and confer on appropriate deadlines to govern discovery responses.

No further discovery for purposes of adjudicating the Application is necessary or warranted, for at least four independent reasons.

*First,* and as a threshold matter, this tribunal should lift the Interim Award for the reasons stated in Ms. Wynn-Williams's opposition to the Application, negating any grounds for discovery based on the Application.

*Second*, Meta should not be granted the privilege of expedited, unilateral discovery outside the normal course to retroactively cure its failure to produce a sufficient record to warrant sanctions. Meta elected to proceed with its Application, on which it bore the burden, rather than await a final adjudication of this matter on a full record. Having made this choice, Meta is constrained by the record it submitted. Any insistence by Meta that it be permitted special or additional discovery to support its unfounded attempt to sanction her is particularly egregious because Meta has not provided any normal-course discovery to Ms. Wynn-Williams. Meta should not be permitted to use its sanctions motion as a vehicle to litigate the merits of this arbitration in expedited fashion on one-sided discovery without affording Ms. Wynn-Williams a symmetrical opportunity to prepare her own defense to those ultimate merits.

*Third*, Meta cannot show that further discovery would alter the record in support of its Application. Meta's own agent(s)—including Annabel Thomas, a "shareholder" (partner level), from Meta's lawyers— surveilled Ms. Wynn-Williams during at least one of the events at issue, and it has put its full knowledge of that event before this tribunal, which demonstrates that Ms. Wynn-Williams did not speak about or otherwise engage in any promotion of her book. Meta demanded that Ms. Wynn-Williams make informal, expedited, and voluntary discovery productions to Meta outside the normal course of discovery in this matter while it threatened her with the filing of the Application. Ms. Wynn-Williams explained that documents and information responsive to most of Meta's requested categories simply did not exist or else Ms. Wynn-Williams did not possess them.[1] There is, thus, no basis to believe that discovery would provide any further applicable information to this tribunal. Indeed, Meta has not advanced any basis to suggest such discovery would be necessary.

*Fourth*, any discovery specific to the Application would be disproportional to the needs of that Application. As Ms. Wynn-Williams argues in the Opposition, at its most

---

[1] The full scope of Meta's twelve voluminous requests and Ms. Wynn-Williams's good faith response to each is set out in Exhibits D-G of the Declaration of Ravi Naik filed in support of the Opposition.

2

Arbitrator Marcus Quintanilla
April 20, 2026

extreme relief here is limited to a $7,500 fine payable to the tribunal, not Meta. The legal costs of any further discovery far outweigh that level of relief.

For all of these reasons, this tribunal should refrain from ordering further discovery and deny the Application now. If the tribunal does allow Meta to serve additional discovery requests related to the Application, Ms. Wynn-Williams requests that she have the reciprocal right to serve such requests on Meta.

* * *

Counsel for Ms. Wynn-Williams remains available should you have any questions.

Sincerely,


*/s/ Philippe Z. Selendy*
Philippe Z. Selendy
Partner

Encl:   SWW Sanctions Opposition Authority.zip

Cc:     All counsel of record (via email)

3

# Exhibit S

**AMERICAN ARBITRATION ASSOCIATION**
**EMPLOYMENT ARBITRATION DIVISION**

In the Matter of the Arbitration between

Meta Platforms, Inc.,

     *Claimant/Counterclaim Respondent*,

v.

Sarah Wynn-Williams,

     *Respondent/Counterclaimant.*

Arbitration Case No.: 01-25-0001-2843

Arbitrator: Hon. Marcus Salvato Quintanilla

Dear Arbitrator Quintanilla:

We write on behalf of Claimant Meta Platforms, Inc. to address the sanctions and scheduling issues about which you instructed the parties to confer. The parties held two meet-and-confer discussions and agreed to submit separate responses pursuant to your instructions.

As an overriding matter and consistent with two core purposes of arbitration (efficiency and expediency), Claimant respectfully requests that you accelerate the schedule and set a new merits hearing date, prior to the currently scheduled October 19 date. Alternatively, we request that you permit reciprocal dispositive motions to streamline the proceedings and schedule them at a future status conference. In view of past delays and Respondent's multiple changes in counsel, we believe any further filings should not be permitted to delay discovery or a merits resolution.

Claimant would welcome the accelerated merits hearing schedule you suggested at the last status conference. This case is straightforward and does not require extensive discovery. Further, an expeditious resolution would be in both parties' interests. Respondent, however, has refused to consent to any acceleration of the schedule.

Alternatively, Claimant is open to dispositive motions, so long as they promote efficiency and do not further delay the proceedings. If you permit dispositive motions, that permission should be reciprocal, allowing both parties to file. Ms. Wynn-Williams

1

can present her legal defenses, and Meta can move on Ms. Wynn-Williams' clear violations of her contractual obligations, which is factually undisputed and will not require extending discovery.

To promote efficiency, any dispositive motions should "narrow the issues in the case" rather than multiply proceedings. R-27 (AAA 2009 Employment Rules). Based on the parties' two meet-and-confer discussions, Respondent appears to be proposing the exact opposite, trying to mimic the sequential stages of litigation: "motion to dismiss" dispositive briefing, followed by a renewed discovery period, then "motion for summary judgment" briefing based on that discovery, effectively seeking two bites of the apple contrary to the norms of arbitration, followed by the full merits hearing. Claimant opposes this inefficient and needlessly burdensome approach for multiple reasons.

First, any dispositive motions should not delay proceedings. When the parties originally "indicated the possibility of seeking leave to file a dispositive motion," you reminded the parties "that any such motion practice should be undertaken early enough in the Arbitration to avoid interference with the Parties' agreed Procedural Timetable." Procedural Order No. 1 at 13 ¶ 42. Respondent's proposal disregards that guidance.

Second, Respondent effectively proposes hitting the pause button on these proceedings more than a year into them. But Respondent's serial replacement of counsel is no reason for delay. True, Ms. Wynn-Williams is on her fourth law firm.[1] When Quinn Emanuel withdrew, however, you vacated only "the current discovery response deadline," which was the next day, and explained your "expectation that all or most of the remaining case-management dates can be salvaged" because "the Merits Hearing is not scheduled until the fall." Feb. 6, 2026, email. Indeed, you later confirmed "that the remaining case-management dates lie reasonably in the future, and that, at this point, there is no cause to alter the procedural timetable set forth in Procedural Order No. 2." Feb. 20, 2026, email. Even regarding nearer deadlines related to the motion for sanctions, you explained that deadlines would "apply whether or not Respondent obtains a substitution of counsel." Mar. 12, 2026, email; *see also* Mar. 30, 2026, email ("As discussed at our status conference, it is not my intent to allow changes of counsel to affect the existing briefing schedule.").

Third, this case is proceeding under the AAA Employment Rules, not the Federal Rules of Civil Procedure. As you previously ruled, "the Employment Rules of 2009 shall

---

[1] Four law firms have appeared on behalf of Respondent in these proceedings: Kaiser PLLC, Quinn Emanuel, AWO, and Selendy Gay. Susman Godfrey also represented Respondent at mediation with Quinn Emanuel and AWO.

2

apply in this Arbitration." Procedural Order No. 1 at 11 ¶ 33. Far from contemplating multiple rounds of dispositive motions, those rules permit the filing of "a dispositive motion" only "if the arbitrator determines that the moving party has shown substantial cause that the motion is likely to succeed and dispose of or narrow the issues in the case." R-27 (AAA 2009 Employment Rules). Respondent's proposal—multiple rounds of briefing on the same issues—would deprive the parties of the efficiency benefits for which they negotiated when agreeing to arbitration.

