**SELENDY GAY PLLC**
Philippe Z. Selendy (admitted *pro hac vice*)
Jennifer M. Selendy (admitted *pro hac vice*)
Claire E. O'Brien (admitted *pro hac vice*)
Corey Stoughton (admitted *pro hac vice*)
Drake Reed (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
jselendy@selendygay.com
cobrien@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com

*Counsel for Plaintiff Sarah Wynn-Williams*

**ZEITGEIST LAW PC**
Marcia C. Hofmann (SBN #250087)
25 Taylor Street
San Francisco, CA 94102
Tel: 415-830-6664
marcia@marciahofmann.com

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| SARAH WYNN-WILLIAMS,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>META PLATFORMS, INC.,<br><br>　　　　　　Defendant. | Case No.:　　4:26-cv-06341-AMO<br><br>**MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　　August 20, 2026<br>Time:　　2:00pm<br>Judge:　　Hon. Araceli Martínez-Olguín<br>Ctrm.:　　Ctrm. 5, 2nd Floor |

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................................2

STATEMENT OF FACTS ..................................................................................................................4

    A.    Ms. Wynn-Williams's Tenure at Facebook, the Harassment She Experienced, and the 2017 Severance Agreement...................................................4

    B.    Meta's Public Commitments Not to Compel Arbitration of Sexual Harassment Claims, Not to Enforce Non-Disparagement Agreements, and to Support Free Expression...........................................................................................5

    C.    Ms. Wynn-Williams's Whistleblower Disclosures and Publication of *Careless People* ...............................................................................................6

    D.    Meta's Pre-Publication Legal Campaign and the *Ex Parte* Interim Award.............7

    E.    *Careless People* Becomes a #1 *New York Times* Bestseller and the Subject of Public Discussion and Congressional Investigation...........................................8

    F.    Meta's Exploitation of the Interim Award to Expand Its Power to Constrain and Punish Ms. Wynn-Williams ...........................................................................9

ARGUMENT ....................................................................................................................................12

I.    Ms. Wynn-Williams Is Likely to Succeed on the Merits of Her Claims That the EFAA Bars the Arbitration as a Matter of Law and Meta Is Estopped from Compelling It ........................................................................................................................12

    A.    The EFAA Bars the Arbitration as a Matter of Law, and the Court—Not the Arbitrator—Must Decide That Issue ...................................................................13

        1.    Section 402(b) Commits the Arbitrability Question to This Court, Not the Arbitrator......................................................................................14

        2.    The Severance Agreement Is a "Predispute Arbitration Agreement" .......14

        3.    The Speech Dispute "Relates to" a "Sexual Harassment Dispute" Within the EFAA's Statutory Definition ...................................................16

    B.    Meta's 2018 Public Commitment to End Forced Arbitration of Sexual Harassment Claims Estops It from Compelling Arbitration Here ........................17

II.    Compelling Ms. Wynn-Williams to Arbitrate a Dispute Meta Has No Right to Arbitrate, While the Interim Award Continues to Suppress Her Speech and Career, Is Irreparable Harm ..................................................................................................................21

III.    The Balance of Equities Tips Sharply in Ms. Wynn-Williams's Favor ...........................22

IV.    The Public Interest Is Served by an Injunction.................................................................23

CONCLUSION.................................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aceves v. U.S. Bank, N.A.*,
  192 Cal. App. 4th 218 (Cal. Ct. App. 2011) ..................................................................19, 20

*Aloha Islandair Inc. v. Tseu*,
  128 F.3d 1301 (9th Cir. 1997) .............................................................................................16

*Baldwin v. TMPL Lexington LLC*,
  2024 WL 3862150 (S.D.N.Y. Aug. 19, 2024) ................................................................15, 16

*Bruce v. Adams & Reese, LLP*,
  168 F.4th 367 (6th Cir. 2026) ..............................................................................................15

*Coinbase, Inc. v. Suski*,
  602 U.S. 143 (2024)........................................................................................................13, 22

*Delo v. Paul Taylor Dance Found., Inc.*,
  685 F. Supp. 3d 173 (S.D.N.Y. 2023)...................................................................................16

*Diaz-Roa v. Hermes L., P.C.*,
  757 F. Supp. 3d 498 (S.D.N.Y. 2024)..............................................................................15, 17

*Ding v. Structure Therapeutics, Inc.*,
  755 F. Supp. 3d 1200 (N.D. Cal. 2024) ..........................................................................14, 15

*Elrod v. Burns*,
  427 U.S. 347 (1976)..............................................................................................................21

*Empros Cap. LLC v. Rosenbach*,
  2020 WL 6684854 (N.D. Cal. Nov. 12, 2020) .....................................................................21

*Garcia v. World Sav., FSB*,
  183 Cal. App. 4th 1031 (Cal. Ct. App. 2010) ......................................................................19

*Gathers v. K&K Fam. Ventures*,
  2025 WL 892773 (D.S.C. Mar. 24, 2025) ............................................................................16

*Gathers v. K&K Fam. Ventures, LLC*,
  2025 WL 1032252 (D.S.C. Feb. 19, 2025)............................................................................16

*Goffman v. Bank of Am., N.A*,
  2012 WL 6011906 (Cal. Ct. App. Nov. 29, 2012)................................................................20

*Goldman, Sachs & Co. v. City of Reno*,
  747 F.3d 733 (9th Cir. 2014) ...............................................................................................13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) ...................................................................................................13

*J.H. v. Lawrenceville Sch.*,
    2026 WL 217593 (N.J. Super. Ct. App. Div. Jan. 28, 2026).....................................................16

*Kader v. S. Cal. Med. Ctr., Inc.*,
    99 Cal. App. 5th 214 (Cal. Ct. App. 2024) ...............................................................................15

*Kennedy v. Meta Platforms, Inc.*,
    No. CGC-23-604370 (Cal. Super. Ct. Apr. 28, 2023) ................................................................4

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ..................................................................................................23

*League of Wilderness Defs. v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ....................................................................................................23

*Lee v. Marriott Int'l, Inc.*,
    2025 WL 2689263 (N.D. Cal. Sep. 21, 2025) ...........................................................................16

*Meta Platforms, Inc.*,
    No. 19-CA-312724, 2024 WL 3469667 (N.L.R.B. July 19, 2024) .............................................4

*Morgan Stanley & Co., LLC v. Couch*,
    134 F. Supp. 3d 1215 (E.D. Cal. 2015).........................................................................13, 22, 25

*Polen v. API Grp. Life Safety USA, LLC*,
    2025 WL 3251349 (D. Or. Nov. 21, 2025)...........................................................................16, 17

*Pyro Spectaculars N., Inc. v. Souza*,
    861 F. Supp. 2d 1079 (E.D. Cal. 2012)......................................................................................22

*Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ....................................................................................................22

*Sateriale v. R.J. Reynolds Tobacco Co.*,
    697 F.3d 777 (9th Cir. 2012) ...............................................................................................18, 19

*Snyder v. Phelps*,
    562 U.S. 443 (2011)...................................................................................................................24

*Sykes v. Escueta*,
    2010 WL 4942608 (N.D. Cal. Nov. 29, 2010) ..........................................................................25

*Turner v. Tesla, Inc.*,
    686 F. Supp. 3d 917 (N.D. Cal. 2023) .......................................................................................14

*Univ. of Haw. Pro. Assembly v. Cayetano*,
    183 F.3d 1096 (9th Cir. 1999) ..................................................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................... *passim*

**Statutes & Rules**

U.S. Const. amend. I ........................................................................................... *passim*

9 U.S.C. § 401 ..................................................................................................... *passim*

9 U.S.C. § 402 ..................................................................................................... *passim*

Fed. R. Civ. P. 65 ...................................................................................................... 12

N.D. Cal. Civil L.R. 7-2 ............................................................................................ 12

N.D. Cal. Civil L.R. 65 .............................................................................................. 12

**Other Authorities**

*A Time for Truth: Oversight of Meta's Foreign Relations and Representations to
    the United States Congress*, Hearing Before the Subcomm. on Crime and
    Counterterrorism of the S. Judiciary Comm., 119th Cong. (2025),
    https://www.judiciary.senate.gov/committee-activity/hearings/a-time-for-
    truth-oversight-of-metas-foreign-relations-and-representations-to-the-united-
    states-congress ......................................................................................................... 9

Ashley Gold, *Tech CEOs Summoned to Capitol for June Hearing*, Axios (May
    15, 2026), https://www.axios.com/2026/05/15/tech-ceos-grassley-june-hearing ............... 9, 24