Fourth, even if we were operating under the federal rules without the scheduling guidance you have previously provided, a motion to dismiss would be untimely. This case has been pending for approximately *fourteen months*. Respondent filed an answer more than a year ago. Respondent was previously represented by Quinn Emanuel, a large, sophisticated firm. Quinn Emanuel was counsel for nearly one full year before withdrawing. It certainly had the ability and resources to seek to file a motion to dismiss, but realizing it would have lacked merit, did not do so. It is far too late in the day for Respondent to seek a do-over, much less one that stays discovery. *Cf.* Fed. R. Civ. P. 12(a).[2]

In the end, this is an arbitration, not a court proceeding. Consistent with the norms of arbitration, Respondent should get one bite at the apple. If she truly believes her defenses are susceptible to decision as a matter of law (despite Quinn Emanuel's evident acknowledgment that they were not), she should not attempt to reserve the right to re-present the same issues after discovery and again at the merits hearing. Either these unspecified issues do not require further factual development, allowing them to be decided once-and-for-all now, or they do, in which case they should wait. Respondent cannot have it both ways.

Respectfully submitted,

Mathew S. Rosengart              Jonathan F. Cohn
Mark D. Kemple                   Mary Elizabeth Miller
GREENBERG TRAURIG, LLP           LEHOTSKY KELLER COHN LLP

---

[2] Resolution of the pending sanctions motion does not require resolution of merits issues through dispositive motions. As Claimant's sanctions motion explained, "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." Claimant's Appl. for Sanctions at 13 (quoting *GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 386 (1980)). Respondent's brief did not rebut this point. *See generally* Resp.'s Opp. to Appl. for Sanctions.

3

1840 Century Park East, Suite 1900
Los Angeles, CA 90067

*Attorneys for Claimant*

200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001

William T. Thompson
Alexis Swartz
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735

Drew F. Waldbeser
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Meredith R. Pottorff
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206

*Attorneys for Claimant*

4

# Exhibit T

Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104

███████

Selendy|Gay

Philippe Z. Selendy
Partner

█████████

pselendy@selendygay.com

May 6, 2026

<u>Via E-mail</u>

Marcus Quintanilla
Arbitrator

████████████████
██████████████

      **Re:**    *Meta Platforms, Inc. v. Sarah Wynn-Williams*, **Case No. 01-25-0001-2843**

Arbitrator Quintanilla,

      I write pursuant to your order following the April 22 conference.[1]  Ms. Wynn-Williams seeks leave to file a motion to dismiss the arbitration demand, as you suggested as "Pathway A" at that conference.  There are threshold legal issues that should be resolved before the parties expend the time and effort of proceeding to the merits, and as a matter of urgency given the ongoing unlawful constraints the Interim Award places on Ms. Wynn-Williams's speech.  Ms. Wynn-Williams contests jurisdiction and the arbitrability of this matter and should be granted a full and fair opportunity to be heard on those and other arguments that this arbitration threatens her constitutional rights and financial livelihood.  Ms. Wynn-Williams proposes to file the motion on May 21, with Meta's opposition due June 4 and reply due June 11.[2]

---

[1] Ms. Wynn-Williams does not waive and in fact expressly preserves all objections to jurisdiction and arbitrability in this matter.

[2] All discovery deadlines should remain vacated.  Ms. Wynn-Williams is an individual, and she should not have to incur the extraordinary costs associated with civil discovery when she intends to raise threshold dispositive legal issues that can be resolved in her favor on the pleadings.  Proceeding with discovery under those circumstances would be disproportionately burdensome on her as compared to a blue-chip corporation like Meta.

Arbitrator Marcus Quintanilla
May 6, 2026

Meta's view—that the merits hearing should be accelerated to July, that its sanctions application should be heard *before* Ms. Wynn-Williams' motion to dismiss, and that it should file a summary judgment motion in parallel—is both prejudicial and logically flawed.

Ms. Wynn-Williams strongly opposes any acceleration of the merits hearing. She has only just retained Selendy Gay after her prior counsel to withdrew for reasons she could not foresee or control. Selendy Gay's immediate attention was diverted to opposing Meta's sanctions application. Moving the merits hearing to just two months from now—before counsel has familiarized itself with the record and legal issues, and before the parties have served discovery responses, agreed to a protective order, or produced a single document—would be extremely prejudicial and costly.

The arbitrator should likewise reject Meta's alternative proposal that its sanctions application be heard before the motion to dismiss and that Meta receive leave to file a summary judgment motion on the same briefing schedule as Ms. Wynn-Williams's motion to dismiss. As you observed at the April 22 conference, the sanctions application is inextricably intertwined with the merits—reaching the merits of that application would be an improper and premature determination of this case.[3] Nor could Meta file a summary judgment motion on the same schedule as the motion to dismiss. Meta has characterized this proposal as one of "reciprocal" motions. It is anything but. Ms. Wynn-Williams seeks to raise threshold legal arguments about the enforceability of the severance agreement forming the jurisdictional basis for this arbitration, while Meta seeks to establish liability on a fact-bound summary judgment motion—without having exchanged any discovery. Meta's proposal is another attempt to achieve what it sought in its sanctions application: an expedited liability determination on an abbreviated, lopsided record.

Accordingly, Ms. Wynn-Williams requests leave to file a motion to dismiss and asks that you order her opening brief on that motion be filed on May 21, Meta's opposition be filed on June 4, and Ms. Wynn-Williams's reply be filed on June 11. Ms. Wynn-Williams further requests that you deny both Meta's request to accelerate the merits hearing and Meta's alternative request for leave to file a summary judgment motion. We are available at your convenience if you have any questions.

Respectfully,


*/s/ Philippe Z. Selendy*
Philippe Z. Selendy
Partner

Cc:    All counsel of record (via email)

---

[3] For the reasons stated in Ms. Wynn-Williams's opposition to Meta's application for sanctions, this tribunal can and should resolve the application *without* reaching its merits by dissolving the Interim Award.

# Exhibit U

| | |
|---|---|
| **From:** | Marcus Quintanilla |
| **To:** | Corey Stoughton; Rosengart, Mathew S. (Shld-LA-LT); Drake Reed; alexis@lkcfirm.com; drew@lkcfirm.com; jon@lkcfirm.com; Kemple, Mark D. (Shld-LA-LT-Labor-EmpLaw); Linhardt, Alex L. (Shld-LA-LT); mary@lkcfirm.com; todd@lkcfirm.com; will@lkcfirm.com; Jennifer Selendy; Philippe Selendy; Claire O"Brien; Sarah Wynn-Williams; Ravi Naik; ICDR Erin Brennan |
| **Subject:** | Re: Meta v. Wynn-Williams, Case Number 01-25-0001-2843, Memo of Status Conference |
| **Date:** | Thursday, May 7, 2026 4:27:44 PM |
| **Attachments:** | Outlook-u0yvgyui.png<br>Outlook-o2dqgunu.png |

**\*EXTERNAL TO GT\***

Dear Colleagues:

I am now in receipt of the Parties' respective reports, both of which were timely submitted yesterday, in accordance with the instructions provided in the thread below.

In the interest of efficiency, speed, and fairness, I now rule on the outstanding requests as follows:

1.     Claimant's request to accelerate the Procedural Timetable is denied.

2.     Both Parties' requests for leave to file dispositive motions are denied.

3.     The Merits Hearing remains on calendar for October 19-23, 2026.

4.     A ruling on Claimant's motion for sanctions shall be deferred until the final merits determination in the Final Award.  Claimant may include a prayer for sanctions among the relief sought in its Statement of Claim.  Any such prayer must be argued and supported with evidence and legal authority, in the same way as any other prayer for relief.

5. Given the Parties' lack of progress on discovery, it may be appropriate for them to negotiate some modest adjustments to the procedural timetable set forth in Procedural Order No. 2 (*e.g.,* as relates to discovery and the schedule for the Parties' respective memorials).  If the Parties cannot agree on appropriate adjustments, either Party may request a status conference at which we will address the issues in real time.  In any case, the Parties should move forward on discovery without further delay.  If a Protective Order must be entered first, they should submit their joint proposed protective order (or their competing proposals) not later than Tuesday, May 12, 2026, at noon (Pacific Time).

Counsel are requested to confirm receipt of this email at their earliest opportunity.

IT IS SO ORDERED.