Dave Simpson, *Facebook, Google Won't Make Harassed Workers Arbitrate*,
    Law360 (Nov. 9, 2018) https://www.law360.com/articles/1101035/facebook-
    google-won-t-make-harassed-workers-arbitrate ........................................................ 5

 Douglas MacMillan, *Facebook to End Forced Arbitratsion for Sexual-
    Harassment Claims*, Wall Street J. (Nov. 9, 2018),
    https://www.wsj.com/articles/facebook-to-end-forced-arbitration-for-sexual-
    harassment-claims-1541799129 ................................................................................ 5

Meta Platforms, Inc., *Meta Reports Fourth Quarter and Full Year 2025 Results*
    (Jan. 28, 2026), https://investor.atmeta.com/investor-news/press-release-
    details/2026/Meta-Reports-Fourth-Quarter-and-Full-Year-2025-
    Results/default.aspx ................................................................................................ 23

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on August 20, 2026, or as soon as the matter may be heard, in the courtroom of the Honorable Araceli Martínez-Olguín at the United States District Court for the Northern District of California, Oakland Division, Plaintiff Sarah Wynn-Williams, will, and hereby does, move the Court to preliminary enjoin further proceedings in the arbitration before AAA-ICDR under the caption *Meta Platforms, Inc. v. Sarah Wynn-Williams*, No. 01-25-0001-2843 (filed Mar. 7, 2025) (Quintanilla, Arb.) (the "Motion").

The Motion is made on the grounds that (a) Ms. Wynn-Williams is likely to succeed on the merits of her claims or her claims raise serious questions going to the merits, (b) Ms. Wynn-Williams will continue to suffer irreparable injury if Meta is not so enjoined, (c) the balance of hardships weighs strongly in Ms. Wynn-William's favor, and (d) the public interest supports the issuance of a preliminary injunction. Ms. Wynn-Williams requests that the Court consolidate the briefing schedule and hearing on the Motion with Meta's motion to compel arbitration, ECF 28, and set a hearing on the earliest possible date.

The Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities and supporting declarations; all pleadings in this action; all matters of which the Court may take judicial notice; and any other written or oral argument or evidence that Ms. Wynn-Williams may present to the Court.

Dated:    July 9, 2026                                        Respectfully Submitted,

                                                             By: /s/ *Corey Stoughton*

**ZEITGEIST LAW PC**                        **SELENDY GAY PLLC**
Marcia C. Hofmann (SBN #250087)             Philippe Z. Selendy (admitted *pro hac vice*)
25 Taylor Street                            Jennifer M. Selendy (admitted *pro hac vice*)
San Francisco, CA 94102                     Claire E. O'Brien (admitted *pro hac vice*)
Tel: 415-830-6664                           Corey Stoughton (admitted *pro hac vice*)
marcia@marciahofmann.com                    Drake Reed (admitted *pro hac vice*)
                                            1290 Avenue of the Americas
                                            New York, NY 10104
                                            Tel: 212-390-9000
                                            pselendy@selendygay.com
                                            jselendy@selendygay.com
                                            cobrien@selendygay.com
                                            cstoughton@selendygay.com
                                            dreed@selendygay.com

                                            *Counsel for Plaintiff Sarah Wynn-Williams*

**ISSUES TO BE DECIDED**

Section 402(a) of the Ending Forced Arbitration Act (the "EFAA") renders any predispute arbitration agreement unenforceable at the plaintiff's election in a case relating to a sexual harassment dispute, and Section 402(b) of the EFAA commits that question exclusively to a court. Ms. Wynn-Williams is a former Facebook employee and whistleblower whose disclosures in *Careless People* and before Congress concern the sexual harassment she experienced at Meta; her 2017 Severance Agreement with Meta predates the dispute relating to those disclosures by eight years; and in 2018 Meta publicly disavowed enforcement of forced arbitration provisions related to sexual harassment disputes.

Should the Court enjoin the arbitration because the EFAA bars it as a matter of law and because Meta's own public disavowal independently estops it?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Defendant Meta Platforms, Inc. ("Meta") is using a private arbitration to silence whistleblower and former Meta employee, Plaintiff Sarah Wynn-Williams, whose memoir, *Careless People*, lays bare the sexual harassment and corporate misconduct she reported to the Securities and Exchange Commission, the Department of Justice, and the United States Congress. When Meta learned of *Careless People*, the company initiated an emergency arbitration proceeding claiming that the book violated a non-disparagement provision in the severance agreement it presented to Ms. Wynn-Williams upon her termination from Facebook in 2017 (the "Severance Agreement"). Through that proceeding, Meta obtained a sweeping *ex parte* injunction (the "Interim Award") prohibiting Ms. Wynn-Williams and her attorneys from "promoting" the memoir and from speaking about the misconduct she exposed.[1] In recent months, Meta has exploited the Interim Award to initiate an escalating series of sanctions threats targeting Ms. Wynn-Williams's public appearances, regardless of their relationship to Meta or her book, including appearances where she has not spoken at all. These threats have the purpose and effect of using the coercive power of the tribunal to punish and chill Ms. Wynn-Williams's exercise of rights protected by the First Amend-

---

[1] The emergency arbitrator (the "Emergency Arbitrator") issued that injunction without any effort to adjudicate whether it was a justified constraint on unprotected speech—*i.e.*, whether Ms. Wynn-Williams had validly waived her right to publish *Careless People* through the Severance Agreement and whether, even if she did, the Interim Award met the demanding standard for injunctions against speech. These facts, along with the vagueness in the Interim Award that has enabled Meta's exploitation of it to even more broadly attack Ms. Wynn-Williams's speech, render the Interim Award an invalid and unenforceable prior restraint on Ms. Wynn-Williams's speech, arguments that Ms. Wynn-Williams raises in her separately filed Motion to Vacate the Interim Award.

ment.  The tribunal has denied Ms. Wynn-Williams's repeated requests to lift the Interim Award and put an end to Meta's sanctions threats and their untenable chilling effect on her First Amendment rights, leaving her no choice but to seek relief from this Court.

Meta's exploitation of the arbitration process is unlawful. Congress barred enforcement of the arbitration provision of Meta's Severance Agreement in the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. 117-90, 136 Stat. 26 (2022) (codified at 9 U.S.C. § 401 *et seq.*) (the "EFAA").  Congress enacted the EFAA in 2022 to keep victims of sexual harassment out of private arbitrations their employers' contracts forced them into and to ensure that questions about such arbitrability are resolved by the courts.  The law renders the arbitration clause of Meta's Severance Agreement unenforceable at Ms. Wynn-Williams's election and commits the merits of that question exclusively to this Court, not an arbitrator.

Independently, Meta is estopped from compelling arbitration here.  In 2018, Meta publicly committed to abandon enforcement of compelled arbitration of sexual harassment claims, telling the *New York Times* and the *Wall Street Journal* that doing so was "a pivotal moment" and "the right thing to do."  Meta cannot be allowed to break its word now to bury the very disclosures that Congress, and Meta itself, promised to protect.

Ms. Wynn-Williams accordingly moves this Court to preliminarily enjoin the ongoing arbitration pending resolution of her claims before this Court in order to put an end to the increasingly irreparable impact of Meta's exploitation of that process.  The equities and the public interest only sharpen the case for this emergency relief. *Careless People* is already a #1 *New York Times* bestseller; Meta has nothing left to gain by suppressing it.  Yet due to Meta's recent sanctions threats and the tribunal's refusal to address them, Ms. Wynn-Williams is forced to forgo or constrain her ability to share her significant public policy expertise with the world, including on matters of obvious and urgent public concern.  The arbitration (and the Interim Award) deprive the public of one of the few primary sources providing insight into Meta, one of the world's most powerful and era-defining companies.  For these reasons, the Court should preliminarily enjoin the arbitration pending the Court's resolution of the substantive challenges Ms. Wynn-Williams has brought to the arbitration and Meta's broader course of conduct.