**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

Admitted: California, Texas, New York

**From:** Marcus Quintanilla <​███████████████████​>
**Sent:** Wednesday, April 22, 2026 4:20 PM
**To:** Corey Stoughton <cstoughton@selendygay.com>; rosengartm@gtlaw.com <rosengartm@gtlaw.com>; Drake Reed <dreed@selendygay.com>; alexis@lkcfirm.com <alexis@lkcfirm.com>; drew@lkcfirm.com <drew@lkcfirm.com>; jon@lkcfirm.com <jon@lkcfirm.com>; kemplem@gtlaw.com <kemplem@gtlaw.com>; linhardta@gtlaw.com <linhardta@gtlaw.com>; mary@lkcfirm.com <mary@lkcfirm.com>; todd@lkcfirm.com <todd@lkcfirm.com>; will@lkcfirm.com <will@lkcfirm.com>; Jennifer Selendy <jselendy@selendygay.com>; Philippe Selendy <pselendy@selendygay.com>; Claire O'Brien <cobrien@selendygay.com>; Sarah Wynn-Williams <​███████████████​>; Ravi Naik <█████████; ICDR Erin Brennan <​███████████​>
**Subject:** Meta v. Wynn-Williams, Case Number 01-25-0001-2843, Memo of Status Conference

Dear Colleagues:

This will memorialize our status conference this morning, which began at 10:00 a.m. (Pacific) and ended at approximately 10:40 a.m. (Pacific).

Mr. Rosengart appeared for Meta, accompanied by Mr. Thompson.

Ms. Stoughton appeared for Ms. Wynn-Williams, accompanied by Mr. Seleny and other colleagues.

I thanked the Parties for the updates they had provided prior to the hearing, and I provided an overview of certain legal and factual questions that I view as relevant to a final resolution—not only of the pending application for sanctions but also for the merits of the case more broadly.

I outlined options for fast-tracking the proceedings, and I requested that counsel meet and confer about their preferences and in an effort to finalize a protective order so that both sides can produce discovery as soon as possible.

We agreed that you would jointly revert to me not later than May 6, 2026.

In the meantime, please advise whether Ms. Wynn-Williams should continue to receive correspondence of this sort now that she is represented.

Thank you for your courtesy and professionalism.

All the best,




**Marcus Salvato Quintanilla, FCIArb**
**Arbitrator, Mediator, Counsel**

Admitted: California, Texas, New York

# Exhibit V

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| Meta Platforms, Inc., | No. 01-25-0001-2843 |
| *Claimant*, | Arbitrator: |
| v. | Marcus Salvato Quintanilla, Esq. |
| Sarah Wynn-Williams, | Demand Filed: March 7, 2025 |
| *Respondent.* | Trial Date: October 5, 2026 |

**<u>PROTECTIVE ORDER</u>**

WHEREAS, Claimant Meta Platforms, Inc. ("Meta") and Respondent Sarah Wynn-Williams[1] (collectively, the "Parties" and each a "Party") have each submitted proposed protective orders regarding the disclosure and discovery of information and tangible things in the arbitration between the Parties entitled *Meta Platforms, Inc. v. Sarah Wynn-Williams*, AAA Arbitration Case No. 01-25-0001-2843 (the "Arbitration");

IT IS HEREBY ORDERED that the following provisions govern the disclosure and discovery of information and tangible things in this Arbitration.

1.      <u>PURPOSES AND LIMITATIONS</u>

Disclosure and discovery activity in this Arbitration may involve production of confidential, proprietary, trade secret, personal, and/or private information for which protection from public disclosure and from use for any purpose other than participating in this arbitration may be warranted.[2] The Parties acknowledge that this Protective Order does not confer blanket

---

[1] Respondent maintains and does not waive her jurisdictional objections regarding this Arbitration, nor her objections to the invalidity of the Interim Award issued in the Arbitration.

[2] As used herein, "discovery" refers to a party's production of documents, things, or testimony in response to

-1-

protections on all disclosures or responses to discovery, and that the protection it affords from public disclosure and use extends only to the limited information and tangible things that are entitled to confidential treatment under the applicable legal principles.

2.    DEFINITIONS

2.1    Challenging Party: a Party or Non-Party that challenges the designation or non-designation of Discovery Material or Privileged Material under this Protective Order.

2.2    "CONFIDENTIAL" Protected Material: Protected Material (regardless of how it is generated, stored, or maintained) that contains personal, business, strategic, proprietary, or commercially sensitive information that has not become part of the public record. Without any Receiving Party's waiver to challenge any information designated as "CONFIDENTIAL," this could include but is not limited to the following categories of information: competitively sensitive business information, personal health information, personal financial information, personally identifiable information (e.g. any information that would be harmful to an individual should the information be made public), or any information from or about an individual employee, former employee, user, advertiser, or partner.

2.3    Counsel (without qualifier): Outside Counsel of Record and In House Counsel (as well as their support staff).

2.4    Designating Party: a Party or Non-Party that designates, or that has a reasonable expectation of the right to designate, any Discovery Material as Protected Material—whether "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

---

another party's evidence requests, whether or not the information obtained is later placed before the Arbitrator. "Disclosure," in contrast, refers to any party's submission of evidence for consideration by the Arbitrator, regardless of the provenance of that evidence. "Production" embraces both the exchange of information through discovery and all other forms of disclosure in the Arbitration.

2.5    Discovery Material: all information and tangible things, regardless of the medium or manner in which they are generated, stored, or maintained (including, among other things, documents, testimony, and transcripts), that are produced, disclosed, or used in this matter, including any productions made prior to the entry of this Order.

2.6    Expert: a person who has been retained by a Party or its Counsel to serve as an expert witness or as a consultant in this Arbitration.

2.7    "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Protected Material: "CONFIDENTIAL" Protected Material that a Party or Non-Party in good faith reasonably believes is substantially likely to cause injury if disclosed other than as permitted pursuant to Section 7.4 of this Protective Order. Without any Party's waiver to challenge any information designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," this could include but is not limited to proprietary design and development materials for products and/or services, sensitive products and/or services, and strategic decision-making information.

2.8    In House Counsel: attorneys who are employees, including contractors, of a Party to this Arbitration. In House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.9    Non-Party: any natural person, partnership, corporation, association, or other legal or governmental entity not named as a Party to this Arbitration.

2.10    Outside Counsel of Record: attorneys who are not employees of a Party to this Arbitration but are retained to represent or advise a Party to this Arbitration and have appeared in this Arbitration on behalf of that Party.

2.11    Producing Party: a Party or Non-Party that produces Discovery Material in this Arbitration.

2.12     Professional Vendors: persons or entities that provide arbitration support services (e.g., photocopying, scanning, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, searching or retrieving data in any form or medium) and their employees and subcontractors.

2.13     Protected Material: any Discovery Material that is designated as "CONFIDENTIAL," or as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

2.14     Receiving Party: a Party that receives Discovery Material.

3.     SCOPE

The protections conferred by this Protective Order cover not only Protected Material, as defined above and including any Protected Material produced in this matter prior to the entry of this Order, but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) portions of any testimony, conversations, or presentations by Parties or their Counsel that contain Protected Material. However, the protections conferred by this Protective Order do not cover: (a) any information that is in the public domain at the time of production in the Arbitration or becomes part of the public domain after its production in the Arbitration as a result of publication not involving a violation of this Protective Order or another court or arbitral order, including becoming part of the public record through the merits hearing or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. This Protective Order is not intended to, and does not, govern the inspection of Respondent's computer code, associated comments, and/or revision histories for computer code, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms

or structure of software or hardware designs ("Source Code"). Should Source Code become relevant to this Arbitration and require inspection, the parties agree to meet and confer on a separate protective order.