**STATEMENT OF FACTS**

**A.    Ms. Wynn-Williams's Tenure at Facebook, the Harassment She Experienced, and the 2017 Severance Agreement**

Sarah Wynn-Williams joined Meta, then known as Facebook, in 2011 already an accomplished diplomat and public policy expert, and she served in Facebook's public policy team from 2011 to 2017, eventually serving as Director of Global Public Policy.  Wynn-Williams Decl. ¶¶ 3-5.  During her tenure, she was sexually harassed by two senior executives, including her direct supervisor Joel Kaplan, then Facebook's Vice President of Global Policy.  *Id.* ¶ 6.  Ms. Wynn-Williams strained to avoid reporting the harassment internally to protect her career from retaliation.  *Id.* ¶ 7.  But when she learned Facebook was investigating Mr. Kaplan's conduct anyway, she started compiling documents to submit to human resources.  *Id.* ¶¶ 8-10.  Before Ms. Wynn-Williams had a chance to submit those documents or take any other affirmative action, however, Facebook terminated her.  *Id.* ¶ 11.

After terminating Ms. Wynn-Williams, Facebook presented her with a Severance Agreement she had no reasonable alternative but to sign.  *Id.* ¶ 12; *id.* Ex. A (the "Severance Agreement" or "Agreement").  Meta's Severance Agreement contains a non-disparagement clause, *id.* § 9, as well as an arbitration clause, *id.* § 16(d), both of which are at issue in this litigation.  Courts and the National Labor Relations Board have invalidated similar clauses in other of Meta's employment agreements.  *See Meta Platforms, Inc.*, No. 19-CA-312724, 2024 WL 3469667 (N.L.R.B. July 19, 2024) (describing and invalidating less restrictive non-disparagement portion of Meta separation agreement under the National Labor Relations Act); *Kennedy v. Meta Platforms, Inc.*, No. CGC-23-604370 (Cal. Super. Ct. Apr. 28, 2023) (describing and invalidating similar arbitration provision of Meta employment agreement under the EFAA) [https://perma.cc/8UW8-LARH].  Though Meta has used its Severance Agreement as a basis to obtain an arbitral injunction silencing Ms. Wynn-Williams and impairing her career as a public policy expert, the Agreement on its face protects her participation in professional activities, prohibiting "disparaging, critical or otherwise detrimental comments" about Meta and its officers and expressly carving out "good faith expressions of opinion or competitive comparisons involving [Meta] that are not disparaging and are

offered in the scope of [Ms. Wynn-Williams's] future employment or business ventures." Agmt. § 9.

**B.     Meta's Public Commitments Not to Compel Arbitration of Sexual Harassment Claims, Not to Enforce Non-Disparagement Agreements, and to Support Free Expression**

In the years following Ms. Wynn-Williams's termination, Meta repeatedly told the world that it would not enforce arbitration clauses for sexual harassment claims and would not enforce non-disparagement clauses in any circumstances; Meta's Severance Agreement with Ms. Wynn-Williams contains precisely these two clauses.  On November 9, 2018, Meta's Vice President of People, Lori Goler, announced in the *New York Times* and other outlets that Meta would end its practice of using its contractual power to force arbitration of sexual harassment claims, calling the change "a pivotal moment ... and the right thing to do."  Wynn-Williams Decl. Ex. B (*New York Times* article).[2]  Meta's strategy to publicize its policy change worked; Ms. Wynn-Williams learned of it through the *New York Times*'s reporting in November 2018.  Wynn-Williams Decl. ¶ 15.

Four years later, in its 2022 Proxy Statement—issued in response to a shareholder proposal on "concealment clauses" that Ms. Wynn-Williams herself helped organize while in leadership at the Minderoo Foundation—Meta represented that it does not require employees to remain silent about harassment or discrimination, does not enforce non-disparagement clauses preventing discussion of unlawful workplace conduct, and intends to comply with the National Labor Relations Act and the California Silenced No More Act.  Wynn-Williams Decl. ¶¶ 22-23 Ex. D (Meta 2022 Proxy Statement) at 71.  The representation did not carve out former employees, prior agreements, or any other exception, and it spoke directly to the type of non-disparagement provision Meta had required Ms. Wynn-Williams to sign.  The Proxy Statement was issued by the Board of Directors and sent to all shareholders.  *See id.* Ex. D.  Because of the Proxy Statement, Ms. Wynn-Williams

---

[2] *See also, e.g.*, Douglas MacMillan, *Facebook to End Forced Arbitration for Sexual-Harassment Claims*, Wall Street J. (Nov. 9, 2018), https://www.wsj.com/articles/facebook-to-end-forced-arbitration-for-sexual-harassment-claims-1541799129 [https://perma.cc/5JP5-EK9U]; Dave Simpson, *Facebook, Google Won't Make Harassed Workers Arbitrate*, Law360 (Nov. 9, 2018) https://www.law360.com/articles/1101035/facebook-google-won-t-make-harassed-workers-arbitrate [https://perma.cc/7RAC-9H38].

understood that she was free to speak out about the sexual harassment she experienced at Meta without being subjected to the non-disparagement clause or the arbitration clause of the Severance Agreement Meta required her to sign. *Id.* ¶¶ 18, 25.

Following Ms. Wynn-Williams's departure from Meta, the company also made numerous public commitments to free speech and free expression that Ms. Wynn-Williams followed with interest as a former employee and as an expert in technology policy. On October 17, 2019, Ms. Wynn-Williams watched live as Facebook streamed Mr. Zuckerberg's "Standing for Voice and Free Expression" speech from Georgetown University. Wynn-Williams Decl. ¶ 19. In the speech, Mr. Zuckerberg discussed how his and Meta's values were "inspired" by the First Amendment and its ideals of free expression, how "most progress in our lives comes from regular people having more of a voice," and stated "I don't think it's right for a private company to censor politicians or the news in a democracy." *Id.* Ex. C (Oct. 17, 2019 Press Release). On January 7, 2025, Meta issued a press release in which Meta reaffirmed its "commitment to free expression," stating that "inhibiting speech, however well-intentioned the reasons for doing so, often reinforces existing institutions and power structures instead of empowering people," and that free expression "can be messy … But that's free expression." *Id.* Ex. E (Jan. 7, 2025 Press Release). Ms. Wynn-Williams read this press release when Meta issued it, and based on it and Mr. Zuckerberg's speech at Georgetown University, as well as other statements, gained additional confidence that Meta had truly committed to allowing her to speak the truth about what she saw and experienced at the company. *See id.* ¶¶ 21, 26, 28.

**C.     Ms. Wynn-Williams's Whistleblower Disclosures and Publication of *Careless People***

Ms. Wynn-Williams took Meta at its word. Beginning in 2024, after years of good-faith compliance with the terms of the Severance Agreement (despite its invalidities as set forth in the Complaint), she began to disclose what she had observed at Meta to federal regulators and to Congress. Wynn-Williams Decl. ¶¶ 29-30. She filed a whistleblower complaint with the SEC in April 2024 and a whistleblower complaint with the Department of Justice in March 2025. *Id.* ¶¶ 30-33, Ex. F (SEC whistleblower filing), Ex. G (DOJ whistleblower filing). She made these disclosures

despite the fact that Section 4 of the Severance Agreement illegally prohibits her from "recover[ing] any monetary benefit as a result of any claim brought on [her] behalf by any government agency." Agmt. § 4. Ms. Wynn-Williams has not received any monetary benefit from the SEC or DOJ in connection with her whistleblower filings. Wynn-Williams Decl. ¶ 35. Following her disclosures to the SEC and DOJ, in March 2025, she published *Careless People*, a memoir laying bare the conduct she had witnessed at Meta and experienced at the hands of its executives. *Id.* ¶ 34. *Careless People* and the whistleblower filings recount the sexual harassment Ms. Wynn-Williams endured at the hands of Joel Kaplan and Sheryl Sandberg during her time at Facebook—the very conduct Meta had publicly disclaimed any intention of silencing or forcing into arbitration. *See id.* ¶¶ 6, 36, Ex. H (*Careless People* excerpts), Ex. F (SEC whistleblower filing), Ex. G (DOJ whistleblower filing).