4.      DURATION AND FINAL DISPOSITION

To the extent permitted by applicable law, the provisions of this Protective Order shall, absent written agreement of the Parties or further order of the Arbitrator, continue to be binding throughout and after the conclusion and final disposition of the Arbitration, including (without limitation) any petitions to confirm, correct, or vacate an award, reviews of the Arbitration, and appeals.[3]

Within thirty (30) days after receiving notice of the entry of an order, judgment, or decree finally disposing of this Arbitration and the exhaustion of all possible petitions, reviews, or appeals therefrom, all persons having received Protected Material shall either (i) return such material and all copies thereof to counsel for the Producing Party; or (ii) destroy all Protected Material, except where such material exists on backup tapes or other disaster recovery systems that are routinely deleted or written over in accordance with an established routine system maintenance practice, and shall certify that fact in writing to counsel for the Producing Party. Notwithstanding anything else herein to the contrary, Counsel for the Parties shall be entitled to retain copies of filings, correspondence, transcripts, and litigation files (including attorney work product); provided that such Counsel shall maintain the confidentiality thereof pursuant to this Protective Order and shall not disclose such copies to any person except pursuant to a court order, agreement by the Producing Party, or as otherwise required by law.

---

[3] If either Party wishes one or more provisions of this Protective Order to remain in effect after the issuance of the Final Award, the Party should so pray in her/its relevant memorials.

5.    DESIGNATING PROTECTED MATERIAL

5.1    Exercise of Restraint and Care in Designating Protected Material. Each Party or Non-Party that designates Discovery Material for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.

If it comes to a Designating Party's attention that Discovery Material that it designated for protection does not qualify for protection at all or does not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other Parties that it is withdrawing or revising the designation.

5.2    Manner and Timing of Designations. Except as otherwise provided in this Protective Order (see, e.g., section 5.2(b) below), or as otherwise stipulated or ordered, Discovery Material that qualifies for protection under this Protective Order must be clearly designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a)    for Protected Material in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pre-hearing proceedings or merits hearing), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" to every page of the document that contains Protected Material. For Protected Material that is produced in native electronic format, the designation legend must be included on any slipsheets when produced.

(b) for testimony given in deposition or other pre-hearing proceedings, that the Designating Party either (1) identifies on the record or (2) identifies, in writing, within five (5) business days of receipt by the Designating Party of the final transcript, that the transcript or applicable portions thereof must be treated as "CONFIDENTIAL" or "HIGHLY

CONFIDENTIAL – ATTORNEYS' EYES ONLY."  If a Party or Non-Party reasonably believes a deposition or other pre-hearing proceeding will include Protected Material, only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) may be present at those proceedings.  The Party or Non-Party with such reasonable belief shall give notice to the other party at the time the deposition is noticed that it is invoking the preceding sentence.

The use of Protected Material as an exhibit at a deposition or other pre-hearing proceedings will not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Transcripts containing Protected Material must have a legend on the title page that the transcript contains Protected Material, and the title page must be followed by a list of all pages that have been designated as Protected Material and the level of protection being asserted by the Designating Party. During the period for designation, Parties shall treat any transcript that was not designated on the record pursuant to the first paragraph of Section 5 above as if it had been designated "CONFIDENTIAL" in its entirety. After the expiration of that period or of such earlier time that such transcript is designated, the transcript will be treated only as actually designated.

(c) for Protected Material produced in some form other than documentary and for any tangible things, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the Protected Material is produced the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

(d) If a Party obtains or possesses any documents or information over which another Party or Non-Party has a potential claim of privilege, prior to any production of such documents or information in the Arbitration, the obtaining/possessing Party must provide the

-7-

affected Party or Non-Party with an opportunity for review of the material for determination of any applicable privileges or protections from production. To the extent the affected Party or Non-Party determines that it has a claim of privilege or protection from production over all or any portion of the material, the affected Party or Non-Party shall be treated as a Designating Party, and Section 11 below ("Production of Privileged or Otherwise Protected Material") shall govern such privileged or protected material.

5.3     Failure to Designate. A failure to designate qualified Discovery Material as Protected Material, whether inadvertent or otherwise, does not waive the Designating Party's right to secure protection under this Protective Order for such material. Upon correction of a designation, the Receiving Party must make all reasonable efforts to assure that the material is treated in accordance with the provisions of this Protective Order, which may require a Party to withdraw access to Protected Material that was given to a person who is not authorized to have access under the new designation.

In the event that a Producing Party fails to designate qualified Discovery Material as Protected Material, the Producing Party shall give written notice of such production (the "Re-Designation Production Notice") and shall reproduce copies of the Protected Material that are labeled with the appropriate confidentiality designation. Upon receipt of a Re-Designation Production Notice and properly labeled Protected Material, the Receiving Party shall promptly destroy the original produced Protected Material and all copies thereof, except where such material exists on backup tapes or other disaster recovery systems that are routinely deleted or written over in accordance with an established routine system maintenance practice, or return such together with all copies of such Protected Material to counsel for the Producing Party. Should the Receiving Party choose to destroy the original produced Protected Material, the Receiving Party shall notify

the Producing Party in writing of such destruction within 14 calendar days of receipt of the Re-Designation Production Notice and properly labeled Protected Material. This provision is not intended to apply to any production of any document, material, or testimony protected by attorney-client or work-product immunity, which is separately addressed in Section 11 below.

6.      CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1      Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality or non-designation at any time. A Party or Non-Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2      Meet and Confer. The Challenging Party shall initiate the dispute-resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The Parties and/or Non-Parties must attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice-to-voice dialogue; other forms of communication are not sufficient) within fourteen (14) calendar days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or the Designating Party has failed to meet and confer within the fourteen-day (14) period described above.

6.3     Arbitrator Intervention. If the Parties cannot resolve a challenge without the Arbitrator's intervention, the Challenging Party shall contact the Arbitrator in accordance with the Arbitrator's procedures for disputes relating to discovery matters as set forth in Section B(11) of the Arbitrator's Procedural Rules ("APRs"). The Designating Party may also bring a motion relating to its designation. All Parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation until the Arbitrator rules on the challenge.

7.      ACCESS TO AND USE OF PROTECTED MATERIAL

7.1     Basic Principles.

(a) A Receiving Party may use Protected Material only for prosecuting, defending, or attempting to settle this Arbitration; associated petitions to confirm, correct, or vacate an award; and associated appeals.

(b) Protected Material may be disclosed only to the categories of persons and under the conditions described in this Protective Order.

(c) A Receiving Party must comply with the provisions of Section 4 above ("Duration and Final Disposition") for the duration of this Protective Order.

(d) A Receiving Party must store and maintain Protected Material at a location and in a secure manner that ensures that access is limited to the persons authorized under this Protective Order.

7.2     Data Security of Protected Material. Any Receiving Party or any person in possession of or transmitting another Party's Protected Material must maintain a written information security program that includes reasonable administrative, technical, and physical safeguards designed to protect and secure the Protected Material from loss, misuse, unauthorized

-10-

access and disclosure, and protect against any reasonably anticipated threats or hazards to the security of the Protected Material. Reasonable administrative, technical, and physical safeguards may include, but are not limited to: utilization of Secure File Transfer Protocol (SFTP), Secure Sockets Layer (SSL), or Virtual Private Network (VPN) technologies when transferring files; encryption of the data when data is being transferred to the Receiving Party; encryption of the data when data is at rest when being stored by the Receiving Party; and, with respect to e-discovery software and document management systems, an audit trail that maintains a record of all activity by both system and application processes and by user activity with any operating system(s), application(s), file system(s), or file(s) that stores or interacts with the Protected Material.

To the extent the Receiving Party or any person in possession of or transmitting another Party's Protected Material does not have an information security program, the Receiving Party may comply with this Data Security provision by having Protected Material maintained by and/or stored with a secure eDiscovery/litigation support site(s) or claims administrator that maintains an information security program that complies with the requirements above or otherwise aligns with standard industry practices regarding data security.

Any Protected Material in paper format must be maintained in a secure location with access limited to persons entitled to access the Protected Material under this Protective Order. The Receiving Party will take reasonable steps to limit the number of copies that are made of another Party's Protected Material that is produced in paper format.