       **D.**    **Meta's Pre-Publication Legal Campaign and the *Ex Parte* Interim Award**

Before the book could even be published, Meta put its hypocrisy on full display with an aggressive legal campaign to silence and punish Ms. Wynn-Williams. On March 6, 2025, Meta sent a letter to Ms. Wynn-Williams's publishers, Macmillan, Inc. ("Macmillan") and its affiliated imprint Flatiron Books ("Flatiron"), threatening defamation liability and demanding pre-publication review on the theory that the publishers "intend[ed] to imminently publish a book that may contain false statements" about Meta. O'Brien Decl. Ex. A (Mar. 6, 2025 Ltr. to Flatiron/Macmillan) at 1. That letter did not mention Ms. Wynn-Williams at all, nor did it mention Meta's Severance Agreement, the non-disparagement clause, or the arbitration provision. *See id.*

One day later, on March 7, 2025, Meta abandoned the defamation framing and filed an emergency arbitration demand premised entirely on the non-disparagement clause in Meta's Severance Agreement, walking back its promises concerning non-enforcement of both forced arbitration for sexual harassment claims and non-disparagement clauses. *Id.* Ex. B (Mar. 7, 2025 Application for Emergency Relief). Although Meta's Severance Agreement could not bind the publishers—who were not parties to it—Meta sought sweeping injunctive relief against them anyway, including an order enjoining publication of *Careless People* in its entirety. *See id.* Meta's application also sought more expansive restrictions on Ms. Wynn-Williams's speech than the Severance

Agreement contains, without the full scope of that Agreement's clarifying limitations designed to protect her professional activities. *See id.* at 10-11. On March 12, 2025, the Emergency Arbitrator, without the benefit of any opposition from Ms. Wynn-Williams, issued the Interim Award, giving Meta all the constraints on Ms. Wynn-Williams's speech it had asked for. The Interim Award purports to enjoin Ms. Wynn-Williams—and "her agents, servants, employees, attorneys, and any other person(s) or entities [] which she controls"—(1) from making any "disparaging, critical or otherwise detrimental comments" about Meta, without limitation; (2) from "further promoting *Careless People* [] on a book tour or otherwise," without defining what constitutes "promoting"; (3) from further publishing or distributing the book to the extent within her control; and (4) from "amplifying or repeating" any prior such comments to the extent within her control, while also requiring her to retract any prior such comments. O'Brien Decl. Ex. C ("Interim Award") at 3-4.

Meta moved immediately to enforce the Interim Award against Ms. Wynn-Williams and ensure its maximum public exposure in an effort to undermine her credibility, intimidate her from speaking out, and punish her for whistleblowing. On March 18, 2025—just five days after being served—Ms. Wynn-Williams moved to vacate the Interim Award. O'Brien Decl. Ex. E (Mot. to Vacate). The same Emergency Arbitrator who had issued the Interim Award denied vacatur on March 31, 2025. *Id.* Ex. G (Order on Mot. to Vacate).

The American Arbitration Association appointed a merits arbitrator on May 13, 2025, and the parties have since proceeded through preliminary discovery and procedural motions. O'Brien Decl. Ex. O (AAA Notice of Appointment).

**E.** ***Careless People* Becomes a #1 *New York Times* Bestseller and the Subject of Public Discussion and Congressional Investigation**

As these legal maneuvers unfolded, the book was released on March 11, 2025, and quickly became a #1 *New York Times* bestseller and the subject of considerable public discussion. *See* Wynn-Williams Decl. ¶ 38; O'Brien Decl. Ex. H (*New York Times* bestseller list). This was not because Ms. Wynn-Williams set out to drive that discussion—constrained by Meta's legal strategy, she could not—but because of the resonance of her account and Meta's controversial effort to silence it.

Additionally, following the release of *Careless People*, the United States Senate opened multiple bipartisan investigations into the issues Ms. Wynn-Williams raised in the memoir. In connection with these investigations, Senators submitted multiple letters of inquiry to Meta concerning its "efforts to silence whistleblowers," O'Brien Decl. Ex. K (Apr. 14, 2025 Ltr.); its retaliation against Ms. Wynn-Williams for reporting Mr. Kaplan's sexual misconduct, *id.* Ex. M (May 13, 2025 Ltr.); its conduct in China, *id.* Ex. I (Apr. 1, 2025 Ltr.); and its efforts to address online dangers to children and teenagers, *id.* Ex. J (Apr. 8, 2026 Ltr.), Ex. L (Apr. 16, 2025 Ltr.), Ex. P (Sep. 2, 2025 Ltr.). And on April 9, 2025, Ms. Wynn-Williams testified before the Senate Judiciary Committee's Subcommittee on Crime and Counterterrorism regarding "Oversight of Meta's Foreign Relations and Representations to the United States Congress." Wynn-Williams Decl. ¶ 39, Ex. I (hereinafter "Jud. Comm. Hr'g").[3] The full Senate Judiciary Committee recently announced another hearing with the CEOs of Meta and other large technology companies entitled, "Examining Tech Industry Practices and the Implications for Users and Families: Is This Social Media's Big Tobacco Moment?" in connection with these investigations. *See* Ashley Gold, *Tech CEOs Summoned to Capitol for June Hearing*, Axios (May 15, 2026), https://www.axios.com/2026/05/15/tech-ceos-grassley-june-hearing [https://perma.cc/347C-KBYY].

**F.      Meta's Exploitation of the Interim Award to Expand Its Power to Constrain and Punish Ms. Wynn-Williams**

For roughly twelve months, from March 2025 to March 2026, the parties attempted to settle this matter, engaging in a formal mediation process in which a mediator was appointed. During that time and since, Ms. Wynn-Williams has scrupulously adhered to her understanding of the Interim Award. *See* Wynn-Williams Decl. ¶¶ 54-77. To speak in public at all, she disclaims in advance any mention of Meta or her book. *See id.* ¶¶ 55, 64, 67. Sponsors, organizers, and prospective clients have curtailed or withdrawn engagements they otherwise would have offered as a result. *See id.* ¶ 73. For every invitation she has been able to accept, Ms. Wynn-Williams has

---

[3] *See also A Time for Truth: Oversight of Meta's Foreign Relations and Representations to the United States Congress*, *Hearing Before the Subcomm. on Crime and Counterterrorism of the S. Judiciary Comm.*, 119th Cong. (2025) (statement of Sarah Wynn-Williams), https://www.judiciary.senate.gov/committee-activity/hearings/a-time-for-truth-oversight-of-metas-foreign-relations-and-representations-to-the-united-states-congress [https://perma.cc/DX79-CVXW].

declined countless others. For instance, she declined an invitation to speak as an honoree of the April 29, 2026 Organization for Social Media Safety Gala in Los Angeles, which sought to honor the publication of *Careless People*, because the organizers decided to give a copy of the book to each attendee as a gift and she feared that would be attributed to her as promotion. *Id.* ¶ 72.

For nearly a year, Ms. Wynn-Williams's efforts to conform to the constraints of the Interim Award while maintaining her ability to engage as an in-demand public policy expert appeared to be succeeding. But, in a March 5, 2026 letter to the Merits Arbitrator, Meta changed the landscape considerably, accusing Ms. Wynn-Williams of "ongoing and flagrant violations" of the Interim Award because of her February and March 2026 appearances at events in the United Kingdom and her keynote address at the Legal 500 Enterprise GC 2026 conference in London. O'Brien Decl. Ex. Q (Mar. 5, 2026 Ltr.). As Meta knew, this was incorrect. Before each of the events Meta complained about, Ms. Wynn-Williams informed the organizers that she could not speak about her book or about Meta. *See* Wynn-Williams Decl. ¶ 55. At each event, she judiciously confined her remarks to her professional areas of expertise—internet regulation, artificial intelligence, and digital technology in warfare. *Id.* ¶ 57. Ms. Wynn-Williams informed the Merits Arbitrator of her compliance efforts in a March 6, 2026, email, and at a March 12, 2026, status conference, the Merits Arbitrator conveyed that the Interim Award permitted her to speak about certain matters within her area of expertise, including those she had identified in the March 6 email. *Id.* ¶ 57; O'Brien Decl. Ex. R (Mar. 6, 2026 Email to Arbitrator). In subsequent correspondence between counsel, she challenged Meta to articulate any specific basis for their claim that Ms. Wynn-Williams's attendance at the events violated the Interim Award, hoping to gain clarity to allow her to conform her conduct to the injunction's vague and overbroad terms. Wynn-Williams Decl. ¶ 59; O'Brien Decl. Ex. T (Sanctions Opp'n, Naik Decl. Ex. G) ¶¶ 8-12. Meta did not attempt to provide any further clarity. *See id.*

Nonetheless, on March 27, 2026, Meta filed an application for sanctions against Ms. Wynn-Williams in the arbitration based on events identified in its earlier correspondence. O'Brien Decl. Ex. S (Sanctions Appl.) at 1-8. Meta presented no evidence to contradict Ms. Wynn-Williams's representations to the Merits Arbitrator about the steps she took to avoid violating the Interim