If a Receiving Party or any person in possession of or transmitting another Party's or Non-Party's Protected Material discovers any loss of Protected Material or a breach of security, including any actual or suspected unauthorized access, relating to another Party's or Non-Party's Protected Material, the Receiving Party or any person in possession of or transmitting another

Party's or Non-Party's Protected Material shall: (1) promptly provide written notice to the Designating Party of such breach; (2) investigate and make reasonable efforts to remediate the effects of the breach, and provide Designating Party with assurances reasonably satisfactory to Designating Party that such breach will not reoccur; and (3) provide sufficient information about the breach that the Designating Party can reasonably ascertain the size and scope of the breach. In any event, the Receiving Party or any person in possession of or transmitting any Protected Material shall promptly take all necessary and appropriate corrective action to terminate the unauthorized access.

The Receiving Party shall not load, import, submit, or otherwise transfer Protected Material produced by the Producing Party to an open Large Language Model ("LLM") or other open Generative Artificial Intelligence ("AI") platform, nor may the Receiving Party utilize any closed LLM or AI platforms where the Producing Party's Protected Material may be used to train open models or otherwise made accessible to other users of the LLM or AI platform not authorized to receive Protected Material under this Order. Before the Receiving Party transfers any of the Producing party's Protected Material to a closed LLM or AI platform, the Receiving Party shall make reasonably sure that it can delete all such Protected Material from the platform at the final disposition of this Arbitration, as defined in paragraph 4. The Receiving Party will be responsible for destroying such produced information from such tools within thirty (30) days after receiving notice of the entry of an order, judgment, or decree finally disposing of this Arbitration and the exhaustion of all possible petitions, reviews, or appeals therefrom.

7.3    Disclosure of "CONFIDENTIAL" Protected Material. Unless otherwise ordered by the Arbitrator or permitted in writing by the Designating Party, a Receiving Party may disclose

any Protected Material designated as "CONFIDENTIAL" that is not "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a) the Receiving Party's Outside Counsel of Record in this Arbitration, as well as employees of Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Arbitration and Professional Vendors performing services for Outside Counsel of Record in connection with this Arbitration;

(b) Sarah Wynn-Williams and Meta's officers, directors, employees and contractors (including In House Counsel) to whom disclosure is reasonably necessary for this Arbitration;

(c) Experts (as defined in this Protective Order) of the Receiving Party to whom disclosure is reasonably necessary for this Arbitration and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the Arbitrator and his staff;

(e) court reporters and their staff;

(f) professional trial consultants to whom disclosure is reasonably necessary for this Arbitration and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) witnesses in the Arbitration to whom disclosure is reasonably necessary to prepare for or conduct their testimony but only if (i) the Receiving Party notifies the Designating Party in writing of the name of the witnesses and its intent to show the witnesses "CONFIDENTIAL" Protected Material at least five calendar days before the disclosure and/or as ordered by the Arbitrator and (ii) the witnesses have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

-13-

(h) the author or recipient of a document containing the Protected Material or a custodian or other person who otherwise possessed or knew the Protected Material; and

(i) any mediator who is assigned to this matter, and his or her staff, who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A).

7.4     Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Protected Material. Unless otherwise ordered by the Arbitrator, or permitted in writing by the Designating Party, a Receiving Party may disclose any Discovery Material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

(a) the Receiving Party's Outside Counsel of Record in this Arbitration, as well as employees of Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Arbitration and Professional Vendors performing services for Outside Counsel of Record in connection with this Arbitration;

(b) Experts (as defined in this Protective Order) of the Receiving Party to whom disclosure is reasonably necessary for this Arbitration but only if (i) the Receiving Party notifies the Designating Party in writing of the name of the witnesses and its intent to show the witnesses "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" Protected Material at least five calendar days before the disclosure and/or as ordered by the Arbitrator and (ii) the witnesses have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) the Arbitrator and his staff;

(d) court reporters and their staff;

(e) professional trial consultants to whom disclosure is reasonably necessary for this Arbitration and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and

-14-

(f) the author or recipient of a document containing the Protected Material or a custodian or other person who otherwise possessed or knew the Protected Material; and

(g) any mediator who is assigned to this matter and his or her staff, who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A).

(h) witnesses in the Arbitration to whom disclosure is reasonably necessary to prepare for or conduct their testimony but only if (i) the Receiving Party notifies the Designating Party in writing of the name of the witnesses and its intent to show the witnesses "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" Protected Material at least five calendar days before the disclosure and/or as ordered by the Arbitrator and (ii) the witnesses have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A).

For the avoidance of doubt, Sarah Wynn-Williams may not have access to any Discovery Material designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" unless ordered by the Arbitrator or permitted in writing by Meta.

8.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

8.1    If a Receiving Party is served with a subpoena or a court order issued in other litigation, arbitrations, or judicial or quasi-judicial proceedings, or any other legally enforceable request, duly issued subpoena, or request for production requiring the disclosure of Protected Material (a "Demand"), that Party must:

(a) promptly notify in writing the Designating Party. Such notification must include a copy of the subpoena, court order, or request for information;

(b) promptly notify in writing the Party or Non-Party who caused the subpoena or order to issue in the other proceeding that some or all of the material covered by the subpoena or

order is subject to this Protective Order. Such notification must include a copy of this Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected (e.g., filing any Protected Material under seal).

If the Designating Party timely seeks a protective order or otherwise seeks to prevent the production of Protected Material, the Receiving Party served with the Demand shall not produce any Protected Material before a determination by the court or other authority from which the Demand issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection of its Protected Material.

8.2     The provisions set forth herein are not intended to, and do not, restrict in any way the procedures or protections set forth in Federal Rule of Civil Procedure 45.

9.     <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS ARBITRATION</u>

(a) Any discovery requests, including subpoena and deposition notices, propounded to Non-Parties must be accompanied by a copy of this Protective Order.

(b) The terms, remedies, and relief provided by this Protective Order are applicable to Protected Material produced by a Non-Party in this Arbitration. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(c) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information or Protected Material in its possession, custody, or control and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information or Protected Material, then the Party shall:

-16-

1.      promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party; and

2.      promptly provide the Non-Party with a copy of the Protective Order in this Arbitration, the relevant discovery request(s), and a reasonably specific description of the information requested.

(d)      If the Non-Party fails to object or seek a protective order from the Arbitrator within a reasonable period of time after receiving the notice and accompanying information, including but not limited to any contractual notice period in an agreement between the Producing Party and the Non-Party covering the confidentiality and/or disclosure of the information requested, the Producing Party may produce the Non-Party's confidential information or Protected Material responsive to the discovery request. If the Non-Party timely seeks a protective order, the Producing Party shall not produce any information in its possession, custody, or control that is subject to the confidentiality agreement with the Non-Party before a determination by the Arbitrator.

10.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

-17-

11.    <u>PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL</u>

11.1 The production or disclosure of any information protected from discovery, including under the attorney-client privilege, work product doctrine, the joint defense or common interest privilege, or privacy laws ("Privileged Material"), does not result in the waiver of any privilege or protection, including subject matter waiver, associated with such Privileged Material as to the Receiving Party or any Non-Parties in this or in any state or federal proceeding regardless of the circumstances of the disclosure. This Paragraph provides the maximum protection allowed with regard to Privileged Material, including but not limited to all protections afforded by Federal Rule of Evidence 502(d). Nothing contained herein requires the production of Privileged Material, and no Party is required to undertake a "quick peek" process (e.g., Fed. R. Civ. P. 26(b)(5)).

11.2 <u>Clawback Agreement.</u> In the event that a Producing Party discovers that it produced Privileged Material, it shall provide written notice of the claim of privilege or protection to the Receiving Party (a "Clawback Notice"), sufficiently identifying the Privileged Material, stating the basis for the claim of privilege, including a description of the nature of the Privileged Material in a manner that, without revealing information itself privileged or protected, will enable the Receiving Party to assess the claim, and expressly invoking a right to claw back that Privileged Material pursuant to this paragraph of this Protective Order. As soon as practicable after providing the Clawback Notice, the Producing Party shall provide (i) if only a portion of the document contains privileged or protected material, a new copy of the document utilizing the same bates number(s) as the original that has been redacted to protect the privileged or protected material; or (ii) if the entire document is privileged or protected, a slip sheet identifying the same bates number(s) as the original noting that the document has been withheld. Any Privileged Material

that is the subject of a Clawback Notice will be included on a privilege log if and as required by the privilege logging procedures agreed to by the Parties or ordered by the Arbitrator.