Award at her prior engagements, despite the fact that Meta's counsel attended at least one them for the express purpose of gathering evidence of a breach—one part of Meta's broader effort to monitor and catalogue Ms. Wynn-Williams's movements. *See* Wynn-Williams Decl. ¶ 78; O'Brien Decl. Ex. T (Sanctions Opp'n) at 13. Instead, Meta seeks to sanction Ms. Wynn-Williams for the actions of *others* who spoke about, promoted, or sold the book, despite having no evidence that Ms. Wynn-Williams had any control over those individuals and entities. Indeed, Ms. Wynn-Williams had confirmed to Meta and the Merits Arbitrator that she could not control the venues, individuals, or entities offering *Careless People* for sale. *Id.* Ex. R (Mar. 6, 2026 Email to Arbitrator). Meta seeks $1,500 per alleged violation related to those specific events, an award of attorneys' fees, and disgorgement of any income Ms. Wynn-Williams has derived from the events in question, including from subsequent book sales. *Id.* Ex. S (Sanctions Appl.) at 17-18. That is in addition to the substantial relief Meta seeks in the underlying arbitration demand—liquidated damages of $50,000 for each purported violation of the non-disparagement provision of the Severance Agreement, compensatory damages, punitive damages, and disgorgement of any proceeds Ms. Wynn-Williams is said to have derived from sales of her book attributable to the purported violations. *Id.* Ex. F (Am. Arb. Demand).

Ms. Wynn-Williams opposed the sanctions motion and once again asked for the Interim Award to be vacated, arguing that the sanctions request was an abuse of the arbitration process and exposed the untenable vagueness in the Interim Award. *See id.* Ex. T (Sanctions Opp'n). The Arbitrator declined to consider those arguments. At a status conference on April 22, 2026, the Merits Arbitrator acknowledged that the Interim Award could raise First Amendment concerns but nevertheless declined to rule on Ms. Wynn-Williams's opposition and later denied Ms. Wynn-Williams's request for leave to seek dismissal of the arbitration as a matter of law. *Id.* ¶ 22, Ex. U (May 7, 2026 Email from Merits Arbitrator). Instead, the Merits Arbitrator appeared to endorse aspects of Meta's sweeping interpretation of the Interim Award, cautioning that in his view Ms. Wynn-Williams violates the Interim Award any time she voluntarily appears at any event where she knows or should know that her book will be available for sale and that her presence there will likely encourage sales. *Id.* ¶ 22; Wynn-Williams Decl. ¶ 63. When Ms. Wynn-Wil-

liams's counsel asked for specific guidance on how that standard would apply to her planned Hay Festival appearance, the Merits Arbitrator declined, stating that there was too much factual granularity to address the matter further and that Ms. Wynn-Williams must conform her conduct to what she thinks is appropriate.  O'Brien Decl. ¶ 22.

The success of Ms. Wynn-Williams's career as a public policy expert and in-demand commentator on artificial intelligence, technology, geopolitics, regulation, and culture depends in part upon regular public appearances.  *Id*. ¶¶ 41-42.  Similarly, the success of Ms. Wynn-Williams's career as an author depends in part upon engaging with readers at precisely the type of events that Meta is using the Interim Award to prevent her from attending.  *Id*. ¶ 42.  Indeed, Ms. Wynn-Williams earns part of her livelihood directly through such paid public engagements.  *Id*. ¶¶ 42, 64.

## ARGUMENT

Pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rules 7-2 and 65, this Court should preliminarily enjoin Meta from forcing Ms. Wynn-Williams to arbitrate a dispute Meta has no right to arbitrate.  Ms. Wynn-Williams easily satisfies the four preliminary injunction requirements: (1) she is likely to succeed on the merits of her claims that the agreement to arbitrate is unenforceable in the first instance under the EFAA and Meta is estopped from enforcing it,  (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tip in her favor, and (4) an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Critically, under the EFAA, this Court and not an arbitrator must decide whether the statute applies to a case like this one involving sexual harassment.

I. **Ms. Wynn-Williams Is Likely to Succeed on the Merits of Her Claims That the EFAA Bars the Arbitration as a Matter of Law and Meta Is Estopped from Compelling It**

Ms. Wynn-Williams is likely to succeed on the merits of her challenges to Meta's right to arbitrate,[4] or at least raises "serious questions going to the merits," for two reasons.  *hiQ Labs, Inc.*

---

[4] Ms. Wynn-Williams's grounds for preliminary relief correspond to Counts II and VII in her Complaint, each of which relate to the enforceability of the arbitration clause of the Severance Agreement.  Ms. Wynn-Williams does not seek preliminary relief on the Complaint's remaining Counts, which challenge other aspects of the Severance Agreement or seek money damages for Meta's conduct.

*v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022) (citation omitted).  *First*, the EFAA renders any predispute arbitration agreement unenforceable at the plaintiff's election in a case relating to a sexual harassment dispute; the Act also commits that question exclusively to a court.  9 U.S.C. § 402.  Ms. Wynn-Williams's whistleblower speech dispute relates to the sexual harassment misconduct she reported, and she has elected to void the arbitration clause in Meta's Severance Agreement.  *Second*, and independently, Meta's 2018 public disavowal of forced arbitration estops it from enforcing the arbitration clause.  Courts regularly enjoin arbitration proceedings where, as here, "there is no valid, enforceable arbitration agreement between the parties."  *Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215, 1234 (E.D. Cal. 2015) (collecting cases); *Goldman, Sachs & Co. v. City of Reno,* 747 F.3d 733, 747 (9th Cir. 2014) (remanding for district court to consider plaintiff's entitlement to preliminary injunction against arbitration).  And "a court, rather than an arbitrator," must decide whether the EFAA renders an arbitration agreement unenforceable, "irrespective of whether the agreement purports to delegate such determinations to an arbitrator," 9 U.S.C. § 402(b), overriding the usual rule that parties may agree to delegate questions of "whether they agreed to arbitrate the merits" and "who has the primary power to decide arbitrability" to an arbitrator, *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148-49 (2024).

Ms. Wynn-Williams has no reasonable alternative but to seek preliminary relief, and the remaining equitable factors weigh decisively in her favor.  *See Winter*, 555 U.S. at 20.  The Merits Arbitrator—who is prohibited by statute from resolving the applicability of the EFAA—refused Ms. Wynn-Williams's request to move to dismiss the arbitration and will not consider whether the Interim Award violates the First Amendment until the full merits hearing, currently scheduled for October 2026.  Every day the arbitration continues, it harms Ms. Wynn-Williams's career and impinges on her First Amendment rights, as well as preventing the public from hearing Ms. Wynn-Williams speak about her expertise on matters of urgent public concern.

### A.   The EFAA Bars the Arbitration as a Matter of Law, and the Court—Not the Arbitrator—Must Decide That Issue

In 2022, Congress amended the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*., (the "FAA"), to enact the EFAA, which permits victims of sexual harassment or assault, like Ms. Wynn-Wil-

liams, to invalidate and make unenforceable any agreement purporting to force a case related to sexual harassment or assault to arbitration.  The operative section of the EFAA provides:

> [A]t the election of the person alleging conduct constituting a sexual harassment dispute … no predispute arbitration agreement … shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to … the sexual harassment dispute.

9 U.S.C. § 402(a).  The EFAA renders unenforceable the arbitration provision of Meta's Severance Agreement, as Ms. Wynn-Williams exercised her right to non-enforcement by objecting to the arbitrability of Meta's dispute with her and by filing her Complaint.  The arbitration—which Meta is using to wrongfully silence Ms. Wynn-Williams and her experience of sexual harassment while employed at Facebook—therefore must be enjoined.

**1.     Section 402(b) Commits the Arbitrability Question to This Court, Not the Arbitrator**

As a threshold matter, the EFAA states in no uncertain terms that only a court, and not an arbitrator, must decide whether the law applies to any agreement to arbitrate:

> An issue as to whether this chapter applies with respect to a dispute shall be determined under Federal law.  The applicability of this chapter to an agreement to arbitrate and the validity and enforceability of an agreement to which this chapter applies shall be determined by a court, rather than an arbitrator, irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other terms of the contract containing such agreement, and irrespective of whether the agreement purports to delegate such determinations to an arbitrator.

9 U.S.C. § 402(b).  Courts uniformly so hold.  *See, e.g.*, *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 923 (N.D. Cal. 2023); *Ding v. Structure Therapeutics, Inc.*, 755 F. Supp. 3d 1200, 1212 (N.D. Cal. 2024); *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 531, 531 n.7 (S.D.N.Y. 2024); *Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 372 (6th Cir. 2026).