11.3 Procedures Following Clawback Notice.

(a) Within ten (10) business days of receipt of a Clawback Notice (regardless of whether the Receiving Party agrees with the Producing Party's claim of privilege or protection), the Receiving Party must immediately return and/or destroy the Privileged Material, all copies thereof, and any notes that reproduce, copy, or otherwise disclose the substance of the Privileged Material and certify to the Producing Party when this return and/or destruction is complete.

11.4 Challenging Privilege Designations.

(a) Timing of Challenges. Any Party may challenge a privilege at any time. A Party does not waive its right to challenge a privilege designation by electing not to mount a challenge promptly after the original designation is disclosed or receipt of a Clawback Notice.

(b) Meet and Confer. The Challenging Party shall initiate the dispute-resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the privilege challenge is being made in accordance with this specific paragraph of the Protective Order. The Parties must attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice-to-voice dialogue; other forms of communication are not sufficient) within fourteen (14) calendar days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the privilege designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process

-19-

only if it has engaged in this meet and confer process first or the Designating Party has failed to meet and confer within the fourteen-day (14) period described above.

(c) <u>Arbitrator Intervention</u>. If the Parties cannot resolve a challenge without the Arbitrator's intervention, the Challenging Party shall contact the Arbitrator in accordance with the Arbitrator's procedures for disputes relating to discovery matters as set forth in Section B(11) of the Arbitrator's Procedural Rules ("APRs"). The Designating Party may also bring a motion relating to its designation. All Parties and Non-Parties shall continue to afford the material in question as privileged until the Arbitrator rules on the challenge. The Receiving Party must not use or disclose the Discovery Material covered by the Clawback Notice during the time in which the Receiving Party is challenging the Discovery Material except the retained copy for purposes of making a challenge as described in Paragraphs 11.3(a)-(b).

12.    <u>MISCELLANEOUS</u>

12.1 <u>Right to Further Relief</u>.  Nothing in this Order abridges the right of any person to seek its modification by the Arbitrator in the future.

12.2 <u>Right to Assert Other Objections</u>.  No Party waives any right it otherwise would have to object to disclosing or producing any Discovery Material on any ground not addressed in this Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

12.3 <u>Filing Protected Material</u>.  Without written permission from the Designating Party or an arbitral or court order secured after appropriate notice to all interested persons, a Party may not file in the public record any Protected Material, except as set forth in Section 8, above, or as necessary to enforce or challenge any arbitral award issued in the Arbitration.

12.4 <u>Privilege Logs.</u>  The Parties' agreement, if any, regarding the requirements for, timing, format, and content of privilege logs will be memorialized in a separate agreement.  Absent any such agreement, the APRs shall apply.

12.5    <u>Other Proceedings</u>.

By entering this Protective Order and limiting the disclosure of Discovery Material in this case, the Arbitrator does not intend to preclude a court from finding that Discovery Material may be relevant and subject to disclosure in another case.

12.6    <u>Inapplicability of Protective Order to Arbitrator</u>.

Notwithstanding anything herein to the contrary, the obligations created by this Protective Order shall not apply to the Arbitrator, whose duties are defined by applicable institutional rules and controlling law.

IT IS SO ORDERED, this 15th day of June, 2026.

_____
Marcus Quintanilla, Esq., Sole Arbitrator

-21-

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| Meta Platforms, Inc., | No. 01-25-0001-2843 |
| *Claimant*, | Arbitrator: |
| | Marcus Salvato Quintanilla, Esq. |
| v. | |
| | Demand Filed: March 7, 2025 |
| Sarah Wynn-Williams, | Trial Date: October 5, 2026 |
| *Respondent.* | |

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____, declare under penalty of perjury that I have read in its entirety and understand the Protective Order that was issued by the Arbitrator in the arbitration entitled *Meta Platforms, Inc. v. Sarah Wynn-Williams*, AAA Arbitration No. 01-25-0001-2843. I agree to comply with and to be bound by all the terms of that Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to that Protective Order to any person or entity except in strict compliance with the provisions of that Protective Order. I further agree to submit to the jurisdiction of the American Arbitration Association, or any court reviewing an award in this Arbitration, for the purpose of enforcing the terms of that Protective Order, even if such enforcement proceedings occur after termination of this Arbitration.

Printed name: _____

Title: _____

Address: _____

Signature: _____

Date: _____

-22-

# Exhibit W

Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104

███████████

Selendy|Gay

Philippe Z. Selendy
Partner

████████████

pselendy@selendygay.com

April 20, 2026

<u>Via E-mail</u>

Marcus Quintanilla
**Arbitrator**

█████████████████████████
█████████████████████████

> Re:    *Meta Platforms, Inc. v. Sarah Wynn-Williams*, Case No. 01-25-0001-2843

Arbitrator Quintanilla,

I write on behalf of Respondent Sarah Wynn-Williams in the above-referenced arbitration to provide the information you requested in your April 18 Order in advance of the videoconference scheduled for April 22, 2026.

## I.    Cited Authority

I enclose with this letter a ZIP file of the authorities cited in Ms. Wynn-Williams's Opposition to Meta's Application for Sanctions (the "Opposition" and Meta's associated Application for Sanctions the "Application").

## II.    Hay Festival

Ms. Wynn-Williams confirms that her appearance at the Hay Festival is currently scheduled for May 31, 2026.

## III.    Status of Discovery

The Arbitrator has adjourned all deadlines for discovery in this matter. Previously, pursuant to agreement of the parties, February 6 was the mutual deadline to serve discovery responses to already-served discovery requests, and March 16 was the deadline to serve any further requests. On February 5, this tribunal vacated the deadlines while Ms. Wynn-Williams secured replacement counsel. Ms. Wynn-Williams has not received any

Arbitrator Marcus Quintanilla
April 20, 2026

discovery responses from Meta and has served none. Ms. Wynn-Williams's replacement counsel is reviewing Meta's proposed protective order for any discovery that may be produced and expects to have revisions. Before any discovery is produced in this matter, an appropriate and mutually agreeable protective order should be in place, and all discovery obligations should be reciprocal. Once the parties have agreed to a protective order, they can and should meet and confer on appropriate deadlines to govern discovery responses.

No further discovery for purposes of adjudicating the Application is necessary or warranted, for at least four independent reasons.

*First,* and as a threshold matter, this tribunal should lift the Interim Award for the reasons stated in Ms. Wynn-Williams's opposition to the Application, negating any grounds for discovery based on the Application.

*Second*, Meta should not be granted the privilege of expedited, unilateral discovery outside the normal course to retroactively cure its failure to produce a sufficient record to warrant sanctions. Meta elected to proceed with its Application, on which it bore the burden, rather than await a final adjudication of this matter on a full record. Having made this choice, Meta is constrained by the record it submitted. Any insistence by Meta that it be permitted special or additional discovery to support its unfounded attempt to sanction her is particularly egregious because Meta has not provided any normal-course discovery to Ms. Wynn-Williams. Meta should not be permitted to use its sanctions motion as a vehicle to litigate the merits of this arbitration in expedited fashion on one-sided discovery without affording Ms. Wynn-Williams a symmetrical opportunity to prepare her own defense to those ultimate merits.

*Third*, Meta cannot show that further discovery would alter the record in support of its Application. Meta's own agent(s)—including Annabel Thomas, a "shareholder" (partner level), from Meta's lawyers— surveilled Ms. Wynn-Williams during at least one of the events at issue, and it has put its full knowledge of that event before this tribunal, which demonstrates that Ms. Wynn-Williams did not speak about or otherwise engage in any promotion of her book. Meta demanded that Ms. Wynn-Williams make informal, expedited, and voluntary discovery productions to Meta outside the normal course of discovery in this matter while it threatened her with the filing of the Application. Ms. Wynn-Williams explained that documents and information responsive to most of Meta's requested categories simply did not exist or else Ms. Wynn-Williams did not possess them.[1] There is, thus, no basis to believe that discovery would provide any further applicable information to this tribunal. Indeed, Meta has not advanced any basis to suggest such discovery would be necessary.