**2.     The Severance Agreement Is a "Predispute Arbitration Agreement"**

Meta's Severance Agreement is a "predispute arbitration agreement" within the meaning of the EFAA and thus is voidable and unenforceable at Ms. Wynn-Williams's election.  *See* 9 U.S.C. § 402.  Meta's Severance Agreement is an agreement generally governing Ms. Wynn-Williams's separation from Meta (a decision Meta instigated by terminating her), and its arbitration

provision was Meta's standard condition for such contracts to ensure that any subsequently arising disputes with its former employees went to arbitration (a provision it has since disavowed). The arbitration provision of that Agreement provides in relevant part, "[t]he parties agree that any and all disputes arising out of the terms of this Agreement, their interpretation, and any of the matters herein released, shall be subject to arbitration[.]" Agmt. § 16(d). The EFAA broadly defines "predispute arbitration agreement" as "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement." 9 U.S.C. § 401(1). Meta's dispute with Ms. Wynn-Williams arose no earlier than March 2025, when Meta learned of the publication of *Careless People* and asserted a claim that the book violated the non-disparagement provision of the Severance Agreement. *See* 9 U.S.C. § 401(1). Thus, the Severance Agreement is a "predispute arbitration agreement" under the EFAA and is void and unenforceable as applied to this dispute. *See id.*

Courts have interpreted the EFAA in the same way, explaining that under the statute, "a dispute arises 'when one party asserts a right, claim, or demand, and the other side expresses disagreement or takes an adversarial posture.'" *Lewis v. Tesla, Inc.*, 2025 WL 2653639, at *3 (N.D. Cal. Sep. 16, 2025) (quoting *Kader v. S. Cal. Med. Ctr., Inc.*, 99 Cal. App. 5th 214, 222 (Cal. Ct. App. 2024)). Here, no party asserted any right, claim, or demand related to sexual harassment until Meta claimed that the publication of *Careless People* and any promotion of the book violated the non-disparagement provision of the Severance Agreement in March 2025.

The dispute post-dates Meta's Severance Agreement, regardless of exactly when the harassment occurred. The EFAA applies where the alleged sexual harassment or assault occurred prior to the execution of the arbitration agreement at issue. *See Baldwin v. TMPL Lexington LLC*, 2024 WL 3862150, at *2-4 (S.D.N.Y. Aug. 19, 2024) (EFAA applied where harassment occurred prior to plaintiff signing arbitration agreement); *Gathers v. K&K Fam. Ventures, LLC*, 2025 WL 1032252, at *8 (D.S.C. Feb. 19, 2025) (EFAA applied where harassment occurred prior to plaintiff signing arbitration agreement, as claim did not arise until plaintiff later received right-to-sue letter), *report and recommendation adopted in relevant part*, 2025 WL 892773 (D.S.C. Mar. 24, 2025); *J.H. v. Lawrenceville Sch.*, 2026 WL 217593, at *6 (N.J. Super. Ct. App. Div. Jan. 28,

2026) (EFAA applied to bar arbitration of claim of 2019 sexual assault where arbitration agreement was signed in 2022, as sexual assault claim had not yet arisen under New Jersey law).

### 3. The Speech Dispute "Relates to" a "Sexual Harassment Dispute" Within the EFAA's Statutory Definition

Meta's arbitration against Ms. Wynn-Williams and Ms. Wynn-Williams's Complaint against Meta each "relat[e] to conduct that is alleged to constitute sexual harassment under applicable … law." 9 U.S.C. § 401(4). Where, as here, a company seeks to enforce a non-disparagement provision against a current or former employee who speaks out about sexual harassment, that is a "sexual harassment dispute."

In the EFAA context, courts give "broad[]" construction to the phrase "relates to," the recognized plain meaning of which is "has a connection with or reference to." *Polen v. API Grp. Life Safety USA, LLC*, 2025 WL 3251349, at *4 (D. Or. Nov. 21, 2025) (quoting *Aloha Islandair Inc. v. Tseu*, 128 F.3d 1301, 1302 (9th Cir. 1997)). "Congress's use of 'relates to' extends the EFAA exemption to all cases that have a connection to a dispute that involves (includes or concerns) sexual assault. The statute is unambiguous in requiring only that there be a dispute with the defendant involving a nonconsensual sexual act or contact." *Id.* The statute "contains no limitation regarding who committed the sexual assault, where it was committed, or when it was committed." *Id.* Moreover, "there is nothing in the text of the EFAA that suggests its applicability hinges on how a claim is labeled." *Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 181 (S.D.N.Y. 2023). Ms. Wynn-Williams also need not have "asserted a cause of action for sexual harassment or hostile work environment" to fall within the protections of the EFAA. *Lee v. Marriott Int'l, Inc.*, 2025 WL 2689263, at *9 (N.D. Cal. Sep. 21, 2025). "This is because the EFAA does not refer to a 'sexual harassment claim' or 'sexual harassment cause of action,' but rather a 'sexual harassment dispute.'" *Id.*

Thus, courts find that the EFAA applies where the plaintiff's causes of action do not require proof that sexual harassment or assault took place. For instance, in *Polen*, the court found the EFAA applied to the plaintiff's claim that her employer terminated her after she informed her supervisor she was taking time off to move away from an abusive ex-partner who later sexually

assaulted her. 2025 WL 3251349, at *5-6. The "dispute over how [the defendant] handled [the plaintiff]'s status as a victim of sexual assault" itself constituted a "sexual assault dispute." *Id.* at *6. And the EFAA covers retaliation claims even though "[t]he issue on such a claim is whether the plaintiff was retaliated against for reporting sexual harassment, not the plausibility of the underlying harassment claim." *Diaz-Roa*, 757 F. Supp. 3d at 536.

Ms. Wynn-Williams's dispute with Meta fits well within those confines. Ms. Wynn-Williams's whistleblower complaints with the SEC and DOJ and her book *Careless People* extensively discuss Mr. Kaplan's and Ms. Sandberg's sexual harassment of Ms. Wynn-Williams. Meta's action to silence Ms. Wynn-Williams from speaking about those allegations, now or indefinitely into the future, undoubtedly "relates to" them, just as in *Polen* the claims based on the defendant's reaction to the plaintiff's discussion of her sexual assault related to a "sexual assault dispute." 2025 WL 3251349, at *5-6. After all, Meta's public response to *Careless People* included rebuttals to Ms. Wynn-Williams's allegations about Mr. Kaplan's conduct. *See* Wynn-Williams Decl. Ex. J (Mar. 10-12, 2025, Andy Stone X thread). And because this action seeks to enjoin Meta's retaliatory efforts to sanction Ms. Wynn-Williams for earning her livelihood by speaking in public about matters within her area of expertise, the action, like formal claims for retaliation, is covered by the EFAA. *See Diaz-Roa*, 757 F. Supp. 3d at 536. Indeed, the purpose of Meta's dispute with Ms. Wynn-Williams—the arbitration—is to silence her from "alleging conduct constituting" sexual harassment. 9 U.S.C. § 402(a).

In short, Ms. Wynn-Williams is likely to succeed on her claim that under the EFAA she is entitled to litigate her dispute with Meta about *Careless People* and its sexual harassment allegations in open court, not private arbitration. She therefore satisfies the merits *Winter* factor. *See* 555 U.S. at 20.

**B.    Meta's 2018 Public Commitment to End Forced Arbitration of Sexual Harassment Claims Estops It from Compelling Arbitration Here**

Ms. Wynn-Williams is likely to succeed on the merits of her claim that the arbitration provision of Meta's Severance Agreement is unenforceable for an independent reason: Meta has made public statements disavowing it. Wynn-Williams Decl. Exs. B-F. Ms. Wynn-Williams re-

lied on these public statements and, as a result, Meta is estopped from enforcing the arbitration clause. *Id.* ¶ 18. Meta's actions meet the four elements of promissory estoppel: (1) clear and unambiguous promise, (2) reliance, (3) reliance that is both reasonable and foreseeable, and (4) injury from the reliance. *See Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 792 (9th Cir. 2012).