*Fourth*, any discovery specific to the Application would be disproportional to the needs of that Application. As Ms. Wynn-Williams argues in the Opposition, at its most

---

[1] The full scope of Meta's twelve voluminous requests and Ms. Wynn-Williams's good faith response to each is set out in Exhibits D-G of the Declaration of Ravi Naik filed in support of the Opposition.

Arbitrator Marcus Quintanilla
April 20, 2026

extreme relief here is limited to a $7,500 fine payable to the tribunal, not Meta. The legal costs of any further discovery far outweigh that level of relief.

       For all of these reasons, this tribunal should refrain from ordering further discovery and deny the Application now. If the tribunal does allow Meta to serve additional discovery requests related to the Application, Ms. Wynn-Williams requests that she have the reciprocal right to serve such requests on Meta.

<p align="center">* * *</p>

       Counsel for Ms. Wynn-Williams remains available should you have any questions.

Sincerely,


*/s/ Philippe Z. Selendy*
Philippe Z. Selendy
Partner

Encl:   SWW Sanctions Opposition Authority.zip

Cc:     All counsel of record (via email)

<p align="center">3</p>

# Exhibit X

**AMERICAN ARBITRATION ASSOCIATION
EMPLOYMENT ARBITRATION DIVISION**

In the Matter of the Arbitration between

META PLATFORMS, INC.,

    *Claimant/Counterclaim Respondent*,

v.

SARAH WYNN-WILLIAMS,

    *Respondent/Counterclaimant.*

Arbitration Case No. 01-25-0001-2843

Arbitrator: Hon. Marcus Salvato Quintanilla

**RESPONDENT'S OPPOSITION TO
ADDENDUM TO CLAIMANT'S APPLICATION FOR SANCTIONS**

Meta's Addendum to its adjourned Application for Sanctions against Ms. Wynn-Williams (the "Addendum") confirms and exacerbates the grave constitutional error of the Interim Award, which this Tribunal should immediately dissolve.

Ms. Wynn-Williams has steadfastly adhered to the Interim Award. She has not spoken about her book or Meta, has never promoted her book, and has followed this Tribunal's instruction in good faith. In order to ensure that Ms. Wynn-Williams can continue to earn her livelihood as a public policy expert speaking and writing on matters unrelated to Meta, a livelihood that depends upon events such as the Hay Festival, she sought and followed guidance from this Tribunal before appearing at that event. She told the Hay Festival she could not discuss Meta or her book. She asked the Hay Festival to ensure that *Careless People* would not be for sale or on display at the event or available through links on its website. And she attended the event in silence to further avoid any alleged breach of the Interim Award.

Meta, on the other hand, has engaged in a bad-faith campaign to silence and punish Ms. Wynn-Williams, a federal whistleblower, for disclosing the truth about the sexual harassment

she faced and the egregious corporate misconduct she observed while employed at Meta.  Meta's

March 27, 2026, Application for Sanctions (the "Application") and its Addendum go far beyond

the original purpose of the Interim Award; Meta is now exploiting the breadth and the ambiguity

of that Award not only to prevent her from speaking about Meta in public or private conversation

but also to deter Ms. Wynn-Williams from any participation in public life.

Meta's relentless campaign is working.  Meta asks this Tribunal to require Ms. Wynn-Wil-

liams to disclose a list of future public appearances so Meta can monitor her every word and action.

That surveillance is in service of Meta's agenda to control, intimidate, harass, and retaliate against

a whistleblower whose disclosures Meta wants to suppress, actions that cannot be justified under

the Interim Award, the Severance Agreement, or the First Amendment.  Ms. Wynn-Williams was

also surveilled and silenced at the Hay Festival out of fear that anything she said would be cast as

a sanctionable response to other people's criticism of Meta's actions—including Meta's actions in

the course of this arbitration.  The Interim Award prohibits Ms. Wynn-Williams from speaking

about her book or Meta; Meta's Application seeks to punish her for speaking about other things;

and now Meta's Addendum seeks to punish her for not speaking at all.  This Tribunal should end

Meta's campaign by denying the Application and Addendum thereto and dissolving the Interim

Award.

## I.  Ms. Wynn-Williams's Attendance at the Hay Festival Was Not a Violation of the Interim Award

At the April 22, 2026, status conference regarding Meta's Application, when asked about

the Hay Festival, this Tribunal did not suggest that the Interim Award forbade Ms. Wynn-Wil-

liams's appearance.[1]  Instead, the Tribunal instructed that it would be a prima facie showing of a

---

[1] Meta bases its request for an order that Ms. Wynn-Williams provide a list of future speaking engagements on an accusation that Ms. Wynn-Williams hid her plan to attend the Hay Festival.

violation of the Interim Award if Ms. Wynn-Williams were to participate in an event where she knows or should have known that her book would be on sale and her presence would encourage sales. So that Ms. Wynn-Williams could continue her unwavering efforts to comply with the Interim Award, while still preserving her livelihood as a public policy expert, the undersigned requested additional clarification as to how this standard applied to the Hay Festival. The Tribunal did not provide further clarification.

Adhering to the available guidance, Ms. Wynn-Williams, through a letter from counsel, requested the Hay Festival's organizers take measures to prevent the sale of the book and avoid the possibility that her presence would encourage sales. *See* Stoughton Decl. Ex. 1. The letter stated, "[t]o ensure that Ms. Wynn-Williams can appear at the Hay Festival consistent with the pending order, we therefore request you take all reasonable steps to ensure that *Careless People* is not sold at any festival bookshop, book-signing schedule, point-of-sale mechanism, or online link through which sales could be attributed to Ms. Wynn-Williams's appearance at the festival." *Id.*, Ex. 1 at 2. Meta conspicuously does not assert that the book was available for sale at the event as any basis for its renewed application for sanctions. Nor does Meta suggest that Ms. Wynn-Williams's conduct failed to comply with the Tribunal's guidance.

Having taken these precautionary steps in a good faith effort to abide by that guidance, on May 31, 2026, Ms. Wynn-Williams appeared as planned at the Hay Festival on a panel with Tim Wu, a professor at Columbia University, and Carole Cadwalladr, an investigative journalist; the

---

Addendum at 1. That is obviously false; Ms. Wynn-Williams was transparent about her intent to attend the Hay Festival both in her written opposition to Meta's Application and at the April 22, 2026, status conference. Indeed, as far back as March 25, 2026, Ms. Wynn-Williams shared with Meta her intention to appear at the Hay Festival and asked Meta to articulate the basis of any concerns it had about her intended appearance and its relevance to the Interim Award. *See* Respondent's Opp. to Sanctions Appl., Naik Decl., Ex. G ¶¶ 8-12. Meta did not share any specific concerns prior to filing its Application.

event was widely covered in the press. *See id.*, Ex. 2. Notably, Meta does not (and cannot) contend that the event materials mentioned Meta or *Careless People*. Although she had been invited to speak about topics within her professional expertise unrelated to Meta, Ms. Wynn-Williams chose not to speak at all. She did not respond to any comments from her fellow presenters or the audience, to ensure that none of her actions could be interpreted as promoting her book or disparaging Meta, regardless of what other panelists might choose to say.

That silence represents a good faith effort to follow this Tribunal's guidance and does not fall within the scope of the Interim Award. Ms. Wynn-Williams did not promote *Careless People*, nor did she make disparaging statements about Meta. Nothing in the articles Meta cites—or in the declaration of the attorney who attended the Hay Festival on Meta's behalf—suggests otherwise. Meta's argument that Ms. Wynn-Williams's goal in attending the Hay Festival was "increasing sales of her book," Addendum at 4, is false and without support. The accusation only serves to establish that Meta will interpret any action Ms. Wynn-Williams takes as so-called "promotion" and thus continue to exploit the Interim Award to harass, punish, and attempt to silence her. If, for example, Ms. Wynn-Williams had remained silent by cancelling her appearance at the Hay Festival following Meta's sanctions Application, the cancellation would have drawn media attention, and Meta would no doubt have filed the same Addendum making the same accusations of "promotion" under the same faulty logic. If Ms. Wynn-Williams had spoken at the Hay Festival, then Meta would have called that a breach. In seeking to comply with the Interim Award, Ms. Wynn-Williams sat in silence.