In a 2018 statement to the press, Lori Goler, Facebook's Vice President of People, announced that Meta would "end[] its policy of requiring employee sexual-harassment claims to be settled in private arbitration" and "will let Facebook employees pursue those claims in court." Wynn-Williams Decl. Ex. B (*New York Times* article). In its statement, Meta acknowledged this was "a time when we can be part of taking the next step," and that their policy change was "the right thing to do." *Id.* Meta's Director of Corporate Media Relations, Anthony Harrison stated, "Today, we are publishing our updated Workplace Relationships policy and amending our arbitration agreements to make arbitration a choice rather than a requirement in sexual harassment claims." Simpson, *supra* n.2.

Employment policies relating to sexual harassment, especially by senior executives, came under heavy scrutiny around this time due to the push to prevent workplace harassment from going unchecked. Wynn-Williams Decl. ¶ 17. Other large tech companies like Google and Microsoft adopted similar policies to Meta's, no longer requiring sexual harassment disputes to be forced into arbitration. *Id.* Ex. B (*New York Times* article). Ms. Wynn-Williams learned of this announced change from the 2018 *New York Times* article Meta used to publicize its new policy. *Id.* ¶ 15. Meta is thus estopped from now forcing Ms. Wynn-Williams into arbitration. Ms. Wynn-Williams relied on Meta's statements that employees would no longer be forced to arbitrate claims arising from sexual harassment. *Id.* ¶ 18. Meta unilaterally pursued arbitration here, and Ms. Wynn-Williams has opposed this arbitration at each stage. Ms. Wynn-Williams continues to be injured by this ongoing arbitration, and she is entitled to litigate in open court any disputes with Meta related to sexual harassment.

*First*, Meta made a clear promise to end its policy of requiring disputes related to employee sexual harassment to be settled in private arbitration. The promise underlying a promissory estop-

pel claim must be clear, unambiguous, and "definite enough that a court can determine the scope of the duty, and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." *Aceves v. U.S. Bank, N.A.*, 192 Cal. App. 4th 218, 226 (Cal. Ct. App. 2011) (quotations omitted). Meta's statements, both to the press and in its publicly available harassment policy, amount to a clear and unambiguous promise. *Cf. Sateriale*, 697 F.3d at 792 (concluding that a publicly disseminated promise akin to an advertisement was sufficiently clear and definite to support a promissory estoppel claim). The statements were definite, such that this Court can easily determine the scope of Meta's duty not to enforce a mandatory arbitration provision relating to a sexual harassment dispute, and constituted a clear assurance that Meta would not demand arbitration of sexual harassment claims such as Ms. Wynn-Williams's.

*Second*, Ms. Wynn-Williams relied on Meta's promise not to demand arbitration of sexual harassment claims, and *third*, Ms. Wynn-Williams's reliance on Meta's promise was reasonable and foreseeable. *Aceves*, 192 Cal. App. 4th at 227 (explaining elements of reasonable and foreseeable reliance). Under the doctrine of promissory estoppel, a "promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." *Garcia v. World Sav., FSB*, 183 Cal. App. 4th 1031, 1041 (Cal. Ct. App. 2010).

Ms. Wynn-Williams began speaking publicly about the sexual harassment she experienced at Meta only after she learned about Meta's 2018 commitment not to enforce its arbitration clauses. That reliance was reasonable. Meta's 2018 statement was that it would "end[] its policy of requiring employee sexual-harassment claims to be settled in private arbitration" and "will let Facebook employees pursue those claims in court." Wynn-Williams Decl. Ex. B (*New York Times* article). Ms. Wynn-Williams reasonably understood this policy change to mean that despite the arbitration clause in Meta's Severance Agreement, she could elect to have any dispute arising out of her sexual harassment claims take place in court, rather than before an arbitrator. *Id.* ¶ 18. Meta publicly announced and touted this change to its policy, stating this was "a time when we can be part of taking the next step." *Id.* Ex. B (*New York Times* article). Ms. Wynn-Williams reasonably took this to mean it was her decision whether to consent to arbitration or not. This was not "misguided

belief or guileless action," *Aceves*, 192 Cal. App. 4th at 227 (quotation omitted), especially since Meta had acknowledged it was against public policy interests to force employees to arbitrate such disputes without the option to be heard before a court. Ms. Wynn-Williams did not consent to this arbitration, which arises out of her statements in *Careless People* about the sexual harassment she experienced at Meta, and she has continued to object to this arbitration at each step.

Ms. Wynn-Williams's reliance was also foreseeable. When Meta made this public statement, it was foreseeable that Ms. Wynn-Williams—who Meta knew had compiled evidence regarding Mr. Kaplan's sexually harassing conduct—would rely on its updated statements about the company's arbitration policy. Similarly, in *Goffman v. Bank of Am., N.A*, the plaintiff's reliance was reasonably foreseeable to the defendant bank, which knew from prior communications that the plaintiff was seeking to preserve an interest and had pursued earlier relief consistent with that goal. 2012 WL 6011906, at *5 (Cal. Ct. App. Nov. 29, 2012). So too here. Ms. Wynn-Williams had pursued the relief of submitting evidence regarding Mr. Kaplan's actions, and Meta knew that she might continue to rely on its statements pertaining to employee sexual harassment claims. Meta cannot enjoy the public-relations spoils of trumpeting its new policy to bring transparency to sexual harassment disputes and then retreat into the shadows of arbitration to bury embarrassing sexual harassment allegations involving one of its senior executives. This is the exact scenario that the doctrine of promissory estoppel seeks to protect against.

*Fourth*, Ms. Wynn-Williams was injured by relying on Meta's promise. Promissory estoppel "generally entitles a plaintiff to the damages [that would be] available on a breach of contract claim." *Aceves*, 192 Cal. App. 4th at 231. Forced arbitration amounts to irreparable injury. *Empros Cap. LLC v. Rosenbach*, 2020 WL 6684854, at *9 (N.D. Cal. Nov. 12, 2020) ("Being compelled to arbitrate claims without having agreed to arbitrate them is an irreparable injury."). Ms. Wynn-Williams has been injured because she has been forced to arbitrate this sexual harassment dispute in private rather than in the public arena of a courtroom. Ms. Wynn-Williams has also suffered damages, as she has not been able to promote *Careless People* or attend paid speaking engagements as a result of the injunction stemming from the improper arbitration. *See* Wynn-Williams Decl. ¶¶ 72-76.

Ms. Wynn-Williams is thus likely to succeed on her claim that Meta is estopped from enforcing the arbitration clause. *See Winter*, 555 U.S. at 20.

## II.    Compelling Ms. Wynn-Williams to Arbitrate a Dispute Meta Has No Right to Arbitrate, While the Interim Award Continues to Suppress Her Speech and Career, Is Irreparable Harm

Ms. Wynn-Williams faces three independent forms of irreparable harm.    *First*, the Interim Award, and particularly Meta's exploitation of its coercive power through sanctions motions to attack an ever-broadening array of speech, is suppressing Ms. Wynn-Williams's First Amendment rights.  The Supreme Court has long held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  And Ms. Wynn-Williams's speech is chilled by her loss of those freedoms. *See* Wynn-Williams Decl. ¶¶ 68-72, 78-82.  That alone establishes Ms. Wynn-Williams's irreparable harm.

*Second*, the ongoing arbitration is permanently damaging Ms. Wynn-Williams's career as a public policy expert by permitting Meta to threaten speech that goes far beyond any conceivable application of the non-disparagement provision in Meta's Severance Agreement.  That career—her livelihood—depends upon speaking engagements and public appearances.  Wynn-Williams Decl. ¶¶ 41, 42.  Ms. Wynn-Williams has been compelled to decline invitations to speak following the Interim Award, such as the April 29, 2026 Organization for Social Media Safety Gala, which was held in her honor. *Id.* ¶ 72.  For every speaking invitation she has been able to accept because the subject of the event is not *Careless People*, she has had to affirmatively disclaim in advance any reference to Meta or her book—which are matters of great, urgent public concern—and sponsors, organizers, and prospective clients have curtailed or withdrawn engagements they otherwise would have offered. *Id.* ¶¶ 55, 58, 73.  Critically, Meta's response to the Hay Festival and the ongoing uncertainty about the scope of the Interim Award are creating an escalating chilling effect on Ms. Wynn-Williams's ability to accept *any* invitation going forward, regardless of the efforts she makes to comply, foreclosing any reasonable ability to maintain her career in the shadow of these constraints.  Such "intangible injuries" to professional goodwill are not easily measured or

fully compensable in damages and therefore "qualify as irreparable harm." *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012) (quoting *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).