It was in fact *Meta's* actions to silence Ms. Wynn-Williams that drew attention at the Hay Festival and reportedly led to an increase in sales of *Careless People*. Meta cannot seek to sanction

4

Ms. Wynn-Williams for the outcome of its own conduct in these proceedings, a litigation strategy that continues to backfire.

Left only with its absurd contention that Ms. Wynn-Williams's good-faith silence should be sanctioned, Meta's argument once again turns primarily on the actions of other people. Meta seeks to use the Interim Award to punish Ms. Wynn-Williams for the fact that *Ms. Cadwalladr* stated, "I think this might be a Hay first, in which we have an author in a hostage situation. Blink once if you can hear us, Sarah, twice if [Mark] Zuckerberg is an asshole," Addendum at 3-4, even though Ms. Wynn-Williams did not respond to that statement in any manner. Meta also seeks to use the Interim Award to hold Ms. Wynn-Williams responsible for the fact that *Mr. Wu* characterized Ms. Wynn-Williams's book as "critical" of Meta, and that Ms. Cadwalladr expressed her view that "Mr. Zuckerberg comes across as a 'manchild'" and referenced Ms. Wynn-Williams's descriptions of sexual harassment that occurred at Meta. *Id.* at 4 n.3. Meta does not and cannot suggest that Ms. Wynn-Williams had any authority, control, or influence over what those individuals said. The Interim Award does not apply to the actions of Ms. Cadwalladr or Mr. Wu; it applies to only Ms. Wynn-Williams, her agents, and any other persons or entities she controls. Interim Award at 3. There is no basis for sanctioning Ms. Wynn-Williams for the conduct of the Hay Festival organizers and panelists under the Interim Award; they are not her agents nor persons or entities she controls. If it is true that sales of Ms. Wynn-Williams's book rose after the Hay Festival, it is because *Meta's* attempts to suppress Ms. Wynn-Williams's speech triggered a controversy, provoking reactions from people other than Ms. Wynn-Williams. That would have happened regardless of whether Ms. Wynn-Williams sat on stage in silence or cancelled her appearance and stayed at home. As a result, and for the reasons stated in Ms. Wynn-Williams's May 6, 2026, submission regarding the procedural timetable of this arbitration, there is no reason for this

Tribunal to reconsider its decision to defer any determination of the purported merits of Meta's Application until the hearing scheduled in October 2026 and, indeed, Meta's Application and Addendum thereto should be denied.

## II.    This Tribunal Should Dissolve the Interim Award

For these same reasons, this Tribunal must dissolve the Interim Award now.    As Ms. Wynn-Williams set out in detail in her April 17, 2026, opposition to Meta's Application (the "Opposition"), the Interim Award is an unconstitutional and unjustifiable prior restraint on Ms. Wynn-Williams's speech.  Opp. at 8-12.

There has been no adjudication that Ms. Wynn-Williams's speech is unprotected or that the Interim Award's restraint is appropriately tailored.  *See, e.g.*, *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 898 (Cal. 2003) (Moreno, J., concurring); *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071, 1089-90 (C.D. Cal. 2003) (collecting cases); *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1049 (C.D. Cal. 1998) (rejecting injunction against "disseminating or publishing further false, defamatory or disparaging information" because "[s]uch an injunction would necessarily precede an adequate determination that a particular statement by defendant was false, defamatory or disparaging"); *Balboa Island Vill. Inn, Inc. v. Lemen*, 40 Cal. 4th 1141, 1156 (Cal. 2007) (explaining an injunction prohibiting speech is not a prior restraint only if it is issued "following a determination at trial that the enjoined statements are defamatory") (citation omitted).  Even if such an adjudication had been made, the Interim Award sweeps far more broadly than the restrictions in the Severance Agreement and, as Meta's repeated sanctions motions illustrate, is so vague and overbroad that it unreasonably chills protected speech.  Opp. at 8-12.  Meta could not obtain the relief granted by the Interim Award in court, *id.* at 10 (citing *Evans v. Evans*, 162 Cal. App. 4th 1157, 1167-69 (2008); *Lavasoft*, 356 F. Supp. 2d at 1089-90; *Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert*, 194 Cal. App. 4th 519, 533 (2011)), and

6

therefore this Tribunal could not lawfully award it, AAA Employment Arbitration Rules and Mediation Procedures (2009), R-32 ("[T]he arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court."). Meta does not even attempt to address the First Amendment implications of the further unlawful relief it seeks, notwithstanding the Tribunal's acknowledgment during the April 22, 2026, status conference that the Interim Award may raise serious First Amendment concerns.

To the contrary, Meta's Addendum confirms and exacerbates those First Amendment concerns in several ways. *First*, the Addendum shows how Meta will continue to exploit the vagueness of "promotion" to harass and punish Ms. Wynn-Williams unless and until the Interim Award is lifted. Seeking sanctions when Ms. Wynn-Williams did not even speak shows that Meta will interpret any act as "promotion" in violation of the Interim Award. Meta's Addendum expressly suggests that Ms. Wynn-Williams engages in prohibited promotion merely by trying to "garner more attention," that is, by making any sort of public appearance. Addendum at 3.

But any action Ms. Wynn-Williams took relating to the Hay Festival would have "garner[ed] more attention." If she had remained silent by declining or cancelling her appearance, Hay Festival speakers and attendees would have still discovered and reacted to that silence, just as they did when she was silent but present. Meta would have pursued her anyway.

*Second*, Meta's exploitation of the Interim Award to hold Ms. Wynn-Williams responsible for the speech of others, even when that speech is a direct response to Meta's own actions, shows how the Interim Award makes public speech on any topic impossible. It is *Meta's* pursuit of Ms. Wynn-Williams that has ensured the controversy between them remains a topic of widespread public interest. This is evident from the comments of Ms. Cadwalladr and Mr. Wu at the Hay Festival: they were reacting to *Meta's* own actions in this arbitration, having learned of the steps

7

Ms. Wynn-Williams was forced to take in order to protect herself from further accusations that she willfully violated the Interim Award.  The backfiring of Meta's strategy is the predictable fate of every legal censorship campaign, not a basis to further enable that censorship by sanctioning its target.

*Third,* pursuing Ms. Wynn-Williams for appearing at the Hay Festival despite her affirmative good-faith efforts to ensure her book would not be sold or promoted shows that the Interim Award was never about book sales—it is about creating a vehicle for Meta's surveillance, censorship, and punishment.  The costs of defending against the Application and Addendum further chill Ms. Wynn-Williams from exercising her right to speak and impede her ability to earn a livelihood. Meta continues to engage in proactive digital and physical surveillance of Ms. Wynn-Williams, as evidenced by its dispatching an attorney to attend the Hay Festival.  Its request that the Tribunal order Ms. Wynn-Williams to disclose a list of planned events further underscores how Meta seeks to manipulate this arbitration to enable its campaign of intimidation.  By ensuring Ms. Wynn-Williams knows she is always being watched and listened to, Meta reminds her it is a corporation with vast resources that can and will turn any act, or any public or private speech, into an opportunity for surveillance and punishment.

For these reasons and those set forth in Ms. Wynn-Williams's April 17, 2026, submission, the continued application of the Interim Award is untenable, and it must be dissolved.

8

## **CONCLUSION**

For the reasons set forth above, this Tribunal should deny the Application and dissolve the Interim Award.

Dated:   New York, NY
        June 18, 2026

Respectfully submitted,

SELENDY GAY PLLC

By:    /s/ Claire E. O'Brien
Philippe Z. Selendy
Jennifer M. Selendy
Claire E. O'Brien
Corey Stoughton
Drake Reed
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY  10104

pselendy@selendygay.com
jselendy@selendygay.com
cobrien@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com

*Attorneys for Respondent Sarah Wynn-Williams*