*Third*, being forced to arbitrate an unarbitrable dispute "is *per se* irreparable harm." *Morgan Stanley*, 134 F. Supp. 3d at 1235; *see also id.* at 1235 n.21 (collecting cases). As the court in *Morgan Stanley* observed, this *per se* rule follows from "the underlying (and obvious) principle that a party should not be required to arbitrate disputes where the party initiating the arbitration has no right to do so." *Id.* at 1236. As discussed in Section I.A, *supra*, Meta cannot compel arbitration of this dispute. Rather, under the EFAA, Ms. Wynn-Williams is entitled to avoid arbitration, and the statute is clear that arbitrability of agreements within its scope "shall be determined by a court, rather than an arbitrator, … irrespective of whether the agreement purports to delegate such determinations to an arbitrator." 9 U.S.C. § 402(b). *Compare id. with Coinbase*, 602 U.S. at 149 (explaining parties may ordinarily delegate the question of arbitrability). Absent an injunction, Ms. Wynn-Williams must expend significant resources defending herself in a forum the EFAA entitles her to avoid and faces the prospect of an adverse final award that would itself need to be unwound.

These harms were attenuated while the parties pursued settlement and Ms. Wynn-Williams participated in the arbitration to preserve her rights. Now, as Meta has pursued a maximally aggressive posture in the arbitration, they are imminent and threaten untenable, irreparable harm.

**III.    The Balance of Equities Tips Sharply in Ms. Wynn-Williams's Favor**

The balance of equities weighs strongly in Ms. Wynn-Williams's favor. The Court must "identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it," and weigh "the hardships of each party against one another." *Univ. of Haw. Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999); *see also Winter*, 555 U.S. at 24-25.

Simply put, Meta has nothing on its side of the scale. Meta has never identified a concrete harm that enjoining the Interim Award or the Arbitration would inflict on the company. Meta is

one of the world's largest and most powerful corporations. It has virtually unlimited resources to ensure that its message on any issue reaches almost any audience. Whatever interest Meta could have once claimed in suppressing the message of *Careless People* through monetary sanctions for purported violations of the Interim Award has long since evaporated. The book has been published, has sold widely, and has become a #1 *New York Times* bestseller. Wynn-Williams Decl. ¶ 38; O'Brien Decl. Ex. H (*New York Times* bestseller list). The publication of Careless People has not affected Meta's position as one of the world's largest and most powerful companies; its $200 billion in revenue in 2025 was 22% higher than the year before. *See* Meta Platforms, Inc., *Meta Reports Fourth Quarter and Full Year 2025 Results* (Jan. 28, 2026), https://investor.at-meta.com/investor-news/press-release-details/2026/Meta-Reports-Fourth-Quarter-and-Full-Year-2025-Results/default.aspx [https://perma.cc/HX58-ZFMW]. Any countervailing interest Meta might be able to identify can be protected in court.

## IV.    The Public Interest Is Served by an Injunction

The public interest decisively favors preliminary relief. The primary focus of this inquiry is the impact of the injunction on "non-parties." *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014); *cf. Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (explaining the "significant public interest in upholding free speech principles," because violations of those principles "infringe not only the free expression interests of plaintiffs, but also the interests of other people subjected to the same restrictions") (cleaned up). That public interest is at its zenith here, as *Careless People* relates to matters of substantial public concern. Ms. Wynn-Williams was a policy employee at one of the world's largest and influential companies, and the memoir is a firsthand look at the gender-based discrimination and sexual harassment Ms. Wynn-Williams endured there as well as how Meta offered to censor its products to enter the Chinese market then lied about it to Congress, offered advertisers the personal information of vulnerable teenage users including the ability to target teen girls at the moment they had deleted selfies and were feeling "worthless" and contributed to genocide in Myanmar, among other topics "plainly relate[d] to broad issues of interest to society at large." *Snyder v. Phelps*, 562 U.S. 443, 454 (2011). Speech on these issues lies at the "heart of the First Amendment's protection." *Id*. at 451-52 (ci-

tation omitted). The arbitration, and the Interim Award, deprive the public of one of the few primary sources that can explain what Meta is, what drives it, and how its culture shapes its political and societal impact—questions that are among the defining issues of the modern era.[5] Ms. Wynn-Williams also has unique expertise in public policy matters unrelated to Meta or *Careless People*—including the geopolitical implications of artificial intelligence and emerging technologies—that are of urgent and increasing public importance, particularly as society absorbs the lessons of the social-media era. Wynn-Williams Decl. ¶ 41.

The public is also clearly interested in hearing Ms. Wynn-Williams speak. The Senate Judiciary Committee is conducting a bipartisan investigation into the issues raised by Ms. Wynn-Williams in *Careless People*, a process that has included letters of inquiry to Mr. Zuckerberg and testimony by Ms. Wynn-Williams before Congress. *See* O'Brien Decl. Exs. I–M, P (Ltrs.); Jud. Comm. Hr'g, *supra*. Those investigations are ongoing, with another hearing entitled "Examining Tech Industry Practices and the Implications for Users and Families: Is This Social Media's Big Tobacco Moment?" scheduled in the coming weeks where technology company CEOs including Mark Zuckerberg have been invited to testify. *See* Gold, *supra*, at 10.

The public interest is further disserved by allowing arbitration to proceed where the parties have not validly agreed to arbitrate. *See, e.g.*, *Morgan Stanley*, 134 F. Supp. 3d at 1235; *Sykes v. Escueta*, 2010 WL 4942608, at *5 (N.D. Cal. Nov. 29, 2010). That principle has even greater weight here, because Congress enacted the EFAA precisely to vindicate the public interest in keeping sexual harassment disputes out of forced arbitration. *See* 9 U.S.C. §§ 401-402; § I.A, *supra*. And Meta itself publicly committed in 2018 and 2022 not to enforce arbitration of sexual harassment claims. The public has a manifest interest in holding employers to those commitments. § I.B, *supra*.

The stakes for the public interest are reflected in Meta's true rationale for maintain the Arbitration and the Interim Award: the opportunity to unlawfully silence and punish Ms. Wynn-

---

[5] Of course, Meta might not like what Ms. Wynn-Williams has to say. But whether speech is "controversial" is "irrelevant to the question whether it deals with a matter of public concern." *Snyder*, 562 U.S. at 453 (citation omitted). As Meta acknowledged just months before it obtained a prior restraint on Ms. Wynn-Williams's speech, the robust exchange of ideas "can be messy …. But that's free expression." Wynn-Williams Decl., Ex. E (Jan. 7, 2025 Press Release).

Williams for telling the public the unvarnished truth about the company and its executives and to send a message to others who may wish to blow the whistle on Meta in the future. Meta's own shifting rationale confirms as much. What began as a defamation theory aimed at the book's publishers (the March 6, 2025, letter) became a non-disparagement theory against Ms. Wynn-Williams alone (the March 7, 2025, demand) and has now devolved into an effort to drive her out of public life (the March 28, 2026, sanctions motion and June 12, 2026, addendum). That progression is telling. Meta abandoned its defamation theory the day after raising it, as succeeding on a defamation claim would have required Meta to prove that Ms. Wynn-Williams's account is false—a burden it has never attempted to carry. And its *ex parte* pursuit of the overbroad and vague proscriptions of the Interim Award, ongoing surveillance of Ms. Wynn-Williams, and aggressive exploitation of the Award to seek sanctions after every public appearance she makes demonstrate that Meta is not merely attempting to enforce an alleged non-disparagement promise but seeking to intimidate, harass and punish a whistleblower, enabled by the misguided arbitration process. The Court should preliminarily enjoin that process while the Court considers the important issues raised by this Complaint.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests the Court preliminarily enjoin the ongoing Arbitration, including the Interim Award and Meta's attempts to enforce it, pending its resolution of Plaintiff's underlying Complaint.

Dated:   July 9, 2026

**ZEITGEIST LAW PC**
Marcia C. Hofmann (SBN #250087)
25 Taylor Street
San Francisco, CA 94102
Tel: 415-830-6664
marcia@marciahofmann.com

Respectfully Submitted,

By: */s/ Corey Stoughton*

**SELENDY GAY PLLC**
Philippe Z. Selendy (admitted *pro hac vice*)
Jennifer M. Selendy (admitted *pro hac vice*)
Claire E. O'Brien (admitted *pro hac vice*)
Corey Stoughton (admitted *pro hac vice*)
Drake Reed (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
jselendy@selendygay.com
cobrien@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com

*Counsel for Plaintiff Sarah Wynn-Williams